## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| *Plaintiff,* | : | |
| v. | : | Case No. 1:21-cv-181 |
| JANET YELLEN, in her official | : | |
| capacity as Secretary of the | : | |
| Treasury; RICHARD K. DELMAR, | : | |
| in his official capacity as acting | : | |
| inspector general of the Department | : | |
| of Treasury; and U.S. | : | |
| DEPARTMENT OF THE | : | |
| TREASURY, | : | |
| *Defendants.* | : | |

---

## COMBINED MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT OF THE MOTION

---

## MOTION FOR A PRELIMINARY INJUNCTION

The "Tax Mandate" in the American Rescue Plan Act of 2021, *see* Pub. L. No. 117-2, §9901 (adding §602(c)(2)(A) to the Social Security Act (42 U.S.C. §801 et seq.)), exceeds Congress's power under the Spending Clause, *see* U.S. Const. art. I, §8, cl.1. The Mandate is therefore unconstitutional. The State of Ohio moves under Federal Rule of Civil Procedure 65 for an order preliminarily enjoining the defendants from enforcing the Tax Mandate.

Ohio requests a ruling on this motion by May 1, 2021.

DAVE YOST
Ohio Attorney General

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS* (0095284)
Solicitor General
  *Counsel of Record
ZACHERY P. KELLER (0086930)
MAY DAVIS (*PHV application pending*)
Deputy Solicitors General
30 East Broad Street, 17th Floor
6l4-466-8980
benjamin.flowers@ohioattorneygeneral.gov

Counsel for the State of Ohio

1

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION ......................................................................................... 1

STATEMENT OF FACTS ............................................................................. 2

LEGAL STANDARD .................................................................................... 5

ARGUMENT ................................................................................................ 6

    A.    Ohio is likely to prevail here because Congress exceeded its power under the Spending Clause, and violated the anticommandeering doctrine, when it passed the Tax Mandate. ........................................... 6

    B.    Ohio will be irreparably harmed without an injunction. ...................... 17

    C.    Enjoining the Tax Mandate will not harm others, and will promote the public interest. .................................................................................. 18

CONCLUSION ........................................................................................... 19

CERTIFICATE OF SERVICE .................................................................... 20

LOCAL RULE 65.1(B) CERTIFICATION ................................................. 21

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) .......................................................................... 18

*ACLU v. McCreary Cnty.,*
    354 F.3d 438 (6th Cir. 2003) ................................................................ 17

*Alaska v. U.S. Dep't of Transp.,*
    868 F.2d 441 (D.C. Cir. 1989) ............................................................. 17

*Amoco Prod. Co. v. Vill. of Gambell,*
    480 U.S. 531 (1987) .............................................................................. 6

*Barnes v. E-Systems,*
    501 U.S. 1301 (1991) .......................................................................... 18

*Bond v. United States,*
    572 U.S. 844 (2014) .............................................................................. 6

*Celebrezze v. U.S. Dep't of Transp.,*
    766 F.2d 228 (6th Cir. 1985) ................................................................ 17

*City of Pontiac Retired Emps. Ass'n v. Schimmel,*
    751 F.3d 427 (6th Cir. 2014) (*en banc*) ............................................... 5

*Coal. to Defend Affirmative Action v. Granholm,*
    473 F.3d 237 (6th Cir. 2006) ................................................................ 19

*Wyo. ex rel. Crank v. United States,*
    539 F.3d 1236 (10th Cir. 2008) ........................................................... 17

*Elrod v. Burns,*
    427 U.S. 347 (1976) .............................................................................. 17

*Franchise Tax Bd. v. Hyatt,*
    139 S. Ct. 1485 (2019) .......................................................................... 14

*Georgia v. Pruitt,*
    326 F. Supp. 3d 1356 (S.D. Ga. 2018) ................................................. 17

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) .............................................................................. 6

*Holder v. Humanitarian Law Project,*
 561 U.S. 1 (2010) .................................................................................... 1, 5

*Kansas v. United States,*
 249 F.3d 1213 (10th Cir. 2001) ..................................................................... 17

*Maryland v. King,*
 133 S. Ct. 1 (2012) ..................................................................................... 18

*McCulloch v. Maryland,*
 4 Wheat. 316 (1819)..................................................................................... 14

*Murphy v. NCAA,*
 138 S. Ct. 1461 (2018) ............................................................................ 7, 8, 15

