# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| STATE OF OHIO,<br><br>               Plaintiff,<br><br>    v.<br><br>JANET YELLEN, in her official capacity<br>as Secretary of the Treasury, *et al.*,<br><br>          Defendants. | Case No. 1:21-cv-00181-DRC<br><br>District Judge Douglas R. Cole |

## DEFENDANTS' OPPOSITION TO OHIO'S
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

INTRODUCTION........................................................................................1

BACKGROUND .......................................................................................4

    A.    Statutory Background........................................................4

    B.    Factual and Procedural Background..................................7

LEGAL STANDARDS...............................................................................7

ARGUMENT ...........................................................................................8

    I.    OHIO LACKS ARTICLE III STANDING. ................................8

To ensure that billions in new federal funds would be used for the broad categories of state expenditures it identified, Congress specified that States cannot use the federal funds provided under the American Rescue Plan Act to offset a reduction in net tax revenue resulting from changes in state law. 42 U.S.C. § 802(c)(2)(A). Ohio asks this Court to enjoin the enforcement of that offset provision. Ohio lacks Article III standing to seek such relief, however, because it has not enacted any tax cut, has not shown that any hypothetical tax cut will decrease net tax revenue, and has not alleged that it plans to use Rescue Plan funds to offset that theoretical reduction. Because Ohio has not alleged any intention to use the federal funds in a way not permitted under the Act, it lacks standing to challenge the offset provision. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Relatedly, Ohio's challenge is not ripe because it has not alleged that it plans to engage in conduct that could result in recoupment of the federal funds, and the Treasury Department has indicated no imminent plans to recoup from Ohio. Without a credible prospect of recoupment, the State's motion is premature. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003).

    II.    OHIO IS NOT LIKELY TO SUCCEED ON THE MERITS. ..........................12

        A.    Congress Validly Exercised its Spending Clause Authority to Restrict the Use of Rescue Plan Funds..............................13

Federal statutes that place conditions on how a State can use federal funds are commonplace and present no constitutional concern. The Rescue Plan allows States to deploy the considerable funds provided for a broad array of purposes related

i

to the COVID-19 pandemic and its effects. And Congress acted well within constitutional bounds by conditioning the receipt of Rescue Plan funds on the State's agreement to use funds for those purposes and not to offset a reduction in net tax revenue resulting from changes in state law. *See Sabri v. United States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures . . . is bound up with congressional authority to spend in the first place."); *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985).

B.      The Rescue Plan Is Not Coercive......................................................16

Ohio's coercion argument is meritless. To start, Ohio misconstrues the Act. The Act does not "effectively ban[] state tax cuts or credits," but prohibits only a State's "use" of Rescue Plan funds to "offset" a reduction in "*net* tax revenue." 42 U.S.C. § 802(c)(2)(A). States are free to change their tax laws if those changes do not reduce net tax revenue, and States may reduce their net tax revenue as long as they do not use Rescue Plan funds to "offset" that reduction. In any event, the Supreme Court has never applied a coercion analysis to funding conditions that "safeguard [the U.S.] treasury" by "govern[ing] the use of the funds" that have been newly appropriated. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578–80 (2012) [hereinafter "*NFIB*"] (plurality opinion); *South Dakota v. Dole*, 483 U.S. 203, 211 (1987); *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590–91 (1937). And unlike the condition held invalid in *NFIB*, the Rescue Plan does not threaten States with the loss of *preexisting* funds if they fail to undertake new services. *NFIB*, 567 U.S. at 575–85. The condition here affects only the use of the *new* funds provided by the Act, and the consequence is only potential recoupment of the misused funds, which is well within Congress's spending power. The requirement in the Rescue Plan that States use funds for specified purposes and not for others (including to offset reductions in net tax revenue that result from changes in state law) is no more "coercive" than any restriction on the receipt of federal funds that the Supreme Court has held to be a valid exercise of Congress's Spending Clause authority.

C.     The Rescue Plan Provides Clear Notice of the Funding
       Condition.............................................................................................21

Congress must provide "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with" certain conditions. *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 25 (1981). The Act easily meets that requirement because a state official would "clearly understand that one of the obligations of the Act is the obligation" not to use Rescue Plan funds to offset a reduction in net tax revenue resulting from changes in state law. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Congress need not "prospectively resolve every possible ambiguity concerning particular applications of the requirements" of a funding statute. *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985); *see Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002).

III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST PRECLUDE A
       PRELIMINARY INJUNCTION. ............................................................................24

Even if Ohio were able to establish a cognizable injury for purposes of standing, the State does not come close to demonstrating irreparable harm required for a preliminary injunction. If Ohio were to accept the conditioned funding, use that funding to offset a reduction in net tax revenue, and face potential recoupment by the Secretary, any such recoupment proceedings would present "an adequate opportunity to fully present its defenses and objections." *Travis v. Pennyrile Rural Elec. Coop.*, 399 F.2d 726, 729 (6th Cir. 1968). By contrast, enjoining an Act of Congress would unquestionably impose irreparable harm on the federal government and contravene the public interest. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

IV.    ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO OHIO ...................................27

If this Court were to enjoin any aspect of the Rescue Plan (and the Court should not), that injunction should apply only to Ohio because the "plaintiff's remedy must be tailored to redress the plaintiff's particular injury" and must be no broader than "necessary to provide complete relief to the plaintiffs." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Ohio has no serious

interest in whether other States are subject to the offset provision during the pendency of the suit, and the State would be fully redressed through a preliminary injunction prohibiting the Treasury Department from "enforcing" the Rescue Plan against only Ohio.

CONCLUSION ................................................................................................27

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner,*
  387 U.S. 136–149 (1967) ............................................. 12

*Abbott v. Perez,*
  138 S. Ct. 2305 (2018) ............................................... 11

*ACLU of Ky. v. McCreary Cnty., Ky.,*
  354 F.3d 438 (6th Cir. 2003) ........................................ 26

*Alaska v. U.S. Dep't of Transp.,*
  868 F.2d 441 (D.C. Cir. 1989) ....................................... 11

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
  458 U.S. 592 (1982) .................................................. 11

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
  548 U.S. 291 (2006) .............................................. 22, 23

*Babbitt v. Farm Workers,*
  442 U.S. 289 (1979) ................................................. 8, 9

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan,*
  501 U.S. 1301 (1991) ............................................. 11, 26

*Basicomputer Corp. v. Scott,*
  973 F.2d 507 (6th Cir. 1992) ........................................ 26

*Bennett v. Kentucky Department of Education,*
  470 U.S. 656 (1985) ........................................ 15, 20, 22, 23

*Benning v. Georgia,*
  391 F.3d 1299 (11th Cir. 2004) ...................................... 23

*Charles v. Verhagen,*
  348 F.3d 601 (7th Cir. 2003) ..................................... 23, 24

*Charles C. Steward Mach. Co. v. Davis,*
  301 U.S. 548 (1937) ............................................ 18, 19, 20

*Citizens Bank of Md. v. Strumpf*,
    516 U.S. 16 (1995) ................................................................ 18

*City of Los Angeles v. Barr*,
    929 F.3d 1163 (9th Cir. 2019) .......................................... 22

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
    527 U.S. 666 (1999) ..................................................... 13, 21

*Cutter v. Wilkinson*,
    423 F.3d 579 (6th Cir. 2005) ........................................ 23, 24

*D.T. v. Sumner Cnty. Sch.*,
    942 F.3d 324 (6th Cir. 2019) ................................... 3, 7, 8, 24

