# IN THE UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| *Plaintiff,* | : | |
| v. | : | Case No. 1:21-cv-181-DRC |
| | : | |
| JANET YELLEN, in her official | : | District Judge Douglas R. Cole |
| capacity as Secretary of the | : | |
| Treasury; RICHARD K. DELMAR, | : | |
| in his official capacity as acting | : | |
| inspector general of the Department | : | |
| of Treasury; and U.S. | : | |
| DEPARTMENT OF THE | : | |
| TREASURY, | : | |
| *Defendants.* | : | |

---

## REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

---

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS............................................................................... i

TABLE OF AUTHORITIES ........................................................................ ii

I.    The Tax Mandate is unconstitutional............................................. 1

    A.    The Tax Mandate exceeds Congress's Spending Clause authority......... 5

    B.    The Tax Mandate violates the Tenth Amendment. ............................. 12

II.    Ohio has standing and the case is ripe for review. ................................... 14

III.    Ohio is entitled to an injunction. ................................................. 19

CERTIFICATE OF SERVICE ..................................................................... 22

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Aid for Women v. Foulston,*
   441 F.3d 1101 (10th Cir. 2006) ................................................................. 17

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
   576 U.S. 787 (2015) .................................................................... 15, 18

*Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy,*
   548 U.S. 291 (2006) .......................................................................... 5

*Babbitt v. UFW Nat'l Union,*
   442 U.S. 289 (1979) ......................................................................... 17

*Bennett v. Kentucky Department of Education,*
   470 U.S. 657 (1985) .......................................................................... 7

*Benning v. Georgia,*
   391 F.3d 1299 (11th Cir. 2004) .............................................................. 6

*City & Cnty. of S.F. v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) ............................................................... 15

*City of Los Angeles v. Barr,*
   929 F.3d 1163 (9th Cir. 2019) ................................................................ 6

*Clinton v. City of N.Y.,*
   524 U.S. 417 (1998) ......................................................................... 15

*Coyle v. Smith,*
   221 U.S. 559 (1911) ......................................................................... 13

*Daunt v. Benson,*
   956 F.3d 396 (6th Cir. 2020) ................................................................ 15

*Davis v. Monroe Cnty. Bd. of Ed.,*
   526 U.S. 629 (1999) .......................................................................... 6

*Dep't of Comm. v. New York,*
   139 S. Ct. 2551 (2019) ...................................................................... 15

*Detroit v. Sec'y of Comm.,*
   4 F.3d 1367 (6th Cir. 1993) ................................................................. 15

ii

*Dows v. Chicago,*
    78 U.S. (11 Wall.) 108 (1871) ................................................................ 20

*Free Enter. Fund v. PCAOB,*
    561 U.S. 477 (2010) ............................................................................ 1

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ............................................................ 20

*Gruver v. La. Bd. of Supervisors for the La. State Univ. Agric. & Mech.*
    *Coll.,*
    959 F.3d 178 (5th Cir. 2020) ............................................................... 9

*Haight v. Thompson,*
    763 F.3d 554 (6th Cir. 2014) ........................................................ 5, 6

*Hill v. Snyder,*
    878 F.3d 193 (6th Cir. 2017) ...................................................... 18, 19

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ............................................................................ 2

*Kenny v. Wilson,*
    885 F.3d 280 (4th Cir. 2018) ............................................................ 17

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich.*
    *Gaming Control Bd.,*
    172 F.3d 397 (6th Cir. 1999) ............................................................ 15

*Libertarian Party of Ohio v. Wilhem,*
    988 F.3d 274 (6th Cir. 2021) ............................................................ 15

*Marbury v. Madison,*
    1 Cranch 137 (1803) ....................................................................... 6

*Maryland v. King,*
    567 U.S. 1301 (2012) ...................................................................... 20

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ........................................................................ 16

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) .................................................................. 17, 18

*Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.,*
    725 F.3d 571 (6th Cir. 2013) ............................................................ 16

iii

*Michigan v. EPA*,
   576 U.S. 743 (2015) ............................................................... 6

*Murphy v. NCAA*,
   138 S. Ct. 1461 (2018) ........................................................... 9

*Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB")*,
   567 U.S. 519 (2012) .......................................................*passim*

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of
   Jacksonville*,
   508 U.S. 656 (1993) .............................................................. 14

*New York v. United States*,
   505 U.S. 144 (1992) .............................................................. 13

*Roberts v. Neace*,
   958 F.3d 409 (6th Cir. 2020) ................................................ 19

*Sch. Dist. of City of Pontiac v. Sec'y of the U.S. Dep't of Educ.*,
   584 F.3d 253 (6th Cir. 2009) (*en banc*) ............................... 15

*Schooner Exch. v. McFaddon*,
   7 Cranch 116 (1812) ............................................................. 12

*Setser v. United States*,
   566 U.S. 231 (2012) ............................................................... 4

