# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**STATE OF OHIO,**

        **Plaintiff,**

        **v.**

**JANET YELLEN, SECRETARY OF THE TREASURY et al.,[1]**

        **Defendants.**

**Case No. 1:21-cv-181**

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

Our Constitution enacts a system of dual sovereigns—federal and state—allocating certain powers to each. Questions about that distribution of powers, though, are "perpetually arising, and will probably continue to arise, as long as our system shall exist." *McCulloch v. Maryland*, 4 Wheat. 316, 405, 4 L.Ed. 579 (1819). Answering such questions can be a daunting task. That is particularly true about constitutional limitations arising under the Spending Clause, an area in which case law is both sparse and murky. And, much as in *NFIB*, "resolving the controversy this case presents "requires [this Court] to examine both the limits of the Government's power, and [the] limited role [that Article III courts play] in policing those boundaries." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 534 (2012) ("*NFIB*").

Here, Ohio challenges one provision in the American Rescue Plan Act of 2021 ("ARPA"). Among a host of other provisions, the ARPA makes block grants available

---

[1] The Defendants to this lawsuit are Janet Yellen, in her official capacity as Secretary of the Treasury; Richard K. Delmar, in his official capacity as acting inspector general of the Department of Treasury; and the United States Department of the Treasury. The Court refers to the Defendants collectively throughout this opinion as "Secretary."

to the States for specified purposes. But, before a State can receive those funds, it must certify to the Secretary of the Treasury (the "Secretary") that the State will comply with multiple conditions that the law imposes. Ohio claims that one of those conditions—which Ohio labels the "Tax Mandate"—exceeds Congress's power under the Spending Clause and the Tenth Amendment. (Compl., Doc. 1, #10–11). Thus, Ohio filed this action seeking a declaratory judgement and permanent injunction preventing enforcement of the allegedly unconstitutional provision. (*Id*. at #11).

The matter is currently before the Court on Ohio's Motion for a Preliminary Injunction (Doc. 3) seeking to enjoin the Secretary from enforcing the Tax Mandate against Ohio (and only Ohio, as the State made clear at oral argument) while this suit is pending. This Court can grant that relief only if the Court finds *both* that it has jurisdiction over this action, and that such relief is appropriate on the substance of Ohio's claim as presented in Ohio's Complaint. Both issues present close questions. Interestingly, that is not because the merits are particularly close—the conceded ambiguity in the Tax Mandate, as written,[2] establishes that Ohio has a substantial likelihood of showing that the ARPA violates the Spending Clause. Rather, what makes this a close case are issues relating to timing, which impact the analysis of both justiciability generally, and the appropriateness of preliminary relief now. Ultimately, the Court determines that, although the matter is justiciable, the

---

[2] Two days ago, the Secretary filed a notice that the Treasury Department has now issued an "Interim Final Rule implementing the relevant portions of the [ARPA]." (Notice of Interim Final Rule, Doc. 33, #356). The impact of those interim regulations, if any, on Ohio's claims has yet to be addressed in full by the parties. As the Court is denying the preliminary injunction, though, the Count concludes there is no reason to delay issuing this Opinion for additional consideration of that issue at this time.

2

preliminary relief that Ohio seeks is not warranted. Accordingly, the Court **DENIES** Ohio's request for a preliminary injunction.

## BACKGROUND

### A. The COVID-19 Pandemic.

The COVID-19 pandemic has imposed far-reaching, unprecedented consequences on nearly every aspect of life, not only in the United States, but around the world. The pandemic has sickened, and killed, people across the globe, as well as straining (or, in some countries, nearly crippling) healthcare systems. What is more, businesses have suffered financially, and many people have found themselves in financial straits, be it from losing employment or incurring other pandemic-related expenses. And as a result of the pandemic-related disruptions and economic dislocations, the need for, and use of, governmental services and assistance has ballooned. Not surprisingly then, in addition to inflicting human costs, the pandemic has wreaked havoc on state budgets. Ohio is no exception.

### B. The America Rescue Plan Act.

On March 11, 2021, President Biden signed the ARPA into law. The ARPA is Congress's latest effort to address the harms, including economic harms, that COVID-19 has caused. It is a wide-ranging law that commits the federal government to spending up to roughly $1.9 trillion on a host of goods, services, and forms of government assistance. Included in the ARPA is a provision meant to provide aid directly to the States to assist with their budget woes. In particular, the ARPA provides some $195.3 billion in aid to the States and the District of Columbia. *See* 42

3

U.S.C. § 802(b)(3)(A).[3] Ohio's share of the pot, should it elect to take it, is $5.5 billion. According to Ohio's Motion, that amounts to roughly 7.4% of the State's total spending last year. (Mot. for Prelim. Inj., Doc. 3, #33).

As is sometimes the case with federal dollars, the money comes with certain strings attached. In particular, to qualify for the funding, a State must "provide the Secretary [of the Treasury] with a certification, signed by an authorized officer of such State … that such State … requires the payment … to carry out the activities specified in subsection (c) … and will use any payment under this section … in compliance with subsection (c)." 42 U.S.C. § 802(d)(1). The Secretary is to "make the payment required for the State … not later than 60 days after the date on which th[at] certification … is provided to the Secretary." *Id.* § 802(b)(6)(A)(i).

As the above language suggests, the conditions themselves are set forth in subsection (c). That subsection provides that a State shall only use the funds to cover costs incurred by the State:

> (A) to respond to the public health emergency with respect to [COVID-19] or its negative economic impacts …
>
> (B) to respond to workers performing essential work during the COVID-19 public health emergency …
>
> (C) for the provision of government services to the extent of the reduction in revenue of such State … relative to revenues collected in the most recent full fiscal year of the State … prior to the [pandemic] … or

---

[3] Section 9901 of the ARPA amends Title VI of the Social Security Act by adding a new Section 602. As Section 601 of that Act is codified at 42 U.S.C. § 801, presumably the new section will be codified at 42 U.S.C. § 802. That is where the newly enacted language appears on Westlaw, and the Court will thus cite to 42 U.S.C. § 802, rather than the Statutes at Large, in this Opinion.

