## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO

## WESTERN DIVISION

STATE OF OHIO,

                Plaintiff,

v.

JANET YELLEN, in her official capacity as
Secretary of the Treasury; RICHARD K.
DELMAR, in his capacity as acting inspector
general of the Department of Treasury; and
U.S. DEPARTMENT OF THE TREASURY,

                Defendants.

CASE NO: 1.21-cv-181

JUDGE DOUGLAS R. COLE

## BRIEF FOR *AMICUS CURIAE*
## THE NEW CIVIL LIBERTIES ALLIANCE

Angela M. Lavin (0069604)
Wegman Hessler LPA
6055 Rockside Woods Blvd., Suite 200
Cleveland, OH 44131
Telephone:    216.642.3342
Facsimile:     216.642.8826
Email:         alavin@wegmanlaw.com

Margaret A. Little (*pro hac vice pending*)
Richard A. Samp
Sheng Li
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone:     202.869.5210
peggy.little@ncla.legal

*Counsel for Amicus Curiae the New Civil Liberties Alliance*

**CORPORATE DISCLOSURE STATEMENT**

The New Civil Liberties Alliance states that it is a nonprofit organization incorporated under the laws of the District of Columbia.  It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .................................................................. i

TABLE OF CONTENTS ................................................................................................ ii

STATEMENT OF INTEREST ........................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 2

ARGUMENT ..................................................................................................................... 4

    I.   AS A LEGAL MATTER, THE IFR CANNOT CURE THE TAX CUT BAN'S LACK
        OF CLARITY ..................................................................................................... 4

    II.  AS A FACTUAL MATTER, THE IFR DOES NOT CURE THE TAX CUT BAN'S
        LACK OF CLARITY ........................................................................................ 9

    III. AS A POLICY MATTER, THE IFR PRODUCES A CURE WORSE THAN THE
        DISEASE .......................................................................................................... 12

CONCLUSION ................................................................................................................ 16

CERTIFICATE OF COMPLIANCE ............................................................................ 18

CERTIFICATE OF SERVICE ....................................................................................... 19

## STATEMENT OF INTEREST

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil-rights organization founded by Philip Hamburger to defend constitutional freedoms against unlawful exercises of administrative power and conditions imposed on spending as another means of legislating outside proper constitutional channels.[1] NCLA challenges constitutional defects in the modern American legal framework by bringing original litigation, defending Americans from unconstitutional actions, filing *amicus curiae* briefs, and petitioning for a redress of grievances in other ways. Although Americans still enjoy the shell of our Republic, a very different sort of government has developed within it—a type, in fact, that our Constitution was designed to prevent.

Congress's practice of imposing "conditions" on federal spending is particularly disturbing. Far too often, Congress attaches conditions on the receipt of federal funds, thereby defeating state constitutional guarantees. Even worse, this case goes further and constitutes an historically unprecedented usurpation of core power exclusively assigned to the states—the power to change or reduce the taxation of citizens. Worst of all, Congress has done so by ambiguous legislation and unconstitutional delegation to the U.S. Department of Treasury, which in turn published an Interim Final Rule that only compounds the ambiguity. When Congress purports to tell states what laws their legislatures can—and cannot—pass or what their tax policies must be, whether by law or agency regulation, it violates state sovereignty. Cramming ambiguous conditions down on the states, which restrict their use of funds collected from all United States citizens, tramples the Tenth Amendment. This structural violation of the Constitution intrudes upon the states' core sovereignty over their own fiscal affairs and choices about how to tax their residents.

---

[1] No counsel for a party authored any part of this brief. And no one other than the *amicus curiae*, its members, or its counsel contributed money that was intended to finance the preparation or submission of this brief.

NCLA was founded to restore constitutional limits on administrative power and to protect the civil liberties of all Americans—including their right as U.S. citizens to be governed only by federal legislation passed via constitutional channels and their right as self-governing state citizens to have the states alone set tax policy in their respective legislatures. As explained below, Congress's attempted usurpation of state legislative powers that not only were never conferred upon the federal government but were reserved to the several states by the Tenth Amendment, violates several bedrock provisions of the U.S. Constitution that define and constrain federal lawmaking.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The American Rescue Plan Act of 2021 (ARPA), enacted on March 11, 2021, offers approximately $195 billion to states and their residents to assist with economic recovery from the Covid-19 pandemic.[2] But there is a catch: ARPA prohibits states from using the funds "to either directly or indirectly offset a reduction in the net tax revenue of such State … resulting from a change in law, regulation, or administrative interpretation … that reduces any tax." 42 U.S.C. § 802(c)(2)(A). The U.S. Department of Treasury ("Treasury") is authorized to recoup any such impermissible offset of state net tax reduction. *Id.* § 802(e).

