# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| STATE OF OHIO,<br><br>        Plaintiff,<br><br>    v.<br><br>JANET YELLEN, in her official capacity as Secretary of the Treasury; RICHARD K. DELMAR, in his official capacity as acting inspector general of the Department of Treasury; and U.S. DEPARTMENT OF THE TREASURY,<br><br>        Defendants. | Case No. 1:21-cv-181<br><br>Judge Douglas R. Cole |

**BRIEF OF *AMICUS CURIAE* THE BUCKEYE INSTITUTE
IN SUPPORT OF THE STATE OF OHIO'S
MOTION FOR PERMANENT INJUNCTION**

This Court has already determined that "Ohio has shown that it has a substantial likelihood of establishing that, as written, the Tax Mandate does not meet the floor for clarity that the Spending Clause imposes on federal legislation offering money to the States." Dkt. 36, Opinion and Order (hereinafter "Op."), #564. Merely making heads or tails of it "seems a Sisyphean task." *Id.* at #562. *Amicus curiae* agrees and respectfully refers the Court to the arguments it has previously made on that issue. *See* Dkt. 26, *Amicus Curiae* Brief.

In this brief, the *amicus* addresses the relevance of the Interim Final Rule, Dkt. 33-1, that the Government contends cures any constitutional deficiency. The Secretary of the Treasury ("the Secretary") cannot backfill Congress's failure to legislate with clarity. The Constitution requires Congress—not the Executive Branch—to draw clear lines when encroaching upon the States' sovereignty, so as to "enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst St. Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). It is Congress's use of its purse power that has the effect of disrupting the careful federal–State balance, and it is Congress's responsibility to ensure that it does so in a manner that enables States to police that incursion and in a manner that avoids miring States in uncertainty and unduly freezing the exercise of their traditional authorities. Punting the hard questions to discretion of the Executive Branch is inconsistent with our constitutional system.

Even if the Executive Branch had the power to affect a cure, the Interim Final Rule promulgated by the Secretary does not do so. Confirming the Tax Mandate's deficiencies, the rule appoints the Secretary as a virtual viceroy over the States, with authority to review practically every decision that could potentially affect tax revenue—i.e., potentially any exercise of their tax and police powers—and discretion to approve or reject those decisions. Indeed, the Secretary-as-viceroy exercises greater discretion in certain respects than State governors over what States may do.

Worse still, because the Secretary's Interim Final Rule is nothing more than a rule, the Secretary retains the power to withdraw or amend it at any time, even without notice upon a

claim of "good cause." The Administrative Procedure Act is not equal to the requirement that Congress impose conditions on the States' receipt of funds unambiguously in advance of their acceptance, confirming that the responsibility to legislate clearly in this area rests solely upon Congress's shoulders—not those of an executive official who lacks the power of commitment that the Spending Clause requires when State sovereignty is in question.

For these reasons, the Court should permanently enjoin enforcement of the Tax Mandate.

## INTEREST OF *AMICUS CURIAE* [1]

*Amicus curiae* the Buckeye Institute was founded in 1989 as an independent research and educational institution—a "think tank"—to formulate and promote free-market solutions for Ohio's most pressing public policy problems. Through its Legal Center, the Buckeye Institute engages in litigation in support of the principles of federalism enshrined in the U.S. Constitution. The Buckeye Institute is dedicated to upholding the balance of power between States and the federal government as prescribed by the U.S. Constitution. Federalism is perhaps the greatest check on federal power that the Constitution enshrines. It is crucial to ensure the Constitution's system of dual sovereignty be maintained to allow the governments closest to the people to determine policies that impact daily life and encourage States to compete with one another to attract residents, businesses, jobs, and opportunities. The Tax Mandate is an unprecedented arrogation of power by the federal government that ham-handedly disturbs this careful balance in the name of pandemic response.

