# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| STATE OF OHIO, | Case No. 1:21-cv-00181-DRC |
| Plaintiff, | District Judge Douglas R. Cole |
| v. | |
| JANET YELLEN, in her official capacity as Secretary of the Treasury, *et al.*, | |
| Defendants. | |

## DEFENDANTS' COMBINED MOTION TO DISMISS AND OPPOSITION TO OHIO'S MOTION FOR FINAL JUDGMENT

**MOTION TO DISMISS**

Defendants move to dismiss Ohio's complaint, Compl., ECF No. 1, under Federal Rule of Civil Procedure 12(b)(1) and (6) for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted.

## TABLE OF CONTENTS

INTRODUCTION..........................................................................................................1

BACKGROUND ..........................................................................................................2

LEGAL STANDARDS.................................................................................................5

ARGUMENT ...............................................................................................................6

I.      OHIO FAILS TO ESTABLISH JURISDICTION....................................................6

       A.      Any Supposed Harm Stemming from Uncertainty Is Moot Because Ohio Has Certified and Because it did So After the Rule Provided More than Sufficient Clarity. ..........................................................................................7

At the preliminary-injunction stage, the Court's exercise of jurisdiction hinged on Ohio's supposed uncertainty over whether to certify. On May 13, 2021, Ohio certified under 42 U.S.C. § 802(d)(1) that it would abide by the conditions, including the offset provision and any implementing regulations and guidance. Several days later, it received its first-tranche payment of over $2.6 billion. Whether or not Ohio pleaded and suffered a cognizable injury from supposed uncertainty over the proposed deal when it brought this action, accepting that deal moots the injury. The Treasury Department's Rule implementing the offset provision also moots this supposed ambiguity-as-injury claim. Ohio now lacks standing to pursue relief based on that moot theory. *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019).

       B.      Ohio Cannot Establish Standing on Any of the Theories Alleged in the Complaint................................................................................................9

Apart from the theory that the Court invoked in its preliminary-injunction ruling, Ohio lacks a logical or evidentiary basis for any theory of standing in its complaint. Any injury premised on potential recoupment is hypothetical and speculative, as well as unripe. So even if the Court still finds standing for the Spending Clause ambiguity claim, it should dismiss the State's remaining coercion and commandeering claims for lack of standing. Moreover, the pre-enforcement, facial nature of Ohio's challenge should tip the balance against Ohio. *See Warshak v. United States*, 532 F.3d 521, 529 (6th Cir. 2008) (en banc).

II.    Ohio Fails to State a Claim and Cannot Succeed on the Merits. .................. 10

    A.    Ohio Had Clear Notice of the Conditions on Fiscal Recovery Funds and Accepted Those Conditions. ........................................................................ 10

        1.    The statute and its implementing regulations provide adequate notice of the conditions on spending Fiscal Recovery Funds. .............................................................................. 13

With or without the guidance provided by the Rule, the offset provision provides sufficient notice to Ohio. The statute provides a list of acceptable uses of Fiscal Recovery Funds. The offset and recoupment provisions clarify that the acceptable uses do not include using federal money to offset reductions in net tax revenue. And the Rule details the process that Treasury will follow to confirm that federal monies have been used for permissible purposes. *See Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1268 (D.C. Cir. 1996) (remarking that "[t]he key word in the title 'Interim Final Rule' . . . is not interim, but final"). The statute, considered with or without the Rule, gives States sufficient notice of the terms of the federal government's offer for them to make an informed decision whether to accept.

        2.    Ohio's lingering concerns do not render the program unconstitutional. .............................................................................. 16

While the statutory provision itself was more than sufficient to notify Ohio of its obligations, the Rule removes any doubt. The Rule sets forth a comprehensive framework for determining whether a State has "directly or indirectly offset" a reduction in net tax revenue with Fiscal Recovery Funds. The Rule explains that States should use their regular scoring methods to determine whether tax changes are expected to reduce revenue relative to the State's inflation-adjusted 2019 tax revenue. And a State "would only be considered to have used Fiscal Recovery Funds to offset a reduction in net tax revenue" if the State "could not identify sufficient funds from sources other than the Fiscal Recovery Funds to offset the reduction in net tax revenue." 86 Fed. Reg. at 26807. Ohio's

remaining quibbles—which hinge on minor aspects of States using spending cuts as permissible offsets—are meritless.

B.     The Rescue Plan Is Not Coercive or Commandeering. ..............................19

The offset provision is a modest restriction on an otherwise generous outlay of federal funds. It simply ensures that Congress's substantial monetary outlay will be used as intended for the public-health and economic-recovery purposes of the spending program. The coercion inquiry is not implicated where, as here, Congress merely restricts how States use newly appropriated federal money because that "is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, ("*NFIB*"), 567 U.S. 519, 580 (2012). And, in any event, *NFIB* forecloses Ohio's argument that the offset provision is coercive or commandeering because there are no monetary consequences if Ohio had turned down the federal funds. Like every other State, Ohio was free to simply decline the federal money if Ohio disliked the offset provision.

III.    THE COURT SHOULD NOT ENJOIN THE OFFSET PROVISION OR DECLARE IT UNCONSTITUTIONAL. ..................................................................................23

A.     Ohio is Not Entitled to a Permanent Injunction. ........................................23

"An injunction against [even] threatened legal action will not issue if the party will have an adequate opportunity to fully present his defenses and objections in the legal action he seeks to enjoin." *Travis v. Pennyrile Rural Elec. Coop.*, 399 F.2d 726, 729 (6th Cir. 1968). Because Ohio may assert its constitutional argument as a "legal defense" to a recoupment action, it "therefore has an adequate remedy." *Id.* And if Ohio were unable to succeed in such hypothetical future proceedings, the result would simply be that it has to repay money—the quintessential example of harm that is *not* irreparable. With potential recoupment nowhere in sight, Ohio's challenge is "premature" and no injunction should issue. *Travis*, 399 F.2d at 729. By contrast, enjoining an Act of Congress would unquestionably impose irreparable harm on the federal government and contravene the public interest. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001).

B.    The Court Should Not Issue a Declaratory Judgment.............................25

Here, a declaratory judgment is not necessary to clarify any legal re-
lations. The Rescue Plan—especially in combination with the Rule—
provides more than sufficient clarity. And if Ohio (or any other re-
cipient of funds) has any lingering questions, "Treasury encourages
State, local, and Tribal governments in particular to provide feed-
back and to engage with Treasury regarding issues that may arise
regarding all aspects of th[e] [Rule] and Treasury's work in admin-
istering the Fiscal Recovery Funds." 86 Fed. Reg. at 26,788. A de-
claratory judgment also should not issue because there is an alterna-
tive, superior remedy available: Ohio may assert its constitutional
arguments as a defense to a recoupment action.

