# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| STATE OF OHIO, ) | |
| ) | |
| Plaintiff, ) | Case No. 1:21-cv-181 |
| ) | |
| v. ) | Judge Douglas R. Cole |
| ) | |
| JANET YELLEN, in her official capacity as ) | |
| Secretary of the Treasury; RICHARD K. ) | |
| DELMAR, in his official capacity as acting ) | |
| inspector general of the Department of the ) | |
| Treasury; and the U.S. DEPARTMENT OF THE ) | |
| TREASURY, ) | |
| ) | |
| Defendants. ) | |

## BRIEF OF *AMICUS CURIAE* GOLDWATER INSTITUTE
## IN SUPPORT OF THE STATE OF OHIO

Jacob Huebert (Atty. ID# 78562)
Scharf-Norton Center for Constitutional Litigation at the
GOLDWATER INSTITUTE
500 E. Coronado Road
Phoenix, Arizona 85004
Telephone: 602.462.5000
litigation@goldwaterinstitute.org

**CORPORATE DISCLOSURE STATEMENT**

The Goldwater Institute is a nonprofit corporation incorporated under the laws of the State of Arizona. It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

**INTEREST OF *AMICUS CURIAE***

The Goldwater Institute was established in 1988 as a nonpartisan public policy and research foundation devoted to advancing the principles of limited government, individual freedom, and constitutional protections through litigation, research, policy briefings, and advocacy. Through its Scharf-Norton Center for Constitutional Litigation, the Institute litigates cases and files *amicus* briefs when its or its clients' objectives are directly implicated.

The Goldwater Institute advances the idea that the U.S. Constitution provides a guaranteed minimum of protection for individual rights, while leaving states free to enact laws that protect those rights more broadly. That is why the Institute directs its efforts primarily toward states—the "laboratories of democracy"—to introduce innovative ideas that expand freedom. The Goldwater Institute takes interest this case because it concerns an important constitutional limit on federal power, and the "Tax Mandate" that the State of Ohio challenges threatens states' ability to act as laboratories of democracy and to enact policies that better respect individuals' liberty to direct their income as they see fit. Further, as discussed below, the Tax Mandate potentially threatens tax reform that the Institute advocates for its home state of Arizona. *See* Victor Riches, *Governor Ducey's Chance to Make History*, Nat'l Rev., June 2, 2021.[1]

---

[1] https://www.nationalreview.com/2021/06/governor-duceys-chance-to-make-history/.

**ARGUMENT**

The State of Ohio has argued that the "Tax Mandate" in the American Rescue Plan Act of 2021 (the "Act") violates the Spending Clause of the U.S. Constitution because the condition it imposes on a state's acceptance of fiscal recovery funds ("Funds")—effectively, a ban on state tax cuts and credits through 2024—is ambiguous and coercive. That is correct, but there is an additional reason why the Tax Mandate violates the Spending Clause: because the condition it imposes is not reasonably related to the ostensible purpose of the Act's spending.

When Congress places a condition on a federal grant to the states, the condition "must (among other requirements) bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992); *see also South Dakota v. Dole*, 483 U.S. 203, 207-08 & n.3 (1987). The Tax Mandate fails that requirement.

**I.     The Tax Mandate is not reasonably related to ensuring that states use Funds for the Act's permitted purposes.**

Defendants argue that the Tax Mandate ensures that states only use Funds for the Act's "identified purpose" rather than "employing federal funds to finance state tax cuts that decrease tax revenue." Doc. 45, Defs.' Combined Mot. to Dismiss & Opp. to Ohio's Mot. for Final Judgment at 3, 14. But the Tax Mandate is not reasonably related to ensuring that states use Funds for the Act's stated purposes.

The Act's stated purpose for providing Funds to states is "to mitigate the fiscal effects stemming from the public health emergency with respect to the Coronavirus Disease (COVID-19)." 42 U.S.C. § 802(a)(1). Specifically, the Act allows states to use Funds for four purposes:

(1) "to respond to the public health emergency … or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality";

2

(2) "to respond to workers performing essential work … by providing premium pay to eligible workers … or providing grants to eligible employers that have eligible workers who perform essential work";

(3) "for the provision of government services to the extent of the reduction in revenue … due to the [pandemic] relative to revenues collected in the most recent full fiscal year"; and

(4) "to make necessary investments in water, sewer, or broadband infrastructure."

