**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

STATE OF OHIO,

    Plaintiff,

vs.

JANET YELLEN, in her official capacity as Secretary of the Treasury; RICHARD K. DELMAR, in his official capacity as acting inspector general of the Department of Treasury; and U.S. DEPARTMENT OF THE TREASURY,

    Defendants.

Civil Action No. 1:21-cv-00181-DRC

Hon. Douglas R. Cole

---

**BRIEF OF AMICI CURIAE MICHIGAN LEGISLATURE APPROPRIATIONS COMMITTEE CHAIRS SENATOR JIM STAMAS AND REPRESENTATIVE THOMAS ALBERT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

I. The COVID-19 Pandemic Reaches Michigan, Causing Significant Impacts on the State's Budget and Revenue .................................................................................. 2
II. The President Signs the American Rescue Plan Act Into Law ......................................... 4
III. The State of Ohio Challenges the ARPA's Tax Mandate ................................................ 6
IV. In An Attempt to Add Clarity to the Tax Mandate, The Department of Treasury Issues An "Interim Final Rule." ........................................................................................ 7
V. This Court Issues An Opinion And Order Finding That the State of Ohio Is Likely to Succeed On the Merits of Its Challenge to the Tax Mandate's Constitutionality, But Denying the Request for a Preliminary Injunction ...................................................... 7

ARGUMENT ................................................................................................................... 8

I. This Court Correctly Determined The Tax Mandate Is (Likely) Unconstitutional. ........... 8
    A. The Tax Mandate Is Unconstitutionally Ambiguous ........................................... 8
    B. The Tax Mandate Is Coercive ............................................................................ 9
II. The Interim Final Rule Does Not Change the Analysis. .................................................. 11
    A. The Interim Final Rule Leaves More Questions Than Answers. ...................... 11
    B. The Executive Branch Cannot Fix Congress's Errors. ..................................... 12

CONCLUSION ............................................................................................................... 14

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

i

# TABLE OF AUTHORITIES

**Cases**

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) ................................................................................................................... 9

*College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
527 U.S. 666 (1999) ............................................................................................................. 9, 10

*Davis v. Monroe Cty. Bd. of Educ.*,
526 U.S. 629 (1999) ........................................................................................................... 11, 13

*Gundy v. United States,*
139 S. Ct. 2116 (2019) ............................................................................................................. 14

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ....................................................................................................................... 1

*INS v. Chadha*,
462 U.S. 919 (1983) ................................................................................................................. 12

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ......................................................................................................... 2, 9, 10

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ..................................................................................................... 2, 8, 11, 13

*Saenz v. Roe*,
526 U.S. 489 (1999) ................................................................................................................. 12

*South Dakota v. Dole*,
483 U.S. 203 (1987) ........................................................................................................... 2, 8, 9

*Stern v. Marshall*,
564 U.S. 462 (2011) ................................................................................................................. 14

*United States v. Nixon*,
418 U.S. 683 (1974) ................................................................................................................. 13

*United States v. Williams*,
15 F.3d 1356 (6th Cir. 1994) ................................................................................................... 13

**Statutes**

Pub. L. No. 117-2, § 9901(c)(1)(A)-(D) ....................................................................................... 5

Pub. L. No. 117-2, § 9901(c)(2)(A) .............................................................................................. 5

Pub. L. No. 117-2, § 9901(c)(2)(B) .............................................................................................. 5

Pub. L. No. 117-2, § 9901(e) ........................................................................................................ 5

**Other Authorities**

American Rescue Plan Act ................................................................................................... passim

Michigan Public Act No. 166 of 2020 .......................................................................................... 5

ii

**Constitutional Provisions**

U.S. Const. art I, § 8 cl. 1 ................................................................................................ 9, 13

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

**STATEMENT OF INTEREST**

The State of Ohio's Brief in Support of its Motion for Preliminary Injunction explained that the Tax Mandate "gives the States a choice: they can have either the badly needed federal funds or their sovereign authority to set tax policy.  But they cannot have both." (Br. in Supp. of Mot. for Prelim. Injunction at 1, Doc. 3, PageID #: 30.)  The State set forth the grave impact the Tax Mandate will have on Ohio's sovereignty and, as relief in its Complaint, requested that the Court "[d]eclare the Tax Mandate . . . unenforceable" because it exceeds Congress's powers under the Tenth Amendment, and "[e]njoin the defendants" from enforcing the Tax Mandate or recouping funds for alleged violations of the Tax Mandate. (Compl. ¶ 50, Doc. 1, PageID #: 11.)

