## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**STATE OF OHIO,**

   **Plaintiff,**

          **Case No. 1:21-cv-181**
  **v.**         **JUDGE DOUGLAS R. COLE**

**JANET YELLEN, SECRETARY OF**
**THE TREASURY, et al.,[1]**

   **Defendants.**

### OPINION AND ORDER

Through the American Rescue Plan Act ("ARPA"), Congress has exercised its power under the Spending Clause to make nearly $200 billion available to the States to assist with their COVID-19-ravaged state coffers. But that money comes at a price. To receive its share, a State must agree to be bound by certain conditions. In this action, Ohio sues the Secretary of the Treasury (who is charged with enforcing aspects of ARPA) claiming that one of those conditions—which it calls the "Tax Mandate"— exceeds Congress's authority. Ohio argues that this overstep threatens to undermine the federalist system our Constitution enacts.

Before accepting the funds ARPA made available, and thereby subjecting itself to ARPA's conditions, Ohio sought a preliminary injunction to prohibit the Secretary from enforcing the Tax Mandate while this suit is ongoing. The Court denied that

---

[1] The Defendants to this lawsuit are Janet Yellen, in her official capacity as Secretary of the Treasury; Richard K. Delmar, in his official capacity as acting inspector general of the Department of Treasury; and the United States Department of the Treasury. The Court refers to the Defendants collectively throughout this opinion as "Secretary."

request. Now, having opted in to ARPA, Ohio seeks a permanent injunction to prevent the Secretary from enforcing the Tax Mandate against the State.

Ohio's action raises fundamental constitutional concerns. The Constitution incorporates strong separation-of-powers principles. That is true both as between the federal government and the States, which the Constitution makes dual sovereigns, and within the federal government itself, where the Constitution allocates separate powers to the Legislature, the Executive, and the Judiciary. And this is not division for division's sake. At its founding, the country had just escaped a system that concentrated vast governmental power in a single person—the monarch. The Framers adopted a system of checks and balances meant to prevent that coalescence from re-emerging here—a structural mechanism to promote the underlying goal of individual liberty.

Ohio's arguments here, and the Secretary's response, require the Court to consider both federal/state (sometimes called "vertical") and intra-federal (sometimes called "horizontal") separation-of-powers principles. In particular, Ohio claims that the Tax Mandate is ambiguous, and that this ambiguity violates settled Spending Clause jurisprudence that requires Congress to clearly state any conditions it imposes on federal grants offered to the States. And here, Ohio says, that violation results in an impermissible federal intrusion on the States' sovereign authority to tax, a power that the Supreme Court has long recognized as "indispensable" to the States' very "existence." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 199 (1824).

The Secretary's efforts to refute these ambiguity concerns, meanwhile, implicate horizontal separation-of-powers concerns. That is so because, according to the Secretary, even if the Tax Mandate were unconstitutionally ambiguous (which the Secretary disputes), recently issued Treasury Department regulations clarify the Tax Mandate's contours, and thus cure any potential constitutional defect. But that argument raises questions about the extent to which Congress can delegate to an agency the power to "fix" shortcomings in legislative enactments that make conditional grants to the States under the spending power, a thorny issue in its own right.

Separately, the Secretary also raises a jurisdictional challenge to this Court's power to hear the case, which is itself another aspect of the horizontal separation-of-powers framework. Under the Constitution, the judicial power extends only to "live" disputes. Here, the Secretary notes that the original harm that Ohio claimed in filing suit—the difficulty that the Tax Mandate's ambiguity created for Ohio in deciding whether to accept the funding—ended when, ambiguity notwithstanding, Ohio filed its certification with the Secretary, which bound Ohio to ARPA's terms. And the Tax Mandate's alleged ambiguity cannot harm Ohio going forward, the Secretary says, as the Treasury Department regulations have now clarified the Tax Mandate's terms.

None of these are easy questions. As to many parts of the necessary analysis, case law is sparse or itself somewhat ambiguous. Ultimately, though, the Court concludes that Ohio has articulated an ongoing harm arising from the alleged ambiguity in the Tax Mandate, thus creating jurisdiction for this Court to hear Ohio's challenge. On the merits, the Court concludes that the Tax Mandate, as written, falls short of

the clarity that Supreme Court precedent requires for Spending Clause legislation that provides conditional grants to the States. And the Court also rejects the Secretary's argument that the Treasury Department regulations cure that ambiguity. In that regard, the Court stops short of holding that Congress can *never* authorize an agency to supply the requisite clarity, but instead holds that, under ARPA, Congress did not do so here.

Accordingly, the Court finds that the Tax Mandate exceeds Congress's power under the Constitution. The Court further finds that Ohio has met the conditions for injunctive relief to prevent the ongoing harm that this constitutional violation is causing. Thus, the Court **PERMANENTLY ENJOINS** the Secretary from enforcing the Tax Mandate against Ohio. But, because the permanent injunction suffices to remedy Ohio's ongoing harm, the Court **DENIES** Ohio's requested declaratory relief.[2]

## BACKGROUND

### A.    The COVID-19 Pandemic.

As the Court explained in its previous Opinion,[3] the COVID-19 pandemic has inflicted far-reaching, unprecedented consequences on nearly every aspect of life, not only in the United States, but around the world. While the United States appears to be emerging from the worst of the pandemic, at least in terms of ongoing public health

---

[2] Consistent with the above, the Court also **DENIES** the Secretary's Motion to Dismiss.

[3] The Court issued a previous Opinion (Doc. 36) in this matter on May 12, 2021, denying Ohio's request for a preliminary injunction. In that Opinion, the Court covered many of the same background facts, and many of the same legal issues, that this Opinion addresses. To prevent the need to read both Opinions together, the Court endeavors to make this Opinion a standalone document, although that necessarily involves some repetition of the materials presented in the earlier Opinion.

and economic impacts, the lingering economic consequences of earlier pandemic-related disruptions continue to present challenges for state budgets, including Ohio's.

## B. The America Rescue Plan Act.

On March 11, 2021, President Biden signed ARPA into law. ARPA represents Congress's latest effort to address the harms, including economic harms, that COVID-19 caused. It is a wide-ranging law that commits the federal government to spending up to roughly $1.9 trillion on a host of goods, services, and other forms of governmental assistance.

Central to this case, ARPA appropriates approximately $195.3 billion in funding designed to assist the States with their COVID-19-related financial woes. *See* 42 U.S.C. § 802(b)(3)(A). Ohio's share of that funding amounts to $5.4 billion. (Murnieks Decl., Doc. 48-1, #778). Ohio argues, and the Secretary does not dispute, that this amount reflects roughly 7.4% of the State's total spending last year. (Mot. for Prelim. Inj., Doc. 3, #33).

As is often the case with federal dollars, ARPA money comes with strings attached. In particular, to qualify for the funding, a State must "provide the Secretary [of the Treasury] with a certification, signed by an authorized officer of such State … that such State … requires the payment … to carry out the activities specified in subsection (c) … and will use any payment under this section … in compliance with subsection (c)." 42 U.S.C. § 802(d)(1). The Secretary is to "make the payment required for the State … not later than 60 days after the date on which th[at] certification … is provided to the Secretary." *Id.* § 802(b)(6)(A)(i).

As the above language suggests, the conditions themselves are set forth in sub-section (c). That subsection provides that a State shall only use the funds to cover the following types of costs incurred by the State:

> (A) to respond to the public health emergency with respect to [COVID-19] or its negative economic impacts …
>
> (B) to respond to workers performing essential work during the COVID-19 public health emergency …
>
> (C) for the provision of government services to the extent of the reduction in revenue of such State … due to the COVID-19 public health emergency relative to revenues collected in the most recent full fiscal year of the State … prior to the [pandemic] … or
>
> (D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1)(A)–(D). And the State must use the funds for those purposes by December 31, 2024. *Id.* § 802(c)(1).

Ohio does not dispute the validity of any of the above conditions. But ARPA also imposes certain other terms. As relevant here, in a section labeled "Further Restriction On Use Of Funds," ARPA provides that:

> (A) IN GENERAL.—A State or territory shall not use the funds provided under this section … to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 802(c)(2)(A). Ohio refers to this provision as the Tax Mandate, and that provision forms the gist of the dispute here.

6

**C. Ohio Sues The Secretary And Seeks A Preliminary Injunction.**

On March 17, 2021, Ohio filed this suit claiming that the Tax Mandate is unconstitutional. This is so, Ohio says, for two reasons. First, the Tax Mandate allegedly violates the Spending Clause in two ways—it is both unconstitutionally coercive and unconstitutionally ambiguous. (Compl., Doc. 1, #9–10). And second, Ohio claims that the Tax Mandate violates the Tenth Amendment, in that it unconstitutionally commandeers state taxing authority. (*Id*. at #11).