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
 567 U.S. 519 (2012) ................................................................................*passim*

*New York v. United States,*
 505 U.S. 144 (1992) ........................................................................... 2, 7, 9, 15

*Obama for Am. v. Husted,*
 697 F.3d 423 (6th Cir. 2012) ........................................................................ 17

*Printz v. United States,*
 521 U.S. 898 (1997) ..................................................................................... 15

*Roberts v. Neace,*
 958 F.3d 409 (6th Cir. 2020) ........................................................................ 17

*Saenz v. Roe,*
 526 U.S. 489 (1999) ...................................................................................... 6

*South Dakota v. Dole,*
 483 U.S. 203 (1987) .......................................................................... 9, 11, 12, 16

*South Dakota v. Dole,*
 791 F.2d 628 (8th Cir. 1986) ........................................................................ 11

*Steward Mach. Co. v. Davis,*
 301 U.S. 548 (1937) ......................................................................... 2, 10, 11, 13

*Texas v. United States,*
 809 F.3d 134 (5th Cir. 2015) ........................................................................ 17

*United States v. Butler,*
 297 U.S. 1 (1936) ....................................................................................... 11

## Statutes and Constitutional Provisions

U.S. Const. amend. X ............................................................................................ 6

U.S. Const. amend. XIV, §5 .................................................................................. 7

U.S. Const. amend. XV, §2 ................................................................................... 7

U.S. Const. art. I., §8 ........................................................................................ 2, 9

42 U.S.C. §1396 .................................................................................................. 10

American Rescue Plan Act of 2021, Pub. L. No. 117-2, §9901 ..........................*passim*

H.R. 1319, 117th Cong., 1st Sess., tit. V, §5001 (March 2, 2021) ............................... 4

## Other Authorities

167 Cong. Rec. S1051 (daily ed. Mar. 4, 2021) ............................................................ 4

Andy Chow, *Ohio Unemployment Fund Ends 2020 Borrowing $1.2B from Feds*, STATEHOUSE NEWS BUREAU (Dec. 31, 2020) ......................................... 3

Catherine Candisky, *Medicaid caseloads soar, budget gap looms*, THE COLUMBUS DISPATCH (Nov. 7, 2020) ........................................................ 3

Joseph Story, *Commentaries on the Constitution* (1833) ..................................... 8, 14

Kurt T. Lash, *The Lost Original Meaning of the Ninth Amendment*, 83 Tex. L. Rev. 331 (2004) .................................................................................. 8

Lynn A. Baker, *Conditional Federal Spending After* Lopez, 95 Colum. L. Rev. 1911 (1995) ....................................................................................... 8

Monthly Financial Report, Ohio Office of Budget and Management (July 10, 2020) ........................................................................................... 3

Monthly Financial Report, Ohio Office of Budget and Management (March 10, 2021) ......................................................................................... 2

Ohio Office of Budget and Management, Ohio Checkbook ........................................ 4

## INTRODUCTION

On March 11, 2021, President Biden signed the American Rescue Plan Act into law. The Act offers the States *billions* of dollars. The State of Ohio is entitled to claim about $5.5 billion—an amount equal to about 7.4 percent of the State's total expenditure in 2020. But if Ohio accepts that money, it will have to accept the conditions that come with it.

This is a case about one of those conditions, which this brief calls the "Tax Mandate." The Tax Mandate appears in Section 9901 of the Act—it is the provision that amends the Social Security Act to include a Section 602(c)(2)(A). *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2, §9901 (adding §602(c)(2)(A) to the Social Security Act (42 U.S.C. §801 et seq.)). The Tax Mandate bars States that take money under the Act from using that funding to "directly *or indirectly*" offset revenue loss from tax reductions. *Id.* (emphasis added). But since "[m]oney is fungible," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 37 (2010), any money that a State receives through the Act will necessarily offset, either directly or indirectly, every tax reduction that the State might pursue. The Tax Mandate thus gives the States a choice: they can have either the badly needed federal funds or their sovereign authority to set state tax policy. But they cannot have both. In our current economic crisis, that is no choice at all. It is a metaphorical "gun to the head." *Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB")*, 567 U.S. 519, 581 (2012) (op. of Roberts, C.J.).