*Daunt v. Benson*,
    956 F.3d 396 (6th Cir. 2020) ............................................ 7

*Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) ........................................................ 23

*Fowler v. Benson*,
    924 F.3d 247 (6th Cir. 2019) ............................................ 7

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) .................................................... 27

*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*,
    959 F.3d 178 (5th Cir. 2020), *cert. denied,* 141 S. Ct. 901 (2020) .................................... 19

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) ............................................................ 18

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ........................................................ 23

*Kansas v. United States*,
    214 F.3d 1196 (10th Cir. 2000) ...................................... 16

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ............................ 10, 11, 25

*Lewis v. Casey,*
    518 U.S. 343 (1996) ................................................................. 27

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................. 8, 11

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ................................................................. 28

*Maleeah v. Brown, No. 4:18-cv-096,*
    2019 WL 570762 (S.D. Ga. Feb. 12, 2019) ................................... 24

*Marks v. United States,*
    430 U.S. 188 (1977) ................................................................. 19

*Maryland v. King,*
    567 U.S. 1301 (2012) ......................................................... 4, 11, 27

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ............................................................. 10, 11

*Mayhew v. Burwell,*
    772 F.3d 80 (1st Cir. 2014) ............................................... 15, 16, 19

*Mayweathers v. Newland,*
    314 F.3d 1062 (9th Cir. 2002) ............................................... 23, 24

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ................................................................. 24

*Michigan v. Sault Ste. Marie Tribe of Chippewa Indians,*
    737 F.3d 1075 (6th Cir. 2013) ................................................... 12

*Miss. Comm'n on Env't Quality v. EPA,*
    790 F.3d 138 (D.C. Cir. 2015) ................................................... 19

*Munaf v. Geren,*
    553 U.S. 674 (2008) ................................................................. 8

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) (plurality opinion) ............................... *passim*

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803–08 (2003) ........................................................................ 11, 12

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
    434 U.S. 1345 (1977) ......................................................................... 4

*New York v. United States*,
    505 U.S. 144 (1992) ........................................................... 19, 20, 21

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................ 7

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ........................................................... 26

*Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*,
    766 F.2d 228–33 (6th Cir. 1985) ....................................................... 11

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*,
    305 F.3d 566 (6th Cir. 2002) ....................................................... 8, 24

*Pennhurst State School & Hospital v. Halderman*,
    451 U.S. 1 (1981) ......................................................... 21, 22, 23, 24

*Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*,
    769 F.3d 447 (6th Cir. 2014) ........................................................... 8

*Rimini St., Inc. v. Oracle USA, Inc.*,
    139 S. Ct. 873 (2019) ..................................................................... 18

*Roberts v. Neace*,
    958 F.3d 409 (6th Cir. 2020) ........................................................... 26

*S.C. Dep't of Educ. v. Duncan*,
    714 F.3d 249 (4th Cir. 2013) ........................................................... 16

*Sabri v. United States*,
    541 U.S. 600 (2004) ........................................................... 14, 15, 18

*Sampson v. Murray*,
    415 U.S. 61 (1974) ......................................................................... 26

*Segal v. Fifth Third Bank, N.A.*,
    581 F.3d 305 (6th Cir. 2009) .......................................................... 9

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ........................................................... *passim*

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ......................................................... 8, 9

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ........................................................ 11

*Travis v. Pennyrile Rural Elec. Coop.*,
    399 F.2d 726 (6th Cir. 1968) ..................................................... 4, 25

*Trump v. New York*
    141 S. Ct. 530 (2020) ............................................................ 12

*United States v. Morrison*,
    529 U.S. 598 (2000) ............................................................. 13

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ............................................................. 4

*Voisine v. United States*,
    136 S. Ct. 2272 (2016) ........................................................... 17

*Walters v. Nat'l Ass'n of Radiation Survivors*,
    468 U.S. 1323 (1984) ............................................................ 27

*Warshak v. United States*,
    532 F.3d 521 (6th Cir. 2008) (en banc) ........................................... 13

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ............................................................. 13

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................... 24

*Wyoming ex rel. Crank v. United States*,
    539 F.3d 1236 (10th Cir. 2008) .................................................. 11

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ........................................................................ 12

**Statutes**

20 U.S.C. § 241e (1970) ............................................................................ 15

42 U.S.C. § 801 ......................................................................................... 4

42 U.S.C. § 802 ................................................................................. *passim*

42 U.S.C. § 803 ...................................................................................... 4, 5

42 U.S.C. § 804 ........................................................................................ 4

42 U.S.C. § 805 ........................................................................................ 4

American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021) ..................................... 1

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"),
  Pub. L. No. 116-137, 134 Stat. 281 (2020), codified at 42 U.S.C. § 801 ........................... 4

**Other Authorities**

Dave Yost, Twitter, @Yost4Ohio (Mar. 17, 2021), https://twitter.com/Yost4Ohio/sta-
  tus/1372516805818847234 ...................................................................... 9

Dave Yost, Twitter, @Yost4Ohio,
  (Mar. 23, 2021), https://twitter.com/yost4ohio/status/1374387109599973378 ........... 9

*Offset,* Black's Law Dictionary (11th ed. 2019) .................................................... 17

Treasury Statement on State Fiscal Recovery Funds and Tax Conformity (Apr. 7, 2021),
  https://go.usa.gov/xHW6R ..................................................................... 7

Sub. H.B. 110, 134th Ohio Gen. Assembly § 5747.02 (as introduced by H. Comm. on Fin.,
  Apr. 13, 2021), https://perma.cc/5YNQ-X5Z9 ................................................. 9

Yellen Letter to State Attorneys General (Mar. 23, 2021),
  https://go.usa.gov/xHW65 .................................................................. 6, 7

**INTRODUCTION**

As part of the American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021) ("Rescue Plan" or "Act"), Congress appropriated nearly $200 billion in new funding for state governments. 42 U.S.C. § 802. Congress gave States considerable flexibility to use these new federal funds, which may be directed to a broad variety of state efforts to respond to the public health emergency created by the COVID-19 pandemic and to its economic effects, including by funding state-level government services and by providing assistance to households, small businesses, and industries. *Id*. § 802(c). To ensure that the new federal funds would be used for the broad categories of state expenditures it identified, Congress specified that States cannot use the federal funds to offset a reduction in net tax revenue resulting from changes in state law. *Id*. § 802(c)(2)(A) (the "offset provision"). That is a straightforward exercise of Congress's well-settled Spending Clause authority to attach conditions that "preserve its control over the use of federal funds." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579 (2012) [hereinafter "*NFIB*"] (plurality opinion); *see, e.g., South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987).

In seeking a preliminary injunction, Ohio argues that this provision is unconstitutionally "coercive" because it would prevent the State from enacting tax cuts. The State's motion, however, suffers from multiple jurisdictional defects and rests on a fundamental misunderstanding of both the challenged statute and the governing law.

As an initial matter, Ohio lacks Article III standing because it has not enacted *any* tax cut, let alone shown that any hypothetical tax cut will decrease net tax revenue or that the State plans or intends to use Rescue Plan funds to offset that theoretical reduction. Because Ohio has not alleged any intention to use the federal funds in a way not permitted under the Act, it lacks standing to challenge the offset provision.