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ................................................. 5, 6, 12, 14

*Spokeo v. Robins*,
   136 S. Ct. 1540 (2016) .......................................................... 14

*Thomas v. Union Carbide Agric. Prods. Co.*,
   473 U.S. 568 (1985) .............................................................. 19

*United States v. Mitra*,
   405 F.3d 492 (7th Cir. 2005) ................................................. 4

*Voisine v. United States*,
   136 S. Ct. 2272 (2016) ........................................................... 5

## Statutes, Rules, and Constitutional Provisions

Ohio Const., art. II, §2 ................................................................ 20

American Rescue Plan Act of 2021, Pub. L. No. 117-2, §9901 ...................................... 1

Fed. R. Civ. P. 15 ................................................................................................. 18

R.C. §5733.41 ....................................................................................................... 16

R.C. §5747.41 ....................................................................................................... 16

R.C. §5747.065 ..................................................................................................... 16

H.B. 262, 134th Gen. Assemb. (Ohio) .................................................................. 17

Substitute H.B. 110, 134th Gen. Assemb. (Ohio) ................................................. 16

Substitute S.B. 18, 134th Gen. Assemb. (Ohio, enrolled March 31, 2021)......................................................................................................................... 16

**Other Authorities**

Anthony J. Bellia, Jr. & Bradford R. Clark, *The International Law Origins of American Federalism*, 120 Colum. L. Rev. 835 (2020) ....................... 12

The Federalist No. 32 (Hamilton, A.) (Cooke, ed., 1961) ........................................ 13

Hearing on CARES Act Quarterly Report, Sen. Banking, Hous. & Urb. Affairs Comm. (Mar. 24, 2021).............................................................................. 3

Laura Davison, *Treasury Clears States to Cut Taxes—But Not With Stimulus*, Bloomberg (Mar. 18, 2021).................................................................... 2

Letter from Secretary Yellen to State Attorneys General (Mar. 23, 2021).................................................................................................................... 2

Millions of Americans—Ohioans included—are suffering from the economic effects of COVID-19. Some lost their jobs. Others lost, or may soon lose, businesses they spent years building. Congress responded by passing a relief bill that grants States almost $200 *billion*—money the States can use to shore up their budgets and to help their citizens in need. But the money comes with a catch. The "Tax Mandate" says that States, by accepting this funding, agree to ambiguous limits on their sovereign power to tax. States that violate those limits are penalized.

The Tax Mandate is unconstitutional. This brief shows why, establishes Ohio's Article III standing (which is easier to understand in light of the merits), and demonstrates why the Mandate must be enjoined.

## I. The Tax Mandate is unconstitutional.

Congress often tests the limits of its constitutional authority. Thus, when a law lacks "historical precedent," that is a "telling indication of [a] severe constitutional problem." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010) (quotation omitted). The Tax Mandate lacks historical precedent: Congress, as far as Ohio can tell, has never before used the Spending Clause to dictate state tax policy. That *suggests* unconstitutionality. But to know for sure, one must analyze the Mandate doctrinally, which requires first figuring out what the Mandate means. Here is the text:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

American Rescue Plan Act of 2021, Pub. L. No. 117-2, §9901.

1

Every tax cut, unless it increases tax revenue (by spurring growth, for example), causes "a reduction" in "net tax revenue" relative to a world without the tax cut. And because "[m]oney is fungible," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 37 (2010), every reduction in tax revenue is "indirectly offset" by revenue acquired elsewhere. So the Mandate could be read as forbidding States that take Rescue Plan funds from enacting *any* revenue-negative tax reductions.

Apparently recognizing that the Mandate is unconstitutional if it sweeps so broadly, the Secretary has been trying since the Mandate's enactment to offer narrowing constructions. All to no avail. In mid-March, a Treasury spokesperson told Bloomberg News that the Mandate penalizes only revenue reductions that States pay for using federal funds. Laura Davison, *Treasury Clears States to Cut Taxes—But Not With Stimulus*, Bloomberg (Mar. 18, 2021), https://tinyurl.com/NoClarity. But what does that mean "in a world where money is fungible and tax cuts are not 'paid for'" in an easily traceable way? Br. of *Amicus* Chamber of Commerce, *et al.* ("Chamber Br.") at 18. The Secretary herself tried to clarify, writing to State Attorneys General that the Mandate "simply provides that funding received under the Act may not be used to offset a reduction in net tax revenue resulting from certain changes in State law." Letter from Secretary Yellen to State Attorneys General (Mar. 23, 2021), https://perma.cc/ZZX9-T4FN. But adding the word "simply" before paraphrasing the Mandate's ambiguous terms clarified nothing. Nor did the Secretary's appearance in Congress. She said, when asked what the Mandate prohibits: that is a "thorny question[] to work through," and "given the fungibility of money it's a hard question to

answer." Hearing on CARES Act Quarterly Report, Sen. Banking, Hous. & Urb. Affairs Comm. at 1:10:00–1:13:36 (Mar. 24, 2021), https://tinyurl.com/thornyQs.