> (D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id*. § 802(c)(1)(A)–(D). And the State must use the funds by December 31, 2024. *Id*. § 802(c)(1). Ohio does not dispute the validity of any of those conditions. But the ARPA also imposes one more term. In particular, in a section labeled "Further Restriction On Use Of Funds," the ARPA provides that:

> "(A) IN GENERAL.—A State or territory shall not use the funds provided under this section … to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id*. § 802(c)(2)(A). Ohio refers to this provision as the Tax Mandate, and that provision forms the gist of the dispute here.

## C. Ohio's Lawsuit And The Pending Motion.

In its lawsuit, Ohio claims that the Tax Mandate is unconstitutional. This is so, Ohio says, for two reasons. First, the Tax Mandate allegedly violates the Spending Clause in two ways—it is both unconstitutionally coercive, and unconstitutionally ambiguous. (Compl., Doc. 1, #9–10). And second, Ohio claims that the Tax Mandate violates the Tenth Amendment in that it unconstitutionally commandeers state taxing authority. (*Id*. at #11).

On the same day Ohio filed its Complaint, March 17, 2021, the State filed a Motion for a Preliminary Injunction and Memorandum in Support (Doc. 3). In that Motion, the State requested the Court to "enjoin the Tax Mandate." The Court

5

established a briefing schedule for the Motion, and several amici filed briefs supporting Ohio.

The Secretary opposed Ohio's requested relief. More specifically, the Secretary first claimed that the Court does not have jurisdiction, as (1) Ohio lacks standing, and (2) Ohio's claims are not ripe. (Resp. in Opp'n, Doc. 29, #237). Second, the Secretary asserted that Ohio has failed to show that a preliminary injunction is warranted. (*Id.* at #238). Finally, the Secretary argued that any injunctive relief should be limited solely to Ohio. (*Id.* at #263).

The parties completed briefing on April 22, 2021, and the Court heard oral argument on April 30, 2021. At the argument, Ohio clarified that the relief it is seeking through its Motion is an Order enjoining the Secretary from enforcing the Tax Mandate only as against the State of Ohio.

Two additional factual developments have occurred since argument. First, two days ago, the Secretary provided this Court a Notice of Interim Final Rule (Doc. 33), attaching the interim rule (Doc. 33–1). In the Notice, the Secretary explained that the rule "has been submitted to the Office of the Federal Register (OFR) for publication in the Federal Register." (Notice of Interim Final Rule, Doc. 33, #356). Second, yesterday Ohio filed a combined Motion for Leave to File Response to Notice and the corresponding Response to Notice.[4] (Doc. 34). With the impact of those additional filings in mind, Ohio's Motion is now pending.

---

[4] As the contents of Ohio's Response do not change the outcome as to the preliminary relief sought here, the Court determines it need not await a response from the federal government to Ohio's latest filing to address the pending motion.

## LAW AND ANALYSIS

Resolving the pending motion requires consideration of both jurisdictional and merits issues. Typically, when a jurisdictional challenge is raised, the Court would start its analysis there. Here, though, the two issues are inextricably intertwined. That is because the questions of (1) whether Ohio has suffered an injury in fact, and (2) whether its suit is ripe both turn to a large extent on how the injury is characterized. That in turn requires the Court to analyze the nature of the rights that the Spending Clause confers to the States when offered conditional funding. But that issue is also closely related to the likelihood of success on the merits, as well as the nature of the harm that Ohio is currently suffering, if any. And both of those inquiries go to the appropriateness of preliminary injunctive relief. The Court thus starts its discussion by considering the nature of the rights that the Spending Clause creates, and then turns to the implications of its findings on that front for the jurisdictional and preliminary injunction issues, respectively.

### A. The Spending Clause Prevents Congress From Offering The States Money On Ambiguous Terms.

Under our constitutional design, the Framers "split the atom of sovereignty." *Saenz v. Roe*, 526 U.S. 489, 504 n.17 (1999) (quoting *United States Term Limits v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring)). But it was not an even split. The federal sovereign is supreme, *see* U.S. CONST., art. VI, cl. 2, but only in the exercise of its enumerated powers. That is, "[t]he States have broad authority to enact legislation for the public good—what we have often called a 'police power.'" *Bond v. United States*, 572 U.S. 844, 854 (2014) (quoting *United States v. Lopez*, 514 U.S. 549,

567 (1995)). "The Federal Government, by contrast, has no such authority and 'can exercise only the powers granted to it.'" *Id*. (quoting *McCulloch*, 4 Wheat. at 405).

But one of the federal government's enumerated powers creates at least some wiggle room on that front. According to Art. I, § 8, cl. 1, of the Constitution, typically called the Spending Clause:

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States.

This provision authorizes Congress to pay money to the States. And "[i]ncident to this power, Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). In a sense, then, Congress can leverage its spending power to "encourage" States to use their police powers in the fashion that Congress desires. That is, Congress can seek to purchase acquiescence from state governments that Congress otherwise lacks authority to order.

Perhaps recognizing that Congress's unbridled use of the Spending Clause (especially when coupled with the power to tax) could undermine the balance of powers in our dual-sovereign federalist system, the Supreme Court has held that there are limits, inherent in the Clause itself, on how Congress can deploy this power. As the Supreme Court put it in *Dole*, "[t]he spending power is of course not unlimited, but is instead subject to several general restrictions articulated in our cases." *Id*. at 207 (citation omitted).