In the course of resolving Ohio's motion to preliminarily enjoin the Tax Cut Ban, this Court held that this ban is likely unconstitutional because the statutory language "does not meet the floor for clarity that the Spending Clause imposes on federal legislation offering money to the States."

---

[2] ARPA, as implemented by the IFR, provides funds to be spent by the states in four areas:

[1] Strengthening the response to the COVID–19 public health emergency and its economic impacts; [2] easing fiscal pressure on State, local, and Tribal governments that might otherwise lead to harmful cutbacks in employment or government services; [3] providing premium pay to essential workers; and [4] making necessary investments in certain types of infrastructure.

86 Fed. Reg. at 26,816. In "Congress's judgment[,] tax cuts and pension deposits do not fall within these eligible uses." *Id.* at 26,806.

Opinion, ECF 36 at 29. One week later, Treasury published an interim final rule in the *Federal Register* that purports to cure the Tax Cut Ban's unconstitutional ambiguity. 86 Fed. Reg. 26,786 (May 17, 2021) ("IFR"). For states that accept ARPA monies, the IFR sets out a four-step methodology to identify state tax cuts that Treasury might later try to recoup. Boiled to their essence, the four steps are:

(1) <u>Sum All State Tax Cuts Each Year</u>: Each change in [state] law, regulation, or administrative interpretation is identified that could reduce net tax revenue and those reductions are then summed. "The sum of these values in the year for which the government is reporting is the amount it needs to 'pay for' with sources other than [ARPA] Funds … ."

(2) <u>De Minimis Safe Harbor</u>: If the total value of the tax reductions for the reported year fall below a 1% de minimis level, then that bucket of tax reductions does not need to be "paid for" and will not be recouped.

(3) <u>Comparison to Fiscal 2019 as Baseline Year</u>: "If the recipient government's actual tax revenue is greater than the amount of tax revenue received by the recipient for the fiscal year ending 2019, adjusted annually for inflation," then the state will be deemed not to have reduced its net tax revenue.

(4) <u>Identification of Offsets</u>: The state can then "identify any sources of funds that have been used to permissibly offset the total value of covered tax changes other than [ARPA] Funds." Such sources of funds could be either spending cuts in areas not replaced by ARPA funds or tax changes such as an increase in tax rates.

86 Fed. Reg. at 26,807-09. *See* 31 C.F.R. § 35.8 (b)(1)-(4).

There will also be, in practice, a *fifth step*, since 31 C.F.R. § 35.10 allows Treasury to identify the amount of tax cuts that, in its judgment, have not been "paid for" using the above methodology. 86 Fed. Reg. at 26,808 & 26,810. And once such cuts are identified, Treasury decides whether to seek recoupment from the state of that calculated amount of unpaid-for tax cuts considering "all relevant facts and circumstances, including information regarding planned spending cuts and budgeting assumptions." *Id.* at 26,810.

This fifth step thus offers the easiest way to see that the IFR does not reduce the ambiguity of the ARPA deal being proposed to the states. Under the catch-all power Treasury has given itself,

it would be free to consider *any factor it sees fit* in deciding whether to seek recoupment. This self-conferred power renders Treasury's system utterly indeterminate, making the outcome of its recoupment inquiry unknowable in advance.

The IFR should not lead to any change in this Court's initial judgment that the Tax Cut Ban is unconstitutionally ambiguous. Because the Constitution requires *Congress* to provide the requisite clarity regarding any Spending Clause condition, Treasury's IFR cannot cure statutory ambiguity as a matter of law. Indeed, the IFR injects further ambiguity into the scheme and thus fails to provide clarity. Finally, the IFR impermissibly entangles the federal government in states' tax policy decisions.