The Buckeye Institute is also dedicated to creating a pro-growth economic tax system and ensuring responsible government spending. It strives to reform taxes to reward work and encourage entrepreneurship, while also encouraging sustainable state spending to secure prosperity for Ohio residents. In recent years, the State of Ohio has been receptive to its arguments, repeatedly implementing pro-growth rate reductions. The Tax Mandate's capacious, open-

---

[1] All parties have consented to the filing of this brief.

ended prohibition on any state activity that could directly or indirectly offset a reduction in the State's tax revenue frustrates these efforts.

## ARGUMENT

### I. The Executive Branch Cannot Cure Congress's Failure To Speak "Unambiguously" in Imposing Conditions on States' Receipt of Federal Funds

Congressional attempts "to condition the States' receipt of federal funds" must be imposed "'unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Pennhurst*, 451 U.S. at 17 (cleaned up)). This Court has already recognized that Tax Mandate fails to meet this standard. Op., #564 ("the Tax Mandate does not meet the floor for clarity that the Spending Clause imposes on federal legislation offering money to the States"). This constitutional infirmity cannot be cured by the Secretary, via rulemaking or otherwise.

**A.** Precedent dictates that Congress itself, when exercising its power under the Spending Clause, must condition States' receipt of federal funds unambiguously. If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so "unmistakably clear *in the language of the statute*," *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (emphasis added) (holding in the equivalent Eleventh Amendment context), in a manner both "unequivocal and textual," *Dellmuth v. Muth*, 491 U.S. 223, 230 (1989) (same). Congress must draw a clear line demarking the permissible from the impermissible. If Congress fails to clearly cabin an intrusion on State autonomy in this way, then it is not legitimately legislating under the Spending Clause and those vague provisions are facially invalid. *Pennhurst*, 451 U.S. at 17 ("The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'") Put simply, "when Congress desires to impose a condition under the Spending Clause, it is Congress's burden to affirmatively impose

3

the condition in clear and unmistakable statutory terms." *Sharp v. Johnson*, 669 F.3d 144, 154 (3d Cir. 2012).

It necessarily follows that the Constitution does not permit Congress to issue vague statements of principle, depriving States of the ability to guard the boundaries of its autonomy and chilling otherwise acceptable exercises of State authority, while leaving it to the Executive Branch to fill in the details. Reliance on an agency's general gap-filling authority, *see Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173 (2007), is not enough to satisfy the demands of the Spending Clause.

The *en banc* Fourth Circuit addressed that precise issue in *Virginia Department of Education v. Riley*, 106 F.3d 559 (4th Cir. 1997), holding that in order to "commandeer from the States their core function[s]" and sovereignty, Congress itself must "sp[eak] in affirmative and unambiguous terms, so that there could be no question whatsoever of its intent." 106 F.3d at 562.[2] The Court rejected the argument that, in the event of ambiguity, the Court may defer to a reasonable interpretation by the relevant agency. "In order for the States to be bound by a condition upon the receipt of federal monies, the Congress must have affirmatively imposed that condition in clear and unmistakable statutory terms. An adjustment to the critical balance of power between the Federal Government and the States cannot be authorized implicitly." *Id.* at 563. It is "axiomatic," therefore, that any statutory ambiguity "defeats altogether a claim by the Federal Government that Congress has unambiguously conditioned the States' receipt of federal monies in the manner asserted." *Id.* at 567. And it is not enough that Congress indicate, generally, its intent to use its spending power to direct State activity: "a clear statement is required not simply in determining whether a statute applies to the States, but also in determining whether the statute applies in the particular manner claimed." *Id.* at 568 (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460–70 (1991)). *See also id.* at 572 (Motz, J., concurring)

---

[2] In reversing the panel opinion, the *en banc* Fourth Circuit adopted Judge Luttig's dissenting panel opinion. 106 F.3d at 561. Quotes from the opinion are from Judge Luttig's original panel dissent, reproduced by the *en banc* Court.

4

(concurring because she did "not believe Congress has unambiguously required the states to provide education services to disabled children."); *Doe v. Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200*, 115 F.3d 1273, 1278 (7th Cir. 1997) (agreeing with the Fourth Circuit in *Riley*).