CONCLUSION ...............................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Baptist Mem'l Hosp. v. Azar,*
 956 F.3d 689 (5th Cir. 2020) ............................................................ 11

*Basicomputer Corp. v. Scott,*
 973 F.2d 507 (6th Cir. 1992) ............................................................ 24

*Bell v. New Jersey,*
 461 U.S. 773 (1983) ........................................................................ 23

*Bennett v. Ky. Dep't of Educ.,*
 470 U.S. 656 (1985) .................................................................. *passim*

*Bennett v. New Jersey,*
 470 U.S. 632 (1985) ........................................................................ 19

*Blum v. Bacon,*
 457 U.S. 132 (1982) ........................................................................ 10

*Career Coll. Ass'n v. Riley,*
 74 F.3d 1265 (D.C. Cir. 1996) ........................................................ 15

*Charles v. Verhagen,*
 348 F.3d 601 (7th Cir. 2003) ...................................................... 19, 22

*Children's Hosp. Ass'n of Tex. v. Azar,*
 933 F.3d 764 (D.C. Cir. 2019) ........................................................ 11

*Citizens Bank of Md. v. Strumpf,*
 516 U.S. 16 (1995) .......................................................................... 14

*City of Cleveland v. Ohio,*
 508 F.3d 827 (6th Cir. 2007) .......................................................... 11

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Expense Bd.,*
 527 U.S. 666 (1999) ........................................................................ 23

*Connection Distrib. Co. v. Holder,*
 557 F.3d 321 (6th Cir. 2009) .......................................................... 19

*DaimlerChrysler Corp. v. Cuno,*
 547 U.S. 332 (2006) .......................................................................... 6

*Davis ex. rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999) ................................................................. 18

*Delay v. Rosenthal Collins Grp., LLC*,
  585 F.3d 1003 (6th Cir. 2009) ................................................ 6

*eBay, Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ........................................................ 6, 24

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*,
  746 F.2d 323 (6th Cir. 1984) ................................................ 25

*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*,
  959 F.3d 178–84 (5th Cir. 2020) ........................................... 20

*Gundy v. United States*,
  139 S. Ct. 2116 (2019) .......................................................... 15

*Harris v. Olszewski*,
  442 F.3d 456 (6th Cir. 2006) ................................................ 11

*Irving Indep. Sch. Dist. v. Tatro*,
  468 U.S. 883 (1984) ............................................................. 11

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ............................................................. 18

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................... 6

*Maryland v. King*,
  567 U.S. 1301 (2012) ............................................................ 25

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) ........................................ 12, 19

*Miss. Comm'n on Env't Quality v. EPA*,
  790 F.3d 138 (D.C. Cir. 2015) .............................................. 20

*Missouri v. Yellen*,
  No. 4:21-cv-376, 2021 WL 1889867 (E.D. Mo. May 11, 2021) ...................... 9

*Munn v. Illinois*,
  94 U.S. 113 (1876) ............................................................... 19

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) .................................................. 20, 21, 23

*Ohio v. Yellen,*
    --- F. Supp. 3d ---, 2021 WL 1903908 ...................................................................... *passim*

*Pennhurst State School & Hospital v. Halderman,*
    451 U.S. 1 (1981) ..................................................................................................... 12

*Petit v. U.S. Dep't of Educ.,*
    675 F.3d 769 (D.C. Cir. 2012) ................................................................................ 11

*Powell v. McCormack,*
    395 U.S. 486 (1969) .................................................................................................. 7

*Renne v. Geary,*
    501 U.S. 312 (1991) .................................................................................................. 6

*Reno v. Condon,*
    528 U.S. 141 (2000) ................................................................................................ 20

*Rimini St., Inc. v. Oracle USA, Inc.,*
    139 S. Ct. 873 (2019) .............................................................................................. 14

*Rostker v. Goldberg,*
    453 U.S. 57 (1981) .................................................................................................. 19

*Sampson v. Murray,*
    415 U.S. 61 (1974) .................................................................................................. 24

*School Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.,*
    584 F.3d 253 (6th Cir. 2009) (en banc) .............................................................. 12, 23

*Snider v. Creasy,*
    728 F.2d 369 (6th Cir. 1984) .................................................................................. 11

*Solis v. Emery Fed. Credit Union,*
    459 F. Supp. 3d 981 (S.D. Ohio 2020) .................................................................... 6

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ...................................................................................... 19, 20, 23

*Speech First, Inc. v. Schlissel,*
    939 F.3d 756 (6th Cir. 2019) .................................................................................... 7

*Travis v. Pennyrile Rural Elec. Coop.,*
    399 F.2d 726 (6th Cir. 1968) .................................................................................. 24

*U.S. Parole Comm'n v. Geraghty,*
    445 U.S. 388 (1980) .................................................................................................. 7

*United States v. Butler,*
    297 U.S. 1 (1936) ................................................................................ 23

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) ........................................................................... 11

*United States v. Miami Univ.,*
    294 F.3d 797 (6th Cir. 2002) ............................................................ 11

*United States v. Morrison,*
    529 U.S. 598 (2000) ........................................................................... 20

*United States v. Oakland Cannabis Buyers' Coop.,*
    532 U.S. 483 (2001) ........................................................................... 25

*Virginia Dep't of Educ. v. Riley,*
    106 F.3d 559 (4th Cir. 1997) (en banc) ......................................... 12

*Vonderhaar v. Vill. of Evendale, Ohio*
    906 F.3d 397 (6th Cir. 2018) .............................................................. 6

*Walters v. Nat'l Ass'n of Radiation Survivors,*
    468 U.S. 1323 (1984) ......................................................................... 25

*Warshak v. United States,*
    532 F.3d 521 (6th Cir. 2008) (en banc) ................................... 10, 19

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ........................................................................... 10

*Westside Mothers v. Olszewski,*
    454 F.3d 532 (6th Cir. 2006) ............................................................ 11

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ........................................................................... 15

**Statutes**

28 U.S.C. § 2201 ...................................................................................... 6, 25

42 U.S.C. § 802 ..................................................................................... *passim*

**Regulations**

86 Fed. Reg. 26,786 (May 17, 2021) ................................................... *passim*

**Rules**

Fed. R. Civ. P. 56 ........................................................................................ 5

**Other Authorities**

*Offset,* Black's Law Dictionary (11th ed. 2019) ................................................................. 14

## INTRODUCTION

As part of the American Rescue Plan Act, Congress established the "Coronavirus State Fiscal Recovery Fund," which provides nearly $200 billion to mitigate the fiscal impacts of the pandemic on States and the District of Columbia. 42 U.S.C. § 802. Congress gave States flexibility to use these Fiscal Recovery Funds to cover a wide range of costs, *id*. § 802(c)(1), but Congress specified that the funds could not be used to directly or indirectly offset a reduction in net tax revenue resulting from certain changes in state law, *id*. § 802(c)(2)(A).

Congress authorized the Secretary of the Treasury to "issue such regulations as may be necessary or appropriate to carry out" Section 802, *id*. § 802(f), and the Treasury Department exercised this authority by issuing an Interim Final Rule, *see* Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26,786 (May 17, 2021). In addition to implementing the statutory subsections setting forth the permissible uses of Fiscal Recovery Funds, the Rule outlined a process for States to follow to confirm that they are not using Fiscal Recovery Funds to offset a reduction in net tax revenue. *Id*. at 26,807.

After the Rule was issued, Ohio decided to request $2.6 billion of its allocation of Fiscal Recovery Funds. But the State nevertheless asks this Court to enter final judgment declaring the offset provision—which it dubs the "Tax Mandate," although it is no such thing—unconstitutional and enjoining its enforcement against Ohio. The State's challenges to the offset provision are meritless.