42 U.S.C. § 802(c)(1). The Act requires States, territories, and Tribal governments to report their uses of Funds to the Secretary, and it allows the Secretary to recoup Funds that were used for a purpose other than those the Act allows. 42 U.S.C. §§ 802(d)(2), (e).

*These provisions give the Secretary all that she needs to ensure that states use Funds only for purposes that Act authorizes*. Under these provisions, if a state receives, say, $5.5 billion in Funds (Ohio's expected amount, Doc. 1, Compl. ¶ 6), the Secretary can confirm that the state actually spent $5.5 billion on the four purposes the statute enumerates, and she can recoup any funds out of the reported $5.5 billion that were used for unauthorized purposes.

The Tax Mandate, on the other hand, does *not* help ensure that states use Funds for their intended purposes. A state can run afoul of the Tax Mandate even if it accurately reports spending the entire Funds amount it received under the Act for purposes the Act allows.

By its terms, the Tax Mandate does not concern whether a state spends its full Funds amount on the Act's purposes. It concerns whether a state "directly or indirectly" uses Funds to "offset" revenue lost from a tax cut. 42 U.S.C. § 802(c)(2)(A). That is, it seeks to ensure that States do not use the Act's Funds to "pay for" (subsidize) a tax cut, which supposedly would be

3

unrelated to the Act's purposes. *See* Alan Rappeport, *A Last-Minute Add to Stimulus Bill Could Restrict State Tax Cuts*, N.Y. Times, Mar. 12, 2021.[2]

But the Act does not otherwise prohibit States from using Funds to indirectly subsidize activities that are unrelated to the Act's permissible uses of Funds. Instead, it arbitrarily singles out and effectively prohibits just *one* thing a state might do if it finds itself with a windfall: cutting taxes.

The Act does not prevent states from "indirectly" using Funds to subsidize *spending* on things that are not among the Act's permissible uses of Funds. The Tax Mandate might make sense if the Act were otherwise designed to deny Funds to states that could afford to pay for their own COVID relief without help (if they put other policy priorities aside). But the Act does not do that; it leaves states free to spend money other than Funds on whatever they want, regardless of how wasteful, frivolous, or otherwise unrelated to COVID relief that spending might be.

The Act does prohibit states from using Funds "for deposit into any pension fund." 42 U.S.C. § 802(c)(2)(B). At first glance, that might appear to be a restriction on state spending—and a restriction on "blue states" that face large unfunded pension liabilities, such as California and Illinois, to "balance" the Tax Mandate, to which "red states" have objected.[3] But the pension-deposit restriction actually means little because, in contrast with the Tax Mandate, it does not prohibit states from "indirectly" using Funds to subsidize pension deposits. The pension-deposit restriction simply means that, when a state reports its uses of Funds to the Secretary, it may not include pension deposits. The Act does not otherwise require states to

---

[2] https://www.nytimes.com/2021/03/12/us/politics/biden-stimulus-state-tax-cuts.html.
[3] *See* Jason Willick & Alexander Sholtz, *Blue States Have Bigger Pension Debts Than Red States*, Am. Interest, Dec. 16, 2016, https://www.the-american-interest.com/2016/12/16/blue-states-have-bigger-pension-debts-than-red-states/; Rappeport, *supra* (noting that Republican attorneys general have been the Tax Mandate's prominent critics).

report pension deposits (as they must report "modifications to … tax revenue sources," *id.* § 802(d)(2)(A)), and it does not allow the Secretary to recoup money spent on pension deposits if a state does not include that expenditure among its reported uses of Funds (as she may recover amounts equal to state tax revenues lost, *id.* § 802(e)).