Michigan State Senator Jim Stamas and State Representative Thomas Albert ("Amici") submit this brief to explain how the Tax Mandate equally affects Michigan's sovereignty, and to urge this Court to grant the relief requested in the State of Ohio's Complaint.

Representative Albert was elected to the Michigan House of Representatives in November 2016.  He represents Michigan's 86th District, which includes portions of Kent and Ionia counties.  Representative Albert currently serves as Chair of the House Appropriations Committee.  Senator Stamas was elected to the Michigan Senate in 2014, and re-elected in 2018.  He represents the counties of Alcona, Alpena, Arenac, Gladwin, Iosco, Midland, Montmorency, Oscoda, Otsego, and Presque Isle.  He also serves as the chair of the Senate Appropriations Committee.

As chairs of the House and Senate Appropriations Committees, Amici and their Committees are tasked with appropriating funding for most functions of state government.  *See* Mich. Const. art. IV, § 31.  Under the House of Representatives' Standing Rules, "a bill containing an appropriation or a bill with a recommended amendment may only be favorably reported back to the House by the Appropriations Committee." House Standing Rule 38(5).  Under the Senate's

Standing Rules, "[a]ppropriations bills, when reported back to the Senate favorably by a committee other than the Committee on Appropriations, shall, together with amendments proposed by that committee, be referred to the Committee on Appropriations for consideration." Senate Standing Rule 3.602. Each year, the Senate must pass an appropriations bill containing "an itemized statement of estimated revenue by a major source in each operating fund for the ensuing fiscal year, the total of which shall not be less than the total of all appropriations made from each fund in the general appropriation bills as passed." Senate Standing Rule 3.603.

Amici and their Committees have grappled (and continue to grapple) with the Tax Mandate's implications on Michigan's budget and future appropriations. Amici are left to interpret the ambiguous Tax Mandate and the just-as-ambiguous Interim Final Rule to determine whether certain actions violate the Tax Mandate. And they are left to predict whether their everyday acts of appropriating funds will cause billions of dollars to be recouped by the federal government. Amici have a significant interest in this case, and in having the Tax Mandate enjoined so Amici can continue to exercise their sovereign power without concern that doing so will cost their constituents billions of dollars.

# **INTRODUCTION**[1]

In their time as chairs of the Michigan Legislature's Appropriations Committees, never have Amici seen the type of federal intrusion into state sovereignty that Section 9901 (the "Tax Mandate") of the American Rescue Plan Act ("ARPA") presents. When Congress passed the ARPA, it necessarily recognized that the States were in dire need of funding to address the impacts of the COVID-19 pandemic. Indeed, in Michigan, the Fiscal Year 2020 budget was adopted on the assumption of a $2.2 billion drop in general fund and school aid fund revenues. The $6.54 billion in funds recently made available to Michigan under the ARPA—which represents a 10.2% increase to the current Fiscal Year 2021 budget of $64.3 billion—was, therefore greatly needed. But the acceptance and use of those funds will come at a great cost.

The Tax Mandate—while hopelessly ambiguous—prevents the States from using funds to either "directly or indirectly" offset revenue losses from tax reductions. *See* Pub. L. No. 117-2, § 9901. As the State of Ohio and other amici have recognized, "[m]oney is fungible," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 37 (2010), and so it is impossible for Michigan to receive and use any funds under the ARPA without offsetting any tax reduction the Legislature may wish to impose. Essentially, through the ARPA, Congress appears to have left Michigan with a choice: accept the more than $6.5 billion in funds (which represent a 10% increase to its 2021 budget), while allowing the federal government to intrude into state sovereignty and dictate Michigan's tax policy, or decline the funds to the detriment of Michigan citizens. As the United States Supreme Court has already recognized, this is no choice at all. Quite the contrary, "[t]he threatened loss of

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from the Michigan Legislature, made any monetary contribution toward the preparation or submission of this brief.

over 10 percent of a State's overall budget . . . is economic dragooning that leaves the States with no real option but to acquiesce" in the loss of sovereignty. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 582 (2012). Instead of providing "mild encouragement" to Michigan to accept the consequences, Congress has provided "a gun to the head." *Id.* at 581.