On the same day it sued, Ohio moved for a preliminary injunction preventing the Secretary from enforcing the Tax Mandate during this litigation's pendency. (Doc. 3). The Court heard argument on that motion on April 30, 2021. During that argument, the parties focused on the Spending Clause, and particularly the ambiguity issue. The Secretary largely conceded that the Tax Mandate was at least somewhat unclear as written, but offered a few arguments as to why that ambiguity did not amount to a Spending Clause problem this Court could redress. As a threshold matter, the Secretary said, Ohio lacked standing. That was so, the argument went, because the State was not currently suffering an injury in fact absent an imminent threat of recoupment. On the merits, the Secretary pressed two arguments. First, the Secretary argued that a statute need only make clear that there *is* a condition on the federal grant, not provide clarity as to what *the terms* of that condition are. Second, the Secretary argued, while the statutory text may not be clear as written, help was on the way in the form of upcoming Treasury Department regulations to provide further guidance about the Tax Mandate's meaning.

True to its word, on May 10, 2021, the Treasury Department issued an Interim Final Rule ("IFR") expounding on how the Department would assess compliance with the Tax Mandate. The Secretary provided this Court a Notice of that rule. (Doc. 33). The IFR is further described below, as relevant.

**D.     The Court Denies Ohio's Request For A Preliminary Injunction.**

Two days after the Department issued the IFR, on May 12, 2021, the Court denied Ohio's motion for a preliminary injunction. The Court started by addressing the jurisdictional question. On that front, the Court held that the Spending Clause entitled Ohio to clarity regarding the "terms of the deal," so that Ohio could exercise its sovereign prerogative of electing whether to accept the federal government's offer, or not. (Op. and Order, Doc. 36, #554). Depriving Ohio of the constitutionally-mandated clarity regarding that decision, the Court said, was a sufficient injury for Article III standing purposes, if "barely." (*Id.*, #553).

As for the appropriateness of a preliminary injunction, the Court began by finding that Ohio had shown a likelihood of success on the merits of its constitutional claim. More specifically, the Court concluded that the Tax Mandate's language fell well short of the clarity threshold that Spending Clause jurisprudence imposes. (*Id.*, #556). While acknowledging the IFR, the Court noted that the regulation's impact on the Spending Clause analysis was, at the time, uncertain and unbriefed. (*Id.*, #558). And, given that Ohio needed only to show that it had a likelihood of success, not a certainty of it, the Court concluded that Ohio had met this requirement. (*Id.*, #560).

8

The Court also found that Ohio was suffering ongoing irreparable harm. In particular, the Court concluded that the same harm that sufficed to show standing—that Ohio was forced to contemplate accepting a "deal" while in the dark as to its terms—also constituted irreparable harm for preliminary injunction purposes. (*Id.*, #567).

But notwithstanding these findings, the Court denied the requested preliminary relief. The Court concluded that the preliminary injunction that Ohio sought would not prevent Ohio from incurring the ongoing irreparable harm that Ohio asserted. (*Id.*, #568). That was so because a preliminary injunction would last only during the pendency of the action. This type of interim relief could not provide Ohio the clarity it sought in terms of deciding whether to accept the deal. And, as a practical matter, enjoining the Secretary from enforcing the Tax Mandate during the pendency of the suit was meaningless, as it was unlikely (indeed virtually impossible) that the Secretary would seek recoupment during that time.

### E. Ohio Seeks A Permanent Injunction, And Requests Expedited Briefing.

Ohio responded by requesting a permanent injunction and final declaratory relief. It also sought an expedited briefing schedule. According to Ohio, speed was of the essence, as the Tax Mandate's validity and enforceability against Ohio might have an impact on the Ohio General Assembly's consideration of the budget for the then-upcoming biennium, which the General Assembly was required to enact by June

9

30, 2021.[4] To accommodate that concern, the parties agreed to a briefing schedule that resulted in the federal government filing the final brief on June 11, 2021.

Two other factual developments merit mention. On May 13, 2021, the day after the Court issued its Opinion denying Ohio's requested preliminary injunction, and three days after the Treasury Department issued its IFR, Ohio submitted its certification stating that it would participate under ARPA. As required, Ohio represented that it would "use any payment under this section … in compliance with subsection (c) of" 42 U.S.C. § 802. (*See* Murnieks Decl., Doc. 38-1, #603). Second, on May 18, 2021, Ohio received its first tranche of funds under the Act. (*Id.*, #604).

With briefing now complete, the matter is before the Court.

### LAW AND ANALYSIS

As was true at the preliminary injunction stage, resolving Ohio's request for a permanent injunction and declaratory relief requires the Court to address difficult issues as to both jurisdiction and the merits. Because the former go to the extent of the Court's power, the Court starts there. The Court concludes, though, that it continues to have jurisdiction over this action. Accordingly, the Court then turns its consideration to the merits of Ohio's Spending Clause challenge.

---

[4] "Required" is a bit of an overstatement. To be sure, the current budget and its accompanying appropriations lapse at the end of a biennium, which is June 30, but the General Assembly can adopt "budget extensions" if no new budget is in place at that time. For example, the General Assembly enacted the budget bill for the previous biennium on July 17, 2019, and the Governor signed it the next day. That said, it appears from news reports that Ohio's General Assembly passed a budget bill for the upcoming biennium on June 28, 2021, and that Governor DeWine has now signed that bill, albeit with some line-item vetoes.

## A.     The Court Has Jurisdiction Over This Case.

"Time and again," the Supreme Court has "reaffirmed the importance in our constitutional scheme of the separation of [federal] governmental power into the three coordinate branches." *Morrison v. Olson*, 487 U.S. 654, 693 (1988) (citing cases). Those separation-of-powers principles constrain the judicial branch, just as they do the other two branches. "[U]nder our constitutional system, courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1585 (2020) (cleaned up) (Thomas, J., concurring) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610–611 (1973)). Rather, "[t]he Constitution gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'" *California v. Texas*, 539 U.S. __, No. 19-840, slip op. at 4 (June 17, 2021) (quoting U.S. CONST. art. III, § 2); *see also, e.g., Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732 (2008) ("Article III restricts federal courts to the resolution of cases and controversies.").

The case-or-controversy requirement takes effect through the doctrines of standing, ripeness, and mootness. A plaintiff seeking federal court review must show at the outset that he has standing, and that the dispute is ripe for review. Moreover, even when those requirements are met, the judicial power extends only so long as the dispute remains live (i.e., non-moot). Here, the federal government claims that (1) Ohio lacks standing, and (2) that, even if Ohio once had standing, the matter is now moot given events that have occurred since Ohio filed suit.

Start with standing. It is well settled that "[t]he plaintiff bears the burden of establishing standing." *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). "To satisfy the 'irreducible constitutional minimum of standing,' the plaintiff must establish that: (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent rather than conjectural or hypothetical; (2) that there is a causal connection between the injury and the defendant's alleged wrongdoing; and (3) that the injury can likely be redressed." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Or as the Supreme Court put it recently, "[a] plaintiff has standing only if he can 'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *California*, slip op. at 4 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)).

Importantly, those elements are assessed as of the time the plaintiff filed suit. *Davis*, 554 U.S. at 732 (describing standing as "the 'personal interest that must exist at the commencement of the litigation'") (quoting *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). Or, as the Court put it in *Lujan*, "[t]he existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*." 504 U.S. at 569, n.4 (emphasis in original) (quoting *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 830 (1989)). *But see Memphis A. Philip Randolph Inst. v. Hargett*, No. 20-6141, 2021 WL 2547052, at *4 (6th Cir. June 22, 2021) (noting that the Supreme Court "has implied that in certain cases a plaintiff may have to maintain standing throughout the lawsuit," but that the "Supreme Court

… has not explicitly overruled past precedent that confined the standing inquiry to the moment when the lawsuit was filed").

The principal dispute between the parties as to standing here centers on the question of injury in fact. In its previous Opinion, this Court found that Ohio had sufficiently established such an injury. In particular, the Court noted that Spending Clause jurisprudence requires Congress to state clearly the terms upon which it extends an offer of conditional funding to the States. Stated differently, when presented with a federal grant that has strings attached, States are entitled to clarity regarding those strings. And, as the Court also observed, that clarity is critical to a State's ability to exercise its sovereign prerogative of deciding whether to accept that offer. Thus, the Court concluded, Ohio suffered an injury in fact when it was presented an unconstitutionally ambiguous deal.