This coercive offer of federal funds violates the Constitution. The Spending Clause empowers Congress to "provide for"—that is, to spend money in support of—

1

the "general Welfare." Art. I., §8. c.1. But while "Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992). And Congress may not circumvent that limitation by using its spending power to "indirectly coerce[] a State to adopt a federal regulatory system as its own." *NFIB*, 567 U.S. at 578 (op. of Roberts, C.J.). That is precisely what the Tax Mandate attempts to do: it seeks to "drive the state legislatures under the whip of economic pressure into the enactment" of Congress's preferred tax policies. *Steward Mach. Co. v. Davis*, 301 U.S. 548, 587 (1937).

Congress exceeded its constitutional authority when it passed the Tax Mandate. The Court should enjoin the provision's enforcement, at least in its application to Ohio.

## STATEMENT OF FACTS

When COVID-19 reached American shores, it began infecting our citizens. To protect themselves and their loved ones, Americans took precautions, including staying home. By staying home, they reduced demand for goods and services in nearly every economic sector. Reduced demand caused many businesses to close or limit operations. That led to lost jobs and reduced hours. And as a result, the country last year experienced its worst economic decline since World War II. *See* Monthly Financial Report at 2, Ohio Office of Budget and Management (March 10, 2021), https://bit.ly/3eyW8UI.

State budgets suffered accordingly: the immense reduction in commerce led to an immense reduction in state revenues; at the same time, the immense spike in joblessness increased the demand for government services. In Ohio, for example, tax revenue for fiscal year 2020 fell $1.1 billion below estimate. And total non-federal revenues finished the fiscal year $1.2 billion below estimate. *See* Monthly Financial Report at 11, Ohio Office of Budget and Management (July 10, 2020), https://bit.ly/3toNts4. Job loss and economic struggles simultaneously caused demand for state assistance—unemployment benefits and Medicaid coverage, for example—to soar. *See* Catherine Candisky, *Medicaid caseloads soar, budget gap looms*, THE COLUMBUS DISPATCH 1B (Nov. 7, 2020); Andy Chow, *Ohio Unemployment Fund Ends 2020 Borrowing $1.2B from Feds*, STATEHOUSE NEWS BUREAU (Dec. 31, 2020), https://perma.cc/7AHR-NJES. Even the measures Ohio took to counteract the budget crunch—hiring freezes, spending cuts, and more besides—helped only so much.

Because every State finds itself in a similar situation, Congress stepped in. It enacted the American Rescue Plan Act, which, among other things, provides $195.3 billion in aid to the States and the District of Columbia. *See* American Rescue Plan Act of 2021 §9901 (adding §602(b)(3)(A) to the Social Security Act (42 U.S.C. §801 et seq.)). The funding will enable the States to adopt programs to spur growth and renewal in their local economies.

Ohio expects to receive $5.5 billion, calculated based on a formula that considers a State's unemployed population from October through December of 2020. That aid represents a sizeable portion of Ohio's overall budget. Ohio's expenditures in

3

fiscal year 2020 totaled $74.6 billion, meaning the new federal funding equals 7.4 percent of the State's total spending last year. *See* Ohio Office of Budget and Management, Ohio Checkbook, https://checkbook.ohio.gov/State/Budgets/default.aspx.

As is so often true, the legislation changed as it made its way through Congress. When the House of Representatives passed the American Rescue Plan Act, the bill allowed States to use funds to: "respond to or mitigate" the COVID-19 public health emergency or its economic impacts; "cover costs incurred" as a result of COVID-19; "replace revenue that was lost, delayed, or decreased" as a result of COVID-19; and "address" the negative economic impacts of COVID-19. H.R. 1319, 117th Cong., 1st Sess., tit. V, §5001 (March 2, 2021). But when the bill reached the Senate, the majority leader added an amendment that imposed an important limit on the sovereign power of States that accept funding:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly *or indirectly* offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*See* 167 Cong. Rec. S1051, S1112 (daily ed. Mar. 4, 2021) (emphasis added). That amendment added the "Tax Mandate" at issue here. *See* American Rescue Plan Act §9901 (adding §602(c)(2)(A) to the SSA). If a State violates this Tax Mandate, the Secretary of the Treasury is empowered to recoup the lesser of: (1) the amount of the applicable reduction to net tax revenue; or (2) the amount of funds the State received from the Federal Government. *See id.* (adding §602(e) to the SSA). The statute does

4

not entitle the States to any process before the money is reclaimed.