Relatedly, Ohio's challenge is not ripe. The only consequence of Ohio using Rescue Plan funds to pay for a reduction in net tax revenue would be potential recoupment of that amount (*i.e.*, the particular amount used for an impermissible offset) from the

State.  But here, Ohio has not alleged conduct that could result in recoupment, and the Treasury Department has also indicated no imminent plans to recoup from Ohio.  Without a credible prospect of recoupment, the State's motion is premature.  Particularly given the extraordinary nature of Ohio's request for a pre-enforcement preliminary injunction based on the claim that a public-emergency-related federal statute should be invalidated as unconstitutional, this Court should take special care to ensure that the jurisdictional prerequisites for such drastic relief are satisfied.

Nor is Ohio likely to succeed on the merits.  Federal statutes that place conditions on how a State can use federal funds are commonplace and present no constitutional concern.  Such provisions reflect the common-sense proposition that when Congress gives money to States for a particular purpose, it may place conditions on a State's acceptance of the funds to ensure that the funds are in fact used for the intended purpose.  The Rescue Plan allows States to deploy the considerable funds provided for a broad array of purposes related to the COVID-19 pandemic and its effects.  Congress acted well within constitutional bounds by conditioning the receipt of Rescue Plan funds on the State's agreement to use funds for those purposes and not to offset a reduction in net tax revenue resulting from changes in state law.

Ohio's argument that the Rescue Plan is coercive rests on the premise that the offset provision "effectively bans state tax cuts or credits."  Combined Mot. for a Prelim. Inj. & Mem. in Supp. of the Mot. 5, ECF No. 3 ("PI Mot.").  But this disregards the plain language of the Act, which addresses a reduction in a State's "*net* tax revenues"—and the Act does not even prohibit such reductions.  A State is thus free to change its tax law as it believes appropriate, cutting some taxes and increasing others.  And even if a State chooses to make changes that result in a reduction in net tax revenue, the Act only bars a State using Rescue Plan funds to offset that reduction.  Contrary to Ohio's suggestion, the "penalties if it reduces taxes" are not "unknown."  PI Mot. 18.  The Act makes clear that

if a State chooses to use Rescue Plan funds to offset a reduction in net tax revenue result-ing from changes in state law, the only consequence would be a loss of monies commen-surate with the amount of federal funding used for that offset. *See* 42 U.S.C. § 802(e).

The Supreme Court's decision in *NFIB*, 567 U.S. 519, underscores Ohio's misun-derstanding of the governing law. In the controlling opinion of *NFIB*, the Chief Justice concluded that Congress could not require a State to extend Medicaid coverage to a new population on penalty of losing its whole allotment of *preexisting* Medicaid funding. *See id.* at 585. By contrast, the Chief Justice made clear that it was entirely permissible for Congress to make the *new* federal funds provided by the Affordable Care Act—totaling $100 billion per year, *see id.* at 576—contingent on a State's expansion of coverage to cat-egories of people never previously covered by its plan, *see id.* at 585.

Unlike the condition held invalid in *NFIB*, the Rescue Plan does not threaten States with the loss of preexisting funds if they fail to undertake new services. The condition here affects only the use of the *new* funds provided by the Act. Indeed, the Rescue Plan's offset provision is far less restrictive than the ACA provision that *NFIB* indicated was permissible, which made the entirety of the ACA's new Medicaid funding contingent on a State's adoption of the ACA's new adult-eligibility expansion under Medicaid. Unlike that provision, the Rescue Plan does not provide States with an all-or-nothing choice. If a State receiving funds under the Act chose to reduce its net tax revenue and offset that reduction with Rescue Plan funds, its federal grant would be reduced only to the extent it uses Rescue Plan funds to offset that reduction.

Ohio also cannot demonstrate likely irreparable harm, a showing that is "indis-pensable" for a preliminary injunction. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019). Even if Ohio were able to establish a cognizable injury for purposes of stand-ing, the State does not come close to demonstrating irreparable harm. If Ohio were to accept the conditioned funding, use that funding to offset a reduction in net tax revenue, and face potential recoupment by the Secretary, any such recoupment proceedings would

present "an adequate opportunity to fully present its defenses and objections." *Travis v. Pennyrile Rural Elec. Coop.*, 399 F.2d 726, 729 (6th Cir. 1968). And if Ohio were unable to succeed in such hypothetical future proceedings, the result would simply be that it has to repay money—the quintessential example of harm that is *not* irreparable—such that the State "is not entitled to the extraordinary remedy of injunction" at this stage. *Id.*

By contrast, enjoining an Act of Congress would unquestionably impose irreparable harm on the federal government and contravene the public interest. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (emphasizing that "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation") (quotation marks omitted)); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)). Ohio's motion should be denied.

## BACKGROUND

### A.    Statutory Background

In March 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). *See* Pub. L. No. 116-137, § 5001, 134 Stat. 281, 501 (2020) (codified at 42 U.S.C. § 801). The CARES Act established a $150 billion "Coronavirus Relief Fund" for States, tribal governments, and localities for 2020. *See* 42 U.S.C. § 801(a). That fund covers costs that are "necessary expenditures incurred due to the public health emergency" that "were not accounted for in the budget[s]" of those governments. *Id.* § 801(d). If recipients do not use the funds for the permitted purposes, the Act permits the Treasury Department to recoup the amount of any misused funds. *Id.* § 801(e).

On March 11, 2021, Congress enacted the American Rescue Plan Act. *See* Pub. L. No. 117-2, § 9901(a) (codified at 42 U.S.C. §§ 802–805). The Rescue Plan establishes an additional "Coronavirus State Fiscal Recovery Fund," allocating another $220 billion to

broadly "mitigate the fiscal effects" of the pandemic on States, territories, and Tribal governments through 2024. 42 U.S.C. § 802(a)(1); *see id.* § 803(a) (additional $130 billion for localities). Nearly $200 billion is allocated for the States and the District of Columbia. *Id.* § 802(b)(2)(A).

The Rescue Plan provides States with considerable latitude, in scope and duration, to use the funds for pandemic-related purposes. Through 2024, a State may use the funds "to cover costs incurred":

> (A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

> (B) to respond to workers performing essential work during the COVID–19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

> (C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID–19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

> (D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1). While CARES Act funds were limited to covering previously unbudgeted costs of necessary expenditures incurred due to the public health emergency, the Rescue Plan allows States to use the funds for "government services" to the extent the pandemic has resulted in a "reduction in revenue." *Id.* § 802(c)(1)(C). The Rescue Plan also permits recipients to use the funds to respond broadly to the public-health emergency and its negative economic effects, to support essential workers during the pandemic, and to invest in certain infrastructure areas. *Id.* § 802(c)(1)(A), (B), (D).

5

The Rescue Plan includes two "further restrictions" to ensure that the broad outlay of funds is used for the identified purposes while funds are available. 42 U.S.C. § 802(c)(2). One limitation (not challenged here) provides that a State may not "deposit" Rescue Plan funds "into any pension fund." *Id.* § 802(c)(2)(B). The other limitation (at issue here) provides in relevant part that a State:

> shall not use the funds provided under [§ 802] . . . to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 802(c)(2)(A).[1]

By its terms, this funding condition applies only to reductions in "net" tax revenue. *Id.* This limitation on the use of federal funds is not implicated at all by a State's choice to modify its tax code—including by cutting taxes—if the changes, taken together, do not result in a reduction of *net* tax revenue. If a State chooses to reduce its net tax revenue, it may not use the Rescue Plan funds to "offset" that reduction. If a State chooses to do so, the State will be required to repay only the amount of funds used to offset the "reduction to net tax revenue" or "the amount of funds received," whichever is less. 42 U.S.C. § 802(e).