Indeed it is, which is perhaps why the Secretary's brief does not try to answer it. The Secretary makes many unpersuasive assertions about what the Tax Mandate *does not* mean. But she never says, even in general terms, what it *does* mean.

For example, the Secretary says that, under "the Act's plain terms, a State is free" to change its tax laws "as it believes appropriate, with no effect on the amount of the federal grant, as long as the changes—taken together over the reporting period—do not result in a reduction to the State's net tax revenue." Resp.17. That is a convoluted way of saying nothing new. First, it offers no insight as to the difference between "directly" and "indirectly" offsetting expenditure, which is the main source of ambiguity. If a world-class economist like Secretary Yellen cannot explain what an indirect offset is, that proves the phrase is hopelessly ambiguous. Moreover, what constitutes a "reduction to the State's net tax revenue"? Does one determine this by asking whether the tax cut reduces revenue relative to a world with no tax cut? Or does one compare net tax revenue from one period to the net tax revenue from a previous period? If the latter, how does one know whether the change in tax law (as opposed to some other factor) caused the reduction? Does it matter whether tax revenue would have been even lower without the tax cut? The Mandate provides no clue.

The Secretary addresses the ambiguity surrounding "indirectly" by reading the word out of the statute. It is only an "adjective" that modifies a "noun," she says, so it carries no independent meaning. Resp.17–18. No interpretive principle says that

adjectives modifying nouns lack meaning. (Regardless, "indirectly" is an adverb that modifies a verb: "to … offset.") There is, however, an "interpretive rule" requiring courts to "give effect … to every clause and word" in a statute. *Setser v. United States*, 566 U.S. 231, 239 (2012) (quotation omitted). So "indirectly" must mean something.

The Secretary next suggests a narrowing construction that manages to solve nothing while also increasing the Mandate's ambiguity. The argument homes in on the word "use" in the Mandate's command not to "use the funds … to either directly or indirectly offset a reduction in the net tax revenue." This word, the Secretary says, "connotes 'volitional' 'active employment' of federal funds." Resp.17 (quoting *Voisine v. United States*, 136 S. Ct. 2272, 2278–79 (2016)). Therefore, she suggests, States violate the Mandate only when they *intend* their funds to offset revenue decreases.

This narrowing construction suffers from three fatal flaws. *First*, it provides no clarity about the meaning of "indirectly offset." *Second*, the narrowing interpretation actually introduces *more* ambiguity: because legislators know that new funding in some sense "offsets" all revenue lost, there is no coherent distinction (or test for distinguishing) between volitional and non-volitional indirect offsets. The incoherence is especially inescapable given the impracticality of deciphering what a multi-member legislature "intended" its law to do. *See United States v. Mitra*, 405 F.3d 492, 495 (7th Cir. 2005). *Finally*, "use" does not imply what the Secretary supposes. English speakers know what "use" means when coupled with "indirectly." If your (overly formal) neighbor says: "You may use my garden hose, but take care not to directly or indirectly flood my basement," he is saying not to put the hose in the

4

basement and flood it (a direct flooding) or to use it in such a way that the basement ends up flooded (an indirect flooding). The neighbor's meaning is clear because the word "use," while it "conveys the idea that the thing used … has been made the user's instrument," *does not* require that the user intend his use to bring about a particular outcome. *Voisine*, 136 S. Ct. at 2279 (quotation omitted). States "use" funds—they actively employ funds—when they spend or deposit them. Some uses "directly" offset revenue loses; others do so "indirectly"; others offset nothing. Neither the Mandate nor the Secretary provides any clue as to which uses fall into which categories.

The Secretary's brief ends without offering any plausible interpretation of the Tax Mandate. All we know for sure is that the Mandate requires States not to reduce taxes in some (undefined) circumstances. This ambiguous commandeering of state tax policy violates both the Spending Clause and the Tenth Amendment.

**A.    The Tax Mandate exceeds Congress's Spending Clause authority.**

*1. Ambiguity.*  Ambiguous Spending Clause conditions are unconstitutional. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). And the only thing clear from the Secretary's futile attempts at clarifying the Mandate is its terminal ambiguity.

The Secretary responds that, in Spending Clause legislation, the *conditions themselves* need not be clear, as long as the legislation clearly imposes conditions. Resp.22–23. But Supreme Court and Sixth Circuit precedents say otherwise. *See Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 300–01 (2006); *Haight v. Thompson*, 763 F.3d 554, 569 (6th Cir. 2014) (per Sutton, J.). The Secretary herself cites cases confirming that "conditions imposed by Congress must be unambiguous."