The recognized limitations on the Spending Clause powers are threefold. First, "Congress may not impose conditions 'unrelated to the federal interest' in enacting spending legislation." *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dept. of Educ.*, 584

F.3d 253, 284 (6th Cir. 2009) (en banc) (Sutton, J., concurring) (quoting *Dole*, 483 U.S. at 207–08). Second, it may not "coerce the States into accepting funds and the regulations that come with them." *Id.* (citing *Dole*, 483 U.S. at 211). Third, "given [Congress's] authority under the Spending Clause to regulate the States beyond the limited and enumerated powers the Constitution otherwise gives it and given that the States are not represented in the Halls of Congress, the federal courts have required Congress to state those conditions 'unambiguously' in the text of the statute." *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).[5]

Ohio raises both the second and third of those limitations—coercion and ambiguity—in its Complaint and its briefing here. The Court's resolution of the Motion, however, focuses principally on the ambiguity issue. Thus, a few more words regarding that limitation are in order. As a majority of Sixth Circuit judges observed in *City of Pontiac*, this limitation derives largely from analogy to contract law. *See id.* at 276–77 (citing *Pennhurst*, 451 U.S. at 17), 284–85 (Sutton, J., concurring) (citing *Pennhurst*, 451 U.S. at 17). "Viewing the Spending Clause relationship between a State and the federal government as a contract, the Supreme Court has stated that the legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of th[at] contract." *Id.*

---

[5] In his concurrence in *Pontiac*, Judge Sutton described this third limitation as "statutory," *see City of Pontiac*, 584 F.3d at 283, which it is in the sense that it imposes a requirement on how Congress goes about drafting statutes. That is, the limitation is not directed at the substance of the conditions, but rather at ensuring, as a drafting matter, that the conditions are clearly expressed. But, while describing the limitation as statutory, Judge Sutton acknowledged that it has "constitutional roots." *Id.* at 284.

at 276–77 (citing *Pennhurst*, 451 U.S. at 17) (cleaned up). True, the Supreme Court has been "careful not to imply that *all* contract-law rules apply to Spending Clause legislation," but it has also "regularly applied the contract-law analogy in cases" involving receipt of federal funds. *Barnes v. Gorman*, 536 U.S. 181, 186 (2002).

Under those principles, it is not sufficient that the State receive funds merely knowing that some kind of strings are attached. Rather, the question is "whether such a state official would clearly understand *the obligations*." *City of Pontiac*, 584 F.3d at 277 (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,* 548 U.S. 291, 296 (2006)) (cleaned up) (emphasis added). That makes sense, as "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id*. at 268 (quoting *Arlington*, 548 U.S. at 296) (in turn quoting *Pennhurst*, 451 U.S. at 17). "'By insisting that Congress speak with a clear voice,' the Supreme Court enables States 'to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Id*. (quoting *Pennhurst*, 451 U.S. at 17). So, not only does the Constitution require Congress to tell States that there *are* conditions, but Congress must also tell States *what* those conditions are.

## B. Ohio Has Established That It Has Standing And That At Least Its Challenge Under The Spending Clause Is Ripe.

Against that backdrop, let's consider the nature of Ohio's challenge here. Because the federal government has raised justiciability issues, the Court starts there.

The federal government claims both that Ohio lacks standing, and that this matter is not ripe. As to the first, it is well settled that "[t]he plaintiff bears the burden

of establishing standing." *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). "To satisfy the 'irreducible constitutional minimum of standing,' the plaintiff must establish that: (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent rather than conjectural or hypothetical; (2) that there is a causal connection between the injury and the defendant's alleged wrongdoing; and (3) that the injury can likely be redressed." *Id*. (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The principal challenge here goes to the first of those, or the injury-in-fact requirement.

Beyond standing, "[i]t is [also] the plaintiff's burden to prove that its claim is ripe." *B&N Coal, Inc. v. Blue Racer Midstream, LLC*, 414 F. Supp. 3d 1049, 1056 (S.D. Ohio 2019) (citing *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1064 (10th Cir. 2012)); *see also Andrew v. Lohr*, 445 F. App'x 714, 715 (4th Cir. 2011) (per curiam); *Dealer Comput. Servs., Inc. v. Dub Herring Ford*, 623 F.3d 348, 354 (6th Cir. 2010). "A claim is ripe where it is 'fit for judicial decision' and where 'withholding court consideration' will cause hardship to the parties." *Hill v. Snyder*, 878 F.3d 193, 213 (6th Cir. 2017) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

Before diving into details, the Court considers the preliminary question of whether the necessary jurisdictional showings run to *the suit itself*, or instead to *the specific relief* sought through this motion. One well-established principle provides a starting point: the Supreme Court's "standing decisions make clear that 'standing is not dispensed in gross.'" *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650

11

(2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)) (in turn quoting *Lewis v. Casey*, 518 U.S. 343, 358 n. 6 (1996) (alteration omitted)). Rather, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (quoting *Davis*, 524 U.S. at 734).

There is Sixth Circuit case law that could perhaps be read as suggesting that a preliminary injunction is a "form of relief," and thus a plaintiff must establish Article III requirements as to that form of relief itself. In its recent decision in *Online Merchants Guild v. Cameron*, for example, that court observed that "a preliminary injunction is warranted only where the party seeking relief is likely to establish: (1) an injury in fact; (2) traceability; and (3) redressability." No. 20-5723, 2021 WL 1680265, at *4 (6th Cir. Apr. 29, 2021).

But the Sixth Circuit did not specifically say whether the plaintiff was required to make those showings as to the relief sought by the suit, or as to the requested preliminary injunction. And it appears that the Supreme Court's reference to "form of relief" for standing purposes, means form of relief "*requested in the complaint.*" *Town of Chester,* 137 S. Ct. at 1651 ("At least one plaintiff must have standing to seek each form of relief *requested in the complaint.*") (emphasis added). So, for example, if a plaintiff sought both damages and a permanent injunction, the plaintiff would need to establish Article III standing for both aspects of its suit. *Id.* at 1650 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 105–106, and n. 7 (1983) (finding that a plaintiff who has standing to seek damages must also demonstrate standing to pursue injunctive relief)).

12

Of course, a preliminary injunction is not a "form of relief requested in the complaint." *Id.* at 1651. Rather it is a form of temporary relief sought by way of a motion in a pending action over which the Court has jurisdiction. Thus, the Court concludes that the jurisdictional inquiry properly runs to the suit (i.e., the claims asserted, and relief sought, in the Complaint), not the relief sought by way of a motion for preliminary injunction.[6]

That also makes sense based on Article III's language. The judicial power extends to "cases" or "controversies," and thus it is the "cases" or "controversies" themselves that should be the focus of the jurisdictional inquiry. During the pendency of such "cases" or "controversies," the Court may be called upon to decide a host of issues—motions to compel, motions to quash, etc. So long as a court has jurisdiction over the claim itself, this Court is not familiar with precedent that would require the party seeking relief by way of such motions to identify the "injury in fact," "causation," and "redressability," associated with that specific relief each motion seeks. Nor would that approach make sense, either as a conceptual or a practical matter.