## ARGUMENT

### I. AS A LEGAL MATTER, THE IFR CANNOT CURE THE TAX CUT BAN'S LACK OF CLARITY

This case, and similar cases filed by 19 states in five federal circuits, implicates numerous core structural Constitutional doctrines including federalism, the role of dual sovereigns, unconstitutional conditions, commandeering that restructures state and federal governments, the guarantee of a republican form of government, and the Tenth Amendment to the United States Constitution, among others. This *amicus* brief focuses on key aspects of this legislation and the later-issued Treasury Rule discussed in the court's earlier ruling in this matter. It has never been more critical to recognize the value of federalism to counterbalance centralized power and protect liberty. The Constitution does not permit of subverting federalism via the spending power.

As noted by the Court in its earlier ruling, the Spending Clause at Article I, Section 8 of the Constitution sometimes allows Congress to require states to take certain actions as a condition of receiving federal funds, *South Dakota v. Dole*, 483 U.S. 203, 206 (1987), but "it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). "Spending clause conditions thus bind the States only when *Congress spells them out clearly in the text of the law*." *Sch Dist. of City of Pontiac v. Sec'y of*

*U.S. Dept. of Educ.*, 584 F.3d 253, 284 (6th Cir. 2009) (en banc) (Sutton, J., concurring) (emphasis added).

The text of the Tax Cut Ban is indisputably ambiguous. As this Court explained, one simply "cannot fathom what it would mean to 'indirectly offset a reduction in the net tax revenue' of a State, by a 'change in law … that reduces any tax.'" Opinion, ECF 36 at 26 (quoting 42 U.S.C. § 802(c)(2)(A)). Treasury conceded at oral argument that "the Tax Ban may be ambiguous *now*," but insisted that "regulations were likely forthcoming that may provide the missing clarity *later*." *Id.* at 27. But neither the IFR—nor any other Treasury regulation—can cure the Tax Cut Ban's ambiguities for the simple reason that Treasury has no special insight into Congress's ambiguous meaning. Hence, Treasury's attempt to "clarify" the Tax Cut Ban amounts to an impermissible enactment of its own agency-created Spending Clause condition. An agency, however, may not make new law in the guise of interpreting enabling legislation. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213-14 (1976).[3]

The Constitution vests limited power to impose Spending Clause conditions in Congress, U.S. Const. Art. I, §§ 1, 8 cl. 1, and therefore it is Congress that must clearly specify the terms of those conditions, *Dole*, 483 U.S. at 206; *Pennhurst*, 451 U.S. at 17. If "[t]he requisite clarity … is provided by [Congress]," as was the case in *Bennett v. Kentucky Department of Education*, 470 U.S. 656, 666 (1985), an agency may issue regulations to fill in necessary administrative details. Without such baseline clarity, however, the agency could never know what Congress had intended when enacting a Spending Clause condition, and any regulations would require the agency to substitute its own judgment in place of ambiguous Congressional intent. Allowing rulemaking in that circumstance would thus amount to an unconstitutional delegation of Article I's Spending Clause power. *See Grayned v. City of Rockford*, 408 U. S. 104, 108–109 (1972) ("A vague law impermissibly delegates basic policy matters … ."); *see also*

---

[3] Additionally, Treasury should not be heard to complain that the IFR was not challenged in Ohio's complaint because it is Treasury that put its new regulations at issue by offering the IFR as a defense in order to try to stave off the constitutional consequences of ARPA's ambiguity. The validity of the IFR has thus been fully joined in this litigation.

*Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 473 (2001) ("Article I, § 1, of the Constitution vests all legislative Powers herein granted … in a Congress of the United States. This text permits no delegation of those powers.") (cleaned up); *Gundy v. United States*, 139 S. Ct. 2116, 2142 (2019) (Gorsuch J., dissenting).

"The idea that an agency can cure an unconstitutionally standardless delegation of power" is "internally contradictory." *Am. Trucking Assocs.*, 531 U.S. at 473. This is because "[t]he very choice of which portion of the power to exercise—that is to say, the prescription of the standard that Congress had omitted—would itself be an exercise of the forbidden legislative authority." *Id.* The same logic applies to a vague Spending Clause condition. Because such a Spending Clause condition is unconstitutionally ambiguous, the agency cannot discern congressional intent. Any attempt to "cure" such ambiguity through rulemaking would inherently require the agency to choose a condition among multiple possibilities based on its own policy preferences. That very choice, however, would itself be an unconstitutional exercise of Spending Clause power because it would be the agency, rather than Congress, imposing the Spending Clause condition on states. Of course, the Constitution confers no power of the purse on the Executive Branch.