As this Court has recognized, *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985) is not to the contrary. *See* Op., #564. While the *Bennett* court discussed regulations promulgated under Title I of the Elementary and Secondary Education Act of 1965, the Court's analysis made clear that Title I itself was sufficiently clear itself to condition the grant of federal funding to the States: "[t]he requisite clarity in this case is provided by Title I." *Bennett*, 470 U.S. at 666. *Bennett* therefore provides no support for the notion that the Secretary may make up for Congress's lapse.

"Clarity is demanded *whenever* Congress legislates through the spending power." *Haight v. Thompson*, 763 F.3d 554, 569 (6th Cir. 2014) (per Sutton, J.). The Constitution requires that the legislature speak unambiguously when conditioning the grant of federal funds to the States. It is Congress, not the Executive Branch, that must make "its intention clear and manifest…if it intends to impose a condition on the grant of federal moneys." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (internal quotations omitted). As this Court recognized, it is "[b]y insisting that Congress speak with a clear voice," the courts "enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." Op., #545 (citing *Pennhurst*, 415 U.S. at 17). Lacking legislative power, the Executive can enable no such thing.

**B.** The reason that Congress, and Congress alone, must shoulder the burden of imposing conditions unambiguously is that the power being exercised is Congress's, not the Executive's. It is Congress's exercise of its Spending Clause power that has the potential disrupt the careful balance between the federal and State governments. And it is therefore Congress's responsibility to ensure that this power be exercised in a manner consistent with the Constitutional limits on what it can and cannot do. Spending Clause legislation is very "much

5

in the nature of a contract," and the "legitimacy of Congress' power to legislate" under the Clause depends on the clarity with which it acts. *Pennhurst*, 451 U.S. at 17. "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *United States v. Bass*, 404 U.S. 336, 349 (1971).

Placing the burden to speak on Congress is consistent with and reflective of the Constitution's interbranch separation of powers and respect for States' traditional sovereign authorities. The Constitution gives Congress, not the Executive Branch, the power to spend for the "general Welfare of the United States." Art. I, § 8, cl. 1. *Cf. Douglas v. Indep. Living Ctr. of S. Calif, Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting) ("[T]he States under the Spending Clause agree only to conditions clearly specified by Congress, not any implied on an ad hoc basis by the courts."). It "carefully separates the 'purse' from the 'sword' by assigning to Congress and Congress alone the power of the purse." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361–62 (5th Cir. 2021); *see* The Federalist No. 78 at 402 (Alexander Hamilton) (Gideon ed., 2001) ("The Executive…holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated."). And because the Founders viewed the "power over the purse" as "the most complete and effectual weapon" in representing the interests of the people, The Federalist No. 58 at 303 (James Madison)—wielded by a body that posed a "a special threat to individual liberty"—they divided [the legislative] power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2203 (2020).

In contrast, "no such institutional protection from abuse exists" when this power is exercised by the "executive branch, where one individual…determined to impose his or her policy preferences regardless of the will of Congress"—here the Secretary of the Treasury—"could proceed unimpeded by the types of institutional checks present in the legislative body." *City of Chicago v. Barr*, 961 F.3d 882, 887 (7th Cir. 2020). And while "[t]he executive branch

6

has significant powers[,]…the power of the purse is not one of them." *Id.* It is one thing for Congress, made up of the elected representatives of the People and bestowed with limited, enumerated powers (including the spending power) to encumber the State's actions. It can, but it must do so carefully and unambiguously. It is quite another, more offensive thing, for the Secretary to take the power for herself, on the basis of statutory ambiguity. The Constitution does not permit a single officer of the United States to serve as proto-receiver and Budget Czar for the sovereign States, guided by nothing more than her view as to what is an appropriate use of the States' police and taxing power. The States certainly never agreed to this arrangement in exchange for joining the Union. Allowing this arrangement would obliterate federalism. So while there is a "tendency to overlook the formalities of separation of powers to address the issue-of-the-day [that] has been seen many times by the courts,…it is no more persuasive now than it was in those cases." *Id.* As the Supreme Court observed in *Printz v. United States*, 521 U.S. 898, 933 (1997), "[m]uch of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form." (citations omitted). While a given result "may appear 'formalistic'…because such measures are typically the product of the era's perceived necessity….the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day." *Id.*