Ohio primarily argues that the offset provision is "unconstitutionally ambiguous." Combined Mot. for Permanent Inj. & Declaratory J., ("FJ Mot.") 7, ECF No. 38. Although the State acknowledges that the Rule "provides some clarity," its position is that regulations have no role to play in a Spending Clause program because spending conditions must be established by statute alone. *Id*. at 12. In opposing Ohio's preliminary-injunction motion, Defendants contended that the Spending Clause entitles a State to unambiguous notice that funding conditions *exist*, and that the particular applications of the statutory

1

requirement are properly worked out among coordinate sovereigns. Under that framework, agency regulations do not have constitutional import, but instead serve as part of the inter-sovereign dialogue, subject to the usual constraints on agency decisionmaking (like the Administrative Procedure Act). Defendants preserve that argument, as this Court was disinclined to accept that approach.

This Court was instead inclined to find that the Spending Clause requires some degree of specificity as to the content of the funding condition. Supreme Court and Sixth Circuit precedent establishes that federal regulations and other agency actions not only establish valid conditions on the receipt of federal funds but are entitled to deference insofar as they implement and interpret funding conditions enacted under the Spending Clause. Under the approach in which the Constitution requires notice of the content of funding conditions, agency regulations that are issued before a contract-like, state-federal transaction inform whether a State has sufficient notice of the restrictions it may accept. And Ohio was aware of the Rule when it agreed to comply with the Treasury Department's regulations.

Ohio's coercion and Tenth Amendment theories fail for reasons explained in Defendants' prior brief. It is not coercive for the federal government to condition how new federal funds will be spent, which is the case here, given that the only consequence for the misuse of Fiscal Recovery Funds is the recoupment of the particular funds that were misused. Contrary to Ohio's premise, its strong desire to receive Fiscal Recovery Funds from the federal government does not give it license to dictate which conditions it is willing to follow after acceptance of the funding conditions.

## BACKGROUND

As part of the American Rescue Plan Act, Congress established the Coronavirus State Fiscal Recovery Fund, which provides nearly $200 billion to the States and the Dis-

trict of Columbia. 42 U.S.C. § 802(b)(2)(A). The Rescue Plan provides States with considerable latitude, in scope and duration, to use the Fiscal Recovery Funds for pandemic-related purposes. Through the "covered period," a State may use the funds "to cover costs incurred":

> (A) to respond to the public health emergency with respect to the Corona-virus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

> (B) to respond to workers performing essential work during the COVID–19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

> (C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID–19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

> (D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1).[1]

The Rescue Plan includes two "further restrictions" to ensure that the broad outlay of funds is used for the identified purposes while funds are available. 42 U.S.C. § 802(c)(2). One limitation (not challenged here) provides that a State may not "deposit" Fiscal Recovery Funds "into any pension fund." *Id.* § 802(c)(2)(B). The other limitation (at issue here) provides in relevant part that a State:

---

[1] The "covered period" began on March 3, 2021 and "ends on the last day of the fiscal year of such State . . . in which all funds received by the State . . . have been expended or returned to, or recovered by, the Secretary." 42 U.S.C. § 802(g)(1).

> shall not use the funds provided under [§ 802] . . . to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 802(c)(2)(A).

By its terms, the funding condition is a "[f]urther restriction on [the] use of funds," which applies only to reductions in "net" tax revenue. *Id.* The statute thus does not prevent a State from changing its tax policy or modifying its tax code—including by cutting taxes. But if a State chooses to reduce its net tax revenue, it may not use the Fiscal Recovery funds to "offset" that reduction.

The Rescue Plan also authorizes the Secretary of the Treasury "to issue such regulations as may be necessary or appropriate to carry out" the applicable statutory provisions. *Id.* § 802(f). On May 10, 2021, Treasury posted an Interim Final Rule implementing the Rescue Plan, which was published in the Federal Register the following week. *See* Notice of Interim Final Rule, ECF No. 33; 86 Fed. Reg. 26,786 (May 17, 2021) ("the Rule"). The Rule sets forth a framework for determining when a State has used Fiscal Recovery Funds to "directly or indirectly offset" a reduction in net tax revenue:

1. For each year during the covered period, a State will use its ordinary budget-scoring process to evaluate whether changes in law, regulation, or interpretation will result in a reduction in tax revenue. If so, the amount of the reduction is the amount a State needs to "pay for" with sources other than Fiscal Recovery Funds.

2. A State need not show how reductions are paid for if the reductions are de minimis, defined as less than 1% of the State's inflation-adjusted 2019 tax revenue. Under those circumstances, a State will not be subject to recoupment.

3. A State will consider the amount of actual tax revenue recorded in the reporting year. If the State's actual tax revenue is greater than its inflation-adjusted 2019 tax

revenue, the State did not violate the offset provision (regardless of what changes it made to its tax laws) because it experienced no reduction in net tax revenue.

4.   If a State's actual tax revenue in the reporting year is less than the State's inflation-adjusted 2019 tax revenue, the State will identify any sources of funds that have been used to permissibly offset the total value of covered tax changes.  These include any tax changes that increase tax revenue and any spending cuts in areas where the State is not spending Fiscal Recovery Funds.  The State then subtracts those permissible offsets from the total value of revenue-reducing changes calculated in Step 1 to determine what portion of the revenue-reducing changes has not been paid for.  The State is then potentially subject to recoupment for that amount or the difference between the State's actual tax revenue and its inflation-adjusted 2019 tax revenue, whichever is greater.

5.   If there are any amounts that could be subject to recoupment, Treasury will provide notice to the State and the State will have an opportunity to respond. *See* 86 Fed. Reg. at 26,806–10.

On March 17, 2021, Ohio filed a complaint alleging that the offset provision is unconstitutional on its face.  The same day, the State moved for a preliminary injunction, which this Court denied on May 12.  *Ohio v. Yellen*, --- F. Supp. 3d ---, 2021 WL 1903908, at *15 (S.D. Ohio May 12, 2021).  On May 13, Ohio signed and submitted its certification to Treasury under 42 U.S.C. § 802(d), agreeing to abide by the offset provision "and Treasury's regulations implementing" the Rescue Plan.  Murnieks Decl., Ex. 2, ECF No. 38-1.  Five days later, "Ohio received funds through the [Rescue Plan]."  *Id.* ¶ 6.

## LEGAL STANDARDS

Ohio seeks a permanent injunction and declaratory judgment.  Such relief is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A permanent injunction requires not only success on the merits, but also a demonstration

that (1) the movant has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) an equity remedy is warranted after balancing the hardships; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "In a case of actual controversy within [a district court's] jurisdiction," the Declaratory Judgment Act also authorizes the court, in its discretion, to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

But Ohio has not even made plausible allegations in its complaint that would support this Court's jurisdiction or a valid claim on the merits. Courts should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (citations omitted). "The Court lacks subject-matter jurisdiction over a claim—and thus the claim is subject to dismissal—if the plaintiff fails to show that he has standing to bring it" through sufficient allegations. *Solis v. Emery Fed. Credit Union*, 459 F. Supp. 3d 981, 986 (S.D. Ohio 2020) (Cole, J.); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Similarly, for purposes of Defendants' Rule 12(b)(6) motion, the Court must "accept as true all non-conclusory allegations in the complaint and determine whether they state a plausible claim for relief." *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009). "But a pleading must offer more than mere labels and conclusions, because a formulaic recitation of the elements of a cause of action will not do." *Solis*, 459 F. Supp. 3d at 987 (citations omitted).