Similarly, the interim final rule in which the Treasury Department has attempted to clarify the Act states that the Act "precludes use of [Funds] to cover the costs of debt incurred prior to March 3, 2021," among other things. 86 Fed. Reg. 26786, 26796 (May 17, 2021). But that rule and the Act lack any restriction on states "indirectly" using Funds to subsidize debt payments or anything else. Thus, when the rule was announced, Illinois Governor J.B. Pritzker—who previously stated his intention to use Funds to pay off debt that Illinois incurred during the pandemic, as it increased spending by $2.4 billion—announced that the state would instead pay the debt using tax revenues. Adam Schuster, *Federal COVID-19 Relief Going to Illinois Debt Rather Than Business Relief*, Illinois Policy, May 27, 2021.[4] Of course, because money is fungible, that makes no practical difference, *id.*—but the Act and the rule do not prohibit "indirectly" subsidizing debt payments (or spending of any kind), so it is permissible.

Thus, the Act and the Tax Mandate are not designed to protect against states "indirectly" using Funds for unapproved purposes; they are designed *only* to stop states from cutting taxes.

## II. The Tax Mandate's true purposes are to force a pro-tax political philosophy on the states and to stifle tax competition among the states.

In fact, the Tax Mandate's true purposes are to impose a pro-tax political philosophy on states that would otherwise reject it and to stifle tax competition among the states.

---

[4] https://www.illinoispolicy.org/federal-covid-19-relief-going-to-illinois-debt-rather-than-business-relief/.

5

Indeed, the Tax Mandate was inserted into the Act, as a "last-minute change," at the behest of West Virginia Senator Joe Manchin, based on his view that "states should not be cutting taxes." Rappeport, *supra*. Moreover, Manchin reportedly insisted on the provision to thwart a plan by the Governor of West Virginia (an office Manchin previously held) to phase out the state's income tax. *See* Patrick Gleason, *How Senator Joe Manchin's Move to Block Tax Relief In His Own State Costs All U.S. Taxpayers*, Forbes, Mar. 16, 2021.[5] In other words, the Tax Mandate apparently was inserted in the Act specifically to prevent a particular state from pursuing its preferred tax policy.

And although some of its defenders suggest that the Tax Mandate exists to prevent states from opportunistically taking advantage of the Act's grant of Funds to subsidize new tax cuts, *see* Rappeport, *supra*, the Tax Mandate also threatens state plans for tax reform that predate the Act—and not just in West Virginia. In Arizona, for example, Governor Doug Ducey has signed an income tax reduction each year since taking office, having promised to reduce that tax as close to zero as possible. State of Arizona Executive Budget Summary, Fiscal Year 2022, January 2021 ("Ariz. Exec. Budget Summary") at 22.[6] Consistent with that pattern, and facing a budget surplus, Ducey called for further income tax reductions in his latest state budget proposal, issued well before the Act's passage. *Id.*; Jeremy Duda, *Ducey Calls for $600 Million in Permanent Income Tax Cuts*, Ariz. Mirror, Jan. 15, 2021[7]. Now, however, the Tax Mandate threatens that plan. Similarly, before the Act's passage, Idaho Governor Brad Little proposed to partially return that state's budget surplus to Idahoans through tax relief. Keith Ridler, *Idaho*

---

[5] https://www.forbes.com/sites/patrickgleason/2021/03/16/how-senator-joe-manchins-move-to-block-tax-relief-in-his-own-state-costs-all-us-taxpayers/?sh=13bd6cf56188.
[6] https://www.azospb.gov/Documents/2021/FY%202022%20Summary%20Book.pdf.
[7] https://www.azmirror.com/2021/01/15/ducey-calls-for-600-million-in-permanent-income-tax-cuts/.

6

*Lawmakers Propose Sweeping Cuts to Income, Sales Taxes*, AP, Feb. 16, 2021.[8] The state has since enacted those tax cuts, *see* Press Release, Idaho Office of the Governor, *Idaho Achieves Single Largest Tax Cut in State History* (May 12, 2021)[9]—and now the Tax Mandate threatens to punish the state for that choice. A letter that 21 state attorneys general sent to the Secretary regarding the Tax Mandate provides many more examples of proposed tax reforms in various states that were pending before the Act's passage, for which the Tax Mandate could punish the states if they are enacted. Letter from Ariz. Att'y Gen. Mark Brnovich, et al., to U.S. Treasury Sec'y Janet Yellen (Mar. 16, 2021) at 2-4.[10]

Further, the Tax Mandate serves to protect high-tax states from increasing competition from lower-tax states for residents and businesses.