This intrusion into state sovereignty is not an academic matter. It effectively bans any tax measure that reduces Michigan's "net revenues" at a time when industries and businesses are suffering and need tax relief the most. Not only that, but given the Tax Mandate's overbroad and unclear nature—which, this Court stated, "seems a Sisyphean task" to decipher (5/12/2021 Op. & Order at 27, ECF No. 36, PageID #: 562)—Michigan runs the risk of using the funds toward purposes it deems proper, only to have the federal government determine otherwise, and attempt to recoup billions of dollars at the cost of Michigan's taxpayers.

Fortunately, the Constitution prohibits such actions. Congress cannot use the Spending Clause to "indirectly coerce[] a State to adopt a federal regulatory system as its own." *Sebelius*, 567 U.S. at 578. And if it is going to impose any conditions on a state's receipt of federal funds, "it 'must do so unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). The Tax Mandate fails on both counts. It is unduly coercive, and extraordinarily ambiguous. This Court should therefore grant the State of Ohio's Motion for Permanent Injunction.

## BACKGROUND

**I.      The COVID-19 Pandemic Reaches Michigan, Causing Significant Impacts on the State's Budget and Revenue.**

Over the last year, the COVID-19 pandemic has wrought havoc on the lives of people across the world. Michigan was no different. On March 11, 2020, the Michigan Department of

2

Health and Human Services announced that two Michigan residents tested presumptively positive for COVID-19, and a state of emergency was declared within the State.[2] Less than two weeks later, the Governor issued an Executive Order prohibiting all "business or conduct . . . that require[s] workers to leave their homes or places of residence except to the extent that those workers are necessary to sustain or protect life or to conduct minimum basic operations. *See* Mich. Exec. Order 2020-21. And from there, restrictions on business, in-person education and gatherings, travel, and more remained in place in one form or another for more than a year.

The combination of state and federal orders and guidance were put in place to protect the health of Michigan residents. But the orders, along with the voluntary acts of Michigan residents, also had significant impacts on Michigan's economy. Restaurants closed permanently.[3] One report indicated that 24% of Michigan's small businesses "had closed during the pandemic, slightly more than the 22 percent U.S. average."[4] And as of April 2021, total unemployment in the State was 24.9% higher than pre-pandemic levels.[5]

These effects were apparent from the start. At the State's May 2020 Consensus Revenue Estimating Conference, the revenue estimates for the State's general fund were reduced by $2

---

[2] *Michigan announces first presumptive positive cases of COVID-19, Governor Whitmer declares a state of emergency to maximize efforts to slow the spread* (last visited June 7, 2021), *available at* https://www.michigan.gov/coronavirus/0,9753,7-406-98163-521341--,00.html.

[3] *These Southeast Michigan Restaurants Closed Permanently During the Coronavirus Crisis*, Eater Detroit (May 24, 2021), *available at* https://detroit.eater.com/2020/5/27/21239853/detroit-ann-arbor-restaurant-bar-closings-covid-19 (last visited June 7, 2021).

[4] Jay Davis, *Report: Michigan's small and medium-size businesses hit harder by pandemic*, Crain's Detroit (Apr. 8, 2021), *available at* https://www.crainsdetroit.com/small-business/report-michigans-small-and-medium-size-businesses-hit-harder-pandemic (last visited June 7, 2021).

[5] *Michigan unemployment rate declines in April* (May 19, 2021), *available at* https://www.michigan.gov/som/0,4669,7-192-34773-560103--,00.html.

3

billion, and the revenue estimates for the State's school aid fund were reduced by $1.2 billion.[6] Although the latest revenue estimates for future years have improved, Michigan's general fund revenues still came in more than $250 million below the revenue figures projected at the January 2020 Consensus Revenue Estimating Conference. In short, Michigan's budget and economy have felt the effects of the pandemic.