In reaching that result, the Court conceded in its prior Opinion that that legitimate questions could be raised as to whether such an injury was "concrete and particularized," as opposed to intangible or amorphous. Still, it concluded that Ohio's injury cleared the standing hurdle, if barely. This Court noted for example, that in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) ("*NFIB*"), the Supreme Court had not raised any standing concerns with a State's pre-enforcement challenge under the Spending Clause to a provision in the Affordable Care Act. (*See* Op. and Order, Doc. 36, #556). That matters because federal courts bear an independent obligation to dismiss suits containing a jurisdictional defect, even if the parties do not raise that issue. *Summers*, 555 U.S. at 499. So, the Supreme

13

Court's silence on jurisdiction in *NFIB* provides at least an implicit recognition that this type of injury creates standing. And, although the Court did not mention it at the time, the "special solicitude" to which States are entitled in the standing analysis, at least when "protecting … quasi-sovereign interests," *see Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), lends further credence to this result.

The Secretary presses two arguments seeking a different result now. Neither changes the Court's earlier determination.

First, noting that this Court characterized Ohio's injury as "barely" sufficient, the Secretary stresses that the evidentiary showing is greater at this stage of the litigation (where final relief is sought) than it was at the earlier stage. (Mot. to Dismiss, Doc. 45, #725–26 (citing *Vonderhaar v. Vill. of Evendale*, 906 F.3d 397, 401 (6th Cir. 2018))). Thus, the Secretary argues, what was barely sufficient then is insufficient now.

To be sure, Ohio bears a stronger evidentiary burden now (i.e., when seeking final relief) as compared to when it sought a preliminary injunction. *Lujan*, 504 U.S. at 561 (observing the increased "burden of proof" applying to "the manner and degree of evidence required at the successive stages of the litigation"). But that applies to factual showings, not legal questions. In relying on that increased burden, the Secretary misunderstands the sense in which this Court was using the term "barely" in its earlier decision. The Court was not suggesting that, as an evidentiary matter, Ohio had barely cleared the hurdle in terms of demonstrating the *fact* of injury. Rather, the point was that the nature of the injury—the harm that arises when a State must

14

ponder accepting an ambiguous deal—made the injury-in-fact question a close call as a *legal* matter. In other words, there was no doubt that Ohio in fact had suffered the injury on which the Court relied. Instead, the question—a purely legal question—was whether an injury of that nature satisfied the injury-in-fact requirement. Thus, while the Secretary may well be correct that the evidentiary burden on standing is now higher, *see Vonderhaar*, 906 F.3d at 401, that does not impact the Court's earlier legal conclusion about Ohio's injury.

The Secretary's other argument is that the harm on which the Court relied to support standing—the injury Ohio was suffering in facing an unconstitutionally ambiguous offer—is now gone, as Ohio has agreed to accept the deal, ambiguity and all. But that argument, while it may be germane to mootness (a topic to which the Court turns next) does not affect standing. As already noted, standing is measured at the time the suit is filed, rendering any later factual developments wholly irrelevant to that inquiry. *See Lujan*, 504 U.S. at 569, n.4. Thus, on the standing front, this argument is a non-starter.

That still leaves mootness. And in fairness to the Secretary, mootness appears to be the principal thrust of her current argument against ongoing jurisdiction. (*See* Mot. to Dismiss, Doc. 45, #725–26).

The mootness argument starts on firm legal footing. The Secretary is undoubtedly correct that "'when the issues presented [in a case] are no longer "live" or the parties lack a legally cognizable interest in the outcome' the case is moot and must be dismissed." (*Id.*, #726 (quoting *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767

15

(6th Cir. 2019))). But some important qualifiers apply to that statement. First, as this Court observed in its previous Opinion, "[t]he 'heavy burden' of demonstrating mootness falls on the party asserting it." (Op. and Order, Doc. 36, #557 (quoting *Thomas v. City of Memphis*, 996 F.3d 318, 324 (6th Cir. 2021)). Second, the original injury is not the only injury that a court can consider in determining mootness. *See Freedom From Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 476 (3d Cir. 2016) ("'[A] court will not dismiss a case as moot,' even if the nature of the injury changes during the lawsuit, if 'secondary or "collateral" injuries survive after resolution of the primary injury.'") (quoting *Chong v. Dist. Dir., I.N.S.*, 264 F.3d 378, 384 (3d Cir. 2001)). Rather, assuming that there was jurisdiction at the outset of the case, *any* related harm arising from the challenged conduct will suffice to keep that case alive. *Id.*; *accord Spencer v. Kemna*, 523 U.S. 1, 7–8 (1998).

The combination of those two principles dooms the Secretary's mootness argument here. First, the Secretary appears to believe that Ohio, rather than the Secretary, bears the burden of proof on this issue. That is wrong, as the Sixth Circuit confirmed once again just recently. *Hargett*, 2021 WL 2547052, at *4 (quoting *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 531 (6th Cir. 2001)). Any failure of evidence on the question of ongoing harm, then, cuts against the Secretary, not against Ohio.

In any event, on the facts here, there is little doubt that Ohio continues to suffer ongoing harm, at least on Ohio's version of what the Spending Clause requires when Congress makes conditional grants to the States. To be sure, the precise harm

16

on which the Court relied in its previous decision—the harm a State incurs in contemplating whether to accept an ambiguous deal—is now gone. But as the Court *also* noted, a similar type of harm (i.e., harm to a State's ability to exercise its sovereign prerogatives) arises from that same ambiguity when the State is bound to such a deal, as Ohio is now. (Op. and Order, Doc. 36, #550). To expand on that a bit, Ohio has now committed itself to complying with the Tax Mandate, and the State has received funding based on that commitment. Thus if, as Ohio claims, the Tax Mandate is unconstitutionally ambiguous, Ohio now faces an unlawfully-imposed quandary in determining how to exercise its sovereign taxing power. Ohio legislators considering tax changes will have unconstitutionally insufficient information (assuming Ohio is right about what the Spending Clause requires) to determine the impact that such changes will have on Ohio's ability to retain the federal grant money that the State has begun to receive. That ambiguity, in turn, will cast a pall over legislators' abilities to contemplate such tax changes.

The State argues that this is particularly meaningful *now*, as Ohio was in the throes of enacting its budget for the next biennium at the time it filed its brief, a task that must be completed on or about June 30, 2021. But the Court's analysis of the ongoing harm is not tied to that date. As a practical matter, the General Assembly's contemplation of taxation and spending changes for the upcoming biennium started many months ago. It is thus unlikely that any decision by this Court, which could have occurred at the earliest only after briefing was completed in mid-June, would have a meaningful impact on the legislature's taxation decisions for the 2022–23

17

budget. And it now appears that the General Assembly has completed its work on that topic by enacting a budget bill, further undercutting any theory of ongoing harm inextricably linked to the biennium's end date.

At the same time, though, those same considerations serve to illustrate more broadly the type of ongoing harm that Ohio will continue to suffer, even now, with the budget bill in the rearview mirror. To start, the General Assembly can, and some-times does, make changes to taxation *during* a biennium. Indeed, in an example per-haps particularly apropos here, Governor DeWine announced last year that, due to revenue shortfalls associated with the COVID-19 pandemic and the State's response to that pandemic, the legislature may need to consider mid-biennium tax changes for the second year of the previous biennium. *See, e.g.,* Randy Ludlow, *Coronavirus in Ohio: $775 Million in Budget Cuts Due to Pandemic Include $300 Million Reduction to Schools*, COLUMBUS DISPATCH (May 5, 2020), https://www.dis-patch.com/news/20200505/coronavirus-in-ohio-775-million-in-budget-cuts-due-to-pandemic-include-300-million-reduction-to-schools. The economic uncertainty sur-rounding the State's emergence from the pandemic could well lead to just such con-siderations again.

And more generally, issues regarding taxation are never completely removed from legislative consideration. With a two-year budget cycle and a balanced-budget requirement, planning, at least informal planning, regarding taxation and expendi-tures will start anew as a practical matter, almost immediately. Exactly when may be difficult to say, but that just underscores the point—one cannot reliably conclude

18

that the ambiguity surrounding Ohio's use of its taxing powers is not harming Ohio in the exercise of its sovereign prerogatives now. Given the burden of proof on mootness, *Thomas*, 996 F.3d at 324, that is enough.