The Tax Mandate effectively bans state tax cuts or credits. The reason is simple: a State violates the Tax Mandate whenever it uses money received through the Act to "offset," even "indirectly," "a reduction in net tax revenue." American Rescue Plan Act §9901 (adding §602(c)(2)(A) to the SSA). And because "[m]oney is fungible," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 37 (2010), any money received through the Act will "indirectly," at least, "offset a reduction in the net tax revenue" of a State that reduces the tax burdens on its citizens by law, regulation, or administrative interpretation. So every change in tax policy that leads to a decrease in tax revenue violates the Tax Mandate.

Because Congress lacks constitutional authority to limit the States' taxing power in this manner, Ohio seeks a preliminary injunction of the Mandate's enforcement.

## LEGAL STANDARD

Courts must balance "four factors … when considering a motion for preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (*per curiam*) (internal quotation marks omitted). The standard for a permanent injunction is identical, except that the movant must show "actual success" on

5

the merits instead of a likelihood of success on the merits. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987).

## ARGUMENT

This Court should enjoin the Tax Mandate, at least in its application to Ohio.

**A. Ohio is likely to prevail here because Congress exceeded its power under the Spending Clause, and violated the anticommandeering doctrine, when it passed the Tax Mandate.**

Because Congress had no authority to enact the Tax Mandate, Ohio will likely prevail in this challenge to the Mandate's constitutionality.

**1.** "As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). The Framers, in other words, "split the atom of sovereignty." *Saenz v. Roe*, 526 U.S. 489, 504 n.17 (1999) (quoting *United States Term Limits v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring)). "It was the genius of their idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other." *Id.* (quotation omitted).

When the Framers split the atom, they left the States with the bigger slice. The "Federal Government" has only those "limited powers" expressly conferred upon it by the Constitution. *Gregory*, 501 U.S. at 457; *accord Bond v. United States,* 572 U.S. 844, 854 (2014). In sharp contrast, all powers "not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Thus, while the States retain "numerous and indefinite" powers that they may exercise as they see fit, the federal

6

government has only those "few and defined" powers laid out in the Constitution itself. The Federalist No. 45, p.313 (Madison, J.) (Cooke, ed., 1961)).

Congress's few and defined powers do not include any general authority to issue orders to, or to regulate, state governments. *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). True, the Constitution empowers Congress to pass laws regulating state affairs in a few discrete areas. The Civil War Amendments, for example, empower Congress to regulate the States in connection with civil and voting rights. *See* U.S. Const. amend. XIV, §5; amend. XV, §2. But those express grants of authority prove the rule: except where the Constitution affirmatively empowers Congress to direct state affairs, Congress lacks authority to do so. Accordingly, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress's instructions." *New York v. United States*, 505 U.S. 144, 162 (1992) (citing *Coyle v. Smith*, 221 U.S. 559, 565 (1911)).

The prohibition on Congress's directly regulating state governance is often called the "anticommandeering doctrine." *Murphy*, 138 S. Ct .at 1475. The doctrine serves several important values, two of which are especially relevant here. First, it safeguards liberty. By protecting the Constitution's diffusion of power between the state and federal governments, the doctrine protects against the "tyranny and abuse" that can arise from concentrated power. *New York*, 505 U.S. at 181 (quotation omitted). Second, "the anticommandeering rule promotes political accountability." *Murphy*, 138 S. Ct. at 1477. When "a State imposes regulations only because it has been commanded to do so by Congress," voters are unable to accurately determine whom

7

to credit or blame. *Id.* Prohibiting such commandeering aids citizens in holding the right officials accountable.

The fact that Congress *lacks* the power to directly regulate the States informs a proper interpretation of the powers it *has*: courts must not read Congress's enumerated powers so broadly that they allow it to accomplish indirectly the sort of regulation of state affairs that it lacks the power to impose directly. "Otherwise, the two-government system established by the Framers would give way to a system that vests power in one central government." *Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB")*, 567 U.S. 519, 577 (2012) (op. of Roberts, C.J.); *see also* Lynn A. Baker, *Conditional Federal Spending After* Lopez, 95 Colum. L. Rev. 1911, 1920 (1995). Indeed, the founding generation insisted on the Ninth Amendment—which prohibits courts from construing the Constitution's enumeration of some rights "to deny or disparage others retained by the people"—to guard against broad interpretations of Congress's enumerated powers. *See* Kurt T. Lash, *The Lost Original Meaning of the Ninth Amendment*, 83 Tex. L. Rev. 331, 395 (2004); *cf.* 3 Joseph Story, *Commentaries on the Constitution*, §§1898–1900, p.751–53 (1833) (reprinted by Cosimo Classics 2020). Among the "other" rights retained by the people was the right to local self-governance. Lash, *The Lost Original Meaning*, 83 Tex. L. Rev. at 394. And so the Ninth Amendment—in addition to the Tenth Amendment and the entire concept of a federal government with limited and enumerated powers—prohibits interpreting Congress's enumerated powers in a way that permits Congress to exercise a power the Constitution withholds from Congress. One such power is the power to direct the operation of state