The Rescue Plan further authorizes the Secretary of the Treasury "to issue such regulations as may be necessary or appropriate to carry out this section." 42 U.S.C. § 802(f). Although the Secretary has provided some initial guidance, the Treasury Department has not yet issued its implementing regulations. *See* Yellen Ltr. to State Attorneys General (Mar. 23, 2021), https://go.usa.gov/xHW65; Treasury Statement on State Fiscal Recovery Funds and Tax Conformity (Apr. 7, 2021), https://go.usa.gov/xHW6R.

---

[1] The "covered period" began on March 3, 2021 and "ends on the last day of the fiscal year of such State . . . in which all funds received by the State . . . have been expended or returned to, or recovered by, the Secretary." 42 U.S.C. § 802(g)(1).

Once the Treasury Department issues the regulations, a State may receive federal funds after providing a certification (in a form the agency will provide) indicating that it needs the funds to carry out the activities specified in § 802(c) and that it will use the funds in compliance with that provision. 42 U.S.C. § 802(d)(1). States that receive funds must then provide periodic reports and other information as the Secretary may require to administer the Act. *Id*. § 802(d)(2).

      **B.**     **Factual and Procedural Background**

     On March 17, 2021, Ohio brought this suit alleging that the offset provision of § 802(c)(2)(A) "effectively prohibits reductions in taxes." Compl., ECF No. 1, at 1. Ohio expects to receive $5.5 billion under the Rescue Plan. *Id*. at 5. The State nowhere alleges that it expects to cut any taxes, that it intends to enact changes in state law that would reduce net tax revenue, or that it intends to use Rescue Act funds to offset any reduction in net tax revenue. *Id*. at 1-10. Ohio nonetheless requests immediate relief to enjoin Defendants from "enforcing" the offset provision so that it can receive Rescue Plan funds free of that restriction. *See* PI Mot. 1.

**LEGAL STANDARDS**

     A preliminary injunction is an "extraordinary and drastic remedy" that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (quotation omitted). In determining whether to issue a preliminary injunction, courts consider four factors: "(1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T.*, 942 F.3d at 326. Where, as here, the federal government is the defendant, the last two factors merge. *See Daunt v. Benson*, 956 F.3d 396, 422 (6th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And while the factors may be balanced, "the existence of an irreparable injury is mandatory," and "even the strongest showing on the

7

other three factors cannot eliminate the irreparable harm requirement." *D.T.*, 942 F.3d at 326–27 (quotation omitted).

<b>ARGUMENT</b>

Ohio has not demonstrated a justiciable Article III case or controversy and has not established that it satisfies any of the preliminary-injunction factors. It therefore fails to carry its "burden of proving that the circumstances clearly demand" an injunction. *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## I. OHIO LACKS ARTICLE III STANDING.

In assessing Ohio's request for preliminary relief, this Court must determine whether the State has established jurisdiction, including Article III standing. *Munaf v. Geren*, 553 U.S. 674, 691 (2008). To satisfy the "irreducible constitutional minimum" of Article III standing, Ohio must first demonstrate "a concrete and particularized" injury in fact that is "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). When a plaintiff (like Ohio) seeks to enjoin the future enforcement of a statute, "the injury-in-fact requirement" demands that the plaintiff "allege[] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of [enforcement] thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). The prospect of enforcement must be "sufficiently imminent" to create a concrete injury. *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 451 (6th Cir. 2014).

Ohio cannot meet that standard because its asserted injury is hypothetical and speculative. Its complaint and preliminary-injunction motion are silent as to how it intends to use Rescue Plan funds, much less that it plans to use them in a manner inconsistent with the offset provision. Under that provision, a State may not use the new federal funds to offset a reduction in net tax revenue that result from changes in state law. 42 U.S.C. § 802(c)(2)(A). But Ohio does not allege that it has enacted any tax cuts, let alone

8

tax cuts that would (taken together with any tax increases) reduce net tax revenue. Nor does Ohio allege that it intends to use Rescue Plan funds to offset any reductions in its net tax revenue. The State is "the master of [its] complaint" and must "take responsibility for the allegations included"—or not included—"in the complaint." *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 309, 312 (6th Cir. 2009).

Not only has Ohio failed to allege any intent to use Rescue Plan funds to offset a reduction in net tax revenue, but the State's Attorney General has represented the opposite intent. He stated on March 17 that "Ohio isn't planning a tax cut," Dave Yost, Twitter, @Yost4Ohio (Mar. 17, 2021), https://twitter.com/Yost4Ohio/status/1372516805818847234, and confirmed on March 23 that "Ohio is not contemplating a tax cut," *id.* (Mar. 23, 2021), https://twitter.com/yost4ohio/status/1374387109599973378. Ohio cannot demonstrate any actual or imminent injury from the offset provision while publicly declaring that the State has no intention of—indeed, is not even "contemplating"—engaging in the activity addressed in that provision.

Ohio would be in no better position if the State were to simply propose a tax cut. *See, e.g.*, Sub. H.B. 110, 134th Ohio Gen. Assembly § 5747.02 (as introduced by H. Comm. on Fin., Apr. 13, 2021) (proposing a 2 percent personal income tax rate cut), *available at* https://perma.cc/5YNQ-X5Z9. The State has not passed any tax law, shown that the law will decrease net tax revenue, or alleged any intent to use Rescue Plan funds to offset that hypothetical reduction. In other words, merely proposing a tax cut is *not* itself the "course of conduct arguably affected with a constitutional interest" and "proscribed by a statute" required for pre-enforcement standing. *Driehaus*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). The offset provision only restricts using Rescue Plan funds to offset a reduction in net tax revenue resulting from a change in state law, not any tax change on its own.

Unable to demonstrate that the Rescue Plan restricts any conduct that Ohio intends to undertake, let alone that any recoupment is imminent, the State asserts a general intrusion on its "sovereign interests." PI Mot. 17 (quoting *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001)); *see* Compl. 2–3 (alleging "intru[sion] on the State's sovereign authority"). In doing so, Ohio fundamentally misunderstands the Rescue Plan. The Act provides States with a broad outlay of federal funds and considerable flexibility in how to use those funds to address needs related to the pandemic and its effects. But to ensure that the new federal funds are used for those purposes and not others Congress chose not to support, the Act requires a State to agree that it will not use the federal funds to offset a reduction in net tax revenue resulting from changes to state law. The Rescue Plan does not prohibit a State from cutting taxes; it merely restricts a State's ability to use *federal funds* distributed under the Rescue Plan to offset a reduction in net tax revenue. No State has a "sovereign interest" in using federal funds for that purpose. And Ohio, of course, retains the freedom to decline the funds.

Ohio's reliance on its sovereign taxation authority also cannot be reconciled with the Supreme Court's decision in *Massachusetts v. Mellon*, which made clear that Article III jurisdiction is not satisfied by raising "abstract questions . . . of sovereignty." 262 U.S. 447 (1923). There, Congress had enacted through the Spending Clause a maternity program that permitted States to accept funding to protect the health of mothers and infants and provided that violating the program's conditions could result in the withholding of funds. *Id.* at 478–79, 484-85. Massachusetts brought suit, alleging that the statute "imposed upon the [S]tates an illegal and unconstitutional option either to yield to the federal government a part of their reserved rights or lose their share of the moneys appropriated." *Id.* at 482. The Supreme Court held that the State's "naked contention that Congress has usurped the reserved powers of the several States by the mere enactment of the statute" was insufficient to establish an Article III case or controversy. *Id.* at 483. Instead, the Court held that Massachusetts was required to allege that a sovereign interest was

"actually invaded or threatened" by "the actual or threatened operation of the statute," *id.* at 485 — precisely what Ohio has failed to demonstrate here. Ohio relatedly claims injury to its "'power to create and enforce a legal code'" or its "freedom to govern." PI Mot. 17–18 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982)); *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers). But, as noted, Ohio has not alleged any plan to use Rescue Plan funds to offset a reduction in net tax revenue resulting from a change in state law, and even then, only federal money — not state power — would be at stake.