*Benning v. Georgia*, 391 F.3d 1299, 1305 (11th Cir. 2004) (cited at Resp.23).  True, Congress need not specifically identify every permissible and impermissible act.  *See Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 650 (1999).  But the conditions in Spending Clause legislation must be certain enough to give the States "clear notice" of what they are agreeing to.  *Benning*, 391 F.3d at 1306; *Haight*, 763 F.3d 569–70; *see also* Br. of *Amicus* The Buckeye Inst.7–8.

The Secretary continues:  even if the Mandate is ambiguous on its own, forth-coming "agency guidance or regulations" specifying "the parameters of" the Mandate may cure any ambiguity.  Resp.21–22.  No such regulations exist today, however.  And since the Secretary has yet to advance any interpretation (let alone a plausible one) of the Mandate, it is hard to take seriously her claims of forthcoming clarity; any clarifying regulations will entail a rewriting, not an interpretation, of the Tax Man-date.  (Implausible agency interpretations, even on topics about which agencies are authorized to regulate, are invalid.  *See Michigan v. EPA*, 576 U.S. 743, 751 (2015).)

Regardless, agencies may not cure, with a clarifying regulation, the unconsti-tutional ambiguity of a statutory condition.  This follows from our Constitution's structure.  Congress can enact laws *only* pursuant to its enumerated powers.  While the Spending Clause empowers Congress to put conditions on federal funding, Con-gress lacks any power to impose *ambiguous* conditions.  *Dole*, 483 U.S. at 207.  Thus, ambiguous statutory conditions in Spending Clause legislation are "repugnant to the constitution" and "void."  *Marbury v. Madison*, 1 Cranch 137, 177 (1803).  Whatever power agencies have to place *their own* conditions on funding, *cf. City of Los Angeles*

*v. Barr*, 929 F.3d 1163, 1175 n.6 (9th Cir. 2019), they have no power to resuscitate *statutory* conditions that Congress exceeded its authority by enacting.  This additionally follows from the purpose of the unambiguous-condition requirement:  protecting States from being surprised "with post-acceptance or retroactive conditions."  *Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB")*, 567 U.S. 519, 584 (2012) (op. of Roberts, C.J.) (quotation omitted).  Statutory conditions are prospectively binding.  But agencies can change their interpretations.  Given the latitude that agencies would have to reinterpret unconstitutionally ambiguous statutes, allowing them to "clarify" statutes in this way would expose the States to a serious risk of post-acceptance surprises.

The Secretary finds no case giving agencies the power to resuscitate unconstitutionally ambiguous statutory conditions.  That includes *Bennett v. Kentucky Department of Education*, 470 U.S. 657 (1985).  *Bennett* never considered whether an agency could cure impermissible ambiguity in a statutory condition.  It did not have to; in that case, *the statute itself* provided the "requisite clarity."  *Id*. at 666.  *Bennett* did say that, because the statutory program before it was an "ongoing, cooperative program," the State would be free to "seek clarification of the program requirements" from the federal government.  *Id*. at 669.  But that quote is an aside during the Court's consideration of a different question:  whether to apply the *contra proferentem* principle when interpreting the conditions at issue.  *Id*.  *Bennett* did not hold that the option to "seek clarification" from an agency cures an ambiguity problem.

*2. Coercion.*  Although "Congress may use its spending power to create incentives for States to act in accordance with federal policies," it may not use "financial

7

inducements to exert a 'power akin to undue influence.'" *NFIB*, 567 U.S. at 577 (op. of Roberts, C.J.). Congress crosses the line separating permissible encouragement from impermissible dragooning when its inducements "leave[] the States with no real option but to acquiesce" to Congress's instructions. *Id.* at 582 (op. of Roberts, C.J.). The Tax Mandate runs afoul of these principles. Ohio stands to receive $5.5 billion. In the pandemic-caused economic crisis, Ohio cannot realistically turn that down. The $5.5 billion can go a long way toward supporting the many Ohioans and Ohio businesses that have endured untold economic hardship. It can also go a long way toward shoring up state budgets and debts—budgets and debts that, if Ohio declines the funding, Ohioans will have to cover by themselves. Ohioans' taxes are helping fund the Rescue Plan; they rightly demand their fair share of the benefits. And if Ohio refuses to accept the funds to which Ohioans have contributed their fair share, it will put both the State and its citizens at a competitive disadvantage on the road to economic recovery. In these circumstances, Ohio has no choice but to accept.

The Secretary contends that the Mandate is *per se* non-coercive. "'Congress may attach appropriate conditions to federal taxing and spending programs to conserve its control over the use of federal funds.'" Resp.18 (quoting *NFIB*, 567 U.S. at 579 (op. of Roberts, C.J.)). From this, the Secretary infers that the "coercion analysis is inapplicable" when "Congress merely restricts how States use newly appropriated federal money." *Id.* And that, she says, is all the Tax Mandate does.