Based on that understanding, Ohio must show that it has standing to pursue its *Complaint* against the federal government, which sets forth claims under the Spending Clause and the Tenth Amendment, and must also establish that those

---

[6] That is not to suggest that issues such as whether the preliminary injunction will provide the plaintiff relief are irrelevant to the issue of whether to grant the motion. To the contrary, as described below (*see infra*, Section C), the Court concludes that the question of whether the requested injunction will provide meaningful relief, which is a type of redressability inquiry, is part of the second prong of the preliminary injunction framework, which addresses questions of irreparable harm. But that goes to whether it is appropriate for the Court to grant a preliminary injunction, not to whether the Court has the power to do so, which is the jurisdictional inquiry here.

claims are ripe. Or more specifically, Ohio must show that both standing and ripeness existed when it filed its Complaint. *Lujan*, 504 U.S. at 606, n.4 (noting the "longstanding rule that jurisdiction is to be assessed under the facts existing when the complaint is filed").

Start with standing. As noted, the principal question here goes to injury in fact. As is so often the case, whether an injury in fact exists turns on the nature of the right that is protected, and the claims as to how that right was violated. For now, let's focus on the Spending Clause ambiguity argument. As described above, Supreme Court precedent suggests that the constitutional violation occurs when the federal government offers money on ambiguous terms. It is Congress *passing* the Act, not the State *accepting* the money, that violates the Constitution. And that makes sense, of course, as the limitation at issue is a limitation on Congress's powers, not those of the States. So, if the ARPA violates the Spending Clause, that violation already has occurred.

But that does not answer the separate inquiry of whether the violation is (or was at the time suit was filed) harming Ohio (or any other State). There are at least three ways that one could conceptualize the nature of the harm that flows to the States (including Ohio) as a result of that violation. First, the States may claim that the right violated is their right to an unambiguous understanding of the deal that Congress is offering under its spending power. Understood that way, a State would start suffering harm immediately upon receipt of the offer. Ohio could say, "The State is entitled to a clear offer, and you have presented an unclear one."

14

Second, Ohio could claim that it is injured upon sending its certification to the Secretary. After all, it is the certification that binds Ohio to the conditions—including the Tax Mandate that Ohio maintains is unconstitutional.

Third, it may be that the harm does not arise until the Secretary invokes the allegedly ambiguous term in an effort to recoup money from the State. In some ways, this final one tracks better with typical understandings of harm. Wrongfully taking money from another is a classic example of common law notions of injury in fact.

Here, the difference among these may matter for justiciability purposes. Under the ARPA, States apparently have been free to send in their certifications since the effective date of the Act, March 11, 2021 (that was the date that President Biden signed the law, and the ARPA appropriated funds from the current fiscal year). In other words, it appears the "deal" was available to Ohio at the time it brought this action. So, under the first theory above, Ohio was already suffering harm at that time in the form of being forced to ponder whether to accept an unconstitutionally ambiguous deal. Stated differently, forcing Ohio to determine how to respond to the offer of funding under the cloud of an ambiguous term acts as the injury in fact. Nor is it an answer to say that Ohio knows that the Tax Mandate is ambiguous, and thus can decide whether to take the risks associated with that ambiguity. The Spending Clause *prohibits* Congress from offering an ambiguous deal, precisely because the States, as sovereigns, are entitled to clarity. So, if ambiguity constitutes injury in fact, Ohio has alleged it here.

15

But, under either of the latter two injury-in-fact theories, it is more difficult to see that Ohio has suffered an injury in fact, or at least had suffered one as of the time it filed its Complaint. To be sure, this is in part a declaratory judgment action, which is inherently a form of prospective relief. But that "does not alter [jurisdictional] rules or otherwise enable federal courts to deliver 'an expression of opinion' about the validity of laws." *Saginaw County v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 954 (6th Cir. 2020). Ohio still must show that, at the time it filed its Complaint, it was suffering "an actual or imminent injury." *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 515 (6th. Cir. 2019) (quoting *Crawford v. United States Dep't of Treasury*, 868 F.3d 438, 452 (6th Cir. 2017)). And Ohio did not state, for example, that it was currently prepared to send the certification, which is the harm under theory two, let alone that it had done so. As for the last theory, Ohio has not yet received any funding, and, in any event, the federal government says that much more work remains to be done in terms of shaping even how the Secretary would decide whether recoupment is warranted in a given case, before any actual recoupment attempt occurs. (Indeed, that is one of the topics that the Interim Final Rule addresses.) Under such circumstances, it is difficult to conceive that some potential, far-in-the-future recoupment efforts could rise to the level of "imminent."

Determining which of these three theories of injury in fact Ohio asserts, and whether that supports standing here, is not straightforward. Ohio appears to be relying largely on the first one, with a nod to the latter two. In its Complaint, it alleges that the Tax Mandate "unconstitutionally intrud[ed] on the State's sovereign

16

authority" (which seems to invoke the first theory above), and created a "risk that [Ohio] may be made to return funding to the federal government" (which could be understood as invoking one of the latter two injury theories). (Compl., Doc, 1, #3). The Court concludes that the latter stated "harm" does not suffice. The "risk" of which Ohio complains ("returning funding") is currently too remote to satisfy the injury-in-fact requirement. And even if it could, the many contingencies that would need to occur before such recovery is sought would doom that asserted harm on ripeness grounds.

But that still leaves the first theory. Ohio's argument on this front could be labeled as a sort of affront-to-sovereignty theory. That is, Ohio asserts the right, as a co-sovereign under our constitutional structure, to have Congress "bargain" according to the constitutionally imposed strictures of "good faith," which include a requirement that Congress present the terms of a proposed Spending Clause "deal" in an unambiguous fashion at the time the offer is made. Congress has injured Ohio, the State would say, by depriving Ohio of that right.