The ambiguities in this case are not mere minor details that Treasury may fill in. Rather, they cut to the heart of the Tax Cut Ban's meaning. The statute leaves essential questions of what is "net tax revenue" unanswered, such as when does a state experience a "reduction … resulting from a change in law, regulation, or administrative interpretation," and how can it be determined that the reduction has been "directly or indirectly offset" by ARPA funds? *See* Opinion, ECF 36 at 26. Treasury cannot cure these ambiguities because the vague statutory language does not allow it to divine what Congress deemed to be an impermissible "indirect or direct offset" of "a reduction in the net tax revenue." Instead, Treasury's regulations simply impose its own definition of an impermissible offset.

6

Allowing such rulemaking would give Treasury *carte blanche* to impose whatever scheme it wants to enforce against what it—not Congress—deems to be improper offsets to reduced state tax revenue. For example, under the IFR, Treasury deems a "reduction in the net tax revenue" to occur if the state takes legislative or administrative actions that reduce tax revenue by more than 1 percent of the state's inflation-adjusted 2019 revenue, unless the state's tax revenue is higher than its inflation-adjusted 2019 revenue. 86 Fed. Reg. at 26,823; *see* 31 C.F.R. § 35.8 (b)(1)-(3). But why a one percent *de minimis* threshold? Why use both a hypothetical scenario and a prior year as baselines for comparison? And why use the particular fiscal year of 2019 as a baseline year to determine whether a reduction has occurred, instead of the year prior to the reporting year? According to the IFR, a state that cuts taxes from $100 million to $80 million would experience a "reduction in the net tax revenue" under the Tax Cut Ban if the state's 2019 tax revenue had been $90 million. But no "reduction in the net tax revenue" would occur if the same state's 2019 revenue had instead been $75 million. The IFR attempts to reconcile this nonsensical result by explaining that 2019 "is the last full fiscal year prior to the COVID-19 public health emergency." 86 Fed. Reg. 26,808. But that is irrelevant in defining the statutory text of "reduction in the net tax revenue." Treasury is simply inventing terms and conditions based on its own notions.

Also, according to the IFR, an impermissible "indirect or direct offset" takes place if a state could not otherwise offset tax revenue reductions with its own tax increases or spending cuts. Such spending cuts are determined using the state's 2019 inflation-adjusted spending baseline and may not come from any "areas" (whatever that means) in which ARPA funds are spent. *Id.* at 26,807-10. These requirements do not flow naturally or even inferentially from the text of the Tax Cut Ban. For example, a state that increased spending from $80 million in 2019 to $100 million—perhaps to provide relief during the COVID-19 pandemic—and now cuts spending to $90 million, could not under the IFR use the $10 million spending cut to pay for a tax reduction. A $10 million spending cut combined

7

with a $10 million tax cut should result in no "reduction in the net tax revenue," but apparently Treasury disagrees. Again, Treasury claims an atextual license to impose its own Spending Clause conditions on the states.

Taken together, the IFR's complicated process would require each state to undertake the "Sisyphean task" of estimating and reporting the tax and spending effects of all anticipated state legislative, regulatory, and administrative actions, just so Treasury can determine whether to slap the state with a recoupment action. *Id.* at 26,823; Opinion, ECF 36 at 28. The scheme's unprecedented computation and reporting requirements will prove extremely burdensome for states to satisfy. They are also profoundly invasive, conferring on Treasury effective oversight authority over not only states' tax policy, but also over their lawmaking and especially budgeting decisions. If Congress wanted to use the Spending Clause to require states to employ a vast bureaucracy to calculate tax effects for every new law, regulation, or administrative guidance and to allow Treasury to superintend such taxation, lawmaking, and budgeting decisions, at the very least Congress needs to say so clearly and unambiguously. *Dole*, 483 U.S. at 206; *Pennhurst*, 451 U.S. at 17. It did not. *See also Gregory v. Ashcroft*, 501 U.S. 452 (1991) (applying clear-statement rule to protect federalism). These onerous and intrusive requirements were just invented by Treasury out of whole cloth to enforce its own, rather than Congress's, Spending Clause conditions.