Not only does a clear-statement rule ground the policy and decision making as close to the People as possible, allowing the People to "retain the ultimate decision as to whether or not the State will comply" and "to decline a federal grant" if they "view federal policy as sufficiently contrary to local interests," but it also allows the same People to hold their representatives in Congress accountable for the attempted impingement if they disagree with it. *New York v. United States*, 505 U.S. 144, 168 (1992). "Inasmuch as this Court in *Garcia* [*v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985)] has left primarily to the political process the protection of the States against intrusive exercises" of Congressional power, courts

7

"must be absolutely certain that Congress intended such an exercise." *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991). "'[T]o give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests.'" *Id.* (quoting L. Tribe, American Constitutional Law § 6–25, p. 480 (2d ed. 1988)).

      **C.**    This structural argument is bolstered by basic tenets of administrative law: regulations interpreting statutes are only valid inasmuch as they either "match Congress's unambiguous command or are clarifying a statutory ambiguity." *Tex. Educ. Agency*, 992 F.3d at 361 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984)). Relying on the relevant regulations to indicate what Congress intended, when it did not say so clearly itself, is a tacit admission that the statute itself is too ambiguous to provide the constitutionally required clarity.

Indeed, the clear-statement rule at issue here serves, in part, as a sort of "nondelegation canon," a rule that "forbid[s] administrative agencies from making decisions on their own." Peter J. Smith, *Pennhurst, Chevron, and the Spending Power*, 110 Yale L.J. 1187, 1204 (2001). These sorts of canons "typically expressed as clear-statement rules similar to *Pennhurst*'s, are an effort to link 'important interests' with 'appropriate institutional design.' The interests served by *Pennhurst*'s rule, of course is state autonomy, which (on this account) finds its protection principally in the institutional structure of Congress." *Id*. (quoting Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 317 (2000)). Allowing an agency to fill in the gaps via regulation "not only creates the potential that the agency has attempted to impose a condition that was not within Congress's contemplation, but also risks doing so at the expense of important values of federalism." *Id.*

Accordingly, the only merits question for this Court is whether "*Congress* satisf[ied] the *Pennhurst* clear-statement rule by 'clearly' describing 'the conditions that go along with the acceptance…of funds under the Act.'" *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 281 (Sutton, J., concurring) (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v.*

8

*Murphy*, 548 U.S. 291, 304 (2006)) (emphasis added). Because Congress did not, the Court need go no further.

## II. The APA's Rulemaking Provisions Confirm that No Rule Can Cure the Tax Mandate's Fundamental Vagueness

Even if the Constitution permitted the Executive Branch to cure Congress's failure to unambiguously condition federal funding, the Administrative Procedure Act ("APA") is unequal to the task. Whether or not Congress could enact some statutory scheme that might allow durable clarification of vague statutory intrusions on State sovereignty, the APA's features render it insufficient to that end.

Where the APA falls short is its authorization for federal agencies to withdraw or amend rules at their discretion. The APA "makes no distinction…between initial agency action and subsequent agency action undoing or revising that action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). It is generally enough that an agency "display awareness that it *is* changing position" and that the agency has some reason to believe its new position "to be better." *Id*. Moreover, an agency may change position on a dime, without even providing advance notice and an opportunity for comment, by promulgating an interim final rule (as the Secretary did here) based on some exigency. 5 U.S.C. § 553(b)(3)(B), (d)(3); *see, e.g., Am. Transfer & Storage Co. v. Interstate Com. Comm'n*, 719 F.2d 1283, 1303 (5th Cir. 1983). The result is that an agency is powerless to commit itself to follow any set course and so cannot speak with the durability of a duly enacted statute. Exacerbating the problem is the office exercising rulemaking authority here: the Secretary of the Treasury, an individual executive official who enjoys the "'[d]ecision, activity, secrecy, and dispatch' that 'characterise the proceedings of one man.'" *Seila Law*, 140 S. Ct. at 2203 (quoting The Federalist No. 70 at 475 (Alexander Hamilton) (J. Cooke ed. 1961)).