## ARGUMENT

### I. OHIO FAILS TO ESTABLISH JURISDICTION.

"The party that invokes federal jurisdiction must establish its standing at every stage of the litigation" "for each claim [it] press[es]," *Vonderhaar v. Vill. of Evendale, Ohio*, 906 F.3d 397, 401 (6th Cir. 2018) (citing *Lujan*, 504 U.S. at 560; *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)), with a burden of proof that increases "with the manner

and degree of evidence required at the successive stages of litigation," a burden that, for Ohio's request for final judgment, requires the State to adduce actual evidence, *Lujan*, 504 U.S. at 561. Here, as the Court recognized, the justiciability question "turn[s] to a large extent on how the injury is characterized." *Ohio*, 2021 WL 1903908, at \*3. The Court previously concluded that Ohio suffered an injury when it "brought this action" based on the State's "ability to send the statutorily-required certification" with a lack of "information necessary to understand the deal." *Id.* at \*8. But "just barely." *Id.*; *see id.* (acknowledging this injury "could be characterized as 'abstract,' or 'intangible,' rather than 'concrete and particularized,'" and "is perhaps an odd form of injury in fact").

To the extent Ohio had standing when it filed the complaint because it lacked the information needed to decide whether to submit a certification, the case is now moot. Even assuming Ohio could have submitted a certification based only on the statutory text, it did not. The State instead submitted a certification with full awareness of the Rule's content. Moreover, as the Court suggested in its preliminary-injunction ruling, none of Ohio's other theories of standing satisfies the requirements of Article III.

### A. Any Supposed Harm Stemming from Uncertainty Is Moot Because Ohio Has Certified and Because it did So After the Rule Provided More than Sufficient Clarity.

Article III "mandates that a claim must not become moot prior to the court's decision on the merits." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019). "[W]hen the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," the case is moot and must be dismissed. *Id.* (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)); *see also U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (describing mootness as "the doctrine of standing set in a time frame").

At the preliminary-injunction stage, the Court's exercise of jurisdiction hinged on Ohio's supposed uncertainty over whether to certify, a theory absent from Ohio's complaint. *Ohio*, 2021 WL 1903908, at \*8 ("Ohio could not exercise its sovereign prerogative,

as it had no way of knowing whether accepting these funds . . . represented a good deal or a bad deal for the citizens of this State."). Two post-argument events, though, create more than "an additional jurisdictional wrinkle," *id.* at *10; those events create a jurisdictional roadblock by mooting Ohio's sole supposed harm.

*First*, on May 13, 2021, Ohio certified under 42 U.S.C. § 802(d)(1) that it would abide by the conditions, including the offset provision and any implementing regulations and guidance. Murnieks Decl. ¶ 3 & Ex. 2. Several days later, it received its first-tranche payment of over $2.6 billion. *See id.* Whether or not Ohio pleaded and suffered a cognizable injury from uncertainty over the proposed deal when it brought this action, accepting the deal moots that injury. Ohio now lacks standing to pursue relief based on that moot theory.

*Second*, the Rule implementing the offset provision also moots this supposed ambiguity-as-injury claim. *See* Notice of Interim Final Rule; *Ohio*, 2021 WL 1903908, at *1 n.2. As discussed above, Congress authorized the Secretary to promulgate regulations implementing the Fiscal Recovery Fund, and the Rule details how Treasury will implement the offset provision. *See* Background, *supra*; Section II.A., *infra*. Not only has Ohio received further details about this implementation, it has accepted the proposed deal as detailed. *See* Murnieks Decl. Ex. 2 at 2 ("Recipient understands and agrees that the funds disbursed under this award may only be used in compliance with section 602(c) of the Social Security Act (the Act) *and Treasury's regulations implementing that section and guidance*." (emphasis added)).

To obtain final judgment, Ohio must prove—with evidence—that it has an injury to support standing. But the State has not adduced any evidence to satisfy its burden; indeed, the only evidence in the record demonstrates that the State understood that the Rule dictated how its Fiscal Recovery Funds may or may not be spent. Ohio's standing cannot, at this stage, be based merely on allegations. And it cannot be based on allegations that the State is uncertain whether to accept conditioned funding that it has already

accepted. Those developments moot this case because the theory of injury on which the Court previously relied is no longer available in light of subsequent events.

**B. Ohio Cannot Establish Standing on Any of the Theories Alleged in the Complaint.**

Apart from the theory that the Court invoked in its preliminary-injunction ruling, Ohio lacks a logical or evidentiary basis for any theory of standing in its complaint.

As the Court correctly held, the State's "stated" harms premised on potential recoupment do not "suffice" for standing. *Ohio*, 2021 WL 1903908, at *8. That injury is hypothetical and speculative, as well as unripe, and the only precedent Ohio has cited is unavailing. Defs.' Opp'n to Ohio's Mot. for Prelim. Inj. ("Defs.' PI Opp'n"), ECF No. 29; *cf. Ohio*, 2021 WL 1903908, at **7–8 (noting that "it is difficult to conceive that some potential, far-in-the-future recoupment efforts could rise to the level of 'imminent'" because any such injury is "too remote"). The only other district court ruling on another State's similar preliminary-injunction motion dismissed that State's case entirely for lack of standing and ripeness. *Missouri v. Yellen*, No. 4:21-cv-376, 2021 WL 1889867, at *3–5 (E.D. Mo. May 11, 2021), *appeal filed,* No. 21-2118 (8th Cir. May 18, 2021); *see* Defs.' Notice of Suppl. Authority, ECF No. 35. Ohio only reiterates its citations that this Court found inapposite, *see Ohio*, 2021 WL 1903908, at *9 n.7 (distinguishing Ohio's standing cases), and fails to either address the *Missouri* case or include any new or different arguments about standing or ripeness in its current motion. So even if the Court still finds standing for the Spending Clause ambiguity claim, it should dismiss the State's remaining coercion and commandeering claims for lack of standing. *See id.* at *11 n.8.

If the Court finds that the question of justiciability remains "close," *Ohio*, 2021 WL 1903908, at *1, the pre-enforcement, facial nature of Ohio's challenge should tip the balance against Ohio. Courts are "reluctan[t] to grant relief in the face of facial, as opposed to as-applied, attacks on statutes," let alone pre-enforcement facial attacks, where a court

would be prematurely interpreting "'statutes on the basis of factually barebones records.'" *Warshak v. United States*, 532 F.3d 521, 529 (6th Cir. 2008) (*en banc*) (quoting *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 450 (2008)). Ohio has not developed a factual record demonstrating that Treasury would recoup funds from the State, and it is critical to ensure that the jurisdictional prerequisites for this suit are adequately satisfied before entering judgment. Because they are not, the Court should dismiss this action or, in the alternative, deny the State's motion.

## II. OHIO FAILS TO STATE A CLAIM AND CANNOT SUCCEED ON THE MERITS.

### A. Ohio Had Clear Notice of the Conditions on Fiscal Recovery Funds and Accepted Those Conditions.

Ohio's principal contention on the merits is that the offset provision is "unconstitutionally ambiguous." FJ Mot. 7. Ohio asks the Court to pose two questions: (1) is the statute's spending condition ambiguous?; and (2) can an unconstitutionally ambiguous statute be cured by an agency's regulatory guidance? *Id.* at 7-8. That framing is incorrect.

For starters, it is settled that the federal government need not "prospectively resolve every possible ambiguity concerning particular applications of the requirements" of a Spending Clause program in order for the program to pass constitutional muster. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985). In a cooperative state-federal program, some uncertainty, at some level of granularity, is inevitable. Many courts have recognized, in wide-ranging contexts, that agency regulations have a role to play in the implementation of spending conditions.