Decades before the current controversy arose, a legal scholar identified conditional federal grants as a tool by which "a simple majority of states [can] harness the federal lawmaking power to restrict the competition for residents and tax dollars that would otherwise exist among them." Lynn A. Baker, *Conditional Federal Spending After* Lopez, 95 Colum. L. Rev. 1911, 1948 (1995). Through conditional grants, states that already comply with a condition—i.e., states that already pursue the policy that the condition mandates—can coerce other states into pursuing that same policy and thus "divest the outlier state[s] of any competitive gains" they obtained from their different policies. *Id.* at 1949. That of course undermines a key purpose of our federalist system, which is to encourage a diversity of laws throughout the country and competition among the states, which, combined with constitutional protections for individual

---

[8] https://apnews.com/article/personal-taxes-brad-little-legislation-coronavirus-pandemic-sales-taxes-283c8db434ccc0fe6c84a3b6167da907.
[9] https://gov.idaho.gov/pressrelease/idaho-achieves-single-largest-tax-cut-in-state-history/.
[10] https://www.azag.gov/sites/default/files/docs/press-releases/2021/letters/Letter_3_16.pdf.

rights, helps limit governments' ability to abuse their citizens. *See id.* at 1950-54; Doc. 26, Br. of Amicus Curiae Buckeye Inst. at 9-12.

The Tax Mandate is a quintessential example of one group of states using a conditional grant to stifle competition from another group of states.

For years, Americans have been moving from higher-tax states to lower-tax states. *See* Chris Edwards, *Migration to Low-Tax States Continues*, Cato at Liberty, Jan. 9, 2020 (reporting that census and IRS data confirms "people are moving, on net, from tax-punishing places such as California, Connecticut, Illinois, New York, and New Jersey to tax-friendly places such as Florida, Idaho, Nevada, Tennessee, and South Carolina").[11] The pandemic—and the vastly increased opportunities for remote work that have accompanied it—have accelerated that trend. Andrew Osterland, *Pandemic Heats Up State Competition to Attract Businesses and Residents*, CNBC, Feb. 8, 2021.[12] "Last year, the five states with the biggest proportionate outbound migration were California, Connecticut, Illinois, New Jersey and New York," four of which "were ranked in the bottom five for business tax climate in 2021 by the Tax Foundation" (the other, Illinois, ranked 36th). *Id.* "Most experts expect more people and businesses will choose to locate where they can pay lower taxes." *Id.*

In light of these facts, the true motive of Senators and Representatives from high-tax states to enact the Tax Mandate is obvious: to stem their states' loss of residents and businesses to lower-tax states while rescuing their states from the unfortunate consequences of their

---

[11] https://www.cato.org/blog/migration-low-tax-states-continues.
[12] https://www.cnbc.com/2021/02/08/pandemic-heats-up-state-tax-competition-to-attract-businesses-residents-.html.

governments' fiscal policies. The Senate vote on the final version of the Act reflects this: all Senators from the high-tax states with the most outmigration voted for it.[13]

### III. The Tax Mandate contravenes the Act's purpose of providing relief to people, small businesses, and industries affected by COVID-19's negative economic impacts.

Finally, the Tax Mandate is not reasonably related to the Act's purpose because it contravenes one of the Act's stated purposes for grants of Funds: providing assistance to households, small businesses, and industries affected by COVID-19's negative economic impacts. *See* 42 U.S.C. § 802(c)(1)(A). The Tax Mandate wrongly assumes that tax cuts or credits cannot themselves serve as relief for economic harm caused by COVID-19, and enforcing the Tax Mandate would prevent, rather than facilitate, the use of Funds for the Act's approved purposes.

The Tax Mandate effectively prohibits states from independently providing a form of COVID-19 relief—tax relief—that *the Act itself* elsewhere recognizes as legitimate. In fact, the Act provides billions of dollars in federal tax credits. *See* Garrett Watson & Erica York, *The American Rescue Plan Act Greatly Expands Benefits Through the Tax Code in 2021*, Tax Foundation, Mar. 12, 2021.[14] And many states have, like Congress, deemed tax credits or tax reductions to be an appropriate means of mitigating the economic harm caused by COVID-19. For example, Arizona's governor has proposed income tax reductions "to ensure that Arizonans and small businesses that were hit hard by the COVID-19 pandemic, through no fault of their own, are given true and meaningful tax relief." Ariz. Exec. Budget Summary at 22.