## II. The President Signs the American Rescue Plan Act Into Law.

Michigan was not alone. (*See* Chamber of Commerce Amicus Brief at 12-14, ECF No. 24, PageID #: 174-176 (detailing effects of pandemic on budgets and economies throughout the country).) To account for this, President Biden recently signed into law the American Rescue Plan Act ("ARPA")—a $1.9 trillion stimulus package. *See* H.R. 1319 (2021). Under the ARPA, $195.3 billion of that stimulus package is to be divvied among the States and the District of Columbia. Pub. L. No. 117-2, § 9901. Of that amount, $25.5 billion is divided equally among the states and the District of Columbia, while the remaining $170 billion is split on a pro-rata basis depending on each state's average number of unemployed individuals from October through December 2020. *See id.* In total, the State of Michigan was allocated $6.54 billion in funds under the ARPA, while its local governments were allocated nearly $5 billion more.[7] The $6.54 billion in funds represent

---

[6] *Michigan's Economic Outlook and Budget Review: FY 2019-20, FY 2020-21, and FY 2021-22*, Michigan Senate Fiscal Agency (May 14, 2020), available at https://www.house.mi.gov/hfa/PDF/RevenueForecast/SFA_Economic_Outlook_May2020.pdf (last visited June 7, 2020).

[7] *Stabenow, Peters Welcome Nearly $11 Billion in Funding for Michigan State and Local Governments Through the American Rescue Plan Act They Helped Enact Into Law* (May 10, 2021), *available at* https://www.stabenow.senate.gov/news/stabenow-peters-welcome-nearly-11-billion-in-funding-for-michigan-state-and-local-governments-through-the-american-rescue-plan-act-they-helped-enact-into-law/.

4

a 10.2% increase in the State's Fiscal Year 2021 budget. *See* Michigan Public Act No. 166 of 2020 (setting budget).

The ARPA requires these funds to be used by 2024, and requires those funds to be used only for certain purposes. States may use the funds "to cover costs incurred" to: (A) "respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality"; (B) "respond to workers performing essential work during the COVID-19" pandemic "by providing premium pay to eligible workers . . . that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work"; (C) provide "government services to the extent of the [State's] reduction in revenue" due to the pandemic "relative to revenues collected in the most recent full fiscal year"; or (D) "make necessary investments in water, sewer, or broadband infrastructure." Pub. L. No. 117-2, § 9901(c)(1)(A)-(D).

As relevant to this case, the ARPA also includes two "further restriction[s]" on the use of funds. First, in what the parties have termed the "Tax Mandate," it provides:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 9901(c)(2)(A). Second, it provides that "[n]o State or territory may use funds made available under this section for deposit into any pension fund." *Id.* § 9901(c)(2)(B). States that use funds for restricted purposes "shall be required to repay to the Secretary an amount equal to the amount of funds used in violation of such subsection . . ." *Id.* § 9901(e).

5

### III. The State of Ohio Challenges the ARPA's Tax Mandate.

On March 17, the State of Ohio filed its Complaint in this Court challenging the Tax Mandate's constitutionality. (Compl., Doc. 1.) The Complaint explained that Ohio was set to receive $5.5 billion in ARPA funds and, given "the economic instability wrought by the COVID-19 pandemic," had "no real choice except to take the funds." (*Id.* ¶ 26.) Yet at the same time, the Tax Mandate is overbroad and unclear, and "effectively prohibits reduction in taxes" in violation of the Spending Clause. (*Id.* ¶¶ 39, 41 (explaining that "Congress violates its Spending Clause power when it coerces states into agreeing to limit their sovereign authority by offering financial inducements that States cannot practically refuse"); *id.* ¶ 43 (explaining that the Tax Mandate "is ambiguous regarding what precisely constitutes a change in state tax policy that 'indirectly' offsets a loss in tax revenue.").)