Nor is it any answer to say that it would be more appropriate to wait and see what *specific* tax changes Ohio adopted in its recently-enacted budget, or may have in mind for the future, before addressing whether the Tax Mandate is ambiguous. (*See* Mot. to Dismiss, Doc. 45, #729). The Secretary notes, for example, that Ohio will have a right to challenge any recoupment action. A challenge at that time, the Secretary argues, would have the benefit of a specific set of tax changes against which to consider the ambiguity question, suggesting that consideration of that issue is not ripe now. (*Id.*). But, as the Court described in its previous decision, the question of whether the Tax Mandate is unconstitutionally ambiguous turns on the statute's language,[5] and more specifically on whether that language provides sufficient semantic content on the topic of permissible tax changes *in general* to satisfy the clarity requirement articulated in Spending Clause jurisprudence. Showing that the Tax Mandate may be clear as to some subset of specific types of potential state tax changes does not address that problem.

With that in mind, the problem with a wait-and-see approach becomes apparent. As noted, it is not merely the recoupment that harms Ohio. Rather, if the Tax Mandate is ambiguous as to a broad range of potential tax changes, then that

---

[5] Or, possibly, the statute's language as supplemented by the IFR. The Court discusses that issue when addressing the merits of the Spending Clause challenge.

ambiguity will have consequences of its own. The uncertainty itself, uncertainty that exists now that Ohio has tendered its certification, will continue to exert pressure on state legislators not to consider any tax change, or set of tax changes, as to which the Tax Mandate implications cannot be assessed. As further described below, that essentially means that Ohio's legislature may be disinclined to consider *any* rate reduction, as to *any* state tax, because the Secretary could interpret that reduction as triggering a right to recoupment. Or, at the very least, Ohio legislators will have incentives to minimize the *size* of any such reductions in hopes of reducing the magnitude of any associated recoupment.

That type of thumb on the legislative scale is a current and ongoing injury to Ohio in its sovereign capacity. To be sure, it may be a different injury from the one that gave Ohio standing at the time it filed suit. But the claimed harm strikes the same constitutional chord—a harm to Ohio's ability to exercise its sovereign powers—and it arises from the same source—the allegedly unconstitutional ambiguity in the Tax Mandate. That is enough to prevent mootness. In sum, in light of the ongoing injury caused by the allegedly unconstitutional ambiguity, especially when coupled with the billions of dollars that are at risk based on that ambiguity, the Secretary falls short of the "heavy burden" she bears in showing that this case is moot. *Thomas*, 996 F.3d at 324; *Hargett*, 2021 WL 2547052, at *4.

Separately, while Ohio need not rely on the prospect of future recoupment to avoid mootness, that prospect may nonetheless provide an alternative basis for jurisdiction here. At the time Ohio originally sued, it was not bound by the Tax Mandate's

terms, as it had not accepted the ARPA deal. But now Ohio has filed its certification, and thus any decisions it makes (or has made) on taxes are subject to ARPA's terms. That in turn means that Ohio faces a real prospect of enforcement if the Treasury Secretary were to conclude that Ohio had violated the terms of the Tax Mandate. And, if anything, that prospect is now even greater, as Ohio's General Assembly has passed a budget bill that reportedly includes a $1.64 billion income tax cut. Given the ambiguity, as described below, in the Tax Mandate's language, the Secretary certainly *could* conclude that this tax cut gives rise to a right to recoupment under the statute. Thus, Ohio now has an even more concrete example of an "injury that is the result of the statute's actual or threatened enforcement, whether today or in the future," than it did before. *California*, slip op. at 6. Moreover, "the likelihood of [such] future enforcement" is, if anything, more substantial now than it was then, *id.*, and, as noted, such enforcement raises the prospect of billions of dollars in potential recoupment.

The contrast between the current case and the Supreme Court's recent decision in *California v. Texas* further illustrates why jurisdiction is appropriate here. In *California*, the parties sought to attack an aspect of the Affordable Care Act that created a duty on the part of individuals to maintain a minimum level of insurance. At one time, that duty was enforced by a penalty, but "[i]n 2017, Congress effectively nullified the penalty be setting its amount at $0." *Id.*, slip op. at 1. The parties attacking that provision nonetheless asserted standing based on various arguments about alleged financial consequences that the now-nullified provision continued to have on

people's behavior (and the resulting financial impacts on the States). In finding no jurisdiction to consider that challenge, the Supreme Court emphasized that the lack of any prospect that the provision would be enforced meant that the alleged current harms did not count for standing purposes. Here, by contrast, the current harms on which the Court relies to support jurisdiction grow directly out of the prospect of future enforcement of the Tax Mandate. In other words, absent the prospect of enforcement (as was the case in *California*), the Tax Mandate's alleged ambiguity would not in any way impact Ohio legislators' consideration of proposed tax changes. But, unlike in *California*, here the Secretary admits that the Tax Mandate is enforceable. That makes all the difference.

In sum, if the Tax Mandate is indeed unconstitutionally ambiguous, as Ohio asserts, then Ohio was suffering an injury in fact at the time it sued, and it continues to suffer an injury in fact after binding itself to that deal. To be sure, both then and now, Ohio faces a unique *form* of injury. But that is not surprising, as the injury here ties directly to a State's unique role as a sovereign under the Constitution. Moreover, both the original and ongoing injuries arise directly from, and thus are traceable to, the prospect of future enforcement of the allegedly ambiguous—and therefore allegedly unconstitutional—Tax Mandate. Nor, as a final point, can there be any real question regarding redressability as to the ongoing harm. Enjoining the Secretary from enforcing the Tax Mandate against Ohio, or declaring that the provision is unconstitutional as applied to the State, would remedy the uncertainty surrounding Ohio's legislative efforts relating to taxation, which is the harm that Ohio is currently

suffering. Accordingly, the Court finds that it had—and still has—jurisdiction to consider Ohio's Spending Clause challenge to the Tax Mandate, although the Court acknowledges, once again, that this is a close call.

## B.  The Statutory Language Of The Tax Mandate Violates The Spending Clause Requirement Of Clarity As To The Terms Of A Conditional Grant Offered To The States.

Having concluded that it has jurisdiction, the Court must consider the merits of Ohio's constitutional challenge. *Mata v. Lynch*, 576 U.S. 143, 150 (2015) ("[W]hen a federal court has jurisdiction, it also has a virtually unflagging obligation to exercise that authority.") (quotation omitted). Here, that inquiry proceeds in two parts. First, the Court considers whether the Tax Mandate, as written, satisfies the clarity requirement the Spending Clause imposes. As the Court's previous Opinion previewed, the Court concludes that the Tax Mandate does not meet that bar. Second, the Court considers the impact, if any, that the IFR has on the Tax Mandate's failure, as enacted, to meet those clarity requirements. That inquiry, the Court concludes, turns less on Spending Clause jurisprudence, and more on delegation principles (and the strictures that typically apply to such delegations).

### 1.  As Drafted, The Tax Mandate Falls Short Of The Clarity Required For Spending Clause Legislation.

As this Court recently observed in denying Ohio's motion for a preliminary injunction, the Supreme Court's jurisprudence relating to conditional grants under the Spending Clause rests on federalism concerns. It is an outgrowth of the fact that "[i]n our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *NFIB*, 567 U.S. at 533. Stated

differently, the "Federal Government 'is acknowledged by all to be one of enumerated powers,'" and "[t]he Constitution's express conferral of some powers makes clear that it does not grant others." *Id.* at 534. The States, by contrast, retain a "general power of governing," typically called the "police power." *Id.* at 536. That power is, of course, subject to federal constitutional limitations—such as those imposed by the Equal Protection Clause—but beyond that, "state governments do not need constitutional authorization to act." *Id.* at 535.

Importantly, the Supreme Court has also explained that this division of power is not about preserving state power, so much as it is about promoting individual liberty. *Id.* at 536 ("State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power."). As the Court put it in *Murphy v. National Collegiate Athletic Association*:

> The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals.

138 S. Ct. 1461, 1477 (2018) (quotations and citations omitted).

This protection for individual liberty arises from two sources. First, under this dual-sovereign design, "the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed." *NFIB*, 567 U.S. at 536. Second, the division "den[ies] any one government complete jurisdiction over the concerns of public life, [thereby] protect[ing] the liberty of the individual from arbitrary power." *Id.* (quoting *Bond v. United States*, 564 U.S. 211, 222 (2011)). In that sense, the "separation of the two spheres is one of the Constitution's structural

protections of liberty." *Printz v. United States*, 521 U.S. 898, 921 (1997). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id.*; *accord Murphy*, 138 S. Ct. at 1477. In short, limiting Congress to its enumerated powers, thereby reserving certain functions to the States, plays an important role in our constitutional design.

One of Congress's enumerated powers, though, is the power to spend:

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States.