8

governments.

The principle that Congress's enumerated powers ought not be construed so broadly that they permit the direct regulation of States is of particular importance to the Spending Clause. The Clause provides:

> The Congress shall have Power To lay and collect Taxes, Duties, Imposes and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States ….

U.S. Const. art. I., §8 c.1.

Exercising its power to "provide for the … general Welfare," *id*., Congress may grant federal funds to the States. Supreme Court precedent permits Congress to "condition such a grant upon the States' 'taking certain actions that Congress could not require them to take.'" *NFIB*, 567 U.S. at 576 (op. of Roberts, C.J.) (quotation omitted). Those conditions "may influence a State's legislative choices." *New York*, 505 U.S. at 167. There comes a point, however, at which influence or encouragement "'turns into compulsion.'" *South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). That point comes when Congress requires States to accede to conditions in order to receive funding so significant that States have no "legitimate choice" but to "accept." *NFIB*, 567 U.S. at 578 (op. of Roberts, C.J.). When Congress enacts a law like that, "'pressure turns into compulsion,' the legislation runs contrary to our system of federalism," and the law is unconstitutional. *Id*. at 577–78 (op. of Roberts, C.J.) (quoting *Steward Machine*, 301 U.S. at 590). Courts must deny effect to Spending Clause legislation that "drive[s] the state legislatures under the whip of economic pressure into" doing "the

bidding of the central government." *Steward Machine*, 301 U.S. at 587.

The Supreme Court's decision in *NFIB* illustrates these principles in action. That case concerned the constitutionality of certain Medicaid-expansion provisions in the Affordable Care Act. The provisions allowed the Secretary of Health and Human Services to withhold Medicaid funds to States whose Medicaid plans did not "comply with the Act's requirements." *NFIB*, 567 U.S. at 581 (op. of Roberts, C.J.); *see* 42 U.S.C. §1396c (2012). But the withholding of funds would have major effects on state budgets: "Medicaid spending account[ed] for over 20 percent of the average State's total budget, with federal funds covering 50 to 83 percent of those costs." *NFIB*, 567 U.S. at 581 (op. of Roberts, C.J.). Crunching those numbers, failure to abide by the Act's terms could cost a State 10 percent of its total budget. *Id*. The Court held, by a 7–2 vote, that the federally imposed conditions violated the Spending Clause: "The threatened loss of over 10 percent of a State's overall budget," the Chief Justice explained, "is economic dragooning that leaves the States with no real option but to acquiesce" to Congress's demands. *Id*. at 582 (op. of Roberts, C.J., joined by Breyer and Kagan, JJ.); *accord id*. at 681 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). The law's provisions thus constituted not "mild encouragement," but rather "a gun to the head." *NFIB*, 567 U.S. at 581 (op. of Roberts, C.J.). The Spending Clause does not permit Congress to coerce States in that manner.

No doubt, the Supreme Court's decisions leave Congress with significant leeway to exercise its taxing or spending powers in ways that *encourage* States to act. One early case, for example, upheld a law that created a federal tax credit for

10

employers who paid into state unemployment funds. *Steward Machine*, 301 U.S. at 575–76. While this perhaps gave States some incentive to create unemployment funds, this mild encouragement left the States free to act according to their "unfettered will." *Id.* at 590. Similarly, in *South Dakota v. Dole*, the Court upheld a law that denied States a "relatively small percentage" of certain highway funds if they established "a minimum drinking age lower than 21." 483 U.S. at 211. Since the "federal funds at stake constituted less than half of one percent of" the challenger State's "budget at the time," the bill stopped well short of coercing the State. *NFIB*, 567 U.S. at 581 (op. of Roberts, C.J.); *see also South Dakota v. Dole*, 791 F.2d 628, 630 (8th Cir. 1986)). The modest incentives in *Dole* and *Steward Machine* constituted encouragement, not coercion.