The other authorities that Ohio cites to establish a cognizable injury only underscore its absence here. *See* Compl. 2–3; PI Mot. 17–18. Several decisions addressed concrete injuries, not present here, to state interests. *See Kansas*, 249 F.3d at 1227–28 (territorial interests); *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) ("financial loss"). Other decisions addressed whether a defined state statute had been preempted by federal law. *See Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232–33 (6th Cir. 1985); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008); *see also Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1304 (1991) (Scalia, J., in chambers). As discussed, though, no similar potential invasion of a state legislative prerogative is implicated here. *See Lujan*, 504 U.S. at 566 ("Standing is not an ingenious academic exercise in the conceivable," but rather requires "a factual showing of perceptible harm." (citation omitted)).

For similar reasons, even if Ohio had Article III standing, its challenge to the Rescue Plan's funding condition would not be ripe. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies,' and "also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park*

*Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–149 (1967)).

Ohio's claimed harm here rests on the potential recoupment of some Rescue Plan funds from the State. *See* PI Mot. 13. But that contention only demonstrates that Ohio's suit "involves contingent, future events that may never occur." *Michigan v. Sault Ste. Marie Tribe of Chippewa Indians*, 737 F.3d 1075, 1082 (6th Cir. 2013) (reversing pre-enforcement preliminary injunction); *accord Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam). Congress has authorized the Treasury Department "to issue such regulations as may be necessary or appropriate to carry out this section." 42 U.S.C. § 802(f). Once the agency issues those regulations, Ohio would need to submit a certification that it plans to accept Rescue Plan funds, receive those funds from the Treasury Department, and enact changes in state tax laws that might implicate the offset provision. Even then, only if Ohio's net tax revenues fell, and only if Ohio decided to use Rescue Plan funds to offset that reduction, would recoupment even come into the picture. There must be some "concrete action applying [Treasury's] regulation to [Ohio's] situation in a fashion that harms or threatens to harm [it]" before prematurely adjudicating its challenge. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808. Particularly given the extraordinary nature of Ohio's request for a pre-enforcement preliminary injunction based on the purported unconstitutionality of a federal statute, it is especially critical to ensure that the jurisdictional prerequisites for this suit are satisfied.

## II.    OHIO IS NOT LIKELY TO SUCCEED ON THE MERITS.

On the merits, Ohio has not come close to demonstrating that Congress exceeded the bounds of its Spending Clause authority. The Constitution empowers Congress to raise and spend revenue to "provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Congress "may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an

agreement to the actions." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686–87 (1999); *NFIB*, 567 U.S. at 576; *Dole*, 483 U.S. at 207.

Congress's Spending Clause authority is subject to certain limitations. Congress use its spending power in pursuit of "the general welfare" and ensure that its "conditions on the receipt of federal funds" are related to the federal interest. *Dole*, 483 U.S. at 207 (1987). Conditions imposed under the Spending Clause also must not violate "other constitutional provisions" or be "coercive." *Id.* at 208, 211. Finally, Congress's "desire[] to condition the States' receipt of federal funds" must be unambiguous. *Id.* at 207.

In this case, Ohio contends that the offset provision is unduly coercive and unconstitutionally ambiguous and therefore is not a valid exercise of Congress's Spending Clause authority and violates the Tenth Amendment. *See Dole*, 483 U.S. at 207. As noted above, Ohio does not claim that any particular state enactment will lead to recoupment; Ohio instead challenges the condition as a facial matter. Ohio bears a significant burden to demonstrate that the offset provision is "unconstitutional in all its applications," and this Court should be "reluctan[t] to grant relief in the face of facial, as opposed to as-applied, attacks on statutes." *Warshak v. United States*, 532 F.3d 521, 529 (6th Cir. 2008) (en banc); *see also Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 450 (2008). And in evaluating the Act's facial constitutionality, "[d]ue respect for the decisions of a coordinate branch of Government demands that [courts] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). Here, Congress has validly exercised its Spending Clause authority, and Ohio's contentions have no merit.

## A. Congress Validly Exercised its Spending Clause Authority to Restrict the Use of Rescue Plan Funds.

The Rescue Plan is a lawful exercise of Congress's Spending Clause authority. Designed to assist in the Nation's economic recovery during and following a pandemic, the Rescue Plan appropriates nearly $200 billion in new federal funding for States and the

District of Columbia. 42 U.S.C. § 802(b)(2)(A), (c)(1). With that funding, States have considerable flexibility to "mitigate the fiscal effects" of the COVID-19 pandemic as they see fit within the broad parameters specified by Congress. *Id*. § 802(a)(1), (c)(1). Unsurprisingly, Congress sought to ensure that its substantial monetary outlay would be used as intended. To that end, it included a guardrail that prohibits States that choose to accept the federal money from using those funds to "directly or indirectly offset a reduction" in "net tax revenue" resulting from changes in state law. 42 U.S.C. § 802(c)(2)(A).

The offset provision is, by any measure, a modest restriction on an otherwise generous outlay of federal funds. By its plain terms, this restriction applies only when a State uses Rescue Plan funds to offset a reduction in "net" tax revenue. 42 U.S.C. § 802(c)(2)(A). That restriction is not implicated if reductions in some taxes are balanced with increases in others. A State also does not transgress the limitation if it does not "use" Rescue Plan funds to "offset" the reduction in net tax revenue. And the Act specifies that even if a State uses the new federal funds to offset a reduction in net tax revenue, the consequence is proportional to the misuse: the State will be required to repay only the portion of the federal money it used to offset the reduction in net tax revenue (not to exceed the amount of the federal grant). *Id*. § 802(e).

Congress has broad leeway in establishing permissible uses of federal funds. And Congress acted well within its Spending Clause authority in the Act by both describing broad categories of permissible uses and proscribing certain narrow uses. *See Sabri v. United States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures . . . is bound up with congressional authority to spend in the first place.").

Other Spending Clause legislation is illustrative: provisions that require States to maintain their existing fiscal efforts as a condition of receiving federal funds are an uncontroversial and familiar exercise of Congress's spending power. In *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985), for example, the Supreme Court explained that, "[i]n order to assure that federal funds would be used to support additional services

that would not otherwise be available," the regulations implementing Title I of the Elementary and Secondary Education Act of 1965 "from the outset prohibited the use of federal grants merely to replace state and local expenditures." *Id.* at 659. After receiving complaints that Title I funds were nonetheless being used to replace state and local funds that otherwise would have been spent for participating children, Congress amended Title I in 1970 to require that Title I funds be used "to supplement and, to the extent practical, increase the level of funds that would, in the absence of such federal funds, be made available from non-Federal sources for the education of pupils participating in programs and projects assisted under this subchapter," and "in no case, as to supplant such funds from non-Federal sources." *Id.* at 660 (quoting 20 U.S.C. § 241e(a)(3)(B) (1970)). Federal auditors later found that certain Kentucky programs had violated that provision, and the Secretary of Education required Kentucky to repay the federal funds that had been misused. *Id.* at 661. The Supreme Court upheld that determination, explaining that the State "gave certain assurances as a condition for receiving the federal funds, and if those assurances were not complied with, the Federal Government is entitled to recover amounts spent contrary to the terms of the grant agreement." *Id.* at 663, 673–74.