Even if laws that "merely restrict[] how States use newly appropriated federal money" are *per se* non-coercive, *id.*—a proposition the State disputes—the Tax

Mandate is not that kind of law. The Secretary concedes that the coercion test applies to "conditions" in Spending Clause legislation "that do not directly 'govern the use of the funds,'" but rather "attempt to 'pressure the States to accept policy changes.'" *Gruver v. La. Bd. of Supervisors for the La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 183 (5th Cir. 2020) (alteration adopted) (quoting *NFIB*, 567 U.S. at 580 (op. of Roberts, C.J.)). That is precisely what the Mandate does. It requires the States to accept limits on the use of *their own* funds; the Mandate penalizes, for example, tax rebates and credits. The Mandate's conditions also pressure the States into taking a particular approach toward *their citizens*' money: if States decide to take less of their citizens' money by cutting taxes, they can be penalized. So the Mandate cannot be fairly described as "merely" restricting the use of federal money as part of some federal program. Resp.18. Instead, the Mandate attempts to pressure the States into adopting particular tax policies of their own. The law is therefore subject to the coercion analysis. *Gruver*, 959 F.3d at 183; *NFIB*, 567 U.S. at 580 (op. of Roberts, C.J.).

True, the Tax Mandate is phrased to *look like* a regulation of the manner in which federal funds may be spent. But it is not. The coercion test indisputably applies to Spending Clause laws that "pressur[e] the States to accept policy changes." *Id.* at 580 (op. of Roberts, C.J.). And the Tax Mandate does just that. Given the fungibility of money, the Mandate's penalization of indirect offsets attempts to pressure the States into adopting a particular tax policy. As *NFIB* recognized, Congress cannot evade the limits on its authority, including its Spending Clause authority, with artful drafting. 567 U.S. at 582 (op. of Roberts, C.J.); *see also Murphy v. NCAA*,

9

138 S. Ct. 1461, 1478 (2018).  Holding otherwise would transform the Spending Clause from a limit on Congress's power into a limit on its word choice.  To illustrate, imagine two laws.  The first gives States $1 billion that they can use to fund science teachers in schools, as long as the States agree not to provide funding for armed school-safety officers.  The second gives States $1 billion for the same purpose, as long as they agree not to use that money in a way that "indirectly offsets" expenditure on armed school-safety officers.  The laws are functionally identical.  Because the coercion test would apply to the first law, it must apply to the second law also.  Similarly here, Congress cannot evade the coercion analysis by phrasing its attempt at dictating state tax policy as a mere condition on the expenditure of federal funds.

The Secretary additionally argues that the Mandate is non-coercive because the "States do not suffer any 'penalty' to *preexisting* funds if they decline to accept Rescue Plan funds with their attendant conditions."  Resp.20.  That is a *non sequitur*, since "coercion" does not entail the deprivation of a preexisting privilege.  That is true in everyday life:  a threat not to administer lifesaving medicine is just as coercive as a threat to steal lifesaving medicine someone already has.  And it is true in Spending Clause legislation too, as this case shows.  When Congress, in the middle of an unprecedented economic downturn, offers to give the States *billions* of dollars that the States and their citizens badly need, the States have no real choice but to accept the funding and the conditions that come with it.  The money at stake is comparable in size to the offer found coercive in *NFIB*.  *Compare NFIB*, 567 U.S. at 541–42 (op. of Roberts, C.J.), *with* Compl. ¶¶25–35; *accord* Chamber Br.11–12.  While the

10

threatened withholding in *NFIB* included funds to which the States were entitled in previous years, *NFIB*'s coercion principle is not limited to such cases. The Chief Justice expressly declined to "'fix the outermost line' where persuasion gives way to coercion.'" 567 U.S. at 585 (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 591 (1937)). The question is simply whether Congress has used its Spending Clause power to "conscript state agencies into the national bureaucratic army." *Id.* at 585 (alteration adopted and quotation omitted). When Congress conscripts States with threats to withhold funds—newly available or not—it violates the Spending Clause.

Finally, the Court can make short shrift of the suggestion that the Mandate is non-coercive because it requires States to pay back only the amount of funds used in violation of the Mandate. Resp.20. The size of the penalty is relevant to deciding *what burdens* the State was coerced into accepting, not *whether* the State was coerced in the first place. Only the latter issue is relevant. As the Chief Justice explained in *NFIB*: "the size of the new financial burden imposed on a State is irrelevant in analyzing whether the State has been coerced into accepting that burden. 'Your money or your life' is a coercive proposition, whether you have a single dollar in your pocket or $500." 567 U.S. at 582 n.12. Thus, even if the State were forced to pay a mere $1.00 fine for every violation, coercing it into accepting that limit on its sovereign authority would be unconstitutional. If anything, the fact that the penalties for non-compliance are not as draconian as they could be makes it even harder for a State to reject the funds, and thus makes the law *more* coercive. In any event, the Mandate's penalties are potentially exorbitant. Indeed, they amount to a double-penalty: after

11

losing revenue from a tax reduction, the State will lose an equal amount through recoupment. And even if the penalty were small in monetary terms, every such penalty would constitute a serious intrusion into the States' constitutionally reserved powers. That is a serious affront to the States' sovereignty, and we turn to it now.