The Court acknowledges that such an injury could be characterized as "abstract," or "intangible," rather than "concrete and particularized." But the Court ultimately disagrees with that view. If Ohio is correct on the merits of its Spending Clause claim (a topic to which the Court returns below), then Congress has fallen short in delivering the constitutionally required clarity. If so, Ohio suffered an injury in its role as sovereign. When Ohio brought this action, it had the present ability to send the statutorily-required certification (Ohio could do so upon the effective date of

17

the ARPA), but lacked the information necessary to understand the deal. Therefore, Ohio could not exercise its sovereign prerogative, as it had no way of knowing whether accepting these funds, in exchange for agreeing to be bound by the inscrutable Tax Mandate, represented a good deal or a bad deal for the citizens of this State—information to which it is entitled under the Constitution.

The Court acknowledges that this is perhaps an odd form of injury in fact. But that grows out of the unique nature of the constitutional guarantee at issue here (i.e., a right to clear terms), coupled with Ohio's role as a co-sovereign. When considering both of those, intruding on Ohio's sovereign right to receive a clear offer strikes the Court as a sufficient injury in fact to support Article III standing, if just barely.

The federal government might well argue, of course, that any such "harm," in addition to being ephemeral, is voluntarily incurred. After all, the State can wait to send the certification until down the road. Moreover, at argument, the federal government noted that additional clarity might soon arrive in the form of regulations. And, as noted, just two days ago the Secretary published an "Interim Final Rule" that purports to provide additional clarity as to what the Tax Mandate means.

But two responses to that. First, as noted above, standing and ripeness are measured as of the time a party files its complaint. *Lujan*, 504 U.S. at 606, n.4. At that time, waiting was its own form of harm. As Ohio noted, it is in the middle of budgeting for the next biennium *right now*, so a lack of clarity as to potential funding sources creates current hardships for that process. Moreover, as part of that budgeting process, Ohio was (and is) considering changes to its tax laws, and a lack

18

of certainty as to the consequences, if any, that those changes would have on its currently available funding under the ARPA had (and still has) an immediate impact on the state. Being told to wait for the federal government to act provides no relief on either front, and does nothing to avoid the injury in fact.

Second, and relatedly, the Constitution requires the federal government to express clearly the terms of the deal that it is offering to the States. Even if the Secretary's Interim Final Rule issued two days ago "cures" the ambiguity (and would be a constitutionally effective way of doing so, more on that below) that goes to mootness. Nothing that happens post-filing changes the fact that Ohio was pointing to an already-existing alleged constitutional violation at the time it filed suit. Ohio needed to know the terms of the "deal" (which it is constitutionally entitled to know), and it needed to know them at the time it filed suit, not later.

In reaching this conclusion, the Court acknowledges that it has not identified any case law directly on point as to how standing should be assessed in the context of an unconstitutionally-ambiguous-Spending-Clause claim.[7] In that regard, the Court

---

[7] Ohio cites a bevy of cases in its reply brief for the following proposition: "When a plaintiff can participate in a program only by subjecting itself to unconstitutional terms, it suffers an injury in fact." (Ohio Reply Br., Doc. 30, #284–85) (citing *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998); *Libertarian Party of Ohio v. Wilhelm*, 988 F.3d 274, 279 (6th Cir. 2021); *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 407 (6th Cir. 1999)). While these cases may support Ohio's argument when read at a certain level of generality, the Court finds that they do not help Ohio much here. Each case arose in a very different factual context and couched its holding in relatively fact-specific terms. The harm in most of the cases, for example, was some governmental restriction that prevented the plaintiff from participating in a governmental process on an equal footing with other participants. The plaintiffs in those cases therefore brought equal-protection claims challenging those restrictions. None of the cases involved a Spending Clause challenge to a program made available on equal terms to every potential

does not intend that its decision today should be read as adopting a broad view of standing predicated on any potential ambiguity in Spending Clause legislation, involving any potential payment of funds, no matter how small. In the First Amendment context, for example, the Sixth Circuit has observed that "adverse actions [can be] so *de minimis* that they do not rise to the level of a constitutionally cognizable injury." *Maben v. Thelen*, 887 F.3d 252, 266 (6th Cir. 2018). That same type of limitation may apply to standing for Spending Clause challenges. The ambiguity still violates the Constitution (that is a question of the statute's terms, not the amount at stake), but perhaps if the ambiguity is slight, or the dollar amounts low, the resulting injury would be too insignificant to support Article III review.

Here the Court need not reach that issue, however, as the ambiguity at issue in the Tax Mandate is neither immediately dismissible as "slight," nor are the dollar amounts involved small. Indeed, Ohio notes that the grant it can accept from the federal government, if Ohio is willing to agree to the Tax Mandate, amounts to over 7% of the State's spending during the last fiscal year. (Compl., Doc. 1, #8). Thus, the Court has little concern that this is an "inconsequential action[]," even though some other potential Spending Clause challenge might fit that bill. *See id.* at 266 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999)). Whatever the line for a "non-cognizably de minimis Spending Clause ambiguity" may be, the present facts are nowhere near it.

---

recipient (here, the States). Thus, the Court does not rely on those cases as support for its holding on standing here.

Moreover, while the Court has not identified precedent directly on point, the Court takes at least some comfort on the justiciability front from the Supreme Court's decision in *NFIB*. There, twenty-six States were challenging, in 2012, an amendment to the Medicaid funding statute that Congress enacted in 2010, and that would impose financial consequences *starting in 2014* on States that did not make certain changes to their programs by that time. *NFIB*, 567 U.S. at 538–39. The States included in their challenge to the law a Spending Clause claim. True, the Justices had various views about the merits of the underlying claim. But the important thing for present purposes is that not a single one of the Justices thought that standing provided an impediment to reaching those merits.

To be fair, it is likewise true that none of the Justices mentioned standing in the Spending Clause analysis, or explored the nature of the alleged injury in fact (there, the States were relying on a coercion theory, rather than the ambiguity theory). But that is irrelevant. Subject-matter jurisdiction is not waivable, and federal courts have an obligation to determine if it exists before ruling on the merits of a claim. *Foster v. Chatman*, 136 S. Ct. 1737, 1745 (2016) ("Neither party contests our jurisdiction to review Foster's claims, but we 'have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.'") (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). Thus, in considering the merits of the Spending Clause claim in *NFIB*, the Supreme Court tacitly confirmed that Article III's jurisdictional requirements, including standing, were met. The Court reaches that same conclusion here.