Perhaps Congress did not say this "quiet part out loud" because it is revolutionary and would have touched off grave concerns about upside-down federalism with Americans of all stripes.[4] High school civics teaches us that Congress possesses only enumerated powers, while the sovereign states retain plenary governing authority within the bounds of their own constitutions. To put this another way, a Founder who suggested that Congress's Spending Power meant it could purchase from states

---

[4] *See* Federalist 45 ("Ambitious encroachments of the Federal Government … would be signals of general alarm.").

the authority to oversee state spending and budgets would have been laughed out of Philadelphia—if not tarred and feathered. In Federalist 41, James Madison emphasized that "general welfare" was limited by the enumeration of other powers of Congress, and thus was not "a power to legislate in all cases whatsoever." Likewise, in Federalist 45, Madison assured that "the States will retain, under the proposed Constitution, a very extensive portion of active sovereignty" with federal power limited to clear, few and defined powers, focusing on external objects such as war, peace, negotiation, foreign commerce and federal taxation.

Congress cannot require states to "consent" to the surrender of their sovereign taxing authority by accepting the billions in pandemic relief. Setting aside the coercive aspects of this scheme, the Constitution is a law. Being a law and, indeed, a law made by the people, its limits are not alterable by private or state consent, but only by the consent of the people. Accordingly, the government cannot escape its constitutional bounds by securing in any fashion, let alone purchasing, the consent of any lesser body, whether a collection of individuals, private institutions, or states. As put by the Supreme Court in *New York v. United States*, 505 U.S. 144, 182 (1992): "Where Congress exceeds its authority relative to the states, … the departure from the constitutional plan cannot be ratified by the 'consent' of state officials." Looking at this through the lens of enumerated powers, the court concluded, "[s]tate officials … cannot consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution." *Id.*

## II.  AS A FACTUAL MATTER, THE IFR DOES NOT CURE THE TAX CUT BAN'S LACK OF CLARITY

Rather than reducing the scope of ambiguity, the IFR only introduces new ambiguities and uncertainty into operation of the Tax Cut Ban. For this reason, it fails to make clear the terms of the "deal" that states are expected to accept or reject.

The power Treasury conferred on itself in 31 C.F.R. § 35.10 to recoup state tax cuts that, in its judgment, have not been "paid for," *see* 86 Fed. Reg. at 26,808 and 26,810, offers the easiest way to

see that the IFR does not purge ambiguity out of the ARPA deal being proposed to the states. Under the catch-all power Treasury has arrogated, it would be free to consider "all relevant facts and circumstances" in deciding whether to seek recoupment for unpaid-for tax cuts. This self-conferred power renders Treasury's system a black box.

Under *Heckler v. Chaney*, 470 U.S. 821 (1985), states targeted for recoupment will be powerless to demand equal treatment (by forcing Treasury to seek recoupment from other similar states), for there is a presumption that agency decisions not to undertake enforcement actions are beyond judicial review, akin to prosecutorial discretion. Nor could the *Heckler* presumption be overcome, since the IFR confers unchecked discretion on Treasury to consider "all relevant facts and circumstances"—a test devoid of a mandatory duty, failing to "supply [the courts] with 'law to apply.'" *Id.* at 835-36. ARPA starts by favoring states that increase taxes rather than cut them. But the IFR lets Treasury *further pick* winners and losers from amongst even the brave states still interested in cutting taxes.

States compete on the collective packages of fiscal and tax systems they offer, allowing people to "vote with their feet" by moving to states offering the best packages. *See* Charles M. Tiebout, *A Pure Theory of Local Expenditures*, 64 J. Pol. Econ. 416, 417-18 (1956). But their ability to compete is frustrated by the uncertainty created by the IFR—an uncertainty that undermines important federalism values. The states are competing for a share of billions of dollars of federal funds; they should not be forced into that scrum if they are unable to see the playing field clearly.