Consider the contract-law analogy often applied in Spending Clause cases: if a statute is a contract, then a rule like the one here is a post-execution e-mail from a counterparty to the contract saying "I'll interpret that provision this way for now." That e-mail would not be

9

considered part "of the terms of the contract," *City of Pontiac*, 584 F.3d at 277, and could not be said to be sufficient to inform a party of the contract's obligations at the time of execution. The counterparty could change its mind about what it thinks the relevant contract provision means and seek enforcement of the contract against a party that it believes to be infringing. All the Secretary has to do is issue a new rule.

A clear-statement rule ensures any intrusion into State power is cabined to its precise scope. It allows States to jealousy guard their sovereignty, exercise what of it remains to the fullest extent, and police against attempted usurpations. It serves as "concrete safeguard," giving the States themselves the power to "guard against excessive federal intrusion into state affairs and be vigilant in policing the boundaries of federal power." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 655 (1999) (Kennedy, J., dissenting).

A rule promulgated under the APA can achieve none of these things. It provides States with no durable line demarking the limits of the federal government's incursion into its authority. And a rule, even a "final" rule, provides no finality sufficient for a State to order its affairs around its content. It is only an announcement of the Executive's current view, which remains subject to revision through a new rule promulgated at the Secretary's discretion. Put another way, merely because the Secretary has said how she intends to interpret and apply the Tax Mandate now, does not mean that she will maintain those views going forward, even with respect to policy choices that States are making now and in the coming months. States will, therefore, be boxed in by the reality that the terms of the contract may change, leaving them in the lurch.

Even if one were to assume that the current Secretary will stick with the current rule, that still gives the States only limited certainty. A new Secretary, should one take office, could promulgate a new rule. Likewise, a new administration could change course entirely, altering the terms of the "contract" with the States and unilaterally obligating the States to pay the Treasury recoupment for taxing and revenue decisions it had thought were permissible under the current Administration's rules. This Administration's exercise of discretion could

10

suddenly become an unanticipated cost for the States, contrary to the very purposes underlying the clear-statement rule.

The APA and rules promulgated pursuant to it simply cannot cure the fundamental vagueness problem that exists here. Even rules drawn with perfect clarity, *but see* § III *infra*, are still subject to unilateral amendment and revision. If a State cannot rely on the lines drawn via regulation, it will almost certainly be chilled in the exercise of its retained sovereignty. And, in that way, it cannot be said to be able to make a knowing decision now as to whether or not the offered funds are worth the strings that may be attached in the future.

### III. The Secretary's Interim Final Rule Only Highlights the Tax Mandate's Fundamental Vagueness

Even if the Department of the Treasury could theoretically cure the ambiguity of the American Rescue Plan Act through rulemaking, the Interim Final Rule promulgated by the Department of the Treasury falls far short. Despite answering some questions at the margins and providing more information about the procedures that the Treasury will require the States to follow, the Interim Final Rule still leaves crucial questions unanswered about the broad scope of this unprecedented arrogation of State power, while introducing further complications in other ways.

**A.** The rule leaves many central questions unanswered, to the point that what is required of States is anything but clear. As one example, the Interim Final Rule does not define what sorts of "changes in law, regulation or interpretation" are covered by the Tax Mandate. The rule defines "covered change" to include "any final legislative or regulatory action, a new or changed administrative interpretation, and the phase-in or taking effect of any statute or rule where the phase-in or taking effect was not prescribed prior to the covered period." Interim Final Rule, Dkt. 33-1, #444. Does this include changes in property tax assessments? Or a decision to delay sending property tax assessors out to do rounds, due to the pandemic, which might have the effect of lowering revenues? Would it cover the decision to end "to go" sales of alcohol, which have provided restaurants—and state tax collectors—with

11

revenue, over the course of the next year? Does it matter that ending "to go" alcohol sales by restaurants would be a return to the pre-COVID *status quo ante* in most places? Even if such changes are not forbidden under the rule because of the exceptions it recognizes, States are still subject to a federal mandate (contained nowhere in the Tax Mandate itself) to assess those changes' "measured or predicted reductions in tax revenue," which is itself an intrusion on their sovereignty. *Id.* at #505.