In *Blum v. Bacon*, 457 U.S. 132 (1982), for example, the Supreme Court held that a regulation establishing requirements for a grant program under Title IV-A of the Social Security Act, and the Secretary's decision to apply that regulation in rejecting a state plan, "clearly deserve judicial deference." *Id.* at 141. The Supreme Court admonished that it had "often noted that the interpretation of an agency charged with the administration of a statute is entitled to substantial deference." *Id.* (citing cases). Such a holding would

make no sense if the federal government could enforce only what was unambiguous on the face of a Spending Clause statute.

The Sixth Circuit has also recognized that it is appropriate to consider regulatory guidance when applying Spending Clause conditions. In *Harris v. Olszewski*, 442 F.3d 456, 467-68 (6th Cir. 2006), for example, the Sixth Circuit noted that HHS had implemented a condition on Medicaid funds through interim and final rules, and upheld the agency's approval of a state plan amendment. Writing for that court, Judge Sutton explained that "[i]n carrying out that responsibility, HHS was exercising Congress's 'express delegation of specific interpretive authority.'" *Id*. at 467 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)). Indeed, as Judge Sutton noted, courts of appeals routinely accord *Chevron* deference to agency actions implementing the Medicaid statute's funding conditions. *See id*. at 467-68 (citing cases); *see also Westside Mothers v. Olszewski* ["*Westside Mothers II*"], 454 F.3d 532, 543–44 (6th Cir. 2006). According deference to the agency's interpretation implicitly recognizes that the agency has clarified the contours of the statutory funding condition. *See, e.g., City of Cleveland v. Ohio*, 508 F.3d 827, 843 (6th Cir. 2007) (deference applies "[w]here Congress has left gaps in legislation to be filled in by an administrative agency"). And the Sixth Circuit has reversed the judgment of a district court that "ignored the Medicaid Act's implementing regulations" and admonished that "[i]mplementing regulations obligate States" to follow specified procedures. *Westside Mothers II*, 454 F.3d at 543.[2]

---

[2] *See also United States v. Miami Univ.*, 294 F.3d 797, 814-15 (6th Cir. 2002) (giving *Chevron* deference to regulations implementing FERPA's conditions on federal education funds); *Snider v. Creasy*, 728 F.2d 369, 371-73 (6th Cir. 1984) (holding that regulations implementing the AFDC program preempted state law); *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 891-92 (1984) (applying regulations implementing conditions on States that received funds under the Education of the Handicapped Act); *Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 692-93 (5th Cir. 2020) (Medicaid); *Children's Hosp. Ass'n*

The foregoing authorities establish that agency regulations have a role to play in implementing funding conditions in Spending Clause legislation. Ohio makes no attempt to reconcile its position with this body of precedent. But these cases demonstrate that Ohio's framing of the Spending Clause is incorrect.

At the preliminary-injunction stage, Defendants argued that the Spending Clause was best understood to require unambiguous knowledge of the *existence* of a spending condition. Under that approach, which has considerable supporting authority,[3] agency regulations do not bear on the question of constitutionality. If a statutory funding condition *existed*, the implementing agency could regulate the details of the condition subject to the Administrative Procedure Act and the other typical constraints; if not, any agency regulation imposing funding conditions would be unauthorized by the statute.[4] Recognizing that the Court was disinclined to agree, Defendants preserve that argument.

---

*of Tex. v. Azar*, 933 F.3d 764, 770 (D.C. Cir. 2019) (Medicaid); *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 778 (D.C. Cir. 2012) (Individuals with Disabilities Education Act).

[3] *See* Defs.' PI Opp'n 23. The Court's contrary conclusion was based on its reading of *School Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253 (6th Cir. 2009) (en banc). There, the question was whether the No Child Left Behind Act required States to use their own funds to "cover the additional costs of complying with" the Act's requirements to the extent not covered by federal funding. *Id.* at 258–59. The district court ruled that States were indeed required to do so, and its judgment was affirmed by an evenly divided en banc court. As Judge Sutton recognized in upholding the district court's judgment, there were no agency regulations at issue in the *Pontiac* case. *See City of Pontiac*, 584 F.3d at 294 (Sutton, J., concurring) (noting that no one claimed that the "offhand comments by former Secretary of Education Rod Paige" "deserve deference, whether under *Chevron* or any other doctrine"). And even the dissenting judges did not reject the Supreme Court's admonition that "a State's potential obligations" under a funding condition may be "largely indeterminate," as long as Congress gives "clear notice to the States that they . . . would indeed be obligated to comply with" the condition. *Pennhurst*, 451 U.S. at 25; *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002).

[4] That is the upshot of *Virginia Dep't of Educ. v. Riley*, 106 F.3d 559, 568 (4th Cir. 1997) (en banc), cited by Ohio. There, the court reasoned that an agency could not, by regulation, act *ultra vires* to impose spending conditions that did not exist as part of the

The Court was instead inclined to analogize funding conditions to contract terms, on the theory that a State's right to sufficient notice is akin to the right of a contracting party to understand the terms of the bargain. Under that approach, agency regulations inform the terms of the "contract." The "contractual" terms to which Ohio agreed include not just the Rescue Plan itself, but also all "regulations adopted by Treasury pursuant to section 602(f) of the Act." Murnieks Decl. & Ex. 2 at 2. And Ohio was aware of the Rule's conditions when the State submitted its certification. *Id.*; *see* 42 U.S.C. § 802(f); *see Bennett*, 470 U.S. at 670 (explaining that an agency's assessment of a State's liability under a funding program "should be informed by the statutory provisions, regulations, and other guidelines provided by the Department" at the time "the grants were made"); *id.* at 671 (examining ambiguity "[b]ased on the language of the statute and the regulation" in place when the grants were made).

### 1. The statute and its implementing regulations provide adequate notice of the conditions on spending Fiscal Recovery Funds.

With or without the further guidance provided by the Rule, the funding conditions provide sufficient notice to be accepted by the States who find the arrangement desirable. After setting out the permissible uses of Fiscal Recovery Funds, 42 U.S.C. § 802(c)(1), Congress delineated two "[f]urther restriction[s] on the use of funds," *id.* § 802(c)(2). One of those restrictions is the offset provision, which explains that States cannot use Fiscal Recovery Funds "to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period." *Id.* § 802(c)(2)(A). Congress specified that if States misuse Fiscal Recovery Funds as an impermissible offset, Treasury may recoup an amount equal to that misuse. *Id.* § 802(e).

---

statute. In any event, soon after the decision was issued, Congress ratified the agency interpretation that the Fourth Circuit had doubted. *See* Pub. L. No. 105-17, § 612, 111 Stat. 37, 60 (1997).

Under the terms of the statute, the offset provision applies only when a State uses Fiscal Recover Funds to "offset" a reduction in "net" tax revenue resulting from changes in state law. 42 U.S.C. § 802(c)(2)(A). That restriction is not implicated if reductions in some taxes are balanced with increases in others because no "net" tax revenue reduction would then occur. A State also does not transgress the limitation if it does not use Fiscal Recovery Funds to "offset" a reduction in net tax revenue. *Id.* The term "offset" means "[t]o balance" or "compensate for." Offset, Black's Law Dictionary (11th ed. 2019); *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18–19 (1995) (describing "offset" as balancing out a specific loss with another specific gain). And the Act's reference to States' "directly or indirectly" offsetting a reduction in net tax revenue does not alter the statutory meaning of the word they modify (here, "offset"). *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 878 (2019). Taken together, the offset provision's language ensures that States are not employing federal funds to finance state tax cuts that decrease net tax revenue. For example, assuming no other changes, a State could not receive $2 billion in Fiscal Recovery Funds, cut its income tax by an amount expected to equal $2 billion, and use the Fiscal Recovery Funds to offset the revenue loss. That would be using Fiscal Recovery Funds to "directly" offset a reduction in net tax revenue. 42 U.S.C. § 802(c)(2)(A). Similarly, again assuming no other changes, a State could not use Fiscal Recovery Funds to replace $2 billion in planned state expenditures on COVID-19 testing and then use the $2 billion it had originally budgeted for that purpose to offset a $2 billion reduction in state income tax. That would be using Fiscal Recovery Funds to "indirectly" offset a reduction in net tax revenue. *Id.* But, as always, States are free to offset net-tax-revenue reductions by other means, including certain spending cuts.