---

[13] Senate Roll Call Vote, H.R. 1319, 117th Cong. (Mar. 6, 2021), https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=117&session=1&vote=00110.

[14] https://taxfoundation.org/american-rescue-plan-covid-relief/.

The view that state tax cuts can help a state recover from the pandemic is not at odds with the Act or its purposes (even apart from Congress's implicit recognition that tax relief can be COVID relief). As part of a comprehensive pandemic recovery plan, a state could use Funds as the Act prescribes and also enact tax reforms to encourage business and job growth after a long period of business closures and high unemployment due to the pandemic. Just as a state could complement the Act's COVID relief with additional state spending on COVID relief, beyond the Funds the Act provides—which the Act does not discourage—it could also do so with tax relief.

There is no reason why the Act should force states that want to provide extra COVID relief to choose spending over taxes. To allow a state to, for example, assist businesses by sending them a check for $1,000, but not by giving them a tax credit for $1,000, is arbitrary. And of course it is not Congress's place to tell states that they should prefer *state* government spending to *state* tax relief as a means of addressing the pandemic *separately from the state's use of Funds*. Congress's only legitimate concern—which, again, the Act fully addresses separately from the Tax Mandate, and the Tax Mandate does not address—is to ensure that Funds provided by the federal government are spent on the purposes the Act prescribes.

Further, enforcing the Tax Mandate by forcing a state to return Funds based on decreased tax revenue would contravene the Act's purpose. If a state cuts taxes and its revenue declines as a result, the Tax Mandate requires that the state repay Funds received, up to the amount of revenue lost as a result of the tax cut. 42 U.S.C. § 802(e). In that situation, the state would lose federal Funds that it otherwise would have spent on COVID-19 relief—which means that the would-be beneficiaries of that relief would not receive it. In that situation, the Tax Mandate would not serve the Act's ostensible purposes but contravene them by denying people and businesses assistance.

10

In sum, a state's compliance with the Tax Mandate's condition—i.e., declining to reduce taxes when it otherwise would do so—will not serve the Act's purposes because it will only prevent states from independently pursuing a form of COVID-19 relief that Congress itself has recognized as legitimate. And a state's rejection of the Tax Mandate's condition—i.e., lowering taxes in a manner that results in lower state tax revenue—will not serve the Act's purposes because it will cause people and businesses in a state to lose the federal COVID-19 relief that the Act exists to provide.

## CONCLUSION

The Act gives states Funds so they can, in turn, provide relief to their residents, small businesses, and industries that have been affected by the COVID-19 pandemic, and take other measures to address pandemic-related harm. The Tax Mandate does not serve that purpose; it only serves to coerce states to favor government spending over tax cuts and to stifle tax competition among the states. Because the Tax Mandate's condition is not reasonably related to the Act's purpose for providing Funds—and for the reasons the State of Ohio has presented—the Tax Mandate exceeds Congress's powers under the Spending Clause.

The Court should deny Defendants' motion to dismiss the State of Ohio's constitutional challenge to the Tax Mandate.

Respectfully submitted this 7th day of June, 2021,

/s/ *Jacob Huebert*
Jacob Huebert (Atty. ID# 78562)
Scharf-Norton Center for Constitutional Litigation
at the GOLDWATER INSTITUTE
500 E. Coronado Road
Phoenix, Arizona 85004
Telephone: 602.462.5000
litigation@goldwaterinstitute.org

12

## CERTIFICATE OF SERVICE

I, Jacob Huebert, an attorney, certify that on June 7, 2021, I caused to be electronically filed a copy of **BRIEF OF *AMICUS CURIAE* GOLDWATER INSTITUTE IN SUPPORT OF THE STATE OF OHIO** with the Clerk of the United States District Court for the Southern District of Ohio using the CM/ECF system, which will send notification of the filing to the counsel of record at their email addresses on file with the Court.

/s/ *Jacob Huebert*
Jacob Huebert