On the same date, the State of Ohio filed a Motion for Preliminary Injunction, asking this Court to "enjoin the [Tax Mandate's] enforcement, at least in its application to Ohio." (Mot. for Prelim. Injunction at 2, Doc. 3, PageID #: 31.) An oral hearing was held on March 26. As the Court later explained, as of that time, "the federal government was largely unwilling to hazard a guess" as to what the Tax Mandate did and did not prohibit. (5/12/2021 Op. & Order at 27, Doc. 36, PageID #: 562.) Instead, the government first "claimed that the Spending Clause does not require that the *substance* of the conditions be clear, but merely that the statute make clear that conditions *exist*." (*Id.* (emphasis in original).) Second the government "offered that, while the Tax Mandate may be ambiguous *now*, the Secretary [of Treasury] has indicated that regulations were likely forthcoming that may provide clarity *later*." (*Id.*)

6

**IV.     In An Attempt to Add Clarity to the Tax Mandate, The Department of Treasury Issues An "Interim Final Rule."**

Those regulations came in the form of an "Interim Final Rule," which was filed with the Court on May 10, 2021. The Interim Final Rule, however, is anything but "Final." The Rule itself states that "Treasury will provide additional guidance and instructions [as to] the reporting requirements at a later date." (Interim Final Rule, Doc. 33-1, PageID #454.) And as set forth below, the Interim Final Rule leaves more questions than answers.

**V.      This Court Issues An Opinion And Order Finding That the State of Ohio Is Likely to Succeed On the Merits of Its Challenge to the Tax Mandate's Constitutionality, But Denying the Request for a Preliminary Injunction.**

Two days after the Interim Final Rule issued, this Court issued an Opinion and Order on the State's Motion for Preliminary Injunction. The Court addressed the four factors for injunctive relief, and first found "that Ohio made a substantial showing that it is likely to succeed on the merits of its Spending Clause claim, at least on the ambiguity issue." (5/12/2021 Order at 25, Doc. 36, PageID #: 560.) Following Supreme Court precedent, the Court recognized that "the Spending Clause requires Congress to specify the terms of the deal in language that is sufficiently clear to put the State on notice 'of its obligations.'" (*Id.*) And, "[d]espite poring over [the Tax Mandate's] statutory language," the Court could not "fathom what it would mean to 'indirectly offset a reduction in the net tax revenue' of a State, by a 'change in law . . . that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise).'" (*Id.* at 26.) Even with the Interim Final Rule in place, the Court explained that "it is far from clear" whether interim regulations can provide the needed clarity, "and more fundamentally, it is not at all clear that the Secretary"—as opposed to Congress—"can *ever* cure a Spending Clause ambiguity pro[blem], even through final regulations." (*Id.* at 28.)

7

The Court next explained that "the (likely) unconstitutional ambiguity in the statute's language, with its resulting impact on Ohio's exercise of its sovereign powers, constitutes not only an injury in fact, but also irreparable harm." (*Id.* at 32.) Still, because the Court found that "the Secretary is unlikely to be in a position to recoup funds while this suit is pending," the requested preliminary injunction could not cure Ohio's irreparable harm. (*Id.* at 33.) Thus, the motion for preliminary injunction was denied. (*Id.* at 34.)

The State of Ohio then filed its Motion for a Permanent Injunction and Declaratory Judgment. (Doc. 38.) Amici now submit this Brief in support of that motion.

## ARGUMENT

### I. This Court Correctly Determined The Tax Mandate Is (Likely) Unconstitutional.

#### A. The Tax Mandate Is Unconstitutionally Ambiguous.

As a threshold matter, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Dole*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17).

As this Court has already recognized, the Tax Mandate falls far short of this requirement. "Despite poring over [the Tax Mandate's] statutory language, the Court" explained that it could not "fathom what it would mean to 'indirectly offset a reduction in the net tax revenue' of a State, by a 'change in law . . . that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise).'" (5/12/2021 Op. & Order at 26, Doc. 36, PageID #: 561.) Going further, it stated:

> [W]here things get hopelessly muddled is with regard to "indirectly" and "*net* tax revenue of such State." Start with the latter phrase. Net tax revenue as measured against the previous fiscal year? Or against what would have been collected without the change in taxes? Or what? And in either event, how

8

> does one "score" the issue? In other words, let's say a State elects to increase its statewide sales tax, but decrease its income tax. Or a State opts to change how progressive its income tax rates are. Does that effect a reduction in "net tax revenue"? . . . .
>
> That on its own would be bad enough, but the ARPA then lumps "indirectly offset" on top. The Court honestly has no idea what an "indirect offset" to net tax revenues may be.

(5/12/2021 Op. & Order at 26-27, Doc. 36, PageID #: 561-62.)