U.S. CONST., art. I, § 8, cl. 1 (the "Spending Clause"). And "[i]ncident to this power, Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). That is, the federal government can seek to purchase from the States their acquiescence in the exercise of the States' sovereign powers, acquiescence that the federal government otherwise could not command.

The Supreme Court has recognized that unfettered use of this power, especially when coupled with Congress's power to tax, could quickly alter the balance of powers between the federal government and the States. In *NFIB*, for example, seven Justices, spread across two different opinions, articulated versions of that very point. Four Justices described it this way: "This formidable power [i.e., the spending power], if not checked in any way, would present a grave threat to the system of federalism created by our Constitution." 567 U.S. at 675 (Scalia, J., dissenting). Indeed, they

went on, if the power is "limited only by Congress' notion of the general welfare, the reality, given the vast financial resources of the Federal Government, is that the Spending Clause gives power to the Congress to tear down the barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed." *Id*. (quotation omitted). Three other Justices framed it slightly differently, but the thrust is the same: "Respecting this limitation [on the Spending Clause] is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system. … Otherwise the two-government system established by the Framers would give way to a system that vests power in one central government and individual liberty would suffer." *Id*. at 577 (opinion of Roberts, C.J.). In short, unbridled use of the spending power would allow Congress to expand beyond its otherwise enumerated powers.

Consistent with such concerns, the Supreme Court has repeatedly held that "[t]he spending power is of course not unlimited, but is instead subject to several general restrictions articulated in our cases." *Dole*, 483 U.S. at 207 (citation omitted). These limitations admittedly do not arise from the text of the Spending Clause. But they are nonetheless animated by the structural concerns—in this case, federalism—that the Constitution reflects and embodies.

In particular, Spending Clause jurisprudence has recognized three limitations on Congress's ability to induce States to bargain away their sovereign powers. First, "Congress may not impose conditions 'unrelated to the federal interest' in enacting

spending legislation." *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dept. of Educ.*, 584 F.3d 253, 284 (6th Cir. 2009) (en banc) (Sutton, J., concurring) (quoting *Dole*, 483 U.S. at 207–08). Second, it may not "'coerce' the States into accepting funds and the regulations that come with them." *Id.* (citing *Dole*, 483 U.S. at 211). Third, "given [Congress's] authority under the Spending Clause to regulate the States beyond the limited and enumerated powers the Constitution otherwise gives it and given that the States are not represented in the Halls of Congress, the federal courts have required Congress to state those conditions 'unambiguously' in the text of the statute." *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).[6, 7]

Although Ohio raises both coercion and ambiguity in support of its Spending Clause challenge, the Court's resolution of this case rests on ambiguity concerns. Thus, a few more words regarding that limitation are in order. As at least twelve Sixth Circuit judges observed in *City of Pontiac* (albeit across two separate opinions), this limitation derives largely from analogy to contract law. *See id.* at 276–77 (citing *Pennhurst*, 451 U.S. at 17) (opinion of Cole, J.); and *id.* at 284–85 (Sutton, J.,

---

[6] In his concurrence in *Pontiac*, Judge Sutton described this third limitation as "statutory," *see City of Pontiac*, 584 F.3d at 283, which it is in the sense that it imposes a requirement on how Congress goes about drafting statutes. That is, the limitation is not directed at the substance of the conditions, but rather at ensuring, as a drafting matter, that the conditions are clearly expressed. But, while describing the limitation as statutory, Judge Sutton acknowledged that it has "constitutional roots." *Id.* at 284.

[7] The four dissenting Justices in *NFIB* described a fourth limitation: Congress cannot use a conditional grant to "induce the States to engage in activities that would themselves be unconstitutional." *NFIB*, 567 U.S. at 676 (Scalia, J., dissenting) (quoting *Dole*, 483 U.S. at 210). For present purposes this Court need not decide whether that limitation is better understood as arising under the Spending Clause, or instead merely as reflecting the notion that accepting federal grants made under the Spending Clause does not free States from other constitutional obligations. That is because no party has argued that this limitation, if that is what it is, is implicated here.

concurring) (also citing *Pennhurst*, 451 U.S. at 17). "Viewing the Spending Clause relationship between a State and the federal government as a contract, the Supreme Court has stated that the legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of th[at] contract." *Id.* at 276–77 (opinion of Cole, J.) (citing *Pennhurst*, 451 U.S. at 17) (cleaned up). True, the Supreme Court has been "careful not to imply that *all* contract-law rules apply to Spending Clause legislation," but it has also "regularly applied a contract-law analogy in cases" involving receipt of federal funds. *Barnes v. Gorman*, 536 U.S. 181, 186 (2002).

Under those principles, it is not sufficient that the State receives funds merely knowing that some kind of strings are attached. Rather, the question is "whether such a state official would clearly understand *the obligations*" attendant in accepting the grant. *City of Pontiac*, 584 F.3d at 277 (opinion of Cole, J.) (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,* 548 U.S. 291, 296 (2006)) (cleaned up) (emphasis added). And "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* at 268 (quoting *Arlington*, 548 U.S. at 296) (in turn quoting *Pennhurst*, 451 U.S. at 17). Thus, "'[b]y insisting that Congress speak with a clear voice,' the Supreme Court enables States 'to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Id.* (quoting *Pennhurst*, 451 U.S. at 17). So, not only does the Constitution require Congress to tell States that there *are* conditions, but Congress must also tell States *what* those conditions are.

28

Beyond formulations such as "clear understanding" or "clear voice" like those noted above, however, case law is somewhat sparse on describing the exact level of clarity that the Spending Clause requires. That said, one thing is certain—exactitude is not necessary. For example, the Supreme Court has observed that Congress need not "prospectively resolve every possible ambiguity concerning particular applications of [a program's] requirements." *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985). Rather, it is only when a state official is "unable to ascertain" the obligations that a conditional grant imposes, that constitutional problems arise. *Arlington*, 548 U.S. at 296. And a standard akin to "unable to ascertain" seems consistent with the analogy to contract law that drives much of Spending Clause jurisprudence. That is because contractual indefiniteness likewise involves something like an "impossible to understand" standard. *See, e.g., Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 F. App'x 194, 202 (3d Cir. 2012) ("[A] contract fails for indefiniteness when it is 'impossible to understand' what the parties agreed to because the essential terms are ambiguous or poorly defined."). Importantly, though, in determining whether ARPA clears whatever the exact hurdle the Spending Clause imposes, the Court "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Pennhurst*, 451 U.S. at 18 (citations and quotations omitted).

Even though divining the exact standard for unconstitutional ambiguity under the Spending Clause may be difficult, that matters little here. That is because the

Tax Mandate, even when read in context, fails to put the State on "clear notice" of its obligations, *see Arlington*, 548 U.S. at 296, under any reasonable definition of "clear."

Start with the text:

(A) IN GENERAL.—A State or territory shall not use the funds provided under this section … to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

42 U.S.C. § 802(c)(2)(A). As the Court observed in its previous Opinion, parts of that language are clear. "Change in law," for example, refers to new laws. Likewise, the definition of "reduc[ing] any tax," is sufficiently clear—it includes reducing the tax rate, or providing a rebate, deduction, credit, or any other mechanism for reducing that tax.

But, as the Court also observed, beyond that is where things get tricky. That is particularly true when it comes to "indirectly offset[ting] a reduction in the net tax revenue." That phrase raises a host of interpretive problems. Start with this—the notion of "reducing net tax revenue" necessarily assumes some baseline. The IFR expressly provides that missing baseline (i.e., 2019, the last full fiscal year before the onset of the COVID-19 pandemic), *see* 86 Fed. Reg. 26,807 (May 17, 2021), or at least provides that fiscal year 2019 revenues will serve as a safe harbor for calculating the baseline for net revenue reductions, *id*.

But, putting aside that regulatory guidance, the statutory language itself provides no mechanism for determining whether a State's net tax revenues are "reduced"

or not. For example, imagine that the only change Ohio made to its taxes was to reduce its tax rate on gasoline. But further imagine that the total amount of gasoline purchased in FY 2022 (which starts on July 1, 2021) is higher than in FY 2021, given, for example, the impact that the pandemic had on commuting or travel in the earlier fiscal year. Are Ohio's tax revenues "reduced" under the Tax Mandate? Arguably, they are "reduced" from what Ohio would have collected at the higher tax rate (although, depending on the elasticity of demand for gasoline, that may not be the case). But gas tax revenues may still be higher in FY 2022 than they were in FY 2021 because of the change in demand for gasoline as Ohio emerges from the pandemic. In that sense, there would be an "increase," not a "reduction," in Ohio's net tax revenues. The Tax Mandate's language does not select between those two competing views.