In addition to being non-coercive, Spending Clause legislation must satisfy a few other requirements to pass constitutional muster. *First*, as the Clause's text makes clear, "the exercise of the spending power must be in pursuit of 'the general welfare.'" *Dole*, 483 U.S. at 207. In other words, the spending power extends "only to matters of national, as distinguished from local welfare." *United States v. Butler*, 297 U.S. 1, 67 (1936). *Second*, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously …, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Dole*, 483 U.S. at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, (1981)) (alterations adopted). *Finally*, and perhaps most obviously, "other constitutional provisions may provide an independent bar to the conditional grant of federal

funds." *Dole*, 483 U.S. at 208.

Combining all these principles, Congress can impose conditions on the States through Spending Clause legislation *only if* it does so in a non-coercive fashion for the promotion of the national welfare, and *only if* the conditions it imposes are unambiguous and otherwise constitutional.

**2.** The Tax Mandate is unconstitutional. It is unconstitutionally coercive and unconstitutionally ambiguous in violation of the Spending Clause. And it unconstitutionally commandeers the States' taxing authority in violation of the Tenth Amendment.

Recall the facts. The American Rescue Plan Act provides Ohio $5.5 billion in federal funds. That is a tremendous amount of money; it equals roughly 7.4 percent of Ohio's total expenditure in 2020. No State, in the current economic situation, can turn down this "financial inducement." *NFIB*, 567 U.S. at 580 (op. of Roberts, C.J.) (quoting *Dole*, 483 U.S. at 211). So here, as in *NFIB*, the States have "no real option" but to take the funds on offer. *Id*. at 582.

Those funds come with strings attached. Relevant here, every State that accepts funding agrees to abide by the Tax Mandate. The Tax Mandate *forbids* States from using funds acquired through the Act "to either directly *or indirectly* offset a reduction in the net tax revenue of such State … resulting from a change in law … that reduces any tax … or delays imposition of any tax or tax increase." American Rescue Plan Act of 2021, Pub. L. No. 117-2, §9901 (adding §602(c)(2)(A) to the Social Security Act (42 U.S.C. §801 et seq.)) (emphasis added). The Secretary of the

12

Treasury can recoup funds she suspects were used in violation of the Tax Mandate. *Id.* (adding §602(e) to the SSA). And that means the Secretary can make the States pay back federal funding *every time* they reduce taxes. After all, given the fungibility of money, any loss in revenue from a reduction in taxes will *necessarily* be "offset," either "directly or indirectly," with funds collected by other means, including through the Act. In other words, *every* reduction in taxes, unless it can be shown to *generate* revenue, will violate the Tax Mandate. The Tax Mandate is thus tantamount to a prohibition on tax reductions—any State bound by the Mandate will, if it lowers taxes (by statute, regulation, or otherwise) and loses revenue, be subject to a penalty.

This scheme violates the Spending Clause, because the "financial inducement" the Act offers "to the States … is much more than 'relatively mild encouragement'" of the sort the Spending Clause permits—instead, "it is a gun to the head." *NFIB*, 567 U.S. at 580–81 (op. of Roberts, C.J.) (quotation omitted); *accord Steward Machine*, 301 U.S. at 587. The Act requires every State to choose between money it cannot refuse and limits on its sovereign authority. In *NFIB*, the Court determined that the Medicaid expansion coerced the States because it "threatened" to deny States funding equal to "over 10 percent of" their "overall budget[s]" unless they agreed to expand their Medicaid programs. 567 U.S. at 582. The Act is similarly coercive: Ohio will be denied funding equal to 7.4 percent of its total expenditure in 2020—funding the State badly needs in an economic crisis—unless it agrees to limits on its power to tax.