In accord with the Supreme Court's decision, courts of appeals have applied and upheld similar provisions in an array of Spending Clause statutes. For example, in *Mayhew v. Burwell*, 772 F.3d 80, 82 (1st Cir. 2014), the First Circuit upheld the Affordable Care Act's requirement that States accepting Medicaid funds maintain their state-level Medicaid eligibility standards for children for a specified period. The *Mayhew* court held that this requirement "is constitutional, fitting easily within congressional spending power to condition federal Medicaid grants." *Id.*; *see also, e.g., S.C. Dep't of Educ. v. Duncan*, 714 F.3d 249, 252 (4th Cir. 2013) (describing provision in the Individuals with Disabilities Education Act, which generally requires the Secretary to reduce a State's grant by the same

amount by which the State has failed to maintain spending for special education for children with disabilities); *Kansas v. United States*, 214 F.3d 1196, 1197 (10th Cir. 2000) (noting similar requirement in the Temporary Assistance to Needy Families program).

As these cases reflect, statutory provisions that limit federal funds from being used to displace state efforts are both common and undoubtedly within Congress's authority. In the cases discussed above, States were required to maintain a certain level of spending; the federal funds could not be used to displace existing State funding. Here, the Rescue Plan's offset provision is even less proscriptive: it does not mandate any particular spending or taxation level but instead merely prevents States from using federal funds to offset a reduction in net tax revenue. Although federal funding conditions are often specific to the particular state program at issue, Rescue Plan funding is not confined to any particular state program or activity—it broadly covers "government services" and "negative economic impacts," among other potential uses. 42 U.S.C. § 802(c)(1). Congress gave States the additional flexibility to determine which of the broadly defined permissible uses of the new funds are most appropriate to their circumstances. And consistent with that generous, four-year outlay of flexible funding, Congress simply sought the assurance that States would not displace their own tax revenue sources with the federal funds that Congress had appropriated for other purposes.

**B.      The Rescue Plan Is Not Coercive.**

Ohio does not dispute that Congress generally can prohibit States from using federal grants to fund state tax cuts, and it does not argue that it has a constitutional right to use federal funds to make up for a shortfall caused by a State's decision to decrease net revenues through tax cuts. It urges, however, that the Rescue Plan's restriction is "coercive" and an intrusion on its "sovereign authority." PI Mot. 13.

As an initial matter, the State's coercion argument reflects a misunderstanding of the offset provision. Ohio mistakenly assumes that the Rescue Plan requires a State receiving federal funds to freeze its existing tax laws in place and refrain from reducing any

16

taxes. The State incorrectly declares, for example, that under the statute, "the Secretary can make the States pay back federal funding *every time* they reduce taxes," because "*every* reduction in taxes, unless it can be shown to *generate* revenue, will violate" what Ohio dubs the "Tax Mandate." PI Mot. 13.

Ohio thus reads the word "net" out of the statute. Under the Act's plain terms, a State is free to impose taxes as it believes appropriate, with no effect on the amount of the federal grant, as long as the changes—taken together over the reporting period—do not result in a reduction to the State's net tax revenue. A State is also free to lower its net tax revenue, as long as it does not use the Rescue Plan funds to offset—pay for—that reduction. And even if it does that, the only consequence under the Act would be to lower the amount of its federal grant by the amount of the offset. The State is thus wrong to insist that "[i]n essence, States that abide by the Tax Mandate's terms are conducting their tax policy at the behest of the central government." PI Mot. 13–14.

In addition to reading the word "net" out of the statute, Ohio also ignores the words "use" and "offset." The term "use" connotes "volitional" "active employment" of federal funds. *Voisine v. United States*, 136 S. Ct. 2272, 2278–79 (2016). And the term "offset" means "[t]o balance" or "compensate for." *Offset*, Black's Law Dictionary (11th ed. 2019). Taken together, this language simply ensures that States are not employing federal funds to finance state tax cuts. *See Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 19 (1995) (describing "offset" as balancing out a specific loss with another specific gain). But States routinely offset reductions in net tax revenue by other means, including through certain spending cuts. Ohio may thus cut taxes and lower its net tax revenue, but it cannot use the federal funds to counterbalance those reductions.

Ohio nonetheless insists that the offset provision's phrase "directly or indirectly" means that all tax cuts would be considered as offset by federal funds, because "[m]oney is fungible." PI Mot. 1 (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 37 (2010)). But both "directly" and "indirectly" are "adjectives" that cannot "alter the meaning of

the word" that they modify (here, "offset"). *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 878 (2019). It remains the case that the statute restricts only the use of Rescue Plan funds to offset reductions in net tax revenue resulting from changes in state law, not every form of tax reduction. If Congress had sought to prohibit "*every* reduction in taxes," PI Mot. 13, it could have explicitly and concisely said so.

Ohio's coercion argument is also based on a fundamental misunderstanding of the governing law. Nothing in the Constitution or Spending Clause jurisprudence gives States the broad right to do whatever they want with federal funds. *See Sabri*, 541 U.S. at 608 ("The power to keep a watchful eye on expenditures . . . is bound up with congressional authority to spend in the first place."). The Supreme Court has made clear that "Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds." *NFIB*, 567 U.S. at 579; *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590–91 (1937) (holding that where Congress places conditions on the use of federal funds, "[i]n such circumstances, if in no others, inducement or persuasion does not go beyond the bounds of power"). And even when the Supreme Court has applied a coercion analysis, the inquiry has never extended to funding conditions that "safeguard [the U.S.] treasury" by "govern[ing] the use of the funds" that have been newly appropriated. *NFIB*, 567 U.S. at 578–80; *Dole*, 483 U.S. at 211; *Steward Mach.*, 301 U.S. at 590–91; *see also New York v. United States*, 505 U.S. 144, 171 (1992) (not undertaking a "coercion" inquiry where "Congress has placed conditions—the achievement of the milestones—on the receipt of federal funds"). Where, as here, Congress merely restricts how States use newly appropriated federal money, a coercion analysis is inapplicable. *See, e.g., Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 183–84 (5th Cir. 2020); *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 179 (D.C. Cir. 2015).

Ohio's heavy reliance on the Supreme Court's decision in *NFIB* is also misplaced. *See* PI Mot. 13. Unlike the statute challenged here, the Affordable Care Act provision at

issue in *NFIB* threatened States with the loss of all of their *preexisting* Medicaid funding unless they agreed to take part in the ACA's expansion of Medicaid coverage to a new adult population. In the controlling opinion for the Court, the Chief Justice recognized that Congress could "make adjustments to the Medicaid program as it developed"—including by altering the conditions on existing funds—but reasoned that the adult eligibility expansion "accomplishe[d] a shift in kind, not merely degree," because it conditioned the receipt of *old* and *new* funds on a State's agreement to establish a fundamentally different program. *NFIB*, 567 U.S. at 583.[2] The Chief Justice concluded that Congress had "crossed the line distinguishing encouragement from coercion" because of "the way it ha[d] structured the funding," and identified as a critical constitutional flaw that, "[i]nstead of simply refusing to grant the new funds to States that [would] not accept the new conditions, Congress ha[d] also threatened to withhold those States' existing Medicaid funds." *Id.* at 579–80 (citation omitted).