## B. The Tax Mandate violates the Tenth Amendment.

Spending Clause conditions must be "appropriate," and unconstitutional conditions are not. *NFIB*, 567 U.S. at 579 (op. of Roberts, C.J.); *accord Dole*, 483 U.S. at 208. The Tax Mandate is inappropriate: Congress lacked the power to enact it, and so the law violates the Tenth Amendment.

The Mandate unconstitutionally commandeers state taxing authority by coercing States into agreeing to be penalized if they fail to implement tax policy according to Congress's instructions. *See* PI Mot.13–15. And the Tax Mandate additionally violates the Tenth Amendment by interfering with an issue—state taxation—at the core of state sovereignty. When the States joined the Union, they retained the traditional features of sovereignty except to the extent they surrendered those features in the Constitution itself. The Framers made that much clear by "employing the term 'States'"—not "colonies" or "territories" or some other word less bound up with sovereignty—in the Constitution. Anthony J. Bellia, Jr. & Bradford R. Clark, *The International Law Origins of American Federalism*, 120 Colum. L. Rev. 835, 935 (2020); *see also Schooner Exch. v. McFaddon*, 7 Cranch 116, 137 (1812). And some matters are so indispensable to a sovereign state that the federal government exceeds its power by regulating them. *See* Chamber Br.8. For example, Congress lacks the

12

power to regulate the location of a State's capital. *Coyle v. Smith*, 221 U.S. 559, 565 (1911). If this case were about a Capital Mandate—if the Mandate prohibited using the funds "to directly or indirectly offset the costs of hosting the seat of government in a location other than the State's largest city"—its constitutionality "would not be for a moment entertained," *id.*

The sovereign power to tax, however, is just as central to the concept of sovereignty as the power to locate a capital. The founding generation understood that "individual States should possess an independent *and uncontrolable* authority to raise their own revenues for the supply of their own wants." The Federalist No. 32, p.199 (Hamilton, A.) (Cooke, ed., 1961) (emphasis added). And they understood that, "with the sole exception of duties on imports and exports," the States would "retain that authority in the most absolute and unqualified sense; and that an attempt on the part of the national Government to abridge them in the exercise of it would be a violent assumption of power unwarranted by any article or clause of its Constitution." *Id.* So, except in those few areas where the Constitution itself says otherwise, the federal government lacks any authority to regulate state tax policy. State taxing decisions are so central to state sovereignty that Congress's attempts at pressuring States into taxing their citizens—even through Spending Clause conditions—are "inconsistent with the federal structure of our Government established by the Constitution." *New York v. United States*, 505 U.S. 144, 177 (1992).

Indeed, the Tax Mandate is, on its face, *designed* to usurp the States' sovereign authority. Taxes and subsidies are flip sides of the same coin: what a State can do

13

with one it can do with the other. Yet the Tax Mandate, while it forbids States from reducing taxes, places no limits at all on their power to accomplish the same things with subsidies. So while the Mandate would penalize Ohio for giving a $500 tax break to everyone who pays at least $1,000 in taxes, it leaves the State free to give a $500 subsidy to the very same people. The only explanation for allowing one but not the other is a desire to commandeer state *taxing* authority alone: Congress is not concerned with safeguarding federal funds, but rather with pressuring States to adopt a particular philosophy regarding the issue of taxation. A condition that serves no purpose except to commandeer state taxing power intrudes on matters reserved to the States, violating the Tenth Amendment. In fact, this gives rise to an additional Spending Clause problem. "[C]onditions on federal grants" are unconstitutional if they are "unrelated to the federal interest" the program is designed to promote. *Dole*, 483 U.S. at 207 (quotation omitted). Since the Tax Mandate's conditions serve *only* to regulate state tax policy, they lack any proper connection to a valid federal interest.

## II. Ohio has standing and the case is ripe for review.

*A. Standing.* Plaintiffs have Article III standing if they suffer an injury in fact, fairly traceable to the defendant's conduct, that is likely to be redressed by a favorable ruling. *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016). Everyone agrees Ohio has shown traceability and redressability. The only question is whether Ohio suffered an injury in fact. It did, many times over.