21

As is readily apparent from the discussion above, the Court's resolution of the standing issue also disposes of any ripeness problem. The issue here is not that the Secretary may seek recoupment in the future—a dispute that may not be ripe. Rather, the issue is that Ohio alleges it does not have the constitutionally-required clarity at present. A claim based on the lack of that clarity, assuming that counts as an injury in fact, is thus ripe.

Post-argument events, though, add an additional jurisdictional wrinkle. As noted, two days ago the Secretary issued an Interim Final Rule regarding the ARPA. (*See* Doc. 33). That rule was directed, in part, to clarifying the Tax Mandate. Such clarification, of course, may raise potential mootness concerns. On that front, though, while the Court notes it has an independent obligation to assess the issue, "[t]he 'heavy burden' of demonstrating mootness falls on the party asserting it." *Thomas v. City of Memphis*, No. 20-6118, 2021 WL 1712264, at *3 (6th Cir. Apr. 30, 2021) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Here, establishing mootness is not a straightforward proposition, and the federal government has yet to actually present a mootness argument based on the Interim Final Rule. The first question is whether the Interim Final Rule even figures into the Spending Clause analysis. After all, the Spending Clause is an Article I power, so it could well be the case that it is Congress, not an executive agency, that must provide the constitutionally required clarity. *See City of Pontiac*, 584 F.3d at 284 ("[T]he federal courts have required *Congress* to state … conditions

'unambiguously' in the text of the statute.") (Sutton, J., concurring). Indeed, even in a case where the Supreme Court acknowledged the applicability of post-issuance agency guidance to clarify the nature of the condition, the Supreme Court noted that the statute itself provided the constitutionally required level of clarity. *See Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 666 (1985). In other words, *Bennett* suggests that, if a statute meets the Spending Clause's clarity threshold, then an agency can resolve any remaining ambiguity. But that is different from saying that an Executive Branch agency can wholesale fix a constitutionally defective statute.

Second, even if regulations can do so, it is not (or at least not yet) clear that the Interim Final Rule does so. That is so for two reasons. First, recall that the constitutional issue here is a lack of clarity. While an Interim Final Rule has the force of law while in effect, it is expressly subject to revision after issuance. That may impact (not "necessarily impacts," but "may impact") its ability to provide the constitutionally required clarity. Second, there is the question as to whether the Interim Final Rule, even assuming it counts, provides the necessary clarity. To the contrary, Ohio argues in its "Response" that, even with the Interim Final Rule, unconstitutional ambiguity remains. (Doc. 34). The Court has not reached a final determination on that issue yet, and will invite additional briefing from the parties. But for present purposes it is enough to say that the federal government has not yet carried its "heavy burden" of showing mootness, nor does the Court's independent inquiry compel it to find that this case is moot based on the Interim Final Rule.

Therefore, as the Court finds that standing and ripeness were present at the time the Complaint was filed, and the federal government has not (or at least not yet) carried its "heavy burden" of establishing mootness, the Court concludes it has Article III jurisdiction over Ohio's suit.[8]

## C. Ohio Is Not Entitled To A Preliminary Injunction, As The Relief It Requests Will Not Avoid The Harm On Which It Relies In Its Motion.

The jurisdictional finding is not the end of the matter. There is a separate question as to whether the Court should grant Ohio's pending request for a preliminary injunction. Again, the Court concludes that it is a close call, but on balance determines that Ohio does not warrant the requested relief. That is not because Ohio has failed to show a likelihood of success on the merits of its claim (even with the Secretary's recent Interim Final Rule), but rather due to shortcomings in the Court's ability to provide preliminary relief that addresses the harm Ohio claims it would suffer absent a preliminary injunction.

---

[8] The federal government did not press its original jurisdictional arguments (standing and ripeness) in a Rule 12(b)(1) motion directed exclusively at that issue. Rather, it presented the jurisdictional issues as one basis for denying the currently requested injunctive relief. The Court is cognizant of its ongoing obligation to assess justiciability and ensure that it has subject-matter jurisdiction. The Court's ruling on that issue above is based on the information and arguments that the parties have offered to date, and is without prejudice to the federal government's ability to expand on its arguments in a more full-throated motion under Rule 12(b)(1) directed at those issues, along with the mootness issues, should it so choose.

As also noted, the Court acknowledges that "standing is not dispensed in gross … [but rather] a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester*, 137 S. Ct. at 1650 (quotations and citations omitted). Thus, the Court's determination that jurisdiction exists for purposes of the Spending Clause challenge does not mean that the Court has concluded that it is present for the Tenth Amendment claim. As the Court does not rely on the latter claim for purposes of its instant determination, though, that is irrelevant, at least for now.

The parties largely agree on the decisional framework that applies to a request for a preliminary injunction. This Court must balance "four factors ... when considering a motion for preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam) (internal quotation marks omitted). The Court will take them in that order, but ever mindful of the admonition that a "preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.'" *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir. 1991)) (bracket and internal quotation omitted).

On the first prong, the Court finds that Ohio made a substantial showing that it is likely to succeed on the merits of its Spending Clause claim, at least on the ambiguity issue. (Given the Court's ruling on the ambiguity issue, the Court need not, and thus does not, address the coercion or anticommandeering issues at this time.) As described above, the Spending Clause requires Congress to specify the terms of the deal in language that is sufficiently clear to put the State on notice "of its obligations." With that in mind, take a look again at the language here:

> "(A) IN GENERAL.—A State or territory shall not use the funds provided under this section … to either directly or indirectly offset a

25

> reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

42 U.S.C. § 802(c)(2)(A). Despite poring over this statutory language, the Court cannot fathom what it would mean to "indirectly offset a reduction in the net tax revenue" of a State, by a "change in law … that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise)."