Further ambiguity arises because Treasury has not even issued definitive final regulations; it has issued only *interim* final regulations. This leaves Treasury free to revise its regulations significantly after receiving comments. Indeed, Treasury thickens its fog patch by inviting comment on six intricate, multi-part questions posed by the IFR. 86 Fed. Reg. at 26,810-11. Each of these questions, standing alone, introduces further uncertainty; together they create a truly proprietary blend of pea soup opacity. But under *Dole* and *Pennhurst*, Congress can only impose conditions on the states where

the states are, *in advance*, made fully "cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17).[5]

Even more radical ambiguity is introduced because Treasury provides that its IFR incorporates by reference all Executive Orders, presumably including *all future Executive Orders*. *See* 31 C.F.R. § 35.9 ("A recipient must comply with all other applicable Federal statutes, regulations, and Executive orders … ."). Treasury nowhere explains why it has chosen to subject the states taking ARPA monies to new Executive Orders, nor where Treasury derives such power given that Executive Orders may only bind the Executive Branch. Indeed, such a regulatory diktat—not present in ARPA itself—eerily recalls the words uttered by Darth Vader in *The Empire Strikes Back*: "I am altering the deal. Pray I don't alter it any further."

Section 35.9 of the IFR is thus equivalent to telling the states that the tax conditions on the ARPA deal consists of four methodological steps *plus* a black-box step housing unlimitable, all-facts-and-circumstances Treasury enforcement discretion over recoupment, *plus* a second black-box step incorporating any Executive Order that President Biden might happen to issue in the next few years. By signaling the federal government's assertion of authority to make future changes to the Tax Cut Ban, Section 35.9 deprives the states taking ARPA monies of all stability of contract.

Finally, Treasury itself concedes "it may be difficult to predict how a change would affect net tax revenue in future years[.]" 86 Fed. Reg. at 26,807. Professor Somin expands on this concession:

> Estimating the amount of revenue lost as a result of a tax cut is a complex business. Economists sometimes differ among themselves on the methodology. In some instances, as Ohio notes, a tax cut might even increase revenue rather than reduce it. Whether a cut results in a decrease in revenue and by how much may not be known for several years. Even then, experts might still differ on how much of the loss was due to the tax cut …

---

[5] Relatedly, the IFR could be invalidated because it was issued without advance notice and comment. Treasury's invocation of the good-cause exception and its claim that the IFR is mere grantmaking are belied by the unconstitutional nature of the Tax Cut Ban wound into which the IFR pours more salt.

Ilya Somin, *Biden Stimulus Bill Provision Targeting State Tax Cuts Might be Struck Down by Courts for Same Reasons as Trump Efforts to Pull Federal Grants From Sanctuary Cities*, Reason magazine/Volokh Conspiracy blog (May 20, 2021), *available at* https://tinyurl.com/fx27dyfe. Couple that problem with Treasury's questions in the *Federal Register* about how it might alter "macrodynamic scoring, microdynamic scoring, and [the] length of budget windows," *id.* at 26,811, and one now has the recipe for an impenetrable cloud of mathematical and modeling uncertainties obscuring the terms of the deal Congress offered to the states to the point of pitch darkness.

### III.   AS A POLICY MATTER, THE IFR PRODUCES A CURE WORSE THAN THE DISEASE

Treasury's new IFR also embodies a terrible legal and tax-policy "cure" that is much worse even than the purported "disease" of allowing states to decide—as they always have up until now—how to design and implement their own budget policies.

The IFR contravenes principles of federalism. It does this by compounding the array of constitutional problems afflicting ARPA itself.[6] The regulations hopelessly entangle the Treasury Department in the internal tax and interrelated fiscal policy decisions of the states that opt to take ARPA monies. This fact is apparent from Treasury's repeated demand that states taking ARPA monies must prove to Treasury's satisfaction that they can independently "pay for" any tax cuts they might adopt. *See, e.g.,* 86 Fed. Reg. at 26,807 & 26,810. States should not have to go to Treasury on bended knee before they may adopt meaningful tax cuts. Such a new federal power would be transformative and render our Republic unrecognizable. Yet remarkably, Treasury asserts that "[t]his

---

[6] Thirteen states have banded together in the Northern District of Alabama to challenge the Tax Cut Ban. There NCLA set out why ARPA, even before issuance of the Interim Regulations, ran afoul of federalism in its *amicus* brief. *See West Virginia v. Department of Treasury*, Rec. Doc. 48-1 (Apr. 30, 2021) (explaining in Section I how the Tax Cut Ban flunks *Dole* and must be construed narrowly consistent with *Gregory*, in Section II how the Tax Cut Ban is inconsistent with Congress's Spending Clause powers, in Section III how the Tax Cut Ban commandeers the states in violation of the Tenth Amendment, and finally in Section IV how the Tax Cut Ban unconstitutionally intrudes into state taxation powers, *available at* https://nclalegal.org/wp-content/uploads/2021/05/NCLA-Amicus-Brief-States-v.-US-ND-of-Ala.pdf.