On that score, the Interim Final Rule states that "Treasury will provide additional guidance and instructions [*sic*] the reporting requirements at a later date." *Id.* at #454. To be clear, these "instructions" and "requirements" are additional conditions imposed on States. This amounts to an acknowledgement that, even with the Interim Final Rule in hand, the States *still* cannot know the full extent of their obligations under the Tax Mandate. Worse, it indicates that the Secretary anticipates that she or her subordinates will impose these further conditions on States through mere guidance.

One category that the Treasury specifically exempts from the Tax Mandate are "income tax changes—even those made during the covered period—that simply conform with recent changes in Federal law (including those to conform to recent changes in Federal taxation of unemployment insurance benefits and taxation of loan forgiveness under the Paycheck Protection Program)." *Id.* at #445. While a sensible policy choice, it is difficult to see how that choice follows from the text of the Tax Mandate and impossible to predict whether that limitation will survive legal challenge. And this limitation, though an attempt to clarify, itself raises numerous questions that are unanswerable without further exercise of the Secretary's discretion. Will future changes to federal income taxes, including those presently proposed by the Administration, qualify for this exemption? And if these conforming changes raise revenue, can they be considered changes that "pay for," *id.* at #450, other tax decreases?

One potential answer to these and other questions is: "Don't worry about it." The Interim Final Rule contemplate a system wherein a State adds up all their revenues and tries to identify pay-fors to make up any difference. *See id.* at #442. But it remains unclear what

inputs are supposed to be considered as part of this calculation. Nor is it apparent that this formula-based approach is even consistent with the Tax Mandate. And how does the rule handle the possibility that tax revenues are reduced because of changes in the economy due to unforeseen circumstances? Are these to be considered when evaluating covered changes?

All of this is further exacerbated by the Interim Final Rule's charge to the States to "determine the cost of changes in law, regulation, or interpretation that reduce tax revenues and to identify and value the sources of funds that will offset—i.e., cover the cost of—any reduction in net tax revenue resulting from such changes" at the beginning of the year. *Id.* at #440. The rule requires states to "identify and value covered changes that [the State] predicts will have the effect of reducing tax revenue in a given reporting year…based on estimated values produced by a budget model, incorporating reasonable assumptions" and that "aligns with the [State's] existing approach for measuring the effects of fiscal policies." *Id.* at #447–48. But this requirement only highlights the ambiguity of and confusion created by the Tax Mandate. How is a State supposed to know at the beginning of a year the extent to which a "change in interpretation [will] result in a reduction in net tax revenue"? To take one obvious example, States' predictions at the beginning of 2020 were sure to have been off by multitudes. And what if the Treasury concludes that the assumptions that States make or their "existing approach for measuring the effects of fiscal policies" is unreasonable? Ultimately, this does not serve to make things any more clear for States. They do not have a crystal ball, nor can they read the Secretary's mind. This ambiguity remains fatal to the Tax Mandate.

Perhaps to blunt these criticisms, the Interim Final Rule establishes a "de minimis level" of acceptable reduced revenue, "1 percent of the reporting year's baseline," to accommodate the "small changes [that] alter the composition of their tax revenues" and "other policies with marginal effects on tax revenues." *Id.* at #449. The "de minimis level" also attempts to account for "projected revenue effects that turn out to differ from actual effects." *Id.* The creation of this zone of discretion to account for potential ambiguity, though, simply proves the constitutional infirmity in the first place: neither the Tax Mandate, nor the complicated

regulatory scheme meant to enforce it, provide sufficient clarity for States to understand their obligations and the potential costs. That the Secretary intends to use her discretion not to recoup certain monies—a decision she has the discretion to change in an instant, *see* § II *supra*—does not make the text of the statute or regulations any more clear. Ultimately, the obligations imposed on the States must be "unequivocal and textual," *Dellmuth*, 491 U.S. at 230. This is neither.