The Rule simply explains how the terms of the statutory funding condition are to be operationalized. The Rule explains, for example, that the State's benchmark tax revenue should be from 2019—the year before coronavirus upended State budgets. 86 Fed. Reg. at 26,808. It explains that States are authorized to score tax changes in any manner

that uses "reasonable assumptions" and "that aligns with the recipient government's existing approach for measuring the effects of fiscal policies, and that measures relative to a current law baseline." *Id.* at 26,809. And it confirms that States remain free to change their tax policy, so long as they fund anticipated reductions in net tax revenue with sources other than Fiscal Recovery Funds. *Id.* at 26,807.

The statute thus provides a list of acceptable uses of Fiscal Recovery Funds. The offset and recoupment provisions clarify that the acceptable uses do not include using federal money to offset reductions in net tax revenue. And the regulations detail the process that Treasury will follow to confirm that federal monies have been used for permissible purposes.[5] The statute, considered with or without the regulatory guidance, gives States sufficient notice of the terms of the federal government's offer for them to make an informed decision about whether to accept.

It does not matter that the Rule is an Interim Final Rule. FJ Mot. 11. "The key word in the title 'Interim Final Rule,' unless the title is to be read as an oxymoron, is not interim, but *final*." *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1268 (D.C. Cir. 1996). "'Interim' refers only to the Rule's intended duration—not its tentative nature." *Id.* And Ohio was aware of the Rule when it submitted its certification and accepted Fiscal Recovery Funds.

---

[5] Ohio seeks also to rely on the non-delegation doctrine. FJ Mot. 10. "Only twice in this country's history" (and only in 1935) has the Supreme Court "found a delegation excessive." *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality op.). Although Congress must provide some "'intelligible principle' to guide the agency's discretion," FJ Mot. 10 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)), Ohio makes no argument that the offset provision lacks an "intelligible principle" to guide the Secretary's discretion.

### 2. Ohio's lingering concerns do not render the program unconstitutional.

Soon after the Secretary published the Rule, Ohio certified that it was ready to receive Fiscal Recovery Funds and that it understood that its grant was subject to "Treasury's regulations implementing" the Rescue Plan. Murnieks Decl. Ex. 2. Ohio now acknowledges that the Rule provided "some clarity"—evidently, enough clarity to reassure the State that it wanted to accept the offered bargain.

While the offset provision itself was more than sufficient to notify Ohio of its obligations, *see* Section II.A.1., *supra*, the Rule removes any doubt. The Rule sets forth a comprehensive framework for determining whether a State has "directly or indirectly offset" a reduction in net tax revenue with Fiscal Recovery Funds. *See* Background, *supra*. This easily satisfies the Spending Clause.

The Court previously identified two aspects of the offset provision it found ambiguous based on the statutory text alone: "net tax revenue" and "indirectly offset." *Ohio*, 2021 WL 1903908, at *12–13. The Court acknowledged that the Rule appeared to address its lingering questions regarding "net tax revenue." *See id.* *12 n.9. As noted above, the Rule explains that States should use their regular scoring methods to determine whether tax changes are expected to reduce revenue relative to the State's inflation-adjusted 2019 tax revenue. 86 Fed. Reg. at 26,808-09. As for offsets—both direct and indirect—the Rule covers that as well. A State "would only be considered to have used Fiscal Recovery Funds to offset a reduction in net tax revenue" if the State "could not identify sufficient funds from sources other than the Fiscal Recovery Funds to offset the reduction in net tax revenue." *Id.* at 26,807. "If sufficient funds from other sources cannot be identified to cover the full cost of the reduction in net tax revenue," the "remaining amount not covered by these sources will be considered to have been offset by Fiscal Recovery Funds, in contravention of the offset provision." *Id.* State tax-law changes that increase tax revenue, certain spending cuts, and even organic revenue growth—increased tax revenue

from existing sources due to, for example, an improved economy—can all be used to "offset" net-tax-revenue reductions. *Id.*; 86 Fed. Reg. at 26,809–10; *see* Defs.' PI Opp'n 16–18. And a State need not demonstrate how it has offset reductions in net tax revenue at all if the reductions are *de minimis*—*i.e.*, less than 1% of the inflation-adjusted 2019 baseline—a threshold that translates to approximately $300 million for Ohio.

For its part, after scrutinizing the Rule, Ohio zeroes in on two minor issues that it now claims are ambiguous. *See* FJ Mot. 11–14. Neither is.

The first is the word "areas," as in States "may cut spending in certain areas to pay for covered changes that reduce tax revenue." 86 Fed. Reg. at 26,809. "What this means," Ohio says, "is anyone's guess." FJ Mot. 12. But nobody needs to guess because the Rule explains it: "To better align with existing reporting and accounting," Treasury considers "whether the recipient government has spent Fiscal Recovery Funds on th[e] same department, agency, or authority" from which that government has cut spending. 86 Fed. Reg. at 26,809–10. If the recipient governments "have not spent Fiscal Recovery Funds in a department, agency, or authority, the full amount of the reduction in spending counts as a [permissible] covered spending cut, up to the recipient government's net reduction in total spending." *Id.* at 26,810. "If they have, the Fiscal Recovery Funds generally would be deemed to have replaced the amount of spending cut and only reductions in spending above the amount of Fiscal Recovery Funds spent on the department, agency, or authority would count" as permissible offsets for a reduction in net tax revenue. *Id.* By "prevent[ing] recipient governments from using Fiscal Recovery Funds to supplant State or territory funding in the eligible use areas, and then us[ing] those State or territory funds to offset tax cuts," Treasury's approach reinforces the plain text of the offset provision by "ensur[ing] that Fiscal Recovery Funds are not used to 'indirectly' offset revenue reductions due to covered changes." *Id.*; *see* Section II.A.1., *supra*; Defs.' PI Opp'n 16–18.