Neither do Amici, who lead Michigan's legislative committees tasked with appropriating funds. And neither does the federal government, which, "at oral argument . . . was largely unwilling to hazard a guess as to what it meant either." (*Id.* at 27.) Nothing has changed since this Court's May 12 Opinion. For this reason alone, the Tax Mandate should be struck down. *See Dole*, 483 U.S. at 207; *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'").

### B. The Tax Mandate Is Coercive.

Although the Court's May 12 Opinion declined to reach the issue of whether the Tax Mandate is unduly coercive (and need not do so here if it continues to find ambiguity), to the extent any doubt remains, the Tax Mandate's coercive nature provides an alternate ground for enjoining the Tax Mandate. The Spending Clause grants Congress the "Power To lay and collect Taxes, Duties, Imposes and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . ." U.S. Const. art I, § 8 cl. 1. Through this authority, Congress can provide the states with federal funds. And it can even "condition such a grant upon the States' 'taking certain actions that Congress could not require them to take.'" *Sebelius*, 567 U.S. at 576 (quoting *College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999)). But there comes a point when a condition on funding itself turns into a "requirement"

9

for states to take certain action. Put differently, while Congress can encourage states to "voluntarily and knowingly accept[]" funds by complying with certain conditions, it cannot force the States to do so. *See id.* at 577-78. "When 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism. The Constitution simply does not give Congress the authority to require the States to regulate. That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Id.* at 578 (cleaned up).

Granted, the line between pressure and compulsion is not always clear. But the Tax Mandate does not fall on the margins. As the Chamber of Commerce explained, the funds available under the ARPA amount to "nearly 20% of state government revenues nationwide." (Chamber of Commerce Amicus Br. at 3, Doc. 24, PageID #:165.) And as explained above, the $6.54 billion in funds made available to the State of Michigan under the ARPA (not to mention the nearly $5 billion in funds made available to Michigan's local governments) would represent a 10.2% increase in the State's Fiscal Year 2021 budget. This Court need go no further than *Sebelius*, which has already recognized that "[t]he threatened loss of over 10 percent of State's overall budget . . . is economic dragooning that leaves the States with no real option but to acquiesce" to the loss of sovereignty. 567 U.S. at 582; *id.* at 585 (finding that the statutory provision at issue, which would lead to over a 10% loss in the budget, was "surely beyond" the "outermost line" of compulsion). That is particularly so at a time when states like Michigan face an unprecedented challenge to mitigate the effects of a global pandemic that has gravely impacted the people of Michigan and the State's budget. This Court should therefore enjoin the Tax Mandate, and grant the relief requested in the State of Ohio's Complaint.

10

**II.     The Interim Final Rule Does Not Change the Analysis.**

    **A.     The Interim Final Rule Leaves More Questions Than Answers.**

That leaves the question of whether the Department of Treasury's Interim Final Rule changes the analysis. This Court has already express skepticism that it does. (5/12/2021 Op. & Order at 28-29, Doc. 36, PageID #: 565.) Rightly so.

Like the Tax Mandate, the Interim Final Rule fails to provide clear guidance as to the conditions imposed on a state's acceptance of federal money. Indeed, the Interim Final Rule appears to acknowledge this, explaining (without going into specifics) that "Treasury will provide additional guidance and instructions the reporting requirements at a later date." (Interim Final Rule, Doc. 33-1, PageID #:454.) As this suggests, while the Rule is labeled as both "Interim" and "Final," it is more interim than anything. The Secretary is free to amend the rule at any time, or withdraw it completely. While fundamentally unfair, this is also unconstitutional. "Congress' power to legislate under the spending power is broad," but "it does not include surprising participating States with postacceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25; *see also Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) (when exercising power under the Spending Clause, Congress must make the states fully aware of the conditions imposed by legislation). The Interim Final Rule does not do that. States are left to guess as to what revisions or expansions may come in the future, only adding to the ambiguity.