Relatedly, the statutory language does not explain whether the prohibition applies to *expected* tax revenues, or *actual* tax revenues. In other words, when Ohio legislators enact a lower *rate* on a given tax, they may do so based on a belief that actual tax collections will *go up* (for example, because more transactions will occur, given the lower tax rate). Or, even more likely, the Ohio legislature may enact a package of tax changes, with an anticipation that the changes, overall, will be revenue neutral or revenue enhancing. But plans are one thing, and actual tax receipts are another. Especially as Ohio emerges from a nationwide pandemic, with the accompanying economic dislocations, the tax revenues that Ohio actually receives based on a set of changes in its taxes may differ significantly from the State's initial estimate. Again, the IFR provides rules for how to "score" tax changes, but that strikes the

Court as an essential aspect of ensuring that "a state official would clearly understand the obligations" that ARPA imposes, *see City of Pontiac*, 584 F.3d at 277 (opinion of Cole, J.) (quoting *Arlington,* 548 U.S. at 296) (cleaned up), and one on which the Tax Mandate itself says nothing.

That on its own would be bad enough, but ARPA then lumps "indirectly offset" on top. In its previous Opinion, the Court observed that it could not ascertain what an indirect offset may (or may not) be. And the Court was not alone in that. At oral argument on the motion for preliminary injunction, the Secretary declined to take any position on that term either. Perhaps unsurprisingly, Ohio too expressed confusion regarding the contours of the phrase.

The Secretary's more recent briefing on the permanent injunction does not resolve the Court's confusion regarding that term. Even armed with the Court's guidance as to the source of the ambiguity, the Secretary provides no workable definition of what an "indirect offset" is. Indeed, if anything, the briefing confirms that even the Secretary struggles to distinguish between a "direct" and an "indirect" offset, at least based solely on the statutory text.

Rather than offer a definition of one or both terms, the Secretary seeks to illustrate the difference by reference to an example. (*See* Mot. to Dismiss, Doc. 45, #733). The problem is that the example the Secretary offers for a "direct offset" is substantively identical to the one the Secretary provides for an "indirect offset," if stated slightly differently. More specifically, according to the Secretary, a "direct offset" would occur if a State: (1) received $2 billion in ARPA funds, (2) "cut its income

tax by an amount expected to equal $2 billion," and then (3) "use[d] the [ARPA funds] to offset the revenue loss." (*Id.*). In contrast (or at least the Secretary says it is a contrast), an "indirect offset" would arise if a State: (1) received the same $2 billion, (2) used that money to "replace $2 billion in planned state expenditures on COVID-19 testing," and then (3) passed that $2 billion along to Ohio citizens in the form of a "$2 billion reduction in state income tax." (*Id.*).

That amounts to two slightly different ways of saying the same thing, albeit swapping the order in which steps 2 and 3 are presented. In both the "direct" and "indirect" examples that the Secretary provides, the State uses the conditional grant to replace (the Secretary calls it "offset" in the first example and "replace" in the second) state funding for certain current state expenditures. That in turn frees up existing state funds, which the State then uses for a tax refund. The only difference between the two examples, besides the reordering of steps 2 and 3, is that, in the "indirect offset" scenario, the Secretary identified *where* the federal-for-state dollar swap occurred (i.e., COVID-19 testing expenditures), whereas in the "direct offset" example, the Secretary left the area of the federal-for-state dollar swap unidentified. But the Secretary offers no explanation as to why those non-substantive differences would change the "directness" of the offset, and the Court cannot see any reason why that would be the case. In short, it appears that even now the Secretary lacks a coherent theory as to what an "indirect offset" may be, as distinct from a "direct offset," further confirming the Court's suspicion that the phrase is unintelligible as used in the context of the Tax Mandate.

Nor is the problem simply that the two examples are the same. If an "indirect offset" is simply *the same as* a "direct offset," that would not make the term inherently ambiguous. The problem, though, is that, while offering identical examples, the Secretary insists that there is a *difference* between the two terms, and believes that the examples illustrate that difference. In other words, the Secretary's briefing contends that the term "indirect offset" conveys something different from the term "direct offset," yet cannot articulate what that difference is.

And there is still a broader problem. Even if the Secretary had identified an example of an "indirect offset" that was different from a "direct offset," the Secretary still has not provided any definition of the former term, let alone one that flows either from the statutory language, or from the use of that term in the context of the statute more generally. Merely providing a single example of an "indirect offset," without more, does little to establish the outer contours of the phrase. Compounding that shortcoming, providing Ohio an example of something that the Secretary says would count as an indirect offset hardly fixes Ohio's problem. It is far more important for Ohio to know what the Secretary would *not* count as such an offset.

And it bears noting that the ambiguity at issue here is a particularly troubling type of ambiguity. Based on the Tax Mandate's language, the Secretary could deem essentially *any* reduction in the rate of any one or more state taxes—even if other tax rates were increased—to be a "change in [tax] laws" that results in an "indirect[] offset [of] a reduction in [Ohio's] net tax revenues." 42 U.S.C. § 802(c)(2)(A). Combine that sweeping language with the ambiguities identified above—it is almost as though

Congress had written the Tax Mandate, as follows: "Each certifying State agrees that, if a State reduces any tax rate, on any tax, the Secretary may recoup ARPA funding to the extent that the Secretary determines, in her discretion, that the rate reduction resulted in the State losing tax revenues, and the Secretary further determines, in her discretion, that those losses were offset with ARPA funding." Without knowing more about how the Secretary is to make those decisions, that would not cut it under Spending Clause jurisprudence. Yet, given the ambiguity in the phrases "indirect off-set" and "net tax revenues," the Tax Mandate arguably says just that. And that ambiguity may disincentivize Ohio's General Assembly from considering *any* reduction in rates as to *any* state tax, for fear of forfeiting the grant that Ohio received under ARPA, or at the very least, the legislature may minimize any such rate reduction, in hopes of mitigating the magnitude of the potential forfeiture. That is the type of federal invasion of state sovereignty that Spending Clause jurisprudence disfavors.

The bottom line is this—in its previous Opinion, the Court identified aspects of the Tax Mandate that were too ambiguous, at least based on a first look, to pass Spending Clause muster. The Secretary's subsequent briefing fails to convince the Court otherwise. Accordingly, the Court finds that Tax Mandate's language, in and of itself, falls short of the clarity required when Congress exercises its powers under the Spending Clause.

### 2. The Interim Final Rule Does Not Change That Result.

If the Tax Mandate were the only text at issue, the Court's finding above would be the end of the matter. But here, two days before the Court issued its previous

Opinion, the Secretary promulgated the IFR seeking to provide additional clarity as to the Tax Mandate's meaning. The issuance of that rule raises two additional questions. First, to what extent can an administrative regulation provide the clarity needed for a conditional grant to comply with Spending Clause strictures? Second, assuming an administrative regulation can bridge the gap, does the IFR do so? The Court's decision on the first issue, though, obviates the Court's need to consider the second. In particular, the Court concludes that, while Congress may be able to delegate authority to an agency to supply the requisite clarity, Congress must provide for such delegation in clear and unambiguous terms. And Congress did not do so here.

The question of whether regulations can provide the clarity the Spending Clause requires is, at some level, more a matter of delegation principles than Spending Clause jurisprudence. To be sure, one could argue that the Spending Clause, as an Article I power, is a power that the Constitution grants *to Congress*, and thus a court should look only to the congressionally enacted language (i.e., the statute), in deciding whether Congress has validly exercised that power. And, as already cited above, there are Spending Clause cases that could be understood to provide at least passing support to that proposition, as they seem to tie the Spending Clause ambiguity question to whether "Congress" has provided the necessary clarity. *See, e.g., Dole*, 483 U.S. at 206 ("Congress may attach conditions on the receipt of federal funds."); *Pennhurst*, 451 U.S. at 17 (requiring that "Congress speak with a clear voice"); *Bennett*, 470 U.S. at 665 ("Congress must express clearly its intent to impose conditions."); *Pontiac*, 584 F.3d at 284 (Sutton, J., concurring) ("[G]iven its authority under

the Spending Clause to regulate the States beyond the limited and enumerated powers the Constitution otherwise gives it and given that the States are not represented in the Halls of Congress, the federal courts have required Congress to state those conditions 'unambiguously' in the text of the statute.").

At the same time, though, those cases do not address the precise issue here— the extent to which agency regulations can provide the necessary clarity. Thus, the reference to "Congress" in such cases is perhaps merely a generic reference to the federal government, and not to Congress exclusively. And, as for any suggestion that the Constitution strictly forbids Congress from delegating any aspect of its Article I powers, that ship has sailed.