The unconstitutionality is particular stark here because the Act coerces States into acquiescing in the commandeering of their taxing authority. In essence, States

13

that abide by the Tax Mandate's terms are conducting their tax policy at the behest of the central government. That allows Congress to control indirectly what it cannot control directly. And *that* violates the Tenth Amendment. "After independence, the States considered themselves fully sovereign nations," entitled "to all the rights and powers of sovereign states." *Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485, 1493 (2019) (quoting *McIlvaine v. Coxe's Lessee*, 4 Cranch 209, 212 (1808)). The Constitution took away *some* of those sovereign powers, but "the States retained" the "aspects of sovereignty" that were not "'altered by the plan of the Convention or [by] certain constitutional Amendments.'" *Id.* at 1494–95 (quoting *Alden v. Maine*, 527 U.S. 706, 713 (1999)). Among the most important of those retained "aspects of sovereignty" was the power to tax. *See McCulloch v. Maryland*, 4 Wheat. 316, 429 (1819). Indeed, it was such a critical component of sovereignty that, to secure the Constitution's ratification, the Federalists had to persuade their fellow citizens that the federal government's power to tax would exist "concurrent[ly]" with the States' power to do the same. The Federalist No. 32, p.201 (A. Hamilton) (Cooke, ed., 1961); *see also 2* Story, *Commentaries on the Constitution* §§924 & 937, pp.390 & 410. By commandeering that power—by effectively requiring the States to tax in the manner the federal government would prefer—the Act undermines that assurance and thus rips at a critical thread in the fabric of our constitutional order.

The Tax Mandate, in addition to violating the letter of the Constitution, runs counter to the purposes of the anticommandeering doctrine. That is true for two reasons.

*First*, the Tax Mandate erodes the "structural protections of liberty" that the Constitution in general, and the anticommandeering doctrine in particular, secure. *Printz v. United States*, 521 U.S. 898, 921 (1997). The Constitution "divides power among sovereigns and among branches of government." *New York*, 505 at 187. Wisely so: placing too much power in a single entity creates a "risk of tyranny and abuse." *Id.* at 181. The anticommandeering doctrine honors this diffusion of power; it prevents Congress from *covertly* concentrating power by ordering the States to exercise *their* constitutional authority in a manner acceptable to Congress. The Tax Mandate, by commandeering the States' taxing authority, concentrates power in precisely the manner that the anticommandeering doctrine is designed to prevent.

*Second*, the Tax Mandate undermines "political accountability" by dictating to the States how they may exercise their sovereign authority. *Murphy*, 138 S. Ct. at 1477. The effects of tax reductions on economic growth is a matter of vigorous disagreement. Yet the Tax Mandate allows Congress to quietly impose its preferred tax policies without having to pay the full political price for doing so. If legislators or executive officials in States subject to the Mandate decline to reduce taxes, it is likely those "state officials who will bear the brunt of public disapproval"; the representatives and senators "who devised the regulatory program may remain insulated from the electoral ramifications of their decision." *New York*, 505 U.S. at 169. When "responsibility is blurred" in this manner, voters are hindered in holding their representatives to account. *Murphy*, 138 S. Ct. at 1477.

All of this establishes that the Tax Mandate is unconstitutionally coercive and

15

effects an unconstitutional commandeering. It is worth adding that the Tax Mandate is also unconstitutionally ambiguous. Again, Spending Clause legislation must artic-ulate "unambiguously" the conditions it imposes on the States, enabling them to un-derstand the consequences of accepting funds. *Dole*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17). The Tax Mandate is far from "unambiguous." What changes to tax policy that cause a decrease in net revenue are "indirectly" offset by funds acquired through the Act? Unless the answer is "every change to tax policy," neither the English language nor economic theory provides an answer. And how does one know whether a change to tax policy causes a net reduction in revenue? For example, if revenue would have decreased even further but for a tax cut, would the tax cut still violate the Mandate? The Tax Mandate does not answer these questions. As a result, the conditions it imposes are too ambiguous to be upheld under the Spending Clause.

\* 

Congress has significant leeway to impose conditions through Spending Clause legislation. What it may not do is use its Spending Clause power to coerce the States into constraining their own sovereign authority. While the line between strong en-couragement (which is constitutional) and coercion (which is not) is not always bright, the Tax Mandate falls clearly on the coercive side of the line: the States have no real choice but to accept the Act's funding and the conditions that come with it. The Tax Mandate is therefore unconstitutional, and this Court should enjoin the defendants from enforcing it.

16

**B.     Ohio will be irreparably harmed without an injunction.**

Courts presume irreparable harm in cases involving constitutional violations. *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (*per curiam*); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *ACLU v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003). A constitutional violation, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because the Tax Mandate is unconstitutional, it causes irreparable harm to the parties it affects—namely, the States.