By contrast (as particularly relevant here), the Supreme Court made clear that Congress could make the entirety of the *new* federal funds provided by the ACA—totaling $100 billion per year, *see NFIB*, 567 U.S. at 576—contingent on a State's adoption of that *new* program, *id.* at 585. The Supreme Court emphasized that "[n]othing" in its opinion "preclude[d] Congress from offering funds under the Affordable Care Act to expand the availability of health care, and requiring that States accepting such funds comply with the conditions on their use." *Id.* The statute's primary constitutional flaw was the threat to cut off all *existing* Medicaid funding if a State did not agree to the Medicaid expansion. As the Court summarized, "Congress is not free" to "*penalize* States that choose not to

---

[2] Because Chief Justice Roberts, writing for a plurality, "struck down Medicaid expansion on narrower grounds than the joint dissent, the plurality opinion is binding." *Gruver*, 959 F.3d at 183; *Miss. Comm'n on Env't Quality*, 790 F.3d at 176 & n.22; *Mayhew*, 772 F.3d at 88–89; *see also Marks v. United States*, 430 U.S. 188, 193 (1977).

participate in that new program by taking away their *existing* Medicaid funding." *Id.* (emphases added).

The reasoning of *NFIB* forecloses Ohio's argument that the offset provision is coercive. The only funds regulated by the offset provision are the funds that Congress appropriated as part of the Rescue Plan itself. *See* 42 U.S.C. § 802(a)–(c). And unlike *NFIB*, States do not suffer any "penalty" to *preexisting* funds if they decline to accept Rescue Plan funds with their attendant conditions. The requirement in the Rescue Plan that States use funds for specified purposes and not for others (including to offset reductions in net tax revenue that result from changes in state law) is no more "coercive" than any restriction on the receipt of federal funds that the Supreme Court has held to be a valid exercise of Congress's Spending Clause authority. *See, e.g.*, *New York*, 505 U.S. at 171; *Dole*, 483 U.S. at 211; *Bennett*, 470 U.S. at 663; *Steward Mach.*, 301 U.S. at 590–91.

Indeed, the funding condition at issue here is significantly more modest than the prospective funding condition that *NFIB* indicated was permissible. A State's receipt of funds under the Rescue Plan is not an all-or-nothing proposition dependent on compliance with the offset provision. As explained above, the Act makes plain that if a state were to use Rescue Plan funds to offset a reduction in net tax revenue, it could lose no more than those funds used for the offset. *See* 42 U.S.C. § 802(e)(1).

Finally, Ohio's effort to characterize the offset provision as impermissible commandeering under the Tenth Amendment should also be rejected. PI Mot. 13–15. Ohio misstates Tenth Amendment principles when it argues that a grant condition that allows "Congress to control indirectly what it cannot control directly" is one that "violates the Tenth Amendment." PI Mot. 14. To the contrary, the Supreme Court has repeatedly affirmed that "Congress can use [its Spending Clause] power to implement federal policy it could not impose directly under its enumerated powers." 567 U.S. at 578; *Coll. Sav. Bank*, 527 U.S. at 686 (same); *Dole*, 483 U.S. at 207 (same).

20

The inquiry under both the Spending Clause and the Tenth Amendment is whether the challenged "provision is inconsistent with the federal structure of our Government established by the Constitution." *New York*, 505 U.S. at 177; *NFIB*, 567 U.S. at 578–79. Because nothing in the Act "force[s] the States to implement a federal program," *NFIB*, 567 U.S. at 578–79, Ohio's commandeering argument fails. In cases like this one — where "a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds" — the "state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer." *Id.* at 578; *New York*, 505 U.S. at 168 ("Where Congress encourages state regulation rather than compelling it . . . state officials remain accountable to the people."). If Ohio dislikes the funding condition, or any other provision of the Act, it is free to decline the generous federal aid in whole or in part — Ohio's voters know where to turn if they like, or dislike, the State's choice.

### C. The Rescue Plan Provides Clear Notice of the Funding Condition.

Ohio fares no better in urging that the offset provision is "unconstitutionally ambiguous." PI Mot. 16. In *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17, 24 (1981), the Supreme Court reviewed the provisions of a funding statute that were merely "hortatory, not mandatory," and held that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." But that is not an onerous requirement: Congress must provide only "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with" certain conditions. *Id.* at 25. The idea is simply to keep Congress from "surprising participating States with post-acceptance or retroactive conditions." *NFIB*, 567 U.S. at 584 (quoting *Pennhurst*, 451 U.S. at 25); *see City of Los Angeles v. Barr*, 929 F.3d 1163, 1174–75 (9th Cir. 2019).

The Supreme Court has also explained that, when Congress makes clear a State's acceptance of federal funds requires agreement to certain conditions, the details of those conditions can be set out in agency guidance or regulations that specify the parameters

of a condition on federal grants. For example, in *Bennett*—where, as discussed above, the Supreme Court upheld the requirement in Title I of the Elementary and Secondary Education Act—the Court observed that, "[g]iven the structure of the grant program, the Federal Government simply could not prospectively resolve every possible ambiguity concerning particular applications of the requirements of Title I." 470 U.S. at 669. The Court emphasized that "[t]he fact that Title I was an ongoing, cooperative program meant that grant recipients had an opportunity to seek clarification of the program requirements," *id.*, and that "if the State was uncertain" as to its obligations, "it could have sought clarification from the Office of Education," *id.* at 672, which was the agency component charged with administering the federal spending program.

Here, "a state official who is engaged in the process of deciding whether the State should accept [Rescue Plan] funds and the obligations that go with those funds" would "clearly understand that one of the obligations of the Act is the obligation" not to use Rescue Plan funds to offset a reduction in net tax revenue resulting from changes in state law. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The Act establishes conditions on the use of funds (§ 802(c)), requires States to certify that they will use the funds for the intended purposes and to report on the uses (§ 802(d)), and informs States that the potential consequence of non-compliance is the recoupment of no more than the portion of the funds used to offset a net tax revenue reduction (§ 802(e)). The Act further permits the Secretary to implement its provisions by regulation. *Id.* § 802(f).

There is no doubt that a state official deciding whether to accept Rescue Plan funds has clear notice that those funds are conditioned on the State's agreement not to use the funds to offset a reduction in net tax revenue resulting from changes in state law—and that implementation of the Rescue Plan will be set out through Treasury regulations. "Nothing more is required under *Pennhurst*, which held that Congress need provide no more than 'clear notice' to the [S]tates that funding is conditioned upon compliance with

certain standards." *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005) (citing *Pennhurst*, 451 U.S. at 25); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (noting that the Supreme Court has held "there was sufficient notice under *Pennhurst* where a statute made clear that some conditions were placed on the receipt of federal funds"); *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (same).

Ohio attempts to demonstrate ambiguity by posing hypothetical questions. PI Mot. 16. But "Congress is not required to list every factual instance in which a [S]tate will fail to comply with a condition," which would be potentially "impossible." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *see Bennett*, 470 U.S. at 666 (explaining that "every improper expenditure" need not be "specifically identified and proscribed" in the statute); *Jackson*, 544 U.S. 167 at 183 (same); *Davis*, 526 U.S. at 650 (same). Congress must simply "make the existence of the condition itself—in exchange for the receipt of federal funds—explicitly obvious." *Mayweathers*, 314 F.3d at 1067; *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (distinguishing situations where the statute is "unclear as to whether the [S]tates incurred any obligations at all by accepting federal funds"); *see Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) ("[T]he existence of the conditions [must be] clear, such that States have notice that compliance with the conditions is required." (citing *Mayweathers*, 314 F.3d at 1067 and *Pennhurst*, 451 U.S. at 24–25)); *Cutter*, 423 F.3d at 586. The offset provision easily clears that bar.