When a plaintiff can participate in a program only by subjecting itself to unconstitutional terms, it suffers an injury in fact. *See Ne. Fla. Chapter of Associated*

14

*Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *Clinton v. City of N.Y.*, 524 U.S. 417, 433 n.22 (1998); *Libertarian Party of Ohio v. Wilhem*, 988 F.3d 274, 279 (6th Cir. 2021); *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 407 (6th Cir. 1999). So it is here: Ohio is injured by being allowed to obtain a federal benefit *only* by surrendering to an invasion of its sovereign authority. That injury—the injury inherent in having to choose between forgoing a benefit or accepting unconstitutional terms—is the same one that creates standing in every unconstitutional-conditions case. *See, e.g.*, *Daunt v. Benson*, 956 F.3d 396, 417–18 (6th Cir. 2020). Here, the State must choose to be injured by the "loss of federal funds," *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2565 (2019); *accord Detroit v. Sec'y of Comm.*, 4 F.3d 1367, 1375 (6th Cir. 1993), or by the wrongful invasion of its constitutional authority, *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015). Just like every Spending Clause plaintiff made to choose between funding and sovereign authority, the State has standing. *See Sch. Dist. of City of Pontiac v. Sec'y of the U.S. Dep't of Educ.*, 584 F.3d 253, 261–62 (6th Cir. 2009) (*en banc*) (plurality); *id.* at 278 (Sutton, J., concurring in the judgment); *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235–36 (9th Cir. 2018).

The Mandate further injures Ohio "by interfering with the State's orderly management of its fiscal affairs." Compl. ¶12. Because of the Mandate, the State's legislative and executive officials will have to expend additional resources ensuring that changes to state tax law comply with the Mandate (or that the expected penalty for non-compliance is justified). *See* Chamber Br.14–19. The need to expend additional

15

resources in determining whether a change in law will have this effect, and in later challenging any recoupment efforts, qualifies as an Article III injury. *See Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013).

Notwithstanding all this—and notwithstanding the "special solicitude" to which States are "entitled" in the standing analysis, *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)—the Secretary denies that Ohio has suffered an injury. She does not dispute that Ohio will be subject to the Tax Mandate. Instead, she argues that Ohio, because it has not said "how it intends to use Rescue Plan funds," may not be in danger of violating the Mandate. Resp.8. This argument fails for two reasons.

*First*, Ohio has done more than enough to show that it faces sufficient danger of being found to violate the Mandate. Ohio alleged that the Mandate "unconstitutionally intrud[ed] on the State's sovereign authority" and that the Mandate subjects Ohio "to the risk that it may be made to return funding to the federal government." Compl. ¶12. While it did not identify precisely the planned and likely acts that will implicate the Mandate, those acts are now a matter of public record. This Court can take judicial notice, for example, of Ohio's now-enacted S.B. 18. *See* Sub. S.B. 18, 134th Gen. Assemb. (Ohio, enrolled March 31, 2021), https://tinyurl.com/SubSB18. The bill, among other things: lowers the tax rate applicable to certain investors in qualifying pass-through entities, *see* §1 (amending R.C. §§5733.41, 5747.41); creates a tax credit, *id*. (amending R.C. §5747.065(C)); exempts certain workers' compensation dividends from the commercial-activity tax, *id*. §6; and allows for tax refunds, *id*. §5. The General Assembly is considering other tax reductions right now. *See* Sub.

16

H.B. 110, 134th Gen. Assemb. (Ohio), http://perma.cc/5YNQ-X5Z9; H.B. 262, 134th Gen. Assemb. (Ohio), https://tinyurl.com/134HB262.  All this gives the State standing.  Parties have standing to challenge a law when there is a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979).  The actual and proposed legislation creates that danger.  The danger is heightened by the Secretary's inability to say what the Mandate prohibits.  The Secretary faults Ohio for failing to say with certainty that particular laws will violate the Mandate, but Ohio cannot do that "precisely because" the Mandate is "so vague." *Kenny v. Wilson*, 885 F.3d 280, 291 (4th Cir. 2018); *see also Aid for Women v. Foulston*, 441 F.3d 1101, 1110 (10th Cir. 2006).

*Second*, even if Ohio had not yet enacted or considered any actual legislation, it would *still* be injured by being made to accept unconstitutional terms in exchange for benefits, and by having to expend additional resources in determining whether and how to comply with the Mandate. *See above* 14–16; *see also* Chamber Br.14–20. Those are all concrete injuries, not "abstract" allusions to "sovereignty."  Resp. 10 (quoting *Massachusetts v. Mellon*, 262 U.S. 447 (1923)).  That distinguishes this case from *Mellon*, which held that States cannot establish standing with "naked contention[s]" that Congress "usurped [their] reserved powers" by passing legislation beyond its enumerated powers.  262 U.S. at 483. *Mellon* involved Massachusetts's challenge to a federal health program in which States, if they wanted, could participate. *Id*. at 479.  But Massachusetts did not participate, *id*., and it failed to identify any way in which the legislation "actually invaded or threatened" its sovereign authority,

*id.* at 485. Most significantly, the program did not "require the States … to yield" their reserved rights—Massachusetts sought to challenge the law based simply on its belief that Congress, by passing a law it lacked authority to enact, had unconstitutionally legislated about matters left to the States. *Id.* at 482; *see also accord Ariz. State Leg.*, 576 U.S. at 802 n.10. Ohio's case is triply distinguishable. *First*, the State is subject to the conditions it wishes to challenge; it has no choice but to accept the Rescue Plan funds, subjecting it to the Mandate. *Second*, and as a result, Ohio will need to expend resources ensuring compliance (or deciding not to comply) with the Mandate. That is a more concrete injury than anything faced by Massachusetts, which was not subject to the challenged conditions, in *Mellon*. *Finally*, and most importantly, Ohio is not claiming to be injured by Congress's mere enactment of a law it lacked authority to pass. Instead, Ohio is injured by being made to "yield" some of its sovereign authority—its power over tax policy—as a condition for receiving benefits that Ohio indisputably wants (and is being coerced) to accept.