To be fair, the "change in law" part seems clear. Only new laws count. And presumably the cut-off date for "new" is the date on which the State sends its certification. So far, so good. And there appears to be sufficient clarity around what constitutes a reduction in *a* tax—it would be a change in the rate, or a new rebate, or something of the sort. But where things get hopelessly muddled is with regard to "indirectly" and "*net* tax revenue of such State." Start with the latter phrase. Net tax revenue as measured against the previous fiscal year? Or against what would have been collected without the change in taxes? Or what? And, in either event, how does one "score" the issue? In other words, let's say a State elects to increase its statewide sales tax, but decrease its income tax. Or a State opts to change how progressive its income tax rates are. Does that effect a reduction in "net tax revenue"? After all, the State may enact the package of tax changes (or even a single tax change) thinking that the State will collect more taxes as a result, but may simply be wrong. As Ohio notes, and the federal government concedes (rightly so), the COVID-19 pandemic has imposed major disruptions on economic activities in the State (and frankly around

the world). Against that backdrop, projecting the net impacts of any tax change, and certainly any package of tax changes, seems a Sisyphean task.[9]

That on its own would be bad enough, but the ARPA then lumps "indirectly offset" on top. The Court honestly has no idea what an "indirect offset" to net tax revenues may be. It became clear at oral argument that the federal government was largely unwilling to hazard a guess as to what it meant either. Faced with repeated questions on that front, the federal government offered two responses, neither of which explained the meaning of the term. First, the federal government claimed that the Spending Clause does not require that the *substance* of the conditions be clear, but merely that the statute make clear that conditions *exist*. Wrong. As noted above, Supreme Court and Sixth Circuit precedent directly reject that view.

Second, at oral argument, the federal government offered that, while the Tax Mandate may be ambiguous *now*, the Secretary has indicated that regulations were likely forthcoming that may provide the missing clarity *later*. To be fair, subsequent events proved the prescience of that assertion. Just two days ago, the Secretary submitted an Interim Final Rule for publication in the Federal Register expounding on the ARPA, including the Tax Mandate, and provided notice to this Court of that event. (Doc. 33).

---

[9] Interestingly, two of the topics that the Interim Final Rule addresses are: (1) the baseline for determining a net reduction in tax revenue; and (2) how the "scoring" of tax changes works, perhaps reflecting that the Secretary shares the view that the ARPA itself provides little direction on those topics. Whether the Interim Final Rule successfully cures that ambiguity, and is legally capable of doing so, are issues to which the Court returns below.

Especially given that subsequent event, the federal government's regulatory-cure theory gives the Court at least some pause on the likelihood-of-success front. But it does not change the Court's ultimate conclusion on this issue, at least now, for two reasons. (The Court acknowledges that these reasons overlap to some extent with its explanation as to why the new interim regulations do not necessarily moot the suit.)

First, even if *final* regulations are a permissible way of providing the constitutionally required clarity in a Spending Clause "offer" to the States, it is far from clear that the same is true of *interim* final regulations. After all, such regulations are published without notice and comment proceedings, and are subject to revision after publication. *See, e.g.*, *Am. Transfer & Storage Co. v. Interstate Commerce Commission*, 719 F.2d 1283, 1303 (5th Cir. 1983). Accordingly, Ohio may be able to successfully argue that, if Ohio were to file its certification before those regulations became final, those new regulations would not apply to the funding Ohio receives here. *See, e.g.*, *Pennhurst*, 451 U.S. at 25. Thus, as Ohio is free to file its certification whenever it desires, it is currently an open question as to whether those regulations, either now, or if and when finalized, are even relevant to this dispute.

Second, and more fundamentally, it is not at all clear that the Secretary can *ever* cure a Spending Clause ambiguity program, even through final regulations. As noted above, it may be the case that, because the Spending Clause is an Article I power, it is *Congress*, not *Executive* Branch officials, that must provide the requisite clarity.

28

To be sure, the Secretary disagrees and argues that, under *Bennett*, the Secretary *can* cure the Spending Clause ambiguity problem here. But it is not at all clear that *Bennett* offers the Secretary the refuge she seeks. True, *Bennett* rejected the argument that "ambiguities in the requirements should invariably be resolved against the Federal Government as the drafter of the grant agreement." 470 U.S. at 669. And, in doing so, the Court noted that the grant program there "was an ongoing, cooperative program meant that grant recipients had an opportunity to seek clarification of the program requirements." *Id.* But, more important for purposes of the motion in this case, the *Bennett* Court noted at the outset that *the statute* already had the "requisite clarity" mandated under the Spending Clause. 470 U.S. at 666. In other words, *Bennett* suggests that the Spending Clause mandates a threshold level of clarity in the statute itself, with Executive Branch officials able to provide further clarification to address residual ambiguity. But, here, Ohio claims that the constitutional threshold for statutory clarity is not met, and Ohio has shown a substantial likelihood of success on that argument based on the statutory language. *Bennett* does not make clear that the Secretary can fix *that* problem.

In sum, Ohio has shown that it has a substantial likelihood of establishing that, as written, the Tax Mandate does not meet the floor for clarity that the Spending Clause imposes on federal legislation offering money to the States. The impact of the new Treasury regulations, as an "interim" rule, or when final, on that determination is by no means clear. As a result, the Court concludes that the publication of the new

29

Interim Final Rule, by itself, is insufficient to overcome Ohio's showing, based on the statutory language, that is has a substantial likelihood of success on the merits.

Finally, the federal government also argues, almost in passing, that the no-set-of-circumstances test under *United States v. Salerno*, 481 U.S. 739, 745 (1987), precludes Ohio's pre-enforcement challenge here. (Resp. in Opp'n, Doc. 29, #249). As a general matter, *Salerno* holds that a party making a facial challenge "must establish that 'no set of circumstances exists under which [the law] would be valid.'" *Liberty Coins v. Goodman*, 748 F.3d 682, 690–91 (6th Cir. 2014) (quoting *Salerno*, 481 U.S. at 745). And here Ohio agrees that its pre-enforcement challenge is necessarily a facial challenge. So, *Salerno* could be read to say that, as long as the Tax Mandate would be unambiguous as to at least one potential change to Ohio's tax laws, a facial challenge will not lie. But that approach again misunderstands the nature of the claim here. Ohio argues that the Tax Mandate is unconstitutionally ambiguous. As applied to the Tax Mandate, "ambiguous" must mean something like "does not provide an answer as to a large fraction of the state tax law changes to which it would apply." Positing that the Tax Mandate would be clear as to *one* potential tax change reveals nothing about the answer to a large-fraction inquiry. But overall clarity as to the Tax Mandate's meaning is the sovereign right that Ohio asserts (and that the Spending Clause at least arguably recognizes). Given the nature of the claimed right at issue here, *Salerno*'s no-set-of-circumstances test does not bar Ohio's ambiguity-based facial Spending Clause challenge. Ohio thus satisfies the first prong of the preliminary injunction test.