Interim Final Rule does not have federalism implications within the meaning of the Executive Order [13132]." *Id.* at 26,817. Such a spurious claim cannot withstand serious scrutiny.

The methodology that the IFR imposes permits the Department to (i) second guess the modeling predictions of states, (ii) make fiscal 2019 the magical year of departure establishing a one-size-fits-all baseline for measuring when a tax cut occurs (thereby interfering with states' ability to set differing baselines, including ones that *average* multiple pre-COVID-19 fiscal years, as opposed to focusing exclusively on 2019, which was a flush year for state tax revenues), and (iii) intrudes into fiscal policy by requiring states to monitor and report to Treasury the monies they spend in areas *not* augmented by ARPA funds.

Whenever and wherever the structure of federalism is violated, accountability suffers, leaving voters badly confused about where to lodge their complaints. *See NFIB v. Sebelius*, 567 U.S. 519, 536 (2012) (citing Federalist 45 for the proposition that "governments more local [are] more accountable than a distant federal bureaucracy"). ARPA's punt of all critical questions regarding how to operationalize the vague Tax Cut Ban to the Treasury Department atomizes accountability into a vapor. *See* 42 U.S.C. § 802(f) ("The Secretary shall have the authority to issue such regulations as may be necessary or appropriate to carry out this section."). The IFR only diffuses accountability further.

*First*, as noted, the IFR's fifth step allows Treasury to base recoupment decisions on "all relevant facts and circumstances, including information regarding planned spending cuts and budgeting assumptions." *Id.* at 26,810. In other words, Treasury can forgo—or seek—recoupment of state tax cuts based on its own view of good state spending and tax policy and any modeling thereof. Treasury's nose, once placed under state budget tents, would never willingly retreat. "Treasury will monitor changes in spending throughout the covered period [because] Treasury may consider such change to be an evasion of the restrictions of the offset provision and seek recoupment of such amounts." *Id.*

13

*Second*, because states compete with each other, they will have to monitor (and urge Treasury to monitor) what other states are doing, to ensure that all states are subject to the same tax-cut restrictions. The states will thus be forced in the discordant role of unwelcome brother's keepers.

*Third*, the IFR requires "consider[ation of] the department, agency, or authority from which spending has been cut and whether the recipient government has spent [ARPA] Funds on that same department, agency, or authority." 86 Fed. Reg. at 26,809-10. And one of the six questions posed by Treasury shows that it may yet redefine which state spending cuts can be credited toward the obligation to "pay for" tax cuts. *Id.* (asking, "How should Treasury and recipient governments consider the scope of a department, agency, or authority for the use of funds to ensure spending cuts are not being substituted with [ARPA] Funds … ?") (text de-italicized). This approach transforms the Treasury Department into a roving judge of the scope of state-law authority for a host of state agencies across the nation. Nothing in the Constitution permits the federal Executive Branch to occupy that kind of catbird's seat.

The IFR takes the form of a "Christmas tree" regulation, tacking all sorts of ornaments onto legislation whose express purpose is to help states rebuild their economies. These federal policy intrusions into state sovereignty do nothing to improve the clarity of the deal that ARPA is offering.[7]

All of these ornaments raise the prospect that Treasury will wield the discretionary authority claimed under the IFR to disallow state tax and fiscal policies with which it disagrees, while strongly encouraging policies that it prefers. That prospect is quite plausible because Treasury construes ARPAs Tax Cut Ban to allow it to assess *the fit* between the tax and spending policies. This arbitrary

---

[7] The IFR injects policies of racial equity into the statute's implementation, *see* 86 Fed. Reg. at 26,817 (citing Executive Order on Advancing Racial Equity and Support for Underserved Communities through the Federal Government (Jan. 20, 2021)), even though ARPA Section 602's four areas of spending are not framed to address that policy issue. Indeed, most of the "Biden-Harris Administration Immediate Priorities" are incorporated into the IFR, despite the lack of textual support in ARPA for their inclusion. *See* https://www.whitehouse.gov/priorities/ (highlighting COVID-19, Climate, Economy (including racial justice, "building back better"), and Health Care, among other areas). The IFR includes numerous attempts to drive climate policy, 86 Fed. Reg. at 26,802-04, and labor policy, *id.* at 26,802, on matters wholly unrelated to ARPA's spending priorities.

agency system hoists a heavy Sword of Damocles over the heads of states that might otherwise be willing to experiment with tax cuts but are chilled by the fear of costly future recoupment bills.