   **B.** It is also doubtful that the Interim Final Rule can provide any certainty to the States in the areas where it arguably departs from the Tax Mandate's text, such as its exclusion of conforming changes to taxation and the *de minimis* exemption. States' reliance on these provisions of the rule may be subject to challenge in litigation seeking the invalidation of State law as conflicting with the Tax Mandate. Although such issues probably could not arise in federal-court litigation, *see generally DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006), many State courts do recognize taxpayer standing. *See generally* Edward Zelinsky, *Putting State Courts in the Constitutional Driver's Seat: State Taxpayer Standing After Cuno and Winn*, 40 Hastings Const. L.Q. 1, 36–46 (2012) (surveying States' approaches). That includes Ohio. *See State ex rel. Ohio Acad. of Trial Lawyers v. Sheward*, 715 N.E.2d 1062, 1082 (Ohio 1999) ("[W]hen the issues sought to be litigated are of great importance and interest to the public, they may be resolved in a form of action that involves no rights or obligations peculiar to named parties."). Thus, in addition to grappling with the uncertain obligation of the Tax Mandate itself, States must additionally assess whether and to what extent they may rely on the Secretary's "fix." In this way, the Secretary's attempt to clarify the Tax Mandate by departing from its text through such regulatory provisions as the *de minimis* exemption actually increases the uncertainty to States as to the exercise of their sovereign powers.

   **C.** In many ways, the Interim Final Rule simply confirms the overwhelming sweep of the Tax Mandate. It establishes a proto-receivership, under which State governments and their budget offices are mere functionaries reporting to a federal overseer. It requires the State to identify and quantify every policy decision that it makes, and then enact an offset for

14

any that reduces revenue to the satisfaction of the Treasury Department. *See* Interim Final Rule at #454 ("To facilitate the implementation of the framework above…each State and territory will report to Treasury the following items:…" "[e]ach revenue-reducing change made to date during the covered period and the in-year value of each change;" "[e]ach revenue-raising change made to date during the covered period and the in-year value of each change;" and "[e]ach covered spending cut made to date during the covered period, the in-year value of each cut, and documentation demonstrating that each spending cut is covered as prescribed under the Interim Final Rule."). And, despite all that, it indicates that the Treasury will be monitoring the States and indicates that the Treasury—in its discretion—may determine that a State is evading the restrictions and seek recoupment of funds, notwithstanding compliance the onerous procedures it has put in place. *Id.* at #452.

\* \* \*

To the Government's mind, the Interim Final Rule clarifies the lines and boundaries marking the federal government's sweeping incursion into State sovereignty. It does no such thing. Rather than allowing States to police the boundaries of the federal intrusion into every aspect of governance and ensuring that they will not be chilled in the exercise of retained sovereign power, *Davis*, 526 U.S. at 655 (Kennedy, J., dissenting), its 151 pages of instruction, explication, and regulatory text create a labyrinth that States can hardly hope to understand, let alone police. It is anything but clear.

## CONCLUSION

The Court should grant the State of Ohio's motion and permanently enjoin enforcement of the Tax Mandate.

Dated: May 21, 2021

Respectfully submitted,

/s/ Robert Alt
Robert Alt (0091753)
 *Counsel of Record*
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
Telephone: 614.224.4422
robert@buckeyeinstitute.org

Andrew M. Grossman
Sean Sandoloski
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: 202.861.1500
Facsimile: 202.861.1783
agrossman@bakerlaw.com

*Counsel for* Amicus Curiae
*The Buckeye Institute*

## CORPORATE DISCLOSURE STATEMENT

      The Buckeye Institute was founded in 1989 and is an independent research and educational institution whose mission is to advance free-market public policy in the states. It has no parent corporation, nor does any publicly held corporation own 10% or more of its stock. No publicly held corporation or its affiliate that is not a party to this case or appearing amici curiae has a substantial financial interest in the outcome of this litigation by reason of insurance, a franchise agreement, or an indemnity agreement.

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

/s/ Robert Alt
Robert Alt (0091753)
*Counsel for* Amicus Curiae