Ohio's second concern is related to this minor issue. The State essentially complains that Treasury has not spelled out every circumstance in which a State could

"eva[de]" the offset provision through "a spending cut [that] is subsequently replaced with Fiscal Recovery Funds and used to indirectly offset a reduction in net tax revenue." FJ Mot. 12–13. But as an initial matter, it is not difficult to understand what the regulatory language refers to: the prospect that a State might cut spending in an area where it is not spending Fiscal Recovery Funds in a given year, then might spend Fiscal Recovery Funds in that area in a subsequent year, effectively using the Fiscal Recovery Funds to backfill the earlier cut and thus using the funds to indirectly offset a reduction in net tax revenue. For example, if a State claims to be funding a $1 billion tax cut with spending cuts on necessary sewer infrastructure, only to turn around the next year and spend $1 billion of Fiscal Recovery Funds on necessary sewer infrastructure, then Treasury may scrutinize that action to "ensure recipient governments use Fiscal Recovery Funds in a manner consistent with the prescribed eligible uses" and not to "indirectly offset a reduction in net tax revenue." 86 Fed. Reg. at 26,810. At any rate, not "every improper expenditure" must be "specifically identified and proscribed" to satisfy the Spending Clause. *Bennett*, 470 U.S. at 666; *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (same); *Davis ex. rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (same); Reply in Supp. of Mot. for Prelim. Inj., ("Ohio PI Reply") 6, ECF No. 30 ("Congress need not specifically identify every permissible and impermissible act."). Such premonition is "impossible" for both Congress and the agency. *See Charles v. Verhagen*, 348 F.3d 601, 608 (7th Cir. 2003); *Mayweathers*, 314 F.3d at 1067.

Ohio's present concerns with the statutory and regulatory framework are decidedly on the margins. Because declaring an Act of Congress unconstitutional is "the gravest and most delicate duty that" federal courts are "called on to perform," *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) (quotation marks omitted), this Court should be wary of enjoining portions of the Rescue Plan based on the State's speculative concerns about possible future disputes. Indeed, the Rule specifies that no Fiscal Recovery Funds will be recouped before a State is given notice and an opportunity to seek reconsideration. 86

Fed. Reg. at 26,811–12. As the Supreme Court's decisions illustrate, disputes over the particular grant conditions are not resolved in the abstract, but in the concrete context of a recoupment proceeding. *See, e.g., Bennett v. Kentucky*, 470 U.S. at 658 (explaining that "the dispute is whether the Secretary correctly demanded repayment based on a determination that Kentucky violated requirements that Title I funds be used to supplement, and not to supplant, state and local expenditures for education"); *Bennett v. New Jersey*, 470 U.S. 632, 637 (1985) (explaining that the dispute arose out of the Secretary's final decision ordering repayment of specified federal education funds).[6]

After all, "[a]t stake is not an attempt to invalidate the law in a discrete setting but an effort to leave nothing standing, to invalidate the law in each of its applications, to take the law off the books completely." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (citing *Warshak* 532 F.3d at 528). So "[i]f there is doubt, the expressed will of the legislature should be sustained." *Munn v. Illinois*, 94 U.S. 113, 124 (1876); *United States v. Morrison*, 529 U.S. 598, 607 (2000); *Reno v. Condon*, 528 U.S. 141, 148 (2000). The Court should reject Ohio's ambiguity challenge.

### B. The Rescue Plan Is Not Coercive or Commandeering.

Ohio fares no better in arguing that the offset provision violates the Tenth Amendment and unconstitutionally coerces States into accepting Fiscal Recovery Funds with the attendant conditions. Compl. ¶¶ 37–42, 46–49; FJ Mot. 14–17; *see* Defs.' PI Opp'n 20–21 (explaining that the inquiry under both the Spending Clause and the Tenth Amendment is the same). The offset provision is, by any measure, a modest restriction on an otherwise generous outlay of federal funds. It simply ensures that Congress's substantial monetary outlay will be used as intended for the public-health and economic-recovery "federal

---

[6] At oral argument on its preliminary-injunction motion, Ohio incorrectly suggested that the posture of *South Dakota v. Dole*, 483 U.S. 203 (1987), provided support for a pre-enforcement challenge based on the asserted ambiguity of a grant condition. But there was no issue of ambiguity in *Dole*.

purposes" of the spending program. *Dole*, 483 U.S. at 208. And if Ohio disliked the offset provision (or anything else), it was free to simply decline the federal money.

Ohio's position reflects a misunderstanding of governing law. The coercion inquiry is not implicated where, as here, Congress merely restricts how States use newly appropriated federal money because that "is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012) ["NFIB"]; Defs.' PI Opp'n 18; *see, e.g., Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 183–84 (5th Cir. 2020); *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 179 (D.C. Cir. 2015); *Religious Sisters of Mercy v. Azar*, --- F. Supp. 3d ---, 2021 WL 191009, at *25 (D.N.D. Jan. 19, 2021), *appeal pending on other grounds*, No. 21-1890 (8th Cir.). And that is exactly what Congress has done here: the offset provision is titled "[f]urther restriction on *use of funds*" and only applies to a State's "*use [of] the funds* provided under this section" to offset a reduction in net tax revenue. 42 U.S.C. § 802(c)(2) (emphases added). Ohio is free to do anything it wants with its *own* money or tax scheme, including cutting taxes, providing rebates, increasing spending, cutting expenditures, or anything else. *Contra* FJ Mot. 16; *see* Section II.A., *supra*; Defs.' PI Opp'n 16–18. The State simply must refrain from using the *federal* money to "directly or indirectly offset a reduction in the net tax revenue" resulting from state tax-law changes. 42 U.S.C. § 802(c)(2).

Even if the coercion inquiry were implicated here, *NFIB* forecloses Ohio's argument that the offset provision is coercive or commandeering. *See* Defs.' PI Opp'n 18–21. The key aspect of the Medicaid expansion that *NFIB* found to be coercive was that Congress "penalize[d] States that choose *not to participate* in that new program by taking away their *existing* Medicaid funding." *NFIB*, 567 U.S. at 585; *id.* at 687–88 (joint dissent) ("Congress could have made just the *new* funding provided under the ACA contingent on acceptance of the terms of the Medicaid Expansion."). Here, in stark contrast, there are no monetary consequences if a State chooses to decline the Fiscal Recovery Funds. And even

when States accept the new funds, the offset provision is notably more modest than the prospective funding condition that *NFIB* indicated was permissible. *Id.* at 576, 585 (explaining that Congress could make the *entirety* of the new federal funds provided—totaling $100 billion per year—contingent on a State's adoption of that new program). The Act provides that if a State uses Fiscal Recovery Funds to offset a net-tax-revenue reduction, it could lose no more than those funds used for the offset. *See* 42 U.S.C. § 802(e)(1).

Perhaps recognizing these fatal flaws, Ohio makes two new arguments and repeats an old one. None of the State's contentions has merit.

First, Ohio argues that its "*refusal* to accept or use the [federal] money would put Ohioans at an immense competitive disadvantage relative to their peers in other States" because other States may accept the Fiscal Recovery Funds. FJ Mot. 15. That argument contemplates that Congress has offered a generous grant to the States. Congress should not be penalized for its generosity; the Constitution cannot mean that Congress is entitled to exercise its Spending Clause authority only to provide grants of marginal utility that potential grantees might find undesirable. *NFIB*, 567 U.S. at 577 ("Congress may use its spending power to create incentives for States to act in accordance with federal policies."). Ohio offers no support for the suggestion that increased generosity dictates increased scrutiny.