What's more, although the Secretary promulgated the Interim Final Rule to provide clarity to the Tax Mandate, the text of the Interim Final Rule created more questions than it answered. Both the Interim Final Rule and the Tax Mandate fail to acknowledge that our nation's economy has adapted and evolved to serve the needs of the American consumer during the pandemic. As the Buckeye Institute explained, industries around this nation have implemented new practices in

11

response to the pandemic with the blessing of the legislative branches of the fifty states. As examples, practices like to-go alcohol sales, expansion of telehealth meetings, and more streamlined online shopping experiences have all had a direct impact on Michigan's economy. If Michigan takes legislative action to return to a pre-pandemic "normal"—which, undoubtedly will have an impact on Michigan's tax revenue—it is unclear whether this would require the State to forfeit its ARPA funds. The ARPA provides no indication as to what will be required under the Tax Mandate and any further accompanying (and still unconstitutional) guidance from the executive branch. And again, as noted, the Interim Final Rule makes no attempt to clarify. Instead, it punts the deadline further down the road.

### B. The Executive Branch Cannot Fix Congress's Errors.

Even assuming the Interim Final Rule did create clear and concrete conditions for the receipt of federal funds, and even if this Court overlooked the Secretary's ability to alter or retract the Interim Final Rule on a whim, the Interim Final Rule still could not cure the Tax Mandate's deficiencies because the executive branch does not have the authority to change conditions imposed in connection with Congress' Spending Clause power.

The Framers "split the atom of sovereignty" by carving out distinct powers for the states and the federal government to respectively enjoy. *Saenz v. Roe*, 526 U.S. 489, 504 n.17 (1999) (citation omitted). The federal government's piece of the atom was split into three distinct portions. Our nation was built on the separation of powers, where each branch of government has its own duties and authority. *INS v. Chadha*, 462 U.S. 919, 946 (1983). Where power is affirmatively given to one branch of government, it necessarily follows that the other two branches lack that specific power. "For example, the fact that the Constitution grants the President power to grant reprieves and pardons for offenses against the United States implies that the other branches

12

do not have this power." *United States v. Williams*, 15 F.3d 1356, 1361 (6th Cir. 1994) (internal quotation marks and citations omitted).

The Spending Clause's text therefore provides a clear answer for this Court as it determines whether the Executive Branch has the power to fix the shortcomings of Congress' conditions linked to legislation under the Spending Clause. It provides that "[t]he Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1 (emphasis added). Nowhere does the Spending Clause state that Congress *and* the Executive Branch share that power. And nowhere does it give the Executive Branch the authority to alter any ambiguous conditions imposed by Congress. That duty falls to Congress and Congress alone. This Court need not go any further in its analysis. The Supreme Court has made clear that upholding this separation of powers is necessary for our government structure. "Any other conclusion would be contrary to the basic concept of separation of powers and the checks and balances that flow from the scheme of a tripartite government." *United States v. Nixon*, 418 U.S. 683, 704 (1974).

This conclusion is further bolstered by Supreme Court opinions that have discussed the Spending Clause. "The legitimacy of *Congress'* power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract,' *but if Congress* intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17; *see also Davis*, 526 U.S. at 640. "By insisting that *Congress* speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation. *Pennhurst*, 451 U.S. at 17 (emphasis added).

13

The separation of powers our country was built on serves not only to protect the three branches of government from intrusion upon themselves, but also to protect all individuals within the United States. "[E]nforcing the separation of powers isn't about protecting institutional prerogatives or governmental turf. It's about respecting the people's sovereign choice to vest the legislative power in Congress alone." *Gundy v. United States* 139 S. Ct. 2116, 2135 (2019) (Gorsuch, J., dissenting); *see also Stern v. Marshall*, 564 U.S. 462, 483 (2011) ("The structural principles secured by the separation of powers protect the individual as well."). Allowing the Executive Branch to fix the shortcomings of Congress' ambiguous and unclear conditions set forth in the Tax Mandate is both impermissible and unconstitutional. This Court should reject any assertion to the contrary.

## **CONCLUSION**

For these reasons, Amici respectfully request that this Court grant the State of Ohio's Motion for Permanent Injunction.

Dated: June 9, 2021
By: */s/ Kyle M. Asher*
Kyle M. Asher (0098459)
Gary P. Gordon (Michigan Bar No. P26290) (pro hac vice application forthcoming)
Jason T. Hanselman (Michigan Bar No. P61813) (pro hac vice application forthcoming)
DYKEMA GOSSETT PLLC
201 Townsend Street, Suite 900
Lansing, Michigan 48933
(517) 374-9100

*Attorneys for Proposed Amici*

14