Moreover, there are also Spending Clause cases that suggest that the "conditions" that Congress imposes in connection with federal spending can *include* compliance with administrative regulations. *Dole*, for example, stated that, under the Spending Clause power, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory *and administrative* directives." 483 U.S. at 206 (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980) (opinion of Burger, C.J.)) (emphasis added). And, in *Bennett*, the Court noted that, by accepting the federal grants there, each State had "agreed to comply with … the legal requirements in place when the grants were made," which included "statutory provisions, *regulations*, and other guidelines." 470 U.S. at 670 (emphasis added).

Such cases may simply mean, however, that when Congress specifies the grant conditions, Congress must provide the requisite detail, but can do so through incorporating by reference any *then-existing* administrative regulations. In such situations, of course, the clarity would be present at the time the statute is enacted, or at the very least by the time the conditional spending is available to the States. Later-enacted regulations, by contrast, like those the Secretary relies on here, may raise different constitutional concerns, as the requisite clarity is not available at the time that Congress extends the conditional offer to the States.

As Ohio observes, it appears that the sole court to address this issue head on is the Fourth Circuit. *See Va. Dep't of Educ. v. Riley*, 106 F.3d 559 (4th Cir. 1997) (en banc). That court concluded that *only* the statutory language, and not any regulatory follow-on, is what matters for Spending Clause clarity purposes. *Id*. at 567 (adopting the dissenting opinion of Judge Luttig from the panel stage). In *Riley*, the en banc court reconsidered a panel decision on the question of whether the IDEA, which is Spending Clause legislation, required States to continue to provide "educational services to handicapped students expelled for reasons unrelated to their handicap." *Id*. at 565. The Secretary of Education acknowledged the lack of explicit statutory language mandating that result but argued that the Department of Education could require that condition as a reasonable interpretation of the statute. In a 2-1 decision, the panel accepted that argument.

The en banc court reversed. Eight of the fourteen judges joined the portion of the panel dissent applicable here, holding that the court could not defer to agency

interpretation, even "reasonable interpretation by the agency," to defeat a claim of

unconstitutional ambiguity under the Spending Clause:

> The Department of Justice argues … that in the event of ambiguity in the IDEA provision at issue, we defer to a reasonable interpretation by the agency, as if we were interpreting a statute which has no implications for the balance of power between the Federal Government and the States. We do not. *It is axiomatic that statutory ambiguity defeats altogether a claim by the Federal Government that Congress has unambiguously conditioned the States' receipt of federal monies in the manner asserted.* As the Court stated in *Gregory v. Ashcroft*:

> "Inasmuch as this Court in *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985), has left primarily to the political process the protection of the States against intrusive exercises of Congress' Commerce Clause powers, we must be absolutely certain that Congress intended such an exercise. To give the state-displacing weight of federal law to mere congressional ambiguity would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests."

*Riley*, 106 F.3d at 567 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991)) (cleaned

up) (emphasis added).

But, while *Riley*'s language appears on point, the Court offers two observations. First, the decision does not bind this Court. Second, the cited reasoning asserts that it is "axiomatic" that regulations cannot provide the missing clarity, an axiom it locates in *Ashcroft*'s admonition that courts should be cautious about congressional ambiguity in the face of federalism concerns. But, on an issue of this importance, the Court hesitates to simply adopt *Riley* without further exploring *why* it is "axiomatic" under such principles that Congress, and Congress alone, must provide the clarity.

At some level, whether agency regulations should "count" for Spending Clause clarity purposes may depend on what motivates Spending Clause jurisprudence. One author has suggested, for example, that this jurisprudence could be characterized as

animated either by concerns about protecting state choice (a contractual autonomy notion), on the one hand, or concerns about political accountability, on the other. *See generally*, Peter J. Smith, *Pennhurst, Chevron, and the Spending Power*, 110 YALE L.J. 1187 (2001). To the extent that the former is correct, then the point is merely that the deal must be clear in order for the State (as an offeree) to accept it. Under that view, it does not matter so much what the source of that clarity is, but rather only that the clarity exists. Thus, agency clean-up of statutory ambiguity, so long as it is binding, generally would satisfy Spending Clause limitations under this view.

The accountability view of the Spending Clause, by contrast, starts from the notion that the principal protection for state sovereignty is the political process, and in particular Congress's political accountability to the States. *See id.* at 1202 (citing *Garcia v. San Antonio Metro Transit Auth.*, 469 U.S. 528 (1985)). Under this view, Congress must impose the condition at the requisite level of clarity, as only Congress, not unelected agency regulators, are subject to that accountability. *Id.* The Congress-only view, then, would serve that structural accountability notion.

Relatedly, the clarity requirement perhaps instead may be seen as imposing a resource constraint on Congress. Requiring Spending Clause legislation that offers conditional funds to the States to include more detail than other types of legislation makes such legislation more time-consuming to enact. That in turn limits, at least as a practical matter, how frequently Congress can do so. And, if the concern is that Congress's use of its spending powers to make conditional grants to the States may allow Congress to expand its legislative reach beyond its otherwise enumerated

powers, such a constraint serves as a structural mechanism to promote the Constitution's federalist underpinnings. That idea only works, though, if it is Congress, and not executive branch agencies, that must provide the requisite detail.

A problem in selecting among these various views, though, is that it is not at all clear that the contractual-autonomy and political-accountability/structural federalism conceptions of Spending Clause jurisprudence present an either-or choice. Certainly, the Supreme Court "has repeatedly characterized … Spending Clause legislation as 'much in the nature of a contract.'" *NFIB*, 567 U.S. at 576–77 (quoting *Barnes*, 536 U.S. at 186 (in turn quoting *Pennhurst*, 451 U.S. at 17)) (cleaned up). At the same time, much of Spending Clause jurisprudence, including many of the same cases that discuss the analogy to contract law, also makes clear that the jurisprudence reflects structural concerns about protecting federalism. *See e.g., NFIB*, 567 U.S. at 577 (opinion of Roberts, C.J.) (noting, immediately after discussing the contractual nature of Spending Clause jurisprudence, that "[r]especting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system"). It is perhaps most fair to say that *both* contract-driven-autonomy notions *and* sensitivity to structural concerns are complementary ways of promoting the federalism principles that ultimately motivate the relevant jurisprudence. But if that is so, discussions regarding such distinctions do little to answer the do-regulations-count question.

Given the lack of clarity on this issue in Spending Clause case law, the Court considers delegation principles more generally. After all, the Spending Clause is

merely one of many enumerated powers afforded to Congress, and questions regarding the extent to which Congress can delegate to agency personnel the authority to complete Congress's drafting obligations often arise as to those other enumerated powers, as well.

From that delegation case law, certain principles emerge. First, in delegating to agencies the power to draft substantive requirements, Congress must, at the very least, articulate an intelligible principle, as otherwise agency discretion would be unbounded, essentially transferring Congress's Article I legislative powers to unelected agency personnel. *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 472 (2001); *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) ("[W]e have held, time and again, that a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'") (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928))). And when Congress fails to provide such a principle, the agency cannot "cure" the statute by doing so in its stead. *Whitman*, 531 U.S. at 472. In other words, if a statute provides an agency too much discretion, the agency cannot "cure" that delegation by unilaterally limiting its own scope of powers. *Id.* ("We have never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute.").

Second, even when Congress articulates an intelligible principle, if Congress intends for an agency to answer "major questions" relating to a statute, *FDA v. Brown*

& *Williamson*, 529 U.S. 120, 159 (2000)—i.e., a question of deep "economic and polit-ical significance" that is central to the statutory scheme—then Congress must clearly say so. *King v. Burwell*, 576 U.S. 473, 485–86 (2015); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1925 (2020) (Thomas, J., concurring) ("[T]he major questions doctrine … is based on the expectation that Congress speaks clearly when it delegates the power to make 'decisions of vast economic and political significance.'").

Third, when Congress intends to "upset federalism norms" through its enact-ments, it again must "legislate[] clearly." *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 734 (6th Cir. 2013) (Sutton, J., concurring) (citing *Gregory*, 501 U.S. at 460). That is, while Congress itself may have the power to displace such norms, at least when it speaks clearly, it is by no means clear that "agencies [can] upset federalism norms when Congress legislates ambiguously." *Id.* (citing *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001)).

In light of these delegation principles, the Court concludes that it need not answer the question of whether the Spending Clause *allows* Congress to delegate to an agency the power to create the requisite clarity, i.e., the issue that *Riley* reached. That is because, even assuming Congress can do so, it did not do so here.