Even without that presumption, the Court would have to conclude that the Tax Mandate causes irreparable harm. Why? Because the Mandate causes precisely the same harm that occurs every time the federal government intrudes upon the "sovereign interests" of the States. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *accord Texas v. United States*, 809 F.3d 134, 157 (5th Cir. 2015); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018). All States "have an interest, as sovereigns, in exercising 'the power to create and enforce a legal code.'" *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982)). That is why the States have standing to challenge federal laws that purport to constrain that power. *Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232–33 (6th Cir. 1985); *see also Kansas*, 249 F.3d at 1228; *Texas*, 809 F.3d at 157; *Wyo. ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008); *Alaska*, 868 F.2d at 443. And that is why the federal government *always* causes a form of irreparable harm when it improperly interferes with a State's

17

freedom to govern itself. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *accord Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers). The Tax Mandate causes precisely that form of harm: it constrains the State's taxing power, interfering with its sovereignty and thus causing irreparable harm.

The Tax Mandate causes irreparable harm in a second way, too: by subjecting Ohio to unknown penalties if it reduces taxes, the Mandate causes "an interference with the State's orderly management of its fiscal affairs." *Barnes v. E-Systems*, 501 U.S. 1301, 1304 (1991) (Scalia, J., in chambers). That injury cannot be remediated later—there is no mechanism for holding the United States responsible for the unquantifiable injuries Ohio will sustain if made to craft its tax policy in the Mandate's shadow.

## C. Enjoining the Tax Mandate will not harm others, and will promote the public interest.

Enjoining the Tax Mandate will not harm anyone. Ohio seeks to enjoin *only* the Tax Mandate, which is the provision forbidding the States from using the Act's funds "to either directly or indirectly offset a reduction in the net tax revenue of such State ... resulting from a change in law, regulation, or administrative interpretation ... that reduces any tax ... or delays the imposition of any tax or tax increase." American Rescue Plan Act, §9901 (adding §602(c)(2)(A) to the SSA). Enjoining that provision will not keep the United States from distributing the funds, nor will it interfere with any entity's expenditure of the funds. An injunction will enjoin a single provision that impermissibly infringes the States' sovereign authority to set state taxes.

An injunction is in the public interest, too. The "public interest lies in a correct

18

application of the" law, and "upon the will of the people … being effected in accordance with [the] law." *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (citing *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991)). Enjoining the unconstitutional provision, and thus empowering the Ohio General Assembly to do the People's will, would thus promote the public interest.

## CONCLUSION

The Court should enjoin enforcement of the Tax Mandate.

Respectfully submitted,

DAVE YOST (0056290)
Ohio Attorney General

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS* (0095284)
Solicitor General
  **Trial Attorney*
Solicitor General
  *Counsel of Record
ZACHERY P. KELLER (0086930)
MAY DAVIS (*PHV application pending*)
Deputy Solicitors General
30 East Broad Street, 17th Floor
6l4-466-8980
614-466-5087; fax
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for the State of Ohio*

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2021, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically, at the following addresses:

Vipal J. Patel
United States Attorney for the
Southern District of Ohio
U.S. Attorney's Office
303 Marconi Boulevard, Suite 200
Columbus, OH 43215

Merrick Garland
Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Civil-Process Clerk
Office of the United States Attorney
for the Southern District of Ohio
303 Marconi Boulevard, Suite 200
Columbus, OH 43215

Janet Yellen
Secretary of Treasury
U.S. Department of Treasury
1500 Pennsylvania Ave. N.W.
Washington, D.C. 20220

U.S. Department of Treasury
1500 Pennsylvania Ave. N.W.
Washington, D.C. 20220

Richard K. Delmar
Acting Inspector General
U.S. Department of Treasury
1500 Pennsylvania Ave. N.W.
Washington, D.C. 20220

*/s/ Benjamin Flowers*
BENJAMIN FLOWERS (0095284)
Solicitor General

## LOCAL RULE 65.1(B) CERTIFICATION

I hereby certify that on March 17, 2021, I served a copy of the complaint, this motion, and all other filings in this case by email on the defendants' attorney at the following email address:

> Matthew J. Horwitz
> Civil Chief
> United States Attorney for the
> Southern District of Ohio
> Matthew.Horwitz@usdoj.gov

> */s/ Benjamin Flowers*
> BENJAMIN FLOWERS (0095284)
> Solicitor General