Even if the bar were higher, it would make no difference. The Rescue Plan provides in direct terms that States cannot use the federal funds to offset a reduction in net tax revenue resulting from changes in state law. *See* Section II.A–B, *supra*. As the Supreme Court has repeatedly confirmed, more particularized questions that arise in the course of implementing the Act can be addressed by Treasury Department regulations, *see* 42 U.S.C. § 802(f), and by other formal or informal guidance.

### III.  THE BALANCE OF HARMS AND THE PUBLIC INTEREST PRECLUDE A PRELIMINARY INJUNCTION.

**1.**  "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Ohio is not entitled to this "extraordinary remedy" because it cannot establish that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Id.* at 20; *see D.T.*, 942 F.3d at 327 ("[T]he existence of an irreparable injury is mandatory."). Ohio's burden to show irreparable harm is higher than what is required to establish standing. *See, e.g., Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Even if Ohio were able to establish standing, it fails to establish irreparable harm. Ohio cites no imminent plan to cut taxes at all, let alone to reduce net tax revenue or use Rescue Plan funds to offset that reduction. And Ohio has conceded that "it's not as though there's an impending date by which [a ruling is] absolutely critical." Tr. of Prelim. Pretrial Conf. 4, Mar. 26, 2021, ECF No. 15; *see Maleeah v. Brown*, 2019 WL 570762, at *1 (S.D. Ga. Feb. 12, 2019) (denying preliminary-injunction motion where plaintiff conceded on the record that he "is not in imminent harm"). At the very least, the circumstances do not "clearly demand" relief. *Overstreet*, 305 F.3d at 573.

Importantly, "[a]n injunction against [even] threatened legal action will not issue if the party will have an adequate opportunity to fully present his defenses and objections in the legal action he seeks to enjoin." *Travis*, 399 F.2d at 729. Even if Ohio were to accept the conditioned Rescue Plan funding and nonetheless use those funds to offset a reduction in net tax revenue (potentially facing recoupment by the Secretary), the State would have "an adequate opportunity to fully present [its] defenses and objections" in any recoupment proceeding. *Id.* Because a court's "[e]quity jurisdiction is founded on the proposition that the complaining party does not have an adequate and complete remedy at law," a plaintiff "is not entitled to the extraordinary remedy of injunction" when another remedy is available. *Id.* Here, Ohio seeks to preemptively enjoin any recoupment premised on the offset provision, *see* PI Mot. 1–2, but that "legal action that [the State] seeks to

enjoin" is where the State should make its arguments, *Travis*, 399 F.2d at 729. With potential recoupment nowhere in sight, Ohio's challenge is "premature" and no injunction should issue. *Id.*

Despite all this, Ohio argues that the offset provision inflicts irreparable injury "[b]ecause [it] causes precisely the same harm that occurs every time the federal government intrudes upon the 'sovereign interests' of the States." PI Mot. 17 (quoting *Kansas*, 249 F.3d at 1227).[3] As discussed above, however, there is no intrusion on state sovereign interests here.

Ohio argues that "[c]ourts presume irreparable harm in cases involving constitutional violations," PI Mot. 17, but Ohio has not established any constitutional violation, *see* Section II, *supra*. In any event, as illustrated by the decisions Ohio cites, the Sixth Circuit has invoked that principle only for certain types of constitutional violations involving harms that are inherently difficult to quantify or to compensate with money, usually arising in the First Amendment context. *See Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (concluding that "[t]he prohibition on attending any worship service through May 20 assuredly inflicts irreparable harm by prohibiting them from worshiping how they wish"); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (invalidating a limitation on in-person early voting imposed on all non-military Ohio voters); *ACLU of Ky. v. McCreary Cnty.*, 354 F.3d 438 (6th Cir. 2003) (concluding that the plaintiffs were likely to succeed on claim that courthouse and classroom posting of Ten Commandments lacked secular purpose). Here, Ohio is concerned that it might someday need to repay money it receives under the Act. Such future harm would categorically fail to qualify as irreparable because it can be cured by the restoration of any improperly recouped funds if any

---

[3] The "sovereign interest" in the cited case concerned "placing the sovereign status of land within the State of Kansas wholly in the hands of the Miami Tribe and [National Indian Gaming commission]." *Kansas*, 249 F.3d at 1223. No similar sovereign interest is at issue here.

"injury" ever materializes. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). Indeed, courts have routinely characterized the potential loss of money as a quintessential example of harm that is not irreparable. *See, e.g., Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Ohio also contends that the Rescue Plan's funding condition "causes irreparable harm in a second way." PI Mot. 18. The State argues that, "by subjecting Ohio to unknown penalties if it reduces taxes, the Mandate causes 'an interference with the State's orderly management of its fiscal affairs.'" *Id.* (quoting *Barnes*, 501 U.S. at 1304 (Scalia, J., in chambers)).[4] This argument likewise fails. Ohio has not alleged that it will lower taxes at all, let alone imminently, and the State faces no "unknown penalties" if it does decide to cut taxes. The State can alter its taxes as it deems appropriate, with no effect on the amount of its grant, if it does not offset a reduction of net tax revenue with Rescue Plan funds. And if Ohio chooses to use Rescue Plan funds to offset such a reduction, the only consequence under the Act is that the State's grant would be affected only up to the amount of the offset. *See* 42 U.S.C. § 802(e).

**2.** Ohio is on no firmer ground in urging that an injunction against enforcement of the offset provision "will not harm anyone," on the theory that "[e]njoining that provision will not keep the United States from distributing the funds, nor will it interfere with any entity's expenditure of the funds." PI Mot. 18. In other words, Ohio simultaneously asserts that an intrusion on its own sovereign interests (if it existed) would constitute irreparable injury, but that enjoining an Act of Congress would not constitute irreparable injury to the federal government.

---

[4] In *Barnes*, Justice Scalia stayed an order that enjoined enforcement of the Texas Administrative Services Tax Act and directed the State to issue refunds. Ohio identifies no immediate monetary benefit that would result from enjoining the condition on the receipt of federal funds.

The Supreme Court takes a different view. "The presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of [the government] in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers). "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *King*, 567 U.S. at 1303 (Roberts, C.J., in chambers). Thus, an injunction would irreparably harm the United States and undermine the public interest. That is only more evident here, where the legislation at issue is a direct response to a national economic and health emergency of historic proportions.

## IV.   ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO OHIO.

If this Court were to enjoin any aspect of the Rescue Plan (and the Court should not), that injunction should apply only to Ohio. "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). Thus, the "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). And principles of equity independently require that injunctions be no broader than "necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Here, Ohio concedes that this Court may limit the scope of relief to only enjoin the offset provision's "application to Ohio." PI Mot. 2. Indeed, Ohio has no serious interest in whether other States are subject to the offset provision during the pendency of this lawsuit, and the State would be fully redressed through a preliminary injunction prohibiting the Treasury Department from "enforcing" the Rescue Plan against only Ohio.

## CONCLUSION

For the reasons explained above, Ohio's preliminary-injunction motion should be denied.

DATED: April 16, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

/s/ Stephen Ehrlich
STEPHEN EHRLICH
CHARLES E.T. ROBERTS
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

Counsel for Defendants

28