A final note on standing: to the extent the Court thinks Ohio has failed to allege some fact needed to establish jurisdiction, it should not dismiss this case without giving Ohio a chance to amend its complaint, which it can do as of right if the Secretary files a Rule 12(b)(1) motion. Fed. R. Civ. P. 15(a)(1)(B).

**B. Ripeness.** "A claim is ripe where it is 'fit for judicial decision' and where 'withholding court consideration' will cause hardship to the parties." *Hill v. Snyder*, 878 F.3d 193, 213 (6th Cir. 2017) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). Because Ohio's "pre-enforcement facial constitutional challenge[]" presents

18

"'purely legal' issues that 'will not be clarified by further factual development,'" it is necessarily fit for judicial decision. *Id*. at 213–14 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985)). And for all the reasons just discussed, a delay will harm Ohio by complicating its efforts to plan its fiscal affairs. *See also* Chamber Br.14–20. Forcing Ohio to make tax policy "without knowing" what laws the Mandate prohibits "would impose a palpable and considerable hardship." *Thomas*, 473 U.S. at 581. The Secretary, in suggesting that the State wait to sue until it faces a recoupment proceeding, Resp.12, ignores these harms.

### III.    Ohio is entitled to an injunction.

Ohio's likelihood of success on the merits makes it "unnecessary to dwell on the remaining three factors" in the preliminary-injunction analysis. *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (*per curiam*). The Secretary says that principle applies "only for certain types of constitutional violations involving harms that are inherently difficult to quantify or to compensate with money." Resp.25. Even if that is true, the unquantifiable injuries that Ohio is suffering, *see above* 14–16, all fit the bill. Regardless, Ohio satisfies the remaining factors. *See* PI Mot.17–19.

The Secretary responds that Ohio needs no injunction because any money the Treasury seizes through recoupment can be paid back later. But the "potential loss of money," Resp.26, is not the basis of Ohio's challenge. Instead, Ohio will suffer the unquantifiable injuries discussed above. *See* pp. 14–16. Ohio will continue suffering those injuries for as long as the Tax Mandate remains in effect. The Secretary's gotcha argument—that Ohio told the Court it did not need a ruling by a specific date,

Resp.24 (quoting Tr. of Prelim Pretrial Conf., ECF No. 15)—changes nothing. While Ohio did not feel it appropriate to demand a ruling by a particular date (May 1 versus May 7, for example), it *does* need a speedy ruling because it is suffering harm every day it remains subject to the Mandate. Any "delay" in determining what the State can and cannot do with its taxing authority "may derange the operations of government, and thereby cause serious detriment to the public." *Dows v. Chicago*, 78 U.S. (11 Wall.) 108, 110 (1871). Regardless, as a matter of law, Ohio must complete a budget by July 1, *see* Ohio Const., art. II, §2, and uncertainty about whether the Mandate is constitutional (and so binding) will hinder that process.

The Secretary next argues that Ohio does not need an injunction when it can simply defend itself in any future recoupment proceedings. Resp.25–26. This again misunderstands the nature of Ohio's injuries: Ohio is harmed *now* by unconstitutional limits on its sovereign authority and improper interference with its fiscal management. A later repayment cannot cure those injuries.

Finally, while an injunction will inflict on the United States the "form of irreparable injury" that a sovereign always suffers when it is barred from "effectuating statutes enacted by representatives of its people," *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), that injury does not weigh against enjoining an *unconstitutional* law. The "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

\*     \*     \*

The Court should enjoin the Tax Mandate's enforcement.

20

Respectfully submitted,

DAVE YOST (0056290)
Ohio Attorney General

*/s/ Benjamin  M. Flowers*
BENJAMIN M. FLOWERS* (0095284)
Solicitor General
  *Trial Attorney*
ZACHERY P. KELLER (0086930)
MAY DAVIS (*pro hac vice*)
Deputy Solicitors General
30 East Broad Street, 17th Floor
6l4-466-8980
614-466-5087; fax
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for the State of Ohio*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2021 a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

*/s/ Benjamin Flowers*
BENJAMIN M. FLOWERS* (0095284)
Solicitor General
 **Trial Attorney*

22