The Court next turns to the question of irreparable harm. The Sixth Circuit has noted, both recently and often, that "[i]rreparable harm is an 'indispensable' requirement for a preliminary injunction, and 'even the strongest showing' on the other factors cannot justify a preliminary injunction if there is no 'imminent and irreparable injury.'" *Mich. Educ. Ass'n Fam. Retired Staff Ass'n v. Mich. Educ. Ass'n*, No. 20-1174, 2021 WL 1546129, at *5 (6th Cir. Apr. 20, 2021) (quoting *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 392 (6th Cir. 2020) (in turn quoting *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019))). The Court's resolution of this issue starts by piggybacking off its discussion of injury in fact in the standing context. To be sure, the two inquiries are not the same. As the federal government rightly observes, "Ohio's burden to show irreparable harm is higher than what is required to establish standing." (Resp. in Opp'n, Doc. 29, #260 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). But the problem is that the remainder of the federal government's argument on this front appears to assume that the alleged injury will not occur at least until Ohio announces an "imminent plan to cut taxes." (*Id.*).

At the risk of beating a dead horse, that assumption misunderstands the nature of the harm asserted here. Ohio argues that it is struggling to decide whether to claim the funds and what to do with its tax laws for the upcoming biennium. It also contends that the ARPA provides no clarity on the consequences of any particular path as to the latter. In its briefing, the federal government nowhere responds to that asserted harm. And the Court finds that the (likely) unconstitutional ambiguity in

the statute's language, with its resulting impact on Ohio's exercise of its sovereign powers, constitutes not only an injury in fact, but also irreparable harm.

But that is not the end of the inquiry. It is not enough for Ohio to show that it is suffering irreparable harm. Rather, to qualify for the "extraordinary remedy" of a preliminary injunction, Ohio must show that the requested injunctive relief will prevent or terminate that ongoing harm. *See, e.g., Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) ("It is appropriate to use a preliminary injunction *to avoid* harms to goodwill and competitive position.") (emphasis added). There's the rub. The preliminary injunction that Ohio requests here is directed solely at the Secretary's exercise of her recoupment powers. But there is no reason to believe that the Secretary will exercise those powers any time soon. An Order telling the Secretary not to do that which the Secretary has no current ability—or intent—to do, and likely will not be in a position to do at any time soon (as Ohio has not even sent its certification, let alone received its funds), does not avoid any harm that the State is likely to encounter during the pendency of the preliminary injunction.

Indeed, at oral argument, Ohio largely conceded as much. When the Court inquired as to how Ohio was currently being harmed, and what purpose the injunction would serve, Ohio noted only that it believed such an Order would provide *clarity* about the legal consequences of its decisions—for example, whether to send its certification or to enact various changes in its tax laws. But an Order announcing that the Secretary cannot rely on the ambiguous Tax Mandate for recoupment purposes while this case is pending does not—indeed cannot—provide the clarity that

32

Ohio seeks. If anything, it is the Court's analysis of the likelihood of success on the merits that may provide some clarity on that front—and even that has become less certain given the issuance of the new Interim Final Rule. The bottom line is this—a preliminary injunction that stands no meaningful prospect of ever being enforced, as the Secretary is unlikely to be in a position to recoup funds while this suit is pending, adds nothing by way of clarity. Thus, while the Court finds that irreparable harm likely exists, the requested preliminary injunction does not avoid that harm.

Put differently, the Court has two options. It could grant Ohio's motion, which would mean Ohio has to choose whether to accept the ARPA funds knowing that the funds are subject to possible recoupment under the Tax Mandate once the Court issues a merits decision, i.e., if the Court were to conclude that the Tax Mandate is not unconstitutionally ambiguous after all (either in light of, or apart from, any Treasury Department rules), and thus were to decline to convert the preliminary injunction into a permanent injunction. Alternatively, the Court could deny Ohio's motion, which would mean Ohio has to choose whether to accept the ARPA funds knowing that the funds possibly could be recouped down the road based on the Tax Mandate (once again depending on the outcome of this case). The only difference between those scenarios is that, should the Court deny Ohio's motion, the Secretary might then rely on the Tax Mandate to recoup funds between now and when the Court decides the ultimate issues here. But the odds of Ohio submitting a certification, receiving ARPA funds, and having those funds taken away while this case is pending strikes the Court as minimal, at best, and more likely nil.

33

As some avoidable irreparable harm is a necessary showing to preliminary injunctive relief, *see Mich. Educ. Ass'n*, 2021 WL 1546129, at \*5, the Court determines that Ohio is not entitled to such relief at this time. That is particularly true in that the relief that Ohio seeks here is an order from an Article III court enjoining an Executive Branch official from exercising her statutorily assigned powers. The Court must be mindful of the separation of powers issues that inhere in that setting, and will not lightly enter such an Order—even though (or maybe especially because) that Order would almost certainly have no immediate application on the facts here. Of course, if this litigation were to linger to a point when the Secretary sought to recoup funds based on the Tax Mandate, or such an attempt on the Secretary's part was at least imminent, that may well change the analysis. But, at this time, the Court concludes that preliminary injunctive relief will not lie.

Because the Court concludes that the second element of the four-prong analysis is not met, the Court need not consider prongs three and four.

## CONCLUSION

In sum, the Court finds that it currently has jurisdiction, that Ohio has established a substantial likelihood (although by no means a certainty) of success on at least an aspect of its Spending Clause claim, and that Ohio is currently suffering irreparable harm. But the Court also finds that the relief that Ohio requests does not prevent the irreparable harm that Ohio asserts as the basis for its request. Accordingly, this Court **DENIES** Ohio's request for a preliminary injunction, without

prejudice to Ohio's ability to later raise the issue should efforts at recoupment under the Tax Mandate become a meaningful possibility.

**SO ORDERED.**

May 12, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**