Tellingly, Treasury has offered no explanation of what the Tax Cut Ban accomplishes nor said why it is a necessary part of ARPA. Academics have tried to fill that void. For example, Yale Law Professor David Schleicher, counterintuitively argues that the IFR could not do otherwise than deeply entangle the federal government in state tax and budgeting decisions. He argues that in the absence of strong checks on states' authority to cut their own taxes, states will come to expect federal bailouts and thus will lose all incentive to keep their fiscal houses in order. https://tinyurl.com/2kxevspd (May 10, 2021). Respectfully, this analysis falters.

Preventing moral hazard is an *ex-ante* focused design concern that frequently comes into play in the insurance context because once insured, a party has less of an incentive to avoid danger. ARPA and other future federal COVID-relief measures are not akin to insurance contracts; ARPA is instead a *post hoc* rescue of state budgets and economies hit with an exogenous shock.

Additionally, even if one conceives of ARPA in *Dole*-like contractual terms, whether a state could be seen as sidestepping the terms of the deal and thus as creating moral hazard depends on the terms of the deal first being clear, which they are not. The door of moral hazard also swings both ways. The ability of Treasury to abuse a deal now crammed with black boxes is more to be feared than the states'—which are largely kept in check by balanced-budget requirements—getting hooked on federal COVID largesse.

Moreover, the contractual promissory obligation does not have the force of law and more importantly was not enacted as binding law—it is instead a lesser obligation. When the federal government acts through conditions, rather than the formalities of law (bicameralism and presentment), it seeks to avoid legislation that would more obviously offend the Constitution. For purposes of claiming federal supremacy over state taxation powers, Treasury argues that its conditions

are legally binding, but for purposes of avoiding charges that it is violating the Tenth Amendment or commandeering states, it argues its conditions are merely consensual. It cannot have it both ways.

## CONCLUSION

The Tax Cut Ban collapses the Constitution's pillars. The exertion of federal control over core state taxing authority erodes federalism, including its structural limits on centralized power, its financial accountability, its laboratory function, its dispersion of power to dilute the policy errors of centralization, and ultimately the freedom it accords to state self-government and local communities to pursue the vision of their own citizens. It also seeks to co-opt state opposition, thereby undermining a key structural limit on federal power, it commandeers the states, it violates the guarantee of a republican form of government and eviscerates the very concept of enumeration of federal powers and the Tenth Amendment.

The very wealth of doctrines that prohibit Congress from enacting the Tax Cut Ban, as it is framed, itself provides evidence that a critical underpinning of federalism and state sovereignty has been eviscerated. Close examination of Supreme Court case holdings as to each of the governing doctrines leads to the same conclusion: Congress cannot usurp (or even seek to make inroads against) state taxing authority. This Court should declare the Tax Cut Ban unconstitutional and enjoin its enforcement forthwith.

Respectfully submitted,

/s/ *Angela M. Lavin*
Angela M. Lavin (0069604)
Wegman Hessler LPA
6055 Rockside Woods Blvd., Suite 200
Cleveland, OH 44131
Telephone: 216.642.3342
Facsimile: 216.642.8826
Email: alavin@wegmanlaw.com

Margaret A. Little (*pro hac vice pending*)
Richard A. Samp

16

Sheng Li
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone:    202.869.5210
peggy.little@ncla.legal

*Counsel for Amicus Curiae the New Civil Liberties Alliance*

May 28, 2021

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of this court's orders in this case because this brief was prepared using Microsoft Word in 12-point Garamond, a proportionally spaced typeface in the body of the brief and 10-point typeface in the footnotes.

*/s/ Angela M. Lavin*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Ohio by using the CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

New Civil Liberties Alliance

/s/ *Angela M. Lavin*
Of Counsel