Second, Ohio argues that the Rule "*worsens* the coercion problem" because "States must conduct their budgeting, and calculate the effects of their tax policies, on the Treasury Department's terms." FJ Mot. 16. But it is by no means exceptional that States must account for whether they are using federal monies for the purposes authorized by statute. Indeed, that requirement stems not from the Rule but from the statute itself, which mandates that States provide Treasury a "detailed accounting of" the "uses of [Rescue Plan] funds" and "all modifications to the State's or territory's tax revenue sources during the covered period." 42 U.S.C. § 802(d)(2). Ohio cites nothing in Spending Clause or Tenth Amendment doctrine that makes a fully permissible funding condition unconstitutional

21

simply because States self-report compliance with the condition. *Contra Charles*, 348 F.3d at 608 (extolling States' "freedom to tailor compliance according to [their] particular . . . circumstances"). Ohio's argument is especially misplaced here because Treasury's self-reporting regime is particularly permissive. It allows States to calculate the effect of tax-law modifications using "estimated values produced by a budget model, incorporating reasonable assumptions, that aligns with the recipient government's existing approach for measuring the effects of fiscal policies." 86 Fed. Reg. at 26,809. In other words, this approach "offers recipient governments the flexibility to determine their reporting methodology based on their existing budget scoring practices and capabilities." *Id.* So the idea that States must report tax-law changes "on the Treasury Department's terms," FJ Mot. 16, is simply not true.

Third, Ohio repeats its argument that the offset provision is unconstitutional because "the State's power to tax is simply too central to state sovereignty to be regulated by Congress *at all.*" FJ Mot. 17. But, again, the offset provision does not regulate "a State's power to tax"; it simply precludes a State from using *federal funds* to offset a reduction in net tax revenue. *See* Section II.A., *supra*. More fundamentally, though, Ohio continues to misconstrue both the Spending Clause and the Tenth Amendment. It has long been established that "Congress can use [its Spending Clause] power to implement federal policy it could not impose directly under its enumerated powers." *NFIB*, 567 U.S. at 578; *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Expense Bd.*, 527 U.S. 666, 686 (1999) (same); *Dole*, 483 U.S. at 207 (same); *United States v. Butler*, 297 U.S. 1, 66 (1936) (same). And "[r]equiring States to honor the obligations voluntarily assumed as a condition of federal funding before recognizing their ownership of funds simply does not intrude on their sovereignty." *Bell v. New Jersey*, 461 U.S. 773, 790 (1983); *City of Pontiac*, 584 F.3d at 283 (Sutton, J., concurring) ("[T]he Tenth Amendment, the Eleventh Amendment and the Constitution's other structural limitations on congressional authority do not limit properly enacted spending-clause legislation."). So it makes no difference whether this

case involves the offset provision or a statutory provision that "prohibited using the funds 'to directly or indirectly offset the costs of hosting the seat of government in a location other than the State's largest city.'"  Ohio PI Reply 12–13.  Both are constitutional.

Because Ohio had "a legitimate choice whether to accept the federal conditions in exchange for federal funds," *NFIB*, 567 U.S. at 578, its coercion and Tenth Amendment arguments fail.

## III.   THE COURT SHOULD NOT ENJOIN THE OFFSET PROVISION OR DECLARE IT UNCONSTITUTIONAL.

Even if the Court finds a constitutional defect in the offset provision, neither a permanent injunction nor a declaratory judgment is appropriate.

### A.   Ohio is Not Entitled to a Permanent Injunction.

A court, in its "equitable discretion," may enter a permanent injunction if a plaintiff can demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay*, 547 U.S. at 391 (citations omitted).

Ohio fails each of these requirements.  "An injunction against [even] threatened legal action will not issue if the party will have an adequate opportunity to fully present his defenses and objections in the legal action he seeks to enjoin." *Travis v. Pennyrile Rural Elec. Coop.*, 399 F.2d 726, 729 (6th Cir. 1968).  Even if Ohio were to use Fiscal Recovery Funds to offset a reduction in net tax revenue and face potential recoupment by the Secretary, any such recoupment proceedings would present "an adequate opportunity" to present its defenses.  *Id.*; *see* 86 Fed. Reg. at *26811–12 (detailing the recoupment process, including a "reconsideration process [that] provides a recipient the opportunity to submit additional information it believes supports its request" for reconsideration).  Because Ohio may assert its constitutional argument as a "legal defense" to a recoupment action,

it "therefore has an adequate remedy." *Id.* And if Ohio were unable to succeed in such hypothetical future proceedings, the result would simply be that it has to repay money—the quintessential example of harm that is *not* irreparable. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). With potential recoupment nowhere in sight, Ohio's challenge is "premature" and no injunction should issue. *Travis*, 399 F.2d at 729.

The Court previously stated that Ohio had established irreparable harm because "it is struggling to decide whether to claim the funds and what to do with its tax laws for the upcoming biennium." *Ohio,* 2021 WL 1903908, at *14. As discussed above, however, Ohio has now certified and received Fiscal Recovery Funds from the Treasury Department. So it is no longer struggling to make that decision. Nor has Ohio alleged any desire to use the funds it has accepted to offset reductions in tax revenue. As such, the only alleged injury upon which irreparable harm was based is now moot.

By contrast, enjoining an Act of Congress would unquestionably impose irreparable harm on the federal government and contravene the public interest. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (emphasizing that "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation" (quotation marks omitted)); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)). "The presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of [the government] in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers). An injunction would thus irreparably harm the United

States and undermine the public interest. That is only more evident here, where the legislation at issue is a direct response to a national health and economic emergency of historic proportions.

### B. The Court Should Not Issue a Declaratory Judgment.

A court may issue a declaratory judgment "[i]n a case of actual controversy within its jurisdiction." 28 U.S.C. §2201(a). Assuming the threshold requirements of standing and ripeness are met, the Court may consider various factors in determining whether to issue a declaratory judgment, including whether the declaratory judgment would serve a useful purpose in clarifying the legal relations and whether there is an alternative remedy that is better or more effective. *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984).

Here, a declaratory judgment is not necessary to clarify any legal relations. As discussed above, the Rescue Plan—especially in combination with the Rule—provides more than sufficient clarity. And if Ohio (or any other recipient of funds) has any lingering questions, "Treasury encourages State, local, and Tribal governments in particular to provide feedback and to engage with Treasury regarding issues that may arise regarding all aspects of th[e] [Rule] and Treasury's work in administering the Fiscal Recovery Funds." 86 Fed. Reg. at 26,788.

A declaratory judgment also should not issue because there is an alternative remedy available: Ohio may assert its constitutional arguments as a defense to a recoupment action. This alternative is superior to a declaratory judgment because a recoupment action may never come to pass at all, either because Ohio does not use Fiscal Recovery Funds to offset a reduction in net tax revenue (as it has said it has no plans of doing), or because the Secretary may exercise her enforcement discretion not to seek recoupment. *See Ohio*, 2021 WL 1903908, at *14 ("[T]here is no reason to believe that the Secretary will exercise [her recoupment] powers any time soon."). Ohio's request for declaratory judgment should therefore be denied.

## CONCLUSION

For the reasons explained above, Ohio's final-judgment motion should be denied and this case should be dismissed.   But if the Court were to enjoin or declare unconstitutional any aspect of the Rescue Plan, that ruling should be tailored to the portion of the program that the Court believes to be unconstitutional and only to Ohio.  *See* Defs.' PI Opp'n 27; Tr. of Prelim. Inj. Hearing at 6:12–20 (Ohio seeking only "to enjoin enforcement against the State of Ohio"); Tr. of Prelim. Inj. Hearing at. 26:5–13 (Ohio agreeing that the Court could enter "limited relief," like enjoining just "the indirectly clause").

DATED: June 2, 2021                          Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

*/s/ Stephen Ehrlich*
MICHAEL P. CLENDENEN
STEPHEN EHRLICH
CHARLES E.T. ROBERTS
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC  20005
Phone:  (202) 305-9803
Email:   stephen.ehrlich@usdoj.gov

*Counsel for Defendants*