The Court arrives at that answer based both on the Tax Mandate's statutory language and ARPA's overall structure. Start with the former. Even assuming that the Tax Mandate meets the "intelligible principle" standard, there can be little doubt that the language of that provision leaves open "major questions." The Tax Mandate

43

"involv[es] billions of dollars in spending each year," *see Burwell*, 576 U.S. at 485, and is expressly directed at a core State function, the power to tax, that has long been recognized as "indispensable" to the States' very existence. *See, e.g., Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 199 (1824) ("The power of taxation is indispensable to [the States'] existence."); *Bode v. Barrett*, 344 U.S. 583, 585 (1953) (observing that the power of a State to tax is "basic to its sovereignty"); *Dows v. City of Chicago*, 78 U.S. (11 Wall.) 108, 110 (1871) ("It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments.").

Given the scope of the ambiguity in the Tax Mandate's language, the choices made in deciding how to resolve that ambiguity and implement the mandate cannot help but raise "question[s] of deep 'economic and political significance.'" *Burwell*, 576 U.S. at 486 (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 320, 324 (2014)). Thus, just as the Supreme Court observed in *Burwell*, "had Congress wished to assign that question to an agency, it surely would have done so expressly." *Id*. (citing *Util. Air Regulatory Grp.*, 573 U.S. at 324 (quoting *FDA v. Brown & Williamson*, 529 U.S. at 160)). A general provision that "[t]he Secretary shall have the authority to issue such regulations as may be necessary or appropriate to carry out this section,"[8] 42 U.S.C. § 802(f) does not suffice—indeed, as Ohio points out, the statute at issue in *Burwell* had a similar provision.

---

[8] It bears noting that "this section" is not a specific reference to the Tax Mandate, but rather to all of the Coronavirus State Fiscal Recovery Fund provisions, which include the Tax Mandate as one provision.

The point is simply this—when Congress seeks to alter the constitutional design by delegating its powers to agencies on topics of such importance, Congress must do so clearly, especially when federalism concerns are at issue. *Carter*, 736 F.3d at 734; *see also Ala. Assoc. of Realtors v. Dept. of Health and Human Servs.*, 594 U.S. __ (June 29, 2021) (Kavanaugh, J., concurring in denial of certiorari) (explaining that "clear and specific congressional authorization (via new legislation) would be necessary" for an agency to extend an eviction mortarium after the scheduled deadline passed). Congress did not do so here.

Then consider the statutory scheme overall. The Spending Clause entitles the States to clarity regarding the strings attached to federal funding. Against that backdrop, if Congress had intended merely to sketch out in broad brushstrokes the terms of the proposed conditional spending deal, and then have an agency complete the drafting, presumably Congress would have adopted a delayed effective date, or something of the sort, so that this additional work could have been done *before* presenting the offer to the States. For example, Congress could have provided that the Treasury Department would have 180 days to draft the regulations necessary to implement the Tax Mandate, at which time States could then decide whether to certify their acceptance. In that way, Congress could have ensured that the requisite clarity was present at the outset of State eligibility for the conditional funding.

Under ARPA as written, though, States were authorized to send in certifications immediately upon the effective date of the Act. That is strong evidence that Congress considered the terms of the deal to be complete as of that date. At the very

least, the timing here does not provide the necessary evidence that Congress meant to conscript agency drafters into completing its legislative efforts.

Further confirming this view, without something like a delayed effective date, the conditional-spending offer here—which included the Tax Mandate, but not yet the regulations—violated the Constitution when first presented to the States. It is one thing to rely on an agency's drafting efforts to avoid a constitutional violation in the first place, as may be the case with a delayed effective date. But it is another to charge an agency with curing an already-occurring constitutional violation. *See Whitman*, 531 U.S. at 472.

In sum, even assuming that Congress can outsource to an agency the obligation to provide the answers needed to meet the Spending Clause clarity requirement, Congress made no such delegation in ARPA. Accordingly, the Tax Mandate must sink or swim on its own. And, as already explained above, the Court concludes that the Tax Mandate's language falls short of what settled law requires in terms of such clarity. Thus, the Court finds that the Tax Mandate violates the Spending Clause, the IFR notwithstanding.

## C.    Injunctive And Declaratory Relief Are Warranted.

Even though the Court finds that the Tax Mandate falls short of constitutional requirements, there is the separate question of the appropriate remedy. Ohio requests both (1) an injunction preventing the Secretary from enforcing the Tax Mandate against Ohio, and (2) a declaration that the Tax Mandate is unconstitutional.

46

The Court concludes that the first is appropriate, but, in light of its decision on the injunctive-relief issue, determines that the second is not.

Start with the injunction. Both parties agree that *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), controls the analysis. (*See* Doc. 38, #597 (Ohio); Doc. 45, #742 (Secretary)). *eBay* sets forth the following four elements that Ohio must show to obtain a permanent injunction:

> (1) that it suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

547 U.S. at 391. And even then, the issue is committed to the Court's "equitable discretion." *Id.*

Here, all four elements are present. First, as described above, in being bound to an unconstitutionally ambiguous "deal," Ohio is suffering irreparable harm to the exercise of its "indispensable" sovereign power to tax. *See Ogden*, 22 U.S. (9 Wheat.) at 199. Second, the federal government has sovereign immunity against claims for money damages. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.").[9] And in any event, such damages would do nothing to cure the irreparable harm that Ohio is currently suffering. As for the balance of harms, unlike Ohio's current harm, the Secretary will endure no meaningful hardship if the Court enjoins operation of

---

[9] By contrast, even though this is an official-capacity suit, and thus a suit against the federal government, sovereign immunity does not bar a claim for injunctive relief to prevent an unconstitutional act. *See, e.g., Larson v. Domestic & Foreign Commerce Corp.*, 337 US. 682, 690 (1949).

the Tax Mandate against Ohio. The Secretary remains free to enforce, through use of ARPA's recoupment powers, the *other* conditions on the grant (i.e., those statutory conditions specifying the various types of goods, services, and other uses, on which Ohio can spend the federal funds it receives under ARPA), and the Secretary has no judicially cognizable interest in enforcing a provision (like the Tax Mandate) that is unconstitutionally ambiguous. Finally, issuing the requested injunction will promote the public interest. As described above, the limitations on Congress's ability to use its Spending Clause authority to make funding offers to the States are designed to protect this country's dual-sovereign structure, which in turn is meant to promote individual liberty. Accordingly, enforcing those limitations will serve that interest, an interest that qualifies as "public." Thus, the Court concludes that an injunction is appropriate. In awarding that injunctive relief, though, the Court specifically notes that the injunction extends only to prohibiting the Secretary from enforcing a single ARPA provision—the Tax Mandate, 42 U.S.C. § 802(c)(2)(A)—and only as to a single State—Ohio.

Separately, Ohio also requests declaratory relief. As Ohio concedes, "[t]he Declaratory Judgment Act leaves federal courts with 'unique and substantial discretion in deciding whether to declare the rights of litigants.'" (Doc. 38, #598 (quoting *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 758 (6th Cir. 2014) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)))). Here, the Court's grant of injunctive relief fully protects Ohio against every aspect of the ongoing irreparable harm that Ohio is suffering. Moreover, the Court's discussion of the grounds on which it awarded such

48

relief fully explains the Court's reasoning. Accordingly, the declaratory relief that Ohio seeks would add nothing to the Court's resolution of this matter. Thus, exercising its "unique and substantial discretion," the Court denies Ohio's request for such relief.

## CONCLUSION

For the above reasons, the Court finds (1) that it has jurisdiction, (2) that Ohio has met its burden of establishing that the Tax Mandate, due to its ambiguity, exceeds Congress's authority under the Spending Clause, and (3) that the IFR does not cure that constitutional violation. Moreover, Ohio is suffering irreparable harm due to that violation. And, unlike the case at the preliminary injunction stage, a permanent injunction will prevent that ongoing harm. Further, such an injunction is in the public interest. Accordingly, this Court **GRANTS** Ohio's Motion for a Permanent Injunction (Doc. 38), and enjoins the Secretary from seeking to enforce the Tax Mandate, 42 U.S.C. § 802(c)(2)(A), against Ohio. Given that injunction, however, the Court **DENIES** Ohio's request in that same motion for declaratory relief. (*Id.*). The Court further **DENIES** the Secretary's Motion to Dismiss (Doc. 45). The Court **DIRECTS** the Clerk to enter judgment accordingly.

      **SO ORDERED